# EXHIBIT  7



QUINCY MUTUAL
FIRE INSURANCE
COMPANY

August 10, 2006

SENT VIA REGULAR AND CERTIFIED MAIL #7005 2570 0002 1002 5161

Schenkman Kushner Affiliates
C/O Jeff Persky
PO BOX 6872
Bridgewater NJ 08807

RE: Our Insured: Schenkman Kushner Affiliates
    Policy No: CPP 800836
    Claim No: 06L01015
    ·Claimant: Bristol Myers
    Date Of Loss: 03/24/2006

Dear Mr. Persky,

Please be advised that Quincy Mutual Fire Insurance Company ("Quincy Mutual') has been placed on notice of a claim for property damages. Specifically, it is reported that Bristol Myers is alleging a loss of business income due to the negligence of Schenkman Kushner Affiliates. As a result of that claim, coverage has been requested under policy number CPP 800836, which was issued to by Quincy Mutual on May 30, 2005.

At this time we must inform you that Quincy Mutual is reserving its right to **deny coverage** to you due to **late notice**. Our position with respect to coverage is based upon language contained in the contract of insurance and states in pertinent part as follows:

### SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

#### 1. Insuring Agreement

> *a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "**bodily injury**" or "**property damage**" to which this insurance applies. We will have the right and duty to defend the insured against*

any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to **"bodily injury"** and **"property damage"** only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

### 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

*(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.*

b. *If a claim is made or "suit" is brought against any insured, you must:*

*(1) Immediately record the specifics of the claim or "suit" and the date received; and*

*(2) Notify us as soon as practicable.*

. *You must see to it that we receive written notice of the claim or "suit" as soon as practicable.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The date of loss for this claim is March 24, 2006, but Quincy Mutual is only now being informed of this matter. As such, it does not appear that Quincy Mutual was notified of this claim as soon as practicable. If your delayed notice has prejudiced our ability to properly investigate, defend or resolve this matter, **coverage will be denied.**

Please note that no act of any company representative while investigating this claim should be construed as an admission of coverage or liability on the part of Quincy Mutual.

Please note that additional policy provisions or legal principles may be asserted in support of our coverage position. Quincy Mutual will continually monitor and assess this matter and render any further coverage decisions as soon as possible. Once Quincy Mutual has identified any applicable legal principles that further limit our obligations you will be advised promptly.

Please contact the undersigned directly if you wish to discuss the position that we are taking on this matter.

Sincerely,

Mark V. Bissanti
Senior Claims Examiner
800-899-1116 ext 5294

# EXHIBIT  8

# GREENBAUM, ROWE, SMITH & DAVIS LLP

PAUL A. ROWE
WENDELL A. SMITH
ALAN E. DAVIS
DAVID L. BRUCK
MICHAEL A. BACKER
MARTIN E. DOLLINGER
DEAN A. GAVER
ROBERT C. SCHACHTER
MARTIN L. LEPELSTAT
DENNIS A. ESTIS
WILLIAM D. GRAND
RAYMOND M. BROWN
ALAN S. NAAR
STEPHEN H. KNEE
ROBERT M. GOODMAN
DOUGLAS K. WOLFSON
MARK H. SOBEL
HAL W. MANDEL
BARRY S. GOODMAN
LAWRENCE P. MAHER
THOMAS J. DENITZIO, JR.
ROBERT S. GOLDSMITH
JOHN D. NORTH
KENNETH T. BILLS
THOMAS C. SENTER
MARGARET GOODZEIT

W. RAYMOND FELTON
CHRISTINE F. LI
MERYL A. G. GONCHAR
MICHAEL K. FEINBERG
CARLTON T. SPILLER
JOSEPH M. ORIOLO
ARON M. SCHWARTZ
SABRINA A. KOGEL
JACQUELINE M. PRINTZ
STEVEN C. DELINKO
DAVID A. ROTH
GARY K. WOLINETZ
KEVIN T. MCNAMARA
RICHARD L. HERTZBERG
ELLEN A. SILVER
ANDREA J. SULLIVAN
MARC D. POLICASTRO
MARC J. GROSS
LUKE J. KEALY
C. BRIAN KORNBREK
CIPORA S. WINTERS
GALIT KIERKUT
BRIAN R. SELVIN
PETER D. CRAWFORD, JR.
EMILY A. KALLER

COUNSELORS AT LAW

METRO CORPORATE CAMPUS ONE
P.O. BOX 5600
WOODBRIDGE, N. J. 07095-0988
(732) 549-5600
FAX (732) 549-1881

DELIVERY ADDRESS:
99 WOOD AVE. SOUTH
ISELIN, NEW JERSEY 08830-2712

75 LIVINGSTON AVENUE
ROSELAND, NEW JERSEY 07068-3701
(973) 535-1600
FAX (973) 535-1698

EMAIL: INFO@GREENBAUMLAW.COM
WWW.GREENBAUMLAW.COM

OF COUNSEL
ROBERT S. GREENBAUM    ARTHUR M. GREENBAUM
FRANKLIN M. SACHS
J. WARREN WOOD III

COUNSEL

CHRISTINE F. MARKS    HOWARD B. HANDER
ROBERT B. UNDERHILL    LORA L. FONG
STEVEN FIRKSER    KEVIN J. CONNELL
ALLEN V. BROWN    JODI L. ROSENBERG

MICHELE GIBSON    ADAM B. KAPLAN
ROSEMARY CULCASI    JONATHAN J. WALZMAN
ARREN S. GOLDMAN    MARJORIE E. KLEIN
DARREN C. BARREIRO    JESSICA F. BATTAGLIA
OLIVIER SALVAGNO    JEMI M. GOULIAN
STEVEN NUDELMAN    JOHN B. NANCE
DINA M. VANIDES    MICHELLE M. SEKOWSKI
HANY A. MAWLA    JEFFREY A. SIROT
ERIC H. MELZER    JOHN WHITING ROESER
GINA M. PONTORIERO    MICHAEL A. GOROKHOVICH
MARINA SOLO    LISA J. CLAPP
ROBERT BECKELMAN    GREGG H. HILZER
MAJA M. OBRADOVIC    LISA B. DIPASQUA
JANE J. FELTON    MEGHAN O. MURRAY
STACEY R. COHEN    ERNEST E. D'ANGELO
MICHAEL A. KLEIN    JORDAN A. STERN
DEAN E. LOVENTHAL    CATHLENE S BANKER
SENWAN AKHTAR    LAURA M. BILOTTA
BRYAN D. PLOCKER    MICHAEL DINGER
DAVID T. SHIVAS    JAMIE A. YONKS
DAVID S. SCHECHTER    JEANETTE TANNER

WM. L. GREENBAUM (1914-1983)
ALLEN RAVIN (1957-1997)

REPLY TO:
*Woodbridge*

September 7, 2006

## <u>VIA CERTIFIED MAIL – R.R.R. *(w/encl.)* – 70023150000471502470</u>
## <u>AND REGULAR MAIL *(w/encl.)*</u>

Mark V. Bissanti, Senior Claims Examiner
Quincy Mutual Fire Insurance Company
57 Washington Street
Quincy, MA  02169

RECEIVED

SEP 11 2006

QUINCY MUTUAL
FIRE INSURANCE CO.

Re:    ***Bristol-Myers Squibb Company v. Somerville Fidelco Associates, L.P.***
       ***American Arbitration Association No. 18 115 Y 01071 06***
       ***Your Claim No. 06L01015***

Dear Mr. Bissanti:

    We are in receipt of your letter dated August 10, 2006 directed to Mr. Jeff Persky at Schenkman Kushner Affiliates with regard to the referenced matter.  For your convenience, a copy of letter from Drinker Biddle & Reath LLP dated August 4, 2006 with the Demand for Arbitration is attached hereto.  Please direct all future correspondence to me.

    In your letter dated August 10, 2006 you acknowledged receipt of the claim and the insured's request for insurance coverage, including defense and indemnification, for the claims asserted in this matter.  This letter will follow-up on the request for insurance coverage.  Kindly advise me of the status.

    Your August 10, 2006 letter also advised that Quincy Mutual was "reserving its right to deny coverage due to later notice".  We do not understand this position since the letter enclosing the demand for arbitration is dated August 4, 2006 and Quincy Mutual received notice of the demand immediately after it was received by the insured.  In addition, as you know, in order to assert a late notice defense to coverage under New Jersey law, the insurance company

GREENBAUM, ROWE, SMITH & DAVIS LLP

Mark V. Bissanti, Senior Claims Examiner
Quincy Mutual Fire Insurance Company
September 7, 2006
Page 2

must show appreciable prejudice.  See Cooper v. Government Employees Ins. Co., 51 N.J. 86 (1968); Solvents Recovery Serv. v. Midland Ins. Co., 218 N.J. Super. 49 (App. Div. 1987).  In this case, there is no prejudice to the insurer and no basis to disclaim coverage based upon late notice.

We look forward to receipt of a favorable coverage decision from Quincy Mutual shortly. On behalf of the insureds, we continue to reserve all rights under the insurance policies and New Jersey law.

Thank you for your courtesies in this matter.

Very truly yours,

Ellen A. Silver

EAS/sjg
Encl.

# EXHIBIT 9

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

## COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondent | | | Name of Representative (if known) | | |
|---|---|---|---|---|---|
| Somerville Fidelco Associates, L.P. | | | Martin E. Dollinger | | |
| Address | | | Name of Firm (if applicable) | | |
| 520 U.S. Highway 22 East | | | Greenbaum, Rowe, Smith & Davis LLP | | |
| P.O. Box 6872 | | | Representative's Address | | |
| | | | Metro Corporate Center, P.O. Box 5600 | | |
| City | State | Zip Code | City | State | Zip Code |
| Bridgewater | NJ | 08807 | Woodbridge | NJ | 07095-0988 |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| (908) 725-8100 | | (908) 575-2237 | (732) 549-5600 | | (732) 549-1881 |
| Email Address: | | | Email Address: | | |
| | | | mdollinger@greenbaum.com | | |

The named claimant, a party to an arbitration agreement dated __October 23, 1987__, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration. ✱

THE NATURE OF THE DISPUTE
Claim for breach of commercial lease by tenant against landlord arising out of asbestos contamination at leased premises (located in Somerville, New Jersey) caused by landlord's roofing contractor

| Dollar Amount of Claim $734,175.00 | Other Relief Sought: ☐ Attorneys Fees  ☐ Interest |
|---|---|
| | ☐ Arbitration Costs  ☐ Punitive/ Exemplary  ☐ Other _____ |

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $ 325.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:

Commercial lease experience

Hearing locale __Somerville, NJ__    (check one) ☒ Requested by Claimant   ☐ Locale provision included in the contract

| Estimated time needed for hearings overall: | Type of Business: Claimant __Property owner__ |
|---|---|
| _____ hours or __2-3__ days | Respondent __Pharmaceutical Company__ |

Is this a dispute between a business and a consumer? ☐ Yes ☒ No  Does this dispute arise out of an employment relationship? ☐ Yes ☒ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐ Less than $100,000  ☐ $100,000 - $250,000  ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one)  ☐ Atlanta, GA   ☐ Dallas, TX   ☒ East Providence, RI   ☐ Fresno, CA   ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)    Date: | Name of Representative |
|---|---|
| | Charles J. Vinicombe |
| Name of Claimant | Name of Firm (if applicable) |
| Bristol-Myers Squibb Company | DRINKER BIDDLE & REATH LLP |
| Address (to be used in connection with this case) | Representative's Address |
| P.O. Box 4000 | 105 College Road East, Suite 300 |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Princeton | NJ | 08845-4000 | Princeton | NJ | 08542 |
| Phone No. | | Fax No. | Phone No. | | Fax No. |
| (609) 252-5546 | | | (609) 716-6562 | | (609) 799-7000 |
| Email Address: | | | Email Address: | | |
| john.chapman@bms.com | | | charles.vinicombe@dbr.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

✱ The arbitration clause is contained in the original October 23, 1987 lease, which has amendments and extensions dated June 3, 1988, May 14, 1993 and November 25, 2002.

# EXHIBIT 10

**QUINCY MUTUAL
FIRE INSURANCE
COMPANY**

November 17, 2006

SENT VIA REGULAR AND CERTIFIED MAIL #7005 2570 0002 1002 5864

Greenbaum, Rowe, Smith & Davis LLP
Counselors At Law
PO BOX 5600
Woodbridge, NJ 07095-0988

ATTN: Attorney Ellen Silver

RE: Our Insured: Schenkman-Kushner Affiliates
    Your Client: Schenkman-Kushner Affiliates
    Policy No: CPP 800836
    Claim No: 06L01015
    Claimant: Bristol-Meyers Squibb Company
    Date of Loss: 09/26/2005-12/16/2005

Dear Mr. Ages,

Quincy Mutual Fire Insurance Company ("Quincy Mutual") has been placed on notice of a claim for business interruption. Specifically, Bristol-Meyers Squibb Company alleges that they incurred a business interruption loss due to the release of asbestos and asbestos containing material. The loss occurred in 76 4th Street, Somerville, New Jersey. As a result of that claim, coverage has been requested under policy number CPP 800836, which was issued by Quincy Mutual on May 30, 2005.

At this time we must inform you that Quincy Mutual is **denying coverage to Schenkman-Kushner Affiliates** due to the **Absolute Asbestos Exclusion**. Our position with respect to coverage is based upon the language contained within the contract of insurance and states in pertinent part as follows:

### *SECTION I – COVERAGES*

### *COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY*

#### *1. Insuring Agreement*

*a. We will pay those sums that the insured becomes legally obligated to pay as damages because of **"bodily injury"** or **"property damage"** to which this insurance applies. We will have the right and duty to defend the insured against*

any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for **"bodily injury"** or **"property damage"** to which this insurance does not apply. We may, at our discretion, investigate any **"occurrence"** and settle any claim or "suit" that may result. But:

> (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

> (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to **"bodily injury"** and **"property damage"** only if:

> (1) The **"bodily injury"** or **"property damage"** is caused by an **"occurrence"** that takes place in the "coverage territory";

> (2) The **"bodily injury"** or **"property damage"** occurs during the **policy period**.

*******************************************************************

### ABSOLUTE ASBESTOS EXCLUSION

*This endorsement changes the policy. Please read it carefully.*

*This endorsment modifies insurance provided under the following:*
**Business Owners Liability Coverage Form**
**Commercial General Liability Coverage Form**

*In consideration of the premium charge, it is agreed that the insurance provided by this policy shall not apply to any loss, claim or expense caused by, resulting from or arising out of asbestos, exposure to asbestos or any product containing asbestos.*

*It is further agreed that we shall have no duty or obligation to provide or pay for the investigation or defense of any loss, cost, expense, claim or suit excluded herein.*

*******************************************************************

QUINCY MUTUAL FIRE INSURANCE COMPANY    57 Washington Street, Quincy, MA 02169

The investigation shows that Bristol-Myers Squibb Company is alleging that they incurred a business interruption loss due to asbestos and asbestos containing material infiltrating into the building located at 76 4th Street, Somerville, New Jersey. The infiltration of the asbestos and asbestos containing material reportedly occurred while that building was undergoing repair and replacement of the roof.

Because losses that arise due to asbestsos, exposure to asbestos or any products containing asbestos are specifically excluded from coverage by the Absolute Asbestos Exclusion as contained in your contract of insurance, Quincy Mutual is **denying coverage to Schenkman-Kushner Affiliates.** Accordingly, Quincy Mutual will not defend or indemnify Schenkman-Kushner Affiliates in the arbitration proceedings. Please note that if found liable for this loss, Schenkman-Kushner would be responsible for those damages.

If Schenkman-Kushner Affiliates is served with a Summons and Complaint you may forward it to our office for consideration.

Neither the foregoing specificity of grounds for denial, nor any continued investigation by Quincy Mutual Fire Insurance Company or its representatives in this matter, is intended to be, nor shall it be construed as, a waiver by the Company of any of the terms and/or conditions of the subject policy of insurance, nor of any rights or defenses the Company has or may have, whether based upon facts now known or to become known in the future, whether legal or equitable in nature, nor as an admission of liability by the Company to any person or entity whom or whatsoever.

If you disagree with the position that we have taken you may contact the New Jersey Department of Banking and Insurance, Division of Enforcement and Consumer Protection, PO Box 325, Trenton, New Jersey 08625-0325.

Please contact the undersigned directly if you wish to discuss the position that we have taken on this matter.

Sincerely,

Mark V. Bissanti
Senior Claims Examiner
1-800-899-1116, ext 5294

CC: Schenkman-Kushner Affiliates C/O Barry Ages, Director Of Operations

QUINCY MUTUAL FIRE INSURANCE COMPANY    57 Washington Street, Quincy, MA 02169

EXHIBIT  11

**QUINCY MUTUAL**
**FIRE INSURANCE**
**COMPANY**

*06L01015*

March 23, 2007

7005 2570 0002 1003 3845

*Via Certified and Regular Mail*

Ellen Silver, Esq.
Greenbaum, Rowe, Smith & Davis
Metro Corporate Campus one
P.O. Box 5600
Woodbridge, NJ, 07059

> Re:    Insured:        Schenkman Kushner Affiliates
>        Plaintiff:      Bristol-Meyers Squibb Company
>        Date of Loss:   September 26, 2005-December 16, 2005

Dear Ms. Silver:

Quincy Mutual Fire Insurance Company ("Quincy Mutual") is in receipt of your March 14, 2007 correspondence wherein you request reconsideration of our coverage position with regard to the above-referenced matter. After reviewing the information provided, **Quincy Mutual has determined that it will be maintaining its coverage denial.**

As you are aware, Quincy Mutual has denied coverage for this matter pursuant to the Absolute Asbestos Exclusion contained within the policy issued to Schenkman-Kushner Affiliates. The reason for this denial was the fact that the claim presented by Bristol-Meyers Squibb ("Bristol-Meyers") related to damages caused by the infiltration of asbestos during roofing work that was being done at the facility.

In your March 14, 2007 correspondence, you indicate that discovery into this matter has revealed that certain tests performed at the facility failed to show the presence of asbestos. As such, it is your opinion that these test results trigger Quincy Mutual's obligation to provide coverage for the claim presented.

Our review of the information, however, indicates that some of the tests did in fact demonstrate the presence of asbestos. Furthermore, the invoice submitted by Bristol-Meyers lists costs associated with testing for asbestos, monitoring for asbestos, asbestos debris removal, and asbestos services. The fact that *some of the testing* did not reveal asbestos is not dispositive of the fact that the plaintiff was concerned about the asbestos that was present and incurred costs and expenses to protect against the harmful effects of *any* asbestos exposure. It is our opinion that the invoice clearly demonstrates that Bristol Meyer's damages were related to the presence of asbestos. As such, Quincy Mutual

57 Washington Street ■ Quincy, MA 02169 ■ Telephone 617-770-5100 ■ www.quincymutual.com

maintains its denial pursuant to the Absolute Asbestos Exclusion as stated in our November 17, 2006 correspondence.

In addition, we note that the damages listed include the repair and replacement of certain building materials, including ceiling tiles, ceiling grids, ceilings and paint for drywalls. The invoice also lists costs associated with renovations to the premises including adding diffusers, collars, dampers and ducts. These materials are actually considered part of the insured's property and would not be covered under this policy. Our position with respect to coverage on this issue is based upon the language contained within the policy of insurance, which states in pertinent part as follows:

*COMMERCIAL GENERAL LIABILITY COVERAGE FORM  Cg 00 01 10 01*

### SECTION I – COVERAGES
### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**2. Exclusions**

This insurance does not apply to

**j. Damage To Property**

"Property damage" to:

**(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;**

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

QUINCY MUTUAL FIRE INSURANCE COMPANY    🔵    57 Washington Street, Quincy, MA 02169

*Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.*

*Paragraphs (3) , (4) , (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.*

*Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".*

\*       \*       \*

As indicated, Exclusion "j" of the policy excludes coverage for costs or expenses incurred by you or *any other party for the repair, replacement, enhancement and maintenance of property owned by the insured for any reason.* The information provided indicates that the portion of damages listed by Bristol-Meyers which is associated with the ceiling, paint, dampers, diffusers, and ducts is solely related to the repair, replacement and enhancement of property owned by the insured. As such, these damages would be excluded from coverage by Exclusion "j".

Quincy Mutual reserves its right to further amend its coverage position to include any additional policy provisions or legal and/or equitable principles, which may apply to this matter. The position stated in this correspondence is not intended and should not be construed as a waiver of Quincy Mutual's ability to assert its reliance on additional policy provisions or legal and/or equitable principles or defenses in this matter.

If you wish to discuss this correspondence, please contact the undersigned directly. If you disagree with our coverage position, you may contact he New Jersey State Department of Banking and Insurance, 20 West State Street, Trenton, NJ 08608. You may also contact the undersigned to discuss Quincy Mutual's coverage position

Very truly yours,

Linda J. Eckman, Esq.
Claims Counsel
(800) 899-1116 x5264

EXHIBIT  12

# GREENBAUM, ROWE, SMITH & DAVIS LLP

PAUL A. ROWE
WENDELL A. SMITH
ALAN E. DAVIS
DAVID L. BRUCK
MICHAEL A. BACKER
MARTIN E. DOLLINGER
DEAN A. GAVER
ROBERT C. SCHACHTER
MARTIN L. LEPELSTAT
DENNIS A. ESTIS
WILLIAM D. GRAND
RAYMOND M. BROWN
ALAN S. NAAR
STEPHEN H. KNEE
ROBERT M. GOODMAN
DOUGLAS K. WOLFSON
MARK H. SOBEL
HAL W. MANDEL
BARRY S. GOODMAN
LAWRENCE P. MAHER
THOMAS J. DENITZIO, JR.
ROBERT S. GOLDSMITH
JOHN C. NORTH
KENNETH T. BILLS
THOMAS C. SENTER
MARGARET GOODZEIT
W. RAYMOND FELTON
CHRISTINE F. LI
MERYL A. G. GONCHAR

MICHAEL K. FEINBERG
CARLTON T. SPILLER
JOSEPH M. ORIOLO
ARON M. SCHWARTZ
SABRINA A. KOGEL
JACQUELINE M. PRINTZ
STEVEN C. DELINKO
DAVID A. ROTH
GARY K. WOLINETZ
KEVIN T. MCNAMARA
RICHARD L. HERTZBERG
ELLEN A. SILVER
ANDREA J. SULLIVAN
MARC D. POLICASTRO
MARC J. GROSS
LUKE J. KEALY
C. BRIAN KORNBREK
CIPORA S. WINTERS
GALIT KIERKUT
BRIAN R. SELVIN
PETER D. CRAWFORD, JR.
EMILY A. KALLER
ARREN S. GOLDMAN
DARREN C. BARREIRO
OLIVIER SALVAGNO
STEVEN NUDELMAN
DINA M. VANIDES
HANY A. MAWLA

WM. L. GREENBAUM (1914-1983)
ALLEN RAVIN (1957-1987)

COUNSELORS AT LAW

METRO CORPORATE CAMPUS ONE
P.O. BOX 5600
WOODBRIDGE, N. J. 07095-0988
(732) 549-5600
FAX (732) 549-1881

DELIVERY ADDRESS:
99 WOOD AVE. SOUTH
ISELIN, NEW JERSEY 08830-2712

75 LIVINGSTON AVENUE
ROSELAND, NEW JERSEY 07068-3701
(973) 535-1600
FAX (973) 535-1698

EMAIL: INFO@GREENBAUMLAW.COM
WWW.GREENBAUMLAW.COM

OF COUNSEL

ROBERT S. GREENBAUM     ARTHUR M. GREENBAUM
FRANKLIN M. SACHS
J. WARREN WOOD III

COUNSEL

CHRISTINE F. MARKS
ROBERT S. UNDERHILL
STEVEN FIRKSER
ALLEN V. BROWN

HOWARD B. HANDER
LORA L. FONG
JODI L. ROSENBERG
MICHELE GIBSON

ROSEMARY CULCASI
ERIC H. MELZER
MARINA SOLO
ROBERT BECKELMAN
MAJA M. OBRADOVIC
JANE J. FELTON
STACEY R. COHEN
MICHAEL A. KLEIN
DEAN E. LOVENTHAL
SEANNAN AKHTAR
BRYAN B. PLOCKER
DAVID T. SHIVAS
DAVID S. SCHECHTER
ADAM B. KAPLAN
JESSICA F. BATTAGLIA
JEMI M. GOULIAN
JOHN B. NANCE
MICHELLE M. SEKOWSKI

JEFFREY A. SIROT
MICHAEL A. GOROKHOVICH
LISA J. CLAPP
GREGG H. HILZER
LISA B. DIPASQUA
MEGHAN O. MURRAY
ERNEST E. D'ANGELO
JORDAN A. STERN
CATHLENE Y BANKER
LAURA N. BILOTTA
JAMIE A. YONKS
JEANETTE TANNER
MICHAEL S. D'ALBA
BLAKELY D. FISHLIN
KATIE M. HOLDEN
JULIE KUSHNER
CHRISTOPHER J. LEDOUX
CATHERINE S. SHIMSKY

REPLY TO:
*Woodbridge*

*\*\* Privileged and Confidential \*\**
*\*\* Settlement Communication \*\**

April 26, 2007

## VIA TELECOPY AND REGULAR MAIL

Mark V. Bissanti, Senior Claims Examiner
Quincy Mutual Fire Insurance Company
57 Washington Street
Quincy, MA 02169

Re:     ***Bristol-Myers Squibb Company v. Somerville Fidelco Associates, L.P.,***
        **American Arbitration Association No. 18 115 Y 01071 06**
        **Your Claim No. 06L01015**

Dear Mr. Bissanti:

This will follow-up on my voice mail messages from this morning to you and to Linda Eckman, Esq., and my letters dated March 14, 2007, October 17, 2006 and September 7, 2006 on behalf of your insured Somerville Fidelco Associates L.P. ("Somerville Fidelco") regarding our request for insurance coverage, including defense and indemnification, for the claims in the Arbitration proceeding filed by Bristol-Myers Squibb Company ("Bristol-Myers") against Somerville Fidelco in the referenced matter.

*This letter is provided to assist in the defense of the insured and as such is privileged and confidential. This letter shall not be used by the insurer for any other purpose and shall not be disclosed to any other person.*

We previously advised that the Arbitration proceeding was scheduled to commence on April 17, 2007. The date was adjourned until April 26, 2007. Yesterday evening, before commencing the Arbitration, Bristol-Myers and Somerville Fidelco agreed in principle to a settlement of all claims in the matter, subject to approval of the settlement and preparation and approval of the settlement documents. The insured Somerville Fidelco believes that this

GREENBAUM, ROWE, SMITH & DAVIS LLP

Mark V. Bissanti, Senior Claims Examiner
Quincy Mutual Fire Insurance Company
April 26, 2007
Page 2

** Privileged and Confidential **
** Settlement Communication **

settlement is a favorable settlement, avoids the risks and costs of the continuing Arbitration and is in the best interest of the insured and its insurer.

This letter will confirm that Quincy Mutual Fire Insurance Company agrees that the settlement between the Bristol-Myers and Somerville Fidelco will not prejudice Somerville Fidelco's claims against the insurance policies issued by Quincy Mutual Fire Insurance Company or its affiliated and related companies with regard to the claims in the referenced matter. This also will confirm that the insurer will not claim that the settlement is in violation of the terms of the insurance policy.

If we do not hear from you by the close of business on Friday, April 27, 2007, we will trust that the insurer has no objection to the settlement and agrees with this letter, so that our office will proceed in preparing and finalizing the settlement and the settlement documents.

On behalf of Somerville Fidelco, we continue to reserve, and specifically preserve all rights, and claims against the insurer for reimbursement of all defense costs and the settlement amount under the insurance policies and New Jersey law.

If you have any questions, please call me immediately.

Very truly yours,

Ellen A. Silver

EAS/sjg

cc:    Linda J. Eckman, Esq. *(via telecopy and regular mail)*

EXHIBIT  13



## QUINCY MUTUAL
## FIRE INSURANCE
## COMPANY

April 27, 2007

Greenbaum, Rowe, Smith & Davis, LLP
Counselors At Law
Metro Campus One
PO BOX 5600
Woodbridge NJ 07095-0988

RE: Our Insured: Schenkman Kushner Affiliates
    Claimant: Bristol Meyers Squibb Company
    Our Claim No: 06L01015
    Date of Loss: September 26, 2005 – December 16, 2005

Dear Attorney Silver,

Quincy Mutual Fire Insurance ("Quincy Mutual") is in receipt of your correspondence dated April 26, 2007 regarding the above referenced claim of loss.

Per our conversation this date, Quincy Mutual will be standing by its original coverage denials based upon the **"Absolute Asbestos Exclusion"** and **Exclusion J. "Damage to Property."**

Further, it is understood that the matter between Bristol Meyers Squibb and Schenkman Kushner Affiliates may soon be resolved through Arbitration between the two parties. It is understood that Quincy Mutual will not be a participant in that Arbitration or settlement between Bristol Meyers Squibb and Schenkman Kushner Affiliates due to the denial of coverage as noted.

Because we have denied coverage for the above reasons, it is expected that Schenkman Kushner Affiliates would undertake to settle this matter on their own. Should you and Schenkman Kushner Affiliates decide to dispute the original coverage denial based upon the "Absolute Asbestos Exclusion" and Exclusion J. "Damage To Property", **Quincy Mutual will not consider Schenkman Kushner's settlement directly with Bristol Meyers Squibb to be a violation of the terms of the contract of insurance.**

Please contact me at your earliest convenience if you have any questions or wish to discuss this matter further.

Sincerely,

Mark V. Bissanti
Senior Claims Examiner
800-899-1116 ext 5294

EXHIBIT   14

# DrinkerBiddle&Reath
### L L P

Charles J. Vinicombe
609-716-6562
charles.vinicombe@dbr.com

March 29, 2007

<u>Via Federal Express</u>

David M. Rubin, Esq.
Golenbach Eiseman Assor Bell & Peskoe LLP
437 Madison Ave.
New York, NY 10022

> **Re:    18 459 01071 06**
> **Bristol-Myers Squibb Company v. Somerville Fidelco Associates, L.P.**

Dear Mr. Rubin:

Our law firm represents Claimant Bristol-Myers Squibb Company ("BMS") in the above-referenced arbitration. This matter is scheduled for an arbitration hearing during the month of April. Please accept this letter as BMS's pre-hearing submission and brief.

The subject matter of this arbitration is an asbestos incident that occurred at 76 Fourth Street in Somerville, New Jersey (the "Somerville Facility"). The Somerville Facility is a 16,000 square foot building owned by Respondent Somerville Fidelco Associates, L.P. ("Somerville Fidelco"). BMS has been a tenant at the facility since 1987. (*See* Stipulation of Facts, ¶2). The facility is used by BMS to house and quarantine monkeys that are used in pharmaceutical drug testing. (*See* Stipulation of Facts, ¶6).

On October 23, 1987, BMS, as tenant, entered into a Lease with Somerville Fidelco, as landlord, for the Somerville Facility (the "Lease"). (*See* Stipulation of Facts, ¶3). The Lease had an original three-year term and subsequently was extended through a number of Lease Extension Agreements. (*See* Stipulation of Facts, ¶4). The current lease extension (the November 25, 2002 Lease Extension No. 2) is due to expire on October 31, 2008. (*See* Stipulation of Facts, ¶5). The Lease is attached at Tab A.

### Factual Background

By way of background, on July 15, 2005, Somerville Fidelco hired a roofing contractor, Badger Roofing Company, Inc. ("Badger"), to remove and replace the roof at the Somerville Facility. (*See* Stipulation of Facts, ¶10). The roof had a history of leaks going back to at least 1996. (*See* Stipulation of Facts, ¶7). At the time that Badger was retained, the roof had reached the end of its life expectancy and was in a highly deteriorated condition. The roof leaks were so extensive that they created a safety hazard, with water leaking down the interior walls over electrical and environmental controls inside the facility.

*Law Offices*

105 College Road East
P.O. Box 627
Princeton, NJ
08542-0627

609-716-6500 phone
609-799-7000 fax
www.drinkerbiddle.com

*A Delaware Limited
Liability Partnership*

CALIFORNIA
DELAWARE
ILLINOIS
NEW JERSEY
NEW YORK
PENNSYLVANIA
WASHINGTON DC
WISCONSIN

*Jonathan I. Epstein,
Partner responsible for
Princeton Office*

*Established 1849*

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 2

Badger provided its roof removal services for Somerville Fidelco starting in September of 2005. (*See* Stipulation of Facts, ¶12). Approximately four months before Badger began its work, Somerville Fidelco had hired a roofing consultant, Harry H. Leavy, Inc. ("HHL"). On May 25, 2005, HHL sent a written Report to Somerville Fidelco's representative, Barry Ages. The Report, entitled "Presentation of Visual Roof Survey," documents the deteriorated condition of the roof. In the Report, HHL states that the purpose of the survey was to "identify and evaluate the present condition of the smooth surfaces built-up roof system on the building" and that the "Roof Survey Report does not include . . . Testing for Asbestos Containing Roof Materials (ACRM)." On page 3, under "Roof Data," HHL states that the "Insulation" was "Unknown. (*Suggest core samples be taken*)." (*See* Stipulation of Facts, ¶14) (Emphasis added).

Despite its roofing consultant's recommendation that core samples be taken to determine the composition of the roof and whether asbestos containing materials ("ACM") were present, Somerville Fidelco never arranged for core samples to be taken. (*See* Stipulation of Facts, ¶15). Somerville Fidelco did not provide the HHL Report to Badger and did not inform Badger that Somerville Fidelco had received a report from HHL suggesting that core samples be taken of the roof. (*See* Stipulation of Facts, ¶¶16, 17). As confirmed by Barry Ages and Badger's representative, Scott Badger, in their depositions, Somerville Fidelco also did not inform Badger that core samples had not been taken and that no determination had been made whether the roof contained asbestos materials. Badger also did not inquire of Somerville Fidelco whether core samples had been taken or whether the roof contained ACM. (*See* Stipulation of Facts, ¶15).

In his deposition, Mr. Badger testified that Badger is not a qualified asbestos removal contractor and that had Badger known that asbestos was present in the roofing materials at the Somerville Facility, Badger would have proceeded differently—Badger would have either subcontracted the roof removal phase of the project to a qualified asbestos contractor or it would have retained an expert to develop a protocol that Badger could have used to implement appropriate removal measures. (*See* Scott Badger Dep.—annexed at Tab B—at pages 9, 47-51, 65-67). Instead, Badger proceeded with its roof removal work as if ACM was not present.

As a result of Badger's roof removal activities, dust and debris containing asbestos materials infiltrated the Somerville Facility through gaps in the roof decking. When clouds of dust entered the facility, BMS immediately insisted that Badger cease its activities. BMS thereafter arranged for two environmental testing firms, Blasland, Bouck & Lee, Inc. ("BB&L") and Eagle Industrial Hygiene Associates, Inc. ("Eagle"), to conduct sampling and testing on the materials that infiltrated the facility. (*See* Stipulation of Facts, ¶25). Wipe samples of dust and bulk samples of debris that had entered the

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 3

facility and core samples taken from the roof confirmed the presence of asbestos at
regulated levels—more than 1%. (*See* Stipulation of Facts, ¶25).

The asbestos infiltration at the Somerville Facility adversely affected BMS in a
number of respects. First and foremost, BMS was concerned about human exposure to
asbestos dust and fibers. Seven BMS employees—and a number of third parties—were
present in the facility at the time of the roofing job. BMS addressed this situation by
sending letters to contractors and other third parties that were present at the facility
notifying them of their potential exposure to asbestos. BMS also sent its employees to
BMS's medical offices for information concerning their potential exposure. Those
employees currently are participating in a medical monitoring program that BMS is
funding. The New Jersey Department of Labor ("DOL") also became involved, with a
DOL representative visiting the site and requesting information (including sampling
results) from BMS to satisfy the DOL's concerns that the asbestos incident was being
handled appropriately.

Second, BMS was concerned about the monkeys' potential exposure to asbestos
dust. BMS has a large financial investment both in the monkeys and its drug testing. If
the monkeys were exposed to asbestos, they would be considered compromised. Because
the monkeys were housed in self-contained, environmentally controlled (HEPA filtrated)
rooms within the facility, eventually BMS was able to determine, to a reasonable degree
of certainty, that the monkeys had not been exposed or compromised.

Third, BMS had to address the continuation of the roofing job. At BMS's
insistence, the roofing job was suspended until Somerville Fidelco retained an asbestos
removal company, Slavco Construction, Inc. ("Slavco"), and developed a protocol to
appropriately complete the roof removal portion of the roofing job.

Fourth, BMS had to address the asbestos contamination of the facility. The
contamination was addressed in two phases. In October of 2005—after the roofing job
had been suspended—BMS retained the services of Bristol Environmental, Inc. ("BEI")
(no relation to BMS) to conduct a gross decontamination of the facility so that BMS
could conduct limited operations at the facility. After the roofing job was completed in
December of 2006, BEI conducted a more extensive cleanup of the facility which started
in January and ended in March of 2007. (*See* Stipulation of Facts, ¶33).

Fifth, BMS had to address the impact that the asbestos contamination had on its
operations. Although BMS was able to conduct operations on a reduced basis with
employees wearing protective gear while the facility was contaminated, the
contamination of the facility reduced the usable space at the facility.

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 4

## Somerville Fidelco's Liability[1]

### Somerville Fidelco's Liability For Badger's Negligence

Somerville Fidelco is liable to BMS for Badger's negligence in causing asbestos to infiltrate the Somerville Facility pursuant to Section 11.4 of the Lease, which provides that Somerville Fidelco has the right to enter the leased premises to make repairs and that:

> The Landlord agrees to do all such work at all reasonable times during usual business hours and in connection with the doing of any such work to cause as little inconvenience, annoyance, disturbance, loss of business or other damage to the Tenant as may reasonably be possible in the circumstances, and in the event the Landlord shall cause any damage to Tenant's property or *if damage caused by Landlord's* or its agent's or *contractor's negligence, Landlord shall be liable for the damage.*

(Emphasis added).

In accordance with Section 112 of the Clean Air Act ("CAA"), the United States Environmental Protection Agency ("USEPA") established National Emissions Standards for Hazardous Air Pollutants ("NESHAP") to protect the public. *See* USEPA, *Common Questions on the Asbestos NESHAP*, available at http://www.epa.gov/region04/air/asbestos/asbqa.htm. In March 1971, the USEPA identified asbestos as a hazardous air pollutant, and in April 1973, the USEPA promulgated the Asbestos NESHAP (40 *C.F.R.* §61 *et seq.*). The Asbestos NESHAP protects the public by minimizing the release of asbestos fibers during activities involving the processing, handling, and disposal of ACM. Accordingly, the Asbestos NESHAP specifies written notification procedures and work practices that must be followed during demolitions and renovations[2] of all structures and commercial buildings. *See id.*

---

[1]     BMS reserves the right to assert other bases of Somerville Fidelco's common law and statutory liability.

[2]     "Renovation" is defined as "altering a facility or one or more facility components in any way, including the stripping or removal of [Regulated Asbestos Containing Material] from a facility component." 40 *C.F.R.* §61.141. "Operations in which load-supporting structural members are wrecked or taken out are demolitions." *Id.*

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 5

The Asbestos NESHAP categorizes ACM as either "friable" or "nonfriable".[3]  40 C.F.R. §61, App. A to Subpart M, *Interpretive Rule Governing Roof Removal Operations*, at 1.1.  "Nonfriable ACM is further classified as either Category I ACM or Category II ACM." *See id.* at 1.2.  Category I ACM includes asphalt roofing products containing more than 1% asbestos.[4]  Category II ACM includes all other nonfriable ACM, including, for example, asbestos-cement shingles containing more than 1% asbestos. *See id.*

The applicability of the Asbestos NESHAP to Category I and Category II ACM depends upon: (i) the condition of the material at the time of renovation; (ii) the nature of the ACM removal method; and, (iii) the amount of ACM involved. *See id.*

Category I and Category II ACM regulated under the Asbestos NESHAP may be further categorized as "regulated asbestos-containing material" ("RACM"). *Id.* at 1.3. "RACM includes: (1) friable ACM; (2) Category I nonfriable ACM that has become friable; (3) Category I nonfriable ACM that has or will be sanded, ground, cut, or abraded; [and,] (4) Category II nonfriable ACM that has . . . been . . . crumbled, pulverized, or reduced to powder." *Id.*

For Category I ACM (asphalt roofing products), if the area of the roof to be removed is at least 160 square feet, the removal is subject to the Asbestos NESHAP *unless* "slicing,"[5] or other methods that do not sand, grind, cut or abrade, are utilized to remove the ACM. *See* 40 C.F.R. §61, App. A to Subpart M, at 1.A.1.

For all Category II ACM, if the area of roof to be removed is at least 160 square feet, the removal is subject to the Asbestos NESHAP. *See* 40 C.F.R. §61, App. A to Subpart M at 1.A.2.

Persons conducting renovations that are subject to the Asbestos NESHAP must provide written notification of the renovation to the regulatory agencies at least 10

---

[3]    "Friable ACM is ACM that, when dry, can be crumbled, pulverized or reduced to powder by hand pressure." 40 C.F.R. §61, App. A to Subpart M, at 1.1.

[4]    "Asphalt roofing products which may contain asbestos include built-up roofing; asphalt-containing single ply membrane systems; asphalt shingles; asphalt-containing under layment felts; asphalt-containing roof coatings and mastics; and, asphalt-containing base flashings." *Id.* at 1.2.

[5]    "As EPA interprets the NESHAP, the use of certain manual methods (using equipment such as axes, hatchets, or knives, spud bars, pry bars, and shovels, but not saws) or methods that slice, shear or punch (using equipment such as a power slicer or power plow) do not constitute 'cutting, sanding, grinding or abrading.'" *Id.* at 1.C.1.

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 6

working days in advance of the renovation. *See* 40 *C.F.R.* §61, App. A to Subpart M at 2.1.

In accordance with the Asbestos NESHAP, notifications of demolition or renovation projects involving ACM must contain certain specified information, including the scheduled starting and completion date of the work; the location of the project site; the names of asbestos removal contractors; methods of removal; and, the amount of ACM involved in the demolition or renovation. *See* 40 *C.F.R.* §61.145(b). The USEPA has interpreted the Asbestos NESHAP to require that either the owner of the building or the operator of the demolition or renovation project must submit the required notification. *See* USEPA, *Common Questions on the Asbestos NESHAP*, available at *http://www.epa.gov/region04/air/asbestos/asbqa.htm.*

If roofing materials contain more than 1% asbestos and the renovation activity involves RACM covered by the Asbestos NESHAP (e.g., Category I nonfriable ACM that has become friable or Category I nonfriable ACM that has or will be sanded, ground, cut, or abraded), work practices described in 40 *C.F.R.* §61.145(c) must be followed. *See* 40 *C.F.R.* §61, App. A to Subpart M at 1.A.3. In general, 40 *C.F.R.* §61.145(c) requires that:

- All RACM must be removed from the facility "before any activity begins that would break up, dislodge, or similarly disturb the material or preclude access to the material for subsequent removal . . . .";

- When facility components that contain RACM are being taken out of the facility as a unit or in sections, all RACM exposed during cutting or disjoining operations must be adequately wetted[6] and carefully lowered to the ground, not dropping, throwing, sliding, or otherwise disturbing the RACM;

- If RACM is stripped from a facility component that remains in place, the RACM must be adequately wetted;

- All RACM material that has been removed or stripped must be adequately wetted, and it must remain wet until collected, contained and prepared for disposal;

---

[6]     In renovation operations, wetting is not required if: (a) the facility owner or operator has obtained prior written approval from the EPA based on a written application that wetting would unavoidably damage equipment or present a safety hazard; and, (b) the facility owner or operator uses various emissions controls described within the regulations. 40 *C.F.R.* §61.145(c)(3)(i).

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 7

- No RACM may be stripped, removed, or otherwise handled or disturbed at a facility unless there is at least one on-site representative trained in the provisions of 40 *C.F.R.* §61.145 present at the facility.

40 *C.F.R.* §61.145(c) *et seq.*

When performing renovation activities involving RACM that are subject to the Asbestos NESHAP, the observation of dust from ACM materials may be used as evidence of a violation of the "adequately wet" requirement. *See* USEPA, *Asbestos/NESHAP Regulated Asbestos Containing Materials Guidance*, available at *http://www.epa.gov/region4/air/asbestos/asbmatl.htm.* Moreover, visible asbestos-containing debris on the ground outside the boundaries of a work site is considered a "visible emission," and a violation of the Asbestos NESHAP. *See id.*

In addition to the work practices that are prescribed in 40 *C.F.R.* §61.145(c), the Asbestos NESHAP requires that all material produced by the sanding, grinding, cutting, or abrading of Category I nonfriable ACM must be treated as asbestos-containing waste material subject to the waste handling and collection provisions of 40 *C.F.R.* §61.150. *See id.* That is, the debris from Category I nonfriable ACM that has been sanded, ground, cut or abraided must be collected and processed in a manner that either: (a) does not discharge visible emissions to the outside air; or, (b) cleans emissions containing particulate asbestos material before they escape to, or are vented to, the outside air. *See* 40 *C.F.R.* §61.150 *et seq.*

Similar to the USEPA's Asbestos NESHAP, the Occupational Safety and Health Administration's ("OSHA") Asbestos Standard for the Construction Industry (29 *C.F.R.* §1926.1101 *et seq.*) (hereinafter "OSHA Standard") regulates worker exposure to asbestos (both ACM and RACM) during the following construction[7] activities:[8] repairing, maintaining, or renovating asbestos-containing structures; and, cleaning up asbestos releases. 29 *C.F.R.* §1926.1101(a) *et seq.*

The OSHA Standard establishes a classification system for asbestos work and establishes mandatory work practices that must be followed to reduce exposures from each Class of asbestos work. The Classes of asbestos work established by the OSHA Standard are as follows:

---

[7]     Construction work means "work for construction, alteration, and/or repair, including painting and decorating" 29 *C.F.R.* §1910.12(b).

[8]     The list provided is not all inclusive. *See* 29 *C.F.R.* §1926.1101(a) *et seq.*

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 8

*Class I* – Removal of asbestos-containing thermal system insulation ("TSI") and sprayed-on or troweled on surfacing materials ("SM").

*Class II* – Removal of other types of ACM that are not TSI, such as resilient floors or roofing materials.

*Class III* – Repair and maintenance operations where ACM or presumed asbestos-containing material is disturbed.

*Class IV* – Custodial activities where employees clean up ACM debris produced by construction, maintenance or repair activities.

*See* 29 *C.F.R.* §1926.1101(b) *and* Occupational Health and Safety Administration, U.S. Dept. of Labor, Pub. OSHA 3096, *Asbestos Standard for the Construction Industry* (2002) at 3.

The OSHA Standard establishes extensive minimum safety requirements for each Class of asbestos work. No matter what Class of asbestos work is being performed, the OSHA Standard establishes minimum requirements for the following: Permissible Exposure Limits (PELs);[9] Initial Exposure Assessments & Negative Exposure Assessments;[10] Regulated Areas & Warning Signs; Competent Persons;[11] Air Monitoring; Medical Surveillance; Respirators; Protective Clothing; Training; Decontamination; Engineering Controls; and, Permitted and Prohibited Work Practices. *See* 29 *C.F.R.* §1926.1101 *et seq.*

Further, *regardless of exposure levels*, the OSHA Standard requires that employers must use the following engineering controls and work practices for Class I, II, III, and IV work:

---

[9]    The PEL for airborne concentrations of asbestos is 0.1 f/cc as an 8-hour time weighted average (TWA). The Short Term Exposure Limit ("STEL") is 1 f/cc as averaged over a sample period of 30 minutes. Occupational Health and Safety Administration, U.S. Dept. of Labor, Pub. OSHA 3096, *Asbestos Standard for the Construction Industry* (2002) at 4.

[10]    An Initial Exposure Assessment is conducted for purposes of estimating the concentration of asbestos that employees will be exposed to when the work is performed. A Negative Exposure Assessment ("NEI") demonstrates that employee exposures during the operation are consistently below the PEL for asbestos. *Id.* at 5.

[11]    Employers must designate a "Competent Person" to supervise all Classes of asbestos operations covered under the OSHA Standard. The Competent Person must be trained to identify asbestos hazards and be vested with the authority to correct them. A Competent Person must frequently inspect job sites, materials, and equipment. *Id.* at 4-5.

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 9

- Vacuum cleaners equipped with HEPA (High Efficiency Particulate Air) filters to collect all asbestos-containing or presumed asbestos-containing debris and dust.

- Wet methods or wetting agents to control employee exposures except when infeasible (e.g., due to the creation of electrical hazards, equipment malfunction, and slipping hazards).

- Prompt cleanup and disposal in leak-tight containers of asbestos-contaminated wastes and debris.

*See* 29 *C.F.R.* §1926.1101(g)(1) *et seq.;* OSHA 3096, *Asbestos Standard for the Construction Industry* at 19.

In addition, the following work practices are prohibited for all asbestos-related work or work that disturbs ACM or presumed asbestos-containing materials, *regardless of measured exposure levels*:

- High speed abrasive disc saws not equipped with a point-of-cut ventilator or enclosure with HEPA-filtered exhaust air.

- Compressed air to remove asbestos or ACM.

- Dry sweeping, shoveling, or other dry cleanup of dust and debris.

- Employee rotation to reduce exposure.

OSHA 3096, *Asbestos Standard for the Construction Industry* at 20.

Under the OSHA Standard, persons who conduct Class IV work (i.e., the cleanup of ACM debris produced by construction, maintenance or repair activities) *must* have attended an asbestos awareness training program and they *must* use wet methods and HEPA vacuums to clean ACM or presumed asbestos-containing debris. *See* 29 *C.F.R.* §1926.1101(g)(10)    Further, when cleaning debris and waste in "regulated areas,"[12] persons conducting Class IV work *must* wear respirators. *See* 29 *C.F.R.* §1926.1101(g)(10)(i).

When it comes to examining asbestos containing roofing materials and other surfacing materials that may contain asbestos, the USEPA recommends, *inter alia,* that:

---

[12]    "A regulated area is a marked-off site where employees work with asbestos, including any adjoining areas where debris and waste from work accumulates or where airborne concentrations of asbestos exceed, or can possibly exceed, the PEL." *Id.* at 12.

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 10

(a) building materials should be grouped into homogeneous areas based on uniformity of texture and color of the materials; and, (b) at least three cores samples should be obtained from each homogeneous area by selecting sampling locations that are representative of the homogeneous area. *See* USEPA Toxic Substances publication entitled *Guidance for Controlling Asbestos-Containing Materials in Buildings*, EPA560/5-85-024 (June 1985) at 2-6.

According to the USEPA, if asbestos is found, a control or abatement program should be initiated. *See id.* at 2-1. Further, the USEPA advises that:

> "[w]henever the presence of asbestos is in doubt, prudence is recommended: *treat the material as if it contains asbestos.*" *Id.* at 2-4. (Emphasis added)

Identification of homogeneous areas is the first important step in the process of devising an asbestos control or abatement program (*see id.* at 6-6), however, it is "[t]he likelihood of fiber release from ACM that determines the need for and timing of additional action." *Id.* at 4-1.

The USEPA advises that "[t]he likelihood of fiber release from ACM is based on evaluating [the] current condition [of the ACM] and the potential for future disturbance, damage, or erosion." *Id.* According to the USEPA, "[a]ir monitoring alone should not be used for assessment." *Id.* "For example, if [air] sampling is conducted for a short time during a quiet period (i.e., when air movement is limited), many fibers will settle out of the air onto the floor or other surfaces and may not be captured on the filter." *Id.* at 6-5. Moreover, "assessment by air monitoring alone is not recommended because it reflects conditions only at the time of sampling." *Id.* at 4-2. Air monitoring "provides no information about fiber release potential and future air levels." *Id.* at 4-3.

The asbestos contamination at the Somerville Facility was caused by the negligence of Badger, who failed to comply with the Asbestos NESHAP, failed to comply with the OSHA Standard, and failed to follow sound industrial hygiene practices governing the removal of ACM and RACM at the Somerville Facility.

The work at the Somerville Facility that was performed by Badger, involved the removal of more than 160 square feet of Category I non-friable ACM (*see* Stipulation of Facts, ¶11). which, after it was reduced to dust, debris, and powder from having been abraded with a rotating blade Panther saw, became RACM that was subject to the Asbestos NESHAP. *See* 40 *C.F.R.* §61, App. A to Subpart M at 1.3. Moreover, as Badger's work involved the removal of asbestos-containing roofing materials other than TSI, Badger's work qualified as Class II asbestos work under the OSHA Standard. *See*

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 11


29 *C.F.R.* §1926.1101(g); OSHA 3096, *Asbestos Standard for the Construction Industry* at 3.

Badger (which is *not* a licensed or qualified asbestos removal company) was negligent because it:

- Violated the Asbestos NESHAP[13] by failing to provide ten (10) days advance notice of the roofing work involving the removal of ACM, or to ensure that the building owner, Somerville Fidelco, provided ten (10) days advance notice of the roofing work involving the removal of ACM. *See* 40 *C.F.R.* §61, App. A to Subpart M at 2.1. If the regulatory agencies had been notified that Badger intended to remove ACM and RACM without appropriate engineering controls and work practices, the regulatory agencies likely would not have permitted the removal to take place until specific engineering controls and work practices were implemented.

- Violated the Asbestos NESHAP when it failed to remove all RACM from the facility before commencing activities that would break-up or dislodge the materials. *See* 40 *C.F.R.* §61.145(c).

- Violated the Asbestos NESHAP when it failed to adequately wet, and carefully lower to the ground all RACM that was exposed during cutting or disjoining operations. *See* 40 *C.F.R.* §61.145(c). Indeed, BMS employees observed that work performed by Badger produced a large cloud of dust and debris. *See* USEPA, *Asbestos/NESHAP Regulated Asbestos Containing Materials Guidance* (observation of dust from ACM materials may be used as evidence of a violation of the "adequately wet" requirement and visible asbestos-containing debris on the ground outside the boundaries of a work site is considered a "visible emission," and a violation of the Asbestos NESHAP).

- Violated the Asbestos NESHAP when it failed to ensure that at least one on-site representative trained in the provisions of the Asbestos NESHAP was present at the Somerville Facility before any RACM was stripped, removed, or otherwise handled or disturbed. *See* 40 *C.F.R.* §61.145(c).

---

[13]    Under New Jersey law, non-compliance with applicable government regulations provides strong evidence of negligence. *See Constantino v. Ventriglia*, 324 N.J. Super. 437, 441 (App. Div. 1999), *certif. denied*, 163 N.J. 10 (2000); *Sanna v. National Sponge Co.*, 209 N.J. Super. 60, 69 (App. Div. 1986); *Shatz v. TEC Technical Co.*, 174 N.J. Super. 135, 143-44 (App. Div. 1980).

DrinkerBiddle&Reath
LLP

David M. Rubin, Esq.
March 29, 2007
Page 12

- Violated the OSHA Standard[14] when it failed to ensure the on-site presence of a properly trained "Competent Person" to supervise asbestos work. *See* 29 *C.F.R.* §1926.1101(g)(7)(i) *and* OSHA, *Asbestos Standard for the Construction Industry* at 4-5.

- Violated the OSHA Standard when it failed to perform an Initial Exposure Assessment or conduct a Negative Exposure Assessment. *See* 29 *C.F.R.* §1926.1101(g)(7)(ii) *and* OSHA, *Asbestos Standard for the Construction Industry* at 5. But for its attempts to wet down the materials, Badger did not take any precautions when handling the ACM at the Somerville Facility.

- Violated the OSHA Standard when it failed to provide cutting machine misting or HEPA filters for the Panther saw that it used to remove ACM materials from the roof of the Somerville Facility. *See* 29 *C.F.R.* §1926.1101(g)(7)(iv) *and* OSHA, *Asbestos Standard for the Construction Industry* at 20.

- Failed to inquire of Somerville Fidelco about the existence of, or need for, core samples to determine whether ACM was present within the roofing materials at the Somerville Facility. Although Badger is aware that roofing materials can and do contain asbestos, Badger never asked Somerville Fidelco about the presence of ACM in the roofing materials at the Somerville Facility. (*See* Stipulation of Facts, ¶¶18, 19). As Badger has acknowledged, if it knew that the roofing materials contained asbestos, it would have either subcontracted the roof removal phase of the project to a qualified asbestos removal contractor or retained an expert to develop an asbestos removal protocol for Badger to follow.

As a result of its negligence, Badger inappropriately proceeded with the roofing job as if ACM was not present, failed to implement EPA and OSHA removal measures, and caused asbestos and ACM to infiltrate the Somerville facility.

---

[14]    *See supra* n.13. *See also* 29 *C.F.R.* §1926.1101(d)(2) ("Asbestos hazards at a multi-employer work site shall be abated by the contractor who created or controls the source of asbestos contamination."); *Universal Constr. Co., Inc. v. Occupational Safety & Health Review Comm'n,* 182 F.3d 726, 730 (10th Cir. 1999) ("[T]he general rule regarding multi-employer construction worksites is that employers will be liable under [the Occupational Safety and Health Act ("Act")] for hazards the employer either created *or* controlled, *regardless of whose employees are threatened by the hazard.* Thus, a subcontractor that creates a hazard may be cited under [the Act] *even if its own employees are not threatened.*" (emphasis added)).

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 13

## Somerville Fidelco's Negligence

Somerville Fidelco also is liable to BMS for Somerville Fidelco's negligence in connection with the asbestos incident at the Somerville Facility pursuant to Section 11.4 of the Lease, which provides that Somerville Fidelco has the right to enter the leased premises to make repairs and that:

> The Landlord agrees to do all such work at all reasonable times during usual business hours and in connection with the doing of any such work to cause as little inconvenience, annoyance, disturbance, loss of business or other damage to the Tenant as may reasonably be possible in the circumstances, and in the event the Landlord shall cause any damage to Tenant's property or *if damage caused by Landlord's* or its agent's or contractor's *negligence, Landlord shall be liable for the damage.*

(Emphasis added).

Somerville Fidelco was negligent because it:

- Violated the Asbestos NESHAP by failing to provide ten (10) days advance notice of the roofing work involving the removal of ACM, or to ensure that its contractor, Badger, provided ten (10) days advance notice of the roofing work involving the removal of ACM. *See* 40 *C.F.R.* §61, App. A to Subpart M at 2.1.

- Violated the OSHA Standard by failing to inform BMS of the presence, location, and quantity of ACM or presumed asbestos-containing materials at the Somerville Facility. *See* 29 *C.F.R.* §1926.1101(k)(2)(ii)(D) *and* OSHA STANDARD INTERPRETATION LETTER, *Building and/or Facility Owner Notification Requirements* (Feb. 1996) available at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIONS&p_id=22084.

- Violated the OSHA Standard by failing to inform BMS that, when Badger was hired to repair and replace the roof of the Somerville Facility, work that was subject to the OSHA Standard was about to take place. *See* 29 *C.F.R.* §1926.1101(k)(2)(ii)(D) *and* OSHA STANDARD INTERPRETATION LETTER, *Building and/or Facility Owner Notification Requirements* (Feb. 1996). Rather, Somerville Fidelco's contractor, Badger, simply informed BMS that Badger would be removing the roof of the Somerville Facility and, therefore, BMS could expect to have some dust enter the facility.

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 14

- Failed to survey and inspect the Somerville Facility for the presence of ACM and presumed asbestos-containing materials. *See* USEPA *Guidance for Controlling Asbestos-Containing Materials in Buildings* at 2-1. Somerville Fidelco failed to survey and inspect the Somerville Facility for the presence of ACM and presumed asbestos-containing materials, despite the fact that it commissioned the HHL Report which recommended that core samples be taken from the roof.

- Violated the OSHA Standard by failing to notify Badger about the presence, location, and quantity of ACM or presumed asbestos-containing materials in the areas of the building or facility where Badger performed its work. *See* 29 C.F.R. §1926.1101(k)(2)(ii)(B) and OSHA STANDARD INTERPRETATION LETTER, *Building and/or Facility Owner Notification Requirements* (Feb. 1996). Indeed, Somerville Fidelco did not inform Badger that the HHL Report that was commissioned by Somerville Fidelco recommended that the roof of the Somerville Facility be tested for asbestos. (*See* Stipulation of Facts, ¶16, 17).

As a result of Somerville Fidelco's negligence, Badger proceeded with the roofing job as if ACM was not present, failed to implement EPA and OSHA required removal measures and protections, and caused asbestos and ACM to infiltrate the Somerville facility.

### Somerville Fidelco's Liability For The Asbestos Contamination As A "Casualty" Under The Lease

Moreover, regardless of whether or not Somerville Fidelco or Badger was negligent, Somerville Fidelco is liable under the Lease because the asbestos infiltration caused by Badger constitutes a "casualty" under the Lease, for which Somerville Fidelco has assumed liability.

Sections 22.2 and 22.3 of the Lease provide that if the lease premises are "damaged by fire, explosion *or other casualty,* Landlord shall as soon as reasonable proceed to repair such damage" and that "[i]n the event of the damage or destruction of the demised premises by fire or other cause, Landlord will promptly repair and restore, as the case may be, the premises so that the premises after such work shall be substantially the same as prior to such damage." (Emphasis added).

The term "casualty" means a "fortuitous" event or an event by "chance" or "accident." *See Compagnie Des Bauxites De Guinee v. Insurance Co. of N. Am.,* 724 F.2d 369, 372 (3rd Cir. 1983); *Faron v. Penn Mut. Life Ins. Co.,* 179 F.2d 480, 482 (3rd Cir. 1950); *Morton Thiokol, Inc. v. General Accident Ins. Co. of Am.,* 1987 N.J. Super. LEXIS 1487, slip op. at *10 (Ch. Div. 1987).

DrinkerBiddle&Reath
David M. Rubin, Esq.
March 29, 2007
Page 15

The asbestos infiltration caused by Badger's roofing work constitutes a "casualty" within the meaning of the Lease. *See Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3rd Cir. 2002); *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997); *David Danzeisen Realty Corp. v. Continental Ins. Co.*, 170 A.D.2d 432, 565 N.Y.S.2d 223 (2nd Dept. 1991). For example, in *David Danzeisen*, a court held that damage caused by a roofing contractor was a "fortuitous" event and therefore covered under a property insurance policy. The insurer disclaimed coverage, contending that the loss was not fortuitous. The court disagreed, finding that the plaintiff had relied upon a roofing contractor "to do whatever was necessary to properly complete the job," that the loss caused by the contractor was "to a substantial extent beyond (plaintiff's) control" and, therefore, a fortuitous event covered under the insurance policy. *David Danzeisen*, 170 A.D.2d at 432, 565 N.Y.S.2d 224.

### BMS's Damages

Pursuant to the terms of the Lease, an arbitration award should be entered in favor of BMS and against Somerville Fidelco for a total of $746,191 broken down as follows:

- $449,981 for costs incurred by BMS to decontaminate the Somerville Facility;

- $224,210 for animal care and lodging costs incurred by BMS when monkeys that had been purchased and released for delivery by a Texas vendor had to be detained at the vendor while the Somerville Facility was contaminated; and

- $72,000 for a rent abatement during the six month period (October 2005 through March 2006) that BMS had limited use of the facility while the facility was contaminated.

### BMS's Asbestos Cleanup Costs

Pursuant to Sections 11.4, 22.2 and 22.3 of the Lease, Somerville Fidelco is liable for the cleanup costs (totaling $449,981) incurred by BMS to decontaminate the Somerville facility. These costs are summarized on the Chart annexed hereto at Tab C in items 2 through 16.

The cleanup of dust and debris within the Somerville Facility was governed by the requirements of the OSHA Standard that pertain to Class IV asbestos work and the cleanup authorized by BMS was reasonable, appropriate, and necessary. Under the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), friable and non-friable asbestos-containing roofing debris and dust are considered hazardous substances, the release of which must

DrinkerBiddle&Reath
LLP

David M. Rubin, Esq.
March 29, 2007
Page 16

be contained and cleaned up in order to minimize the hazards of exposure. *See* 40 C.F.R. §302.4. *See also* USEPA, *Monthly Hotline Report, RCRA, Superfund and EPCRA* (Oct. 1996) available at http://www.epa.gov/epaoswer/ hotline/ 96report/oct.txt ("Although releases of non-friable asbestos are exempt from release notification requirements, such releases are still subject to CERCLA response and liability provisions"). Because test results confirmed that the dust and roofing debris that entered the facility as a result of Badger's roofing work contained friable asbestos, all dust and roofing debris that entered the facility needed to be contained and cleaned up in order to prevent the building occupants from being exposed to, and redistributing, the materials.

Pursuant to EPA guidance, after it has been confirmed that building materials at a facility contain asbestos, all building materials at a facility that are of the same sort, texture, and color as the confirmed asbestos-containing materials should be presumed to be asbestos-containing materials. *See* USEPA Toxic Substances publication entitled *Guidance for Controlling Asbestos-Containing Materials in Buildings*, EPA560/5-85-024 (June 1985). Moreover, because of the impracticality of sampling every piece of dust and roofing debris that entered the facility, it was appropriate for BMS to approve a scope of work that required BEI to treat all of the dust and debris that entered the facility as though they were materials that contained asbestos that was, or could be, rendered friable.

### BMS's Animal Care and Lodging Costs

Pursuant to Section 11.4 of the Lease, Somerville Fidelco is also liable for the animal care and lodging costs that BMS incurred because monkeys that were already purchased and released for delivery had to be detained at BMS's Texas vendor. These costs (totaling $224,210) are summarized on the Chart annexed at Tab C in item 1 ("BRF Monkey Boarding").

After quarantine, monkeys are shipped from the Somerville Facility to other BMS facilities where they participate in medical trials. As monkeys are shipped out for medical trials, new monkeys are received from Texas. In order to maintain a monkey census that would be sufficient to meet demand for 2006, BMS normally would have received shipments of approximately 100 monkeys in both the third and fourth quarters of 2005. This, however, did not happen. Shipments of new monkeys were not received at the Somerville Facility during the later half of September 2005 and the fourth quarter of 2005 because dust and debris from asbestos-containing roofing materials had infiltrated the Somerville Facility and created a risk of exposure to both the monkeys and the personnel who were resident at the Somerville Facility. All the while, the remaining monkeys were shuffled from room to room within the Somerville Facility so as to accommodate on-going cleanup activities.

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 17

### Rent Abatement

Pursuant to Sections 11.4 and 22.3 of the Lease, BMS should also be awarded a rent abatement equal to two-thirds ($12,000 per month) of the monthly rent of $18,000 for the six-month period (October 2005 through March 2006) that BMS had limited use of the facility while the facility was contaminated.

Under Section 11.4 of the Lease, Somerville Fidelco is generally liable for damage caused to BMS as a result of Somerville Fidelco's and/or Badger's negligence. Moreover, under Section 22.3 of the Lease, BMS is entitled to a rent abatement regardless of whether or not Somerville Fidelco and Badger were negligent. Section 22.3 provides in this regard that:

> If the premises should be thus rendered untenantable, the rent shall abate until the premises can again be used for *Tenant's usual business. . . .* In the event that the demised premises shall be partially damaged or destroyed by fire or other cause so as effectively to limit the use of a portion of the premises for the business of Tenant then the rent shall *abate in proportion to the size of the area rendered untenantable* until such time as effective use of said area is restored. (Emphasis added)

Pursuant to this provision, BMS should be awarded a partial rent abatement for the six-month period that it had reduced use of the facility. *See Neurology Servs., Inc. v. Fairfax Medical PWH, LLC*, 67 Va. Cir. 1 (2005)(complaint alleging that landlord's contractors caused asbestos contamination of the tenant's medical office stated viable claim that landlord had breached the leased and that tenant had been deprived of beneficial use of the facility for its intended purpose); *see also SunAmerica Fin., Inc. v. 260 Peachtree Street, Inc.*, 415 S.E.2d 677 (Ga. Ct. App. 1992)(presence of asbestos in leased premises breached leased and resulted in constructive eviction), *cert. denied*, 1992 GALEXIS 306 (1992).

### BMS Is Not Financially Responsible Under The Lease
### For The Roof Repair Costs Incurred By Somerville Fidelco

In this arbitration, Somerville Fidelco has improperly asserted a setoff defense (but no counterclaim) seeking to setoff the costs it incurred for the roof repairs against any damages that may be awarded to BMS.

The landlord's and tenant's repair obligations are governed by Section 5.1 of the Lease (entitled "Repairs"). This Section provides that Somerville Fidelco "shall make the necessary structural repairs to the roof and walls of the building of which the Premises

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 18

are a part (such obligation not to include operating parts such as overhead ducts or fans or skylights)" and that BMS is responsible for other repairs.

As noted above, the history of roof leaks at this facility dates back to at least 1996. At no time, did Somerville Fidelco ever expense any roof repair costs (including any of the repair costs at issue in this arbitration) to BMS.

Somerville Fidelco's financial responsibility for "structural repairs to the roof" extends to the replacement of the roof membrane at issue. "Structural repairs to the roof" refers to the whole of the roof, not just to the portions of the roof that are structural elements of the building. While the roofing membrane is not a structural member of the building, it is a component of the structure of the roof, which as a whole includes the supporting structural framework, the decking, the insulation, and the waterproofing membrane, together with its flashing and curbs.

Courts have generally recognized that the replacement of a roof is a landlord's responsibility, not a tenant's responsibility. *See Supervalu Operations, Inc. v. Center Design, Inc.,* 206 W.Va. 311, 524 S.E. 2d 666 (W. Va. 1999); *Kalus v. Food Fair, Inc.,* 220 Va. 529, 260 S.E. 2d 212 (Va. 1979); *Reed v. Classified Parking System,* 232 So. 2d 103 (La. App.), *cert. den.,* 234 So. 2d 194 (La. 1970); *Dolid v. Leatherkraft Corp.,* 39 N.J. Super. 194 (App. Div. 1956). In fact, the notion of a tenant having financial responsibility for a substantial improvement such as the replacement of a roof is so unusual and counterintuitive that courts have declined to assign such responsibility to a tenant in the absence of explicit lease language delegating such a responsibility to a tenant. *See ASP Props. Group v. Fard, Inc.,* 133 Cal. App. 4th 1257, 1274, 35 Cal. Rptr. 3d 343, 355 (4th Dist. 2005); *Sandelman v. Buckeye Realty, Inc.,* 216 Ill. App. 3d 226, 230, 576 N.E. 2d 1038, 1040 (1st Dist.), *appeal denied,* 42 Ill. 2d 665, 584 N.E.2d 139 (1991).

Somerville Fidelco's position that BMS is financially responsible for the roof replacement is belied by the facts that: (i) BMS had no involvement in the selection of Badger as a contractor for the roof replacement; (ii) Somerville Fidelco never provided BMS with any estimates for the cost of replacing the roof; (iii) Somerville Fidelco never sought BMS's approval of the roof replacement costs; and, (iv) the roof replacement primarily benefited Somerville Fidelco, as the building owner, inasmuch as the roof replacement is warranted for 20 years and BMS's lease is due to expire 3 years into that warranty period.

Somerville Fidelco' defense for a setoff of its roofing expenses against any damages that may be awarded to BMS is a contrived position. Until BMS requested compensation from Somerville Fidelco for the damages caused by the asbestos incident, Somerville Fidelco

DrinkerBiddle&Reath
LLP

David M. Rubin, Esq.
March 29, 2007
Page 19

had never taken the position that BMS had any financial responsibility under the Lease for any roof repairs.

In addition to the materials referenced above, we have enclosed at Tabs 1 through 30 the legal authorities referenced in this letter.

Sincerely yours,

Charles J. Vinicombe

Enclosures
CJV/sds

cc:    Lawrence P. Maher, Esq.
       (via federal express with enclosures)

PR\506716\8

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION

BRISTOL-MYERS SQUIBB COMPANY,     : Case No. 18 115 Y 01071 06

            : 

        Claimant            : 

            : 

    v.            : 

            : 

SOMERVILLE FIDELCO ASSOCIATES, L.P., : 

            : 

        Respondent.          : 

## STIPULATION OF FACTS

Claimant Bristol-Myers Squibb Company ("BMS") and Respondent Somerville Fidelco Associates, L.P. ("Somerville Fidelco"), by and through their undersigned counsel, hereby stipulate to the following facts in this arbitration proceeding:

1.     At all times relevant to this arbitration, Somerville Fidelco has been the owner of a property located at 76 Fourth Street in Somerville, New Jersey (the "Somerville Facility").

2.     BMS has been a tenant at the Somerville Facility since 1987.

3.     In October 1987, Somerville Fidelco, as landlord, and BMS, as tenant, executed a written lease for the Somerville Facility.

4.     The Lease had an original three-year term and subsequently was extended through a number of Lease Extension Agreements.

5.     The current lease extension (the November 25, 2002 Lease Extension No. 2) is due to expire on October 31, 2008.

6.     The Somerville Facility is used by BMS to house and quarantine monkeys that are used in pharmaceutical drug testing.

7.     The roof at the Somerville Facility had a history of leaks going back to at least 1996.

8.     On June 16, 2005, Badger Roofing Company, Inc. ("Badger") submitted a written proposal to Barry Ages ("Mr. Ages"). Badger's proposal was to perform a roof removal and replacement at the Somerville Facility.

9.     At all times relevant to this arbitration, Mr. Ages was an employee of Schenkman Kushner Affiliates and he acted as the duly authorized representative of Somerville Fidelco.

10.    On July 14, 2005, Mr. Ages accepted, on behalf of Somerville Fidelco, Badger's proposal to perform the roof removal and replacement at the Somerville facility.

11.    The roof at the Somerville Facility that Badger was retained to remove and replace was greater than 160 square feet.

12.    Badger performed its roof removal and replacement services at the Somerville Facility starting in September of 2005.

13.    Approximately four months before Badger began its roof removal and replacement work at the Somerville Facility, Somerville Fidelco had hired a roofing consultant, Harry H. Leavy, Inc. ("HHL").

14.    On May 25, 2005, HHL sent a five page written Report, with six pages of photographs, to Mr. Ages. The Report is entitled "Presentation of Visual Roof Survey" and states that the purpose of the survey is to "identify and evaluate the present condition of the smooth surfaces built-up roof system on the building." On page 2 under "Report Presentation," the Report states that the "Roof Survey Report does not include . . . Testing for Asbestos Containing Roof Materials (ACRM)." On page 3 under "Roof Data," the Report states that the "Insulation" was "Unknown. (Suggest core samples be taken)."

15.    Somerville Fidelco did not arrange for core samples to be taken of the roof at the Somerville Facility prior to or during Badger's roof removal work.

16.    Somerville Fidelco did not provide the May 25, 2005 HHL Report to Badger.

17.    Somerville Fidelco did not inform Badger that Somerville Fidelco's representative, Mr. Ages, had received a report from HHL suggesting core samples be taken of the roof at the Somerville Facility.

18.    Prior to or during Badger's roof removal work, Badger never inquired of Mr. Ages or any other representative of Somerville Fidelco whether core samples had been taken of the roof at the Somerville Facility.

19.    Badger never inquired of Mr. Ages or any other representative of Somerville Fidelco whether the roof at the Somerville Facility consisted of asbestos containing materials ("ACM").

20.    Badger utilized a machine with a rotating blade (a/k/a "Panther Saw") to cut and remove the roofing materials at the Somerville Facility.

21.    Before the roof removal activities were commenced at the Somerville Facility, Badger informed BMS that the roof removal and replacement would cause some dust to enter the interior of the facility.

22.     On September 22, 2005, BMS demanded that Badger cease its roof removal activities at the Somerville Facility.

23.     BMS demanded that Badger cease its roof removal work on September 22, 2005 at the Somerville facility because of the amount of dust and debris from the roof work that was entering the interior of the facility.

24.     Badger ceased its roof removal activities on September 22, 2005.

25.     Thereafter, BMS retained the services of Blasland, Bouck & Lee, Inc. ("BB&L") and Eagle Industrial Hygiene Associates, Inc. ("Eagle") to conduct testing at the Somerville Facility. Some of the wipe samples and bulk samples of the materials that entered the Somerville Facility contained more than 1% asbestos as described in Eagle's September 29, 2005 Report to BMS.

26.     Core samples obtained from the roof of the Somerville Facility after Badger had ceased its roof removal activities indicated that the roof materials at the Somerville Facility contained more than 1% asbestos as described in Eagle's November 15, 2005 Report to BMS.

27.     Air sampling conducted by Eagle at the Somerville Facility as described in Eagle's Reports to BMS dated September 29, 2005, November 15, 2005, January 26, 2006 and April 10, 2006 failed to detect asbestos fibers in the air in concentrations above permissible exposure limits.

28.     On an undetermined date, Slavco Construction, Inc. ("Slavco") submitted a written proposal to Scott Badger from Badger. Slavco's proposal was to complete the roof removal at the Somerville Facility.

29.     On October 12, 2005, Mr. Ages accepted, on behalf of Somerville Fidelco, Slavco's proposal.

30.     Between December 16 and December 19, 2005, Slavco completed the roof removal work that Badger started in September 2005.

31.     Between December 16 and December 19, 2005 Badger completed the roof replacement work.

32.     Somerville Fidelco retained Tuffwrap, Inc. to install a plastic sheathing in the interior of the Somerville Facility during the roof removal and replacement between December 16 and December 19, 2005.

33.     BMS retained the services of Bristol Environmental, Inc. ("BEI") to conduct a cleanup of the dust and debris in the Somerville Facility. The cleanup proceeded in two phases. The first phase of the cleanup occurred in October of 2005. The second phase of the cleanup occurred from January to March of 2006.

Dated: March 29, 2007

Drinker Biddle & Reath LLP
Attorneys for Claimant
Bristol-Myers Squibb Company


By:_____
            Charles Vinicombe


Greenbaum, Rowe, Smith & Davis LLP
Attorneys for Respondent
Somerville Fideleo Associates, L.P.

By:_____
            Lawrence P. Maher