**SODINI & SPINA, LLC**
500 Harding Road
Freehold, NJ  07728
(732)732-0011
Attorneys for Defendant Badger Roofing Company, Inc.

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY,<br><br>            Plaintiff,<br><br>    v.<br><br>SOMERVILLE FIDELCO ASSOCIATES,<br>L.P. and BADGER ROOFING COMPANY,<br>INC.;<br>            Defendants<br>And<br><br>SOMERVILLE FIDELCO ASSOCIATES,<br>L.P.;<br>       Third-Party Plaintiff<br><br>    v.<br><br>QUINCY MUTUAL FIRE INSURANCE<br>COMPANY, AMERICAN HOME ASSURANCE<br>COMPANY,<br>      Third-Party Defendants | UNITED STATES DISTRICT COURT<br>DISTRICT OF NEW JERSEY<br>TRENTON VICINAGE<br><br>DOCKET NO. 07-CV-02763 (AET)(TJB)<br><br><br><br>          Civil Action |

---

**DEFENDANT BADGER ROOFING COMPANY'S BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

                                 **Sodini & Spina, LLC
500 Harding Road
Freehold, NJ  07728
(732-431-0011)
mcollins@sodinispina.com
Attorneys for Defendant
Badger Roofing Company, Inc.**

*On the Brief*:
MICHAEL T. COLLINS, ESQ.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS......................................... i

TABLE OF AUTHORITIES...................................... i

STATEMENT OF FACTS AND PROCEDURAL HISTORY................. 1

LEGAL ARGUMENT........................................... 6

RELEVANT DECISIONAL AUTHORITY............................ 6

POINT I

       BADGER IS ENTITLED TO COVERAGE AS THE
       ASBESTOS EXCLUSION FOES NOT APPLY................ 9

POINT II

       BADGER IS ENTITLED TO COVERAGE AS
       FIDELCO ASSERTED A CLAIM SOUNDING IN
       NEGLIGENCE...................................... 15

POINT III

       BADGER IS ENTITLED TO COVERAGE FROM
       SCOTTSDALE AS THE "ON-GOING WORK"
       EXCLUSION DOES NOT APPLY ....................... 16

CONCLUSION............................................... 18

# TABLE OF AUTHORITIES

Aetna Ins. Co. v. Weiss, 174 N.J.Super. 292, 296
(App. Div.) *cert den'd*, 86 N.J. 127 (1980)................ 10-11, 18

Bryan Const. Co. v. Employer's Surplus Lines Ins.
Co., 60 N.J. 375, 377-378 (1972)......................... 9-10

Ellmex Construction Co., Inc. v. Republic Ins.
Co., 202 N.J.Super. 195, 205 (App. Div. 1985),
*cert. den'd*, 103 N.J. 453 (1986)........................ 10, 18

Federal Home Loan Mortgage Corp. v. Scottsdale
Ins. Co., 316 F.3d 431, 445 (3d Cir. 2003) ............... .6

F.S. v. L.D., 362 N.J.Super. 161, 166 (App. Div. 2003) ........................................ .7

Hebela v. Healthcare Ins., Co., 370 N.J.Super. 260, 269 (App. Div. 2004) ........................ 7

Kievit v. Loyal Protection Life Ins. Co., 34 N.J. 475, 483 (1961) .................................. 10

L.C.S., Inc. v. Lexington Ins. Col., 371 N.J.Super. 482, 490 (App. Div. 2004) ...................... 7

Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 612-613 (1986) ..................................... 9

Mazzilli v. Accident & Cas. Ins. Co., 35 N.J. 1 (1961) ................................................ 9

Morrone v. Harleysville Mut. Ins. Co., 283 N.J. Super. 411, 420 (App. Div. 1995) ............... 10, 18

Morton Intern., Inc. v. General Acc. Ins. Co., 134 N.J. 1, 76 (1993) ................................ 10

Rosario ex rel Rosario v. Haywood, 351 N.J. Super. 521, 534 (App. Div. 2002) .................... 6

Sparks v. Saint Paul Ins. Co., 100 N.J. 325, 338 (1985) ......................................... 9, 10

Voorhees v. Preferred Mutual Insurance Co., 128 NJ 165 (1992 ................................ 6, 8, 9

## FACTS AND PROCEDURAL HISTORY

Scottsdale Insurance Company ("Scottsdale") initiated the within lawsuit by the filing and serving of a Complaint for Declaratory Judgment upon Somerville Fidelco Associates, LP ("Fidelco") and Badger Roofing Company, Inc. ("Badger"). Scottsdale had issued a policy of insurance bearing policy number BCS0010238 (the "Policy") to Badger; the effective dates of coverage were May 1, 2005 through April 31, 2006. There is no dispute that Badger is an insured under this policy or that the policy was in effect during the time of the alleged loss. In the course of their dealings with respect to the project at hand, Fidelco requested that Badger afford it coverage as an additional insured under the Scottsdale policy. A certificate evincing this was issued by the producer and provided to Fidelco.

Fidelco is the owner of real property located at 76 4th Street, Somerville, New Jersey (the "Facility"). At the relevant time herein, said premises were occupied by its tenant, Bristol-Meyers Squibb Company ("BMS') pursuant to a lease agreement. Over the course of time, BMS had repeatedly complained of leaks in the roof at the Facility and Fidelco had undertaken to repair same. In June of 2005, Fidelco sought proposals for the removal and replacement of the roof. Badger

1

submitted a proposal in response and in or around July of 2005, Fidelco accepted same. The Badger proposal submitted to Fidelco was signed and delivered to Badger in or around August of 2005.

Relying upon the agreement, Badger initiated the work effort on or about September 12, 2005 by loading material and equipment at the Facility, then commenced the removal of the roof on September 19, 2005. Badger continued it efforts at the Facility until on or about September 26, 2005 when it was directed by BMS to cease all activities. During the course of the removal of the roof by Badger, there was infiltration of gross debris and dust into the premises and BMS expressed concern that the debris might contain asbestos. BMS arranged for testing of the debris and it was subsequently determined that two samples of roofing material contained asbestos and, for that reason, the roof removal and replacement efforts were suspended.

As a result of the foregoing, Slavco Construction ("Slavco"), an asbestos contractor, was retained by Fidelco to establish a protocol to remove the roof. There was a delay of several months while the protocol was reviewed by BMS. Once the agreed-upon protocol was in place, Slavco and Badger, working in conjunction, completed the removal and replacement of the roof by December 19, 2005.

Contemporaneously, BMS had engaged the services of Eagle

Industrial Hygiene Associates, Inc ("Eagle") to conduct an evaluation of the indoor environmental conditions of the Facility. These evaluations commenced on September 24, 2005, at which point in time air, surface vacuum and bulk debris samples were collected. Only two of the bulk samples were positive for asbestos. These samples had been collected from the roof top and from a dumpster located outside the Facility.

Eagle conducted additional evaluations from October 3 to November 3, 2005. The analysis did not detect any asbestos structures on the filters in the PPE. More importantly, the analysis of the air samples that were collected as part of this evaluation was all "non-detected" for asbestos structures.

Eagle conducted other evaluations from December 16, 2005 through December 21, 2005. The air sample results indicated that there were no airborne asbestos hazards in the Facility during the time of the evaluations. Additionally, debris samples were collected from the floor in the Facility and were analyzed for asbestos content. The samples were negative for asbestos content and the debris was removed from the hallway areas. These findings in December of 2005 are particularly significant as the removal of the old roof by Badger and Slavco was underway during the course of these evaluations. More importantly, these December evaluations establish the absence of any asbestos prior to the time that Bristol Environmental Inc.

started the second phase of the clean up in January of 2006

BMS had retained Bristol Environmental, Inc. ("BEI") to undertake the clean up of the Facility. This cleanup was to proceed in two phases: a minor cleanup in October of 2005 and a major cleanup between January and March of 2006. The second phase cleanup was designed and undertaken as if the entire Facility were contaminated with asbestos-containing dust and particles.

BMS incurred substantial costs as a result of the cleanup and improvements to the Facility. Additionally, it was forced to make alternative arrangements for the boarding of the primates for several months. Finally, it lost the use of sections of the Facility during the course of the cleanup and improvements. BMS demanded reimbursement from Fidelco for these costs, but Fidelco declined.

As a consequence, on or about August 4, 2006, BMS made a Demand for Arbitration against Fidelco. In response, under cover letter dated August 17, 2006, Fidelco made a demand upon Scottsdale for defense and indemnification as an additional insured under the Scottsdale policy issued to Badger. Contemporaneously, Fidelco advised Badger that it was responsible for the damages incurred by BMS and that Fidelco would be looking to it for reimbursement of same.

In or around September, 2007, Badger made a demand upon

4

Scottsdale for a defense and indemnification under the terms of the policy identified above. Although there is no dispute that Scottsdale insured Badger and that the occurrence complained of fell within the policy period, Scottsdale took the position that the claim asserted involved asbestos and/or asbestos-containing materials and that coverage was excluded thereby. Based on the foregoing, Scottsdale denied coverage to Badger and to its additional insured, Fidelco. The Arbitration between BMS and Fidelco proceeded and ultimately generated a settlement in favor of BMS for the sum of $575,000.00. Badger was not a party to the Arbitration process.

Fidelco had placed Scottsdale on notice of the proposed settlement in advance of the resolution and received no objection. Anticipating litigation, Scottsdale filed the within Complaint. In response, Fidelco filed an Answer, Counterclaim and Cross-Claim against Badger. The Counterclaim sought Declaratory Judgment that coverage was available to it as an additional insured. In the Cross-claim, Fidelco sought to recover damages from Badger for negligence, breach of contract and/or indemnification. Badger filed an Answer and a Counterclaim seeking to compel coverage from Scottsdale. Subsequent thereto, Fidelco filed a Third-Party Complaint against American Home Assurance Company ("Home") and Quincy Mutual Insurance Company ("Quincy"). Those additional insurers

filed Answers, denying the claims for coverage.  At present, all insurers have filed motions for summary judgment.

## LEGAL ARGUMENT

### Relevant Decisional Authority

Under well established New Jersey law, coverage under a liability insurance policy "is triggered when the complaint against the insured states a claim constituting a risk insured against." Rosario ex rel Rosario v. Haywood, 351 N.J. Super. 521, 534 (App. Div. 2002).  The Appellate Division, in discussing the test for determining the duty to defend, has stated as follows:

> To determine whether an insurer has a duty to defend, the complaint is "laid alongside the policy" to compare the allegations with the language of the policy.  The duty to defend arises when the comparison reveals that, if the allegations of the complaint are sustained, the insurer will be required to pay any resulting judgment.  Any doubts are resolved in favor of the insured.  Id.

In Federal Home Loan Mortgage Corp. v. Scottsdale Ins. Co., 316 F.3d 431, 445 (3d Cir. 2003), the court, relying upon Voorhees v. Preferred Mutual Insurance Co., 128 NJ 165 (1992), held "[t}hat the claims are poorly developed and almost sure to fail is irrelevant to the insurance company's duty to defend...'Liability of the insured...is not the criterion; it is the allegations...of a cause of action which, if sustained, will impose a liability covered by the policy.'" Id.

Equally important in the matter before this court is that "[t]he insurer's obligation to defend is triggered by a complaint against the insured alleging a cause of action which may potentially come within coverage of the policy, irrespective of whether it ultimately does come within the coverage and hence irrespective of whether the insurer is ultimately obligated to pay." F.S. v. L.D., 362 N.J.Super. 161, 166 (App. Div. 2003). Accordingly, an insured need only show that the claim falls within the policy's coverage to demonstrate the insurer's duty to defend. Hebela v. Healthcare Ins., Co., 370 N.J.Super. 260, 269 (App. Div. 2004).

If the complaint in the underlying action is ambiguous, if it could be read to allege a covered claim, or alternatively, an uncovered claim, "doubts are resolved in favor of the insured and therefore for coverage." L.C.S., Inc. v. Lexington Insurance Co., 371 N.J.Super. 482, 490 (App. Div. 2004). More specifically, "when multiple alternative courses of action are set forth, the duty to defend will continue until every covered claim is eliminated." L.C.S., Inc., supra, 371 N.J.Super at 490. (citations omitted).

In applying the relevant decisional law to the case at bar, it is clear that Badger is entitled to coverage for the claims alleged in the Crossclaim filed by Fidelco. The Fidelco Crossclaim against Badger seeks to recover damages, alleging

that Badger was "negligent and careless in performing the roof removal and that this negligent and careless conduct ... was the direct and proximate cause of costs incurred by Bristol-Myers to perform a comprehensive cleanup of the Premises, and incur expenses for additional security, personal protection equipment and alternative storage facilities for test monkeys."

Scottsdale's policy provides liability coverage for 'property damage ... caused by an occurrence to which this coverage applies". "Occurrence" in the policy is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Here, Fidelco's Crossclaim alleged that the property damages sustained by Bristol-Myers were caused by the negligence of Badger. Even when the complaint does not involve an allegation of negligence but alleges purely intentional acts, the New Jersey courts have ruled that so long as the insured did not subjectively intend the injuries, the incurrence would still be an "accident" for which coverage is provided. Voorhees v. Preferred Mutual Insurance Co., 128 N.J. 165 (1992). The accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury. If not, then the resulting injury is "accidental," even if the act that caused the injury was intentionally. Id. at 183.

Thus, at the time that Badger tendered the notice of the

claim to Scottsdale, as a matter of law, Scottsdale's duty to defend was triggered.   Scottsdale's failure to defend the action constitutes, *inter alia*, a breach of its duty to defend under the insurance contract.

## POINT I

### BADGER IS ENTITLED TO COVERAGE AS THE ASBESTOS EXCLUSION DOES NOT APPLY.

There is a plethora of decisional authority which establishes the proposition that insurance contracts are subject to principles of adhesion contract analysis and that where there is an ambiguity in the contract that will reasonably support two meanings, the ambiguity must be resolved in favor of coverage. Voorhees v. Preferred Mutual Insurance Co., 128 N.J. 165, 175 (1992); Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 612-613 (1986); Sparks v. Saint Paul Ins. Co., 100 N.J. 325, 338 (1985); Mazzilli v. Accident & Casuality Ins. Co., 35 N.J. 1, 7 (1961).  The Supreme Court has held that "courts are bound to protect the insured to the full extent that any fair interpretation will allow."  Id.

In a similar vein, the New Jersey Supreme Court has held "while the courts are in no position to dictate the terminology, they are in a position to mold the pertinent legal doctrines with a view toward affording just measures of protection to the insured."  Bryan Const. Co. v. Employer's Surplus Lines Ins.

Co., 60 N.J. 375, 377-378 (1972).  The ready inference emanating from these guiding principles is that where the policy language itself may be considered unambiguous to a sophisticated reader, because insurance policies are contracts of adhesion, they will be construed liberally in favor of the insured in order to meet the insured's reasonable expectations.  See Sparks v. St. Paul Ins. Co., 100 N.J. 325 (1985); Morton Intern., Inc. v. General Acc. Ins. Co., 134 N.J. 1, 76 (1993); Kievit v. Loyal Protection Life Ins. Co., 34 N.J. 475, 483 (1961) ("[w]here particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective").

In addition to the foregoing principles, it is also well settled in this jurisdiction that "exclusionary clauses are enforceable only if clearly applicable, are narrowly read and any ambiguities are resolved in favor of the insured." Morrone v. Harleysville Mut. Ins. Co., 283 N.J. Super. 411, 420 (App. Div. 1995).  See also Ellmex Construction Co., Inc. v. Republic Ins. Co., 202 N.J.Super. 195, 205 (App. Div. 1985), cert. den'd, 103 N.J. 453 (1986) (Courts must construe exclusionary clauses strictly against the insurer).

The insurer has the burden of showing that the exclusion bars coverage and that the insured's interpretation of the exclusion is entirely unreasonably.  See Aetna Ins. Co. v.

Weiss, 174 N.J.Super. 292, 296 (App. Div.) *cert den'd*, 86 N.J. 127 (1980).   Since the matter at hand involves the application of an exception (or, in this case, exceptions), the well established rules requiring narrow application of the exclusion in favor of the insured must be applied.

Scottsdale's communication of January 31, 2007, which disclaims coverage for Badger in an abbreviated fashion, refers to an earlier Scottsdale communication of September 7, 2006 wherein it sets forth certain policy provisions which may limit or exclude coverage under the policies.   Scottsdale asserted, *inter alia*, that the policy contains exclusion for claims arising out of asbestos exposure and/or arising from pollution. The policy exclusion relied upon by Scottsdale states the following:

> The coverage afforded by this policy does not apply to bodily injury, personal injury or property damage arising out of:
>
> > 1.   inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos; or
> >
> > 2.   the use of asbestos in construction or manufacturing any good, product or structure; or
> >
> > 3.   the removal of asbestos from any good, product or structure; or
> >
> > 4.   the manufacture, sale, transportation, storage or disposal of asbestos or goods or products containing asbestos.

The Arbitration proceeding filed by BMS involved alleged property damage and loss of use of the Facility. The Facility in question was used by BMS for evaluating, preparing and testing animals to be participants in drug studies preformed by BMS at other sites. BMS' Demand for Arbitration asserted that the alleged damages it sustained at the Facility arose out of business interruption due to the cleanup and boarding fees incurred for the primates during the cleanup and other miscellanea.

By its terms, the asbestos exclusion contained in the Scottsdale policy did not apply to the claim in question **because it does not involve inhaling, ingesting or prolonged physical exposure; or the use of asbestos in construction, or manufacturing any good, product or structure; or the removal of asbestos; or the manufacture, sale, transportation, storage or disposal of asbestos containing goods or products.**

The claim involves the alleged property damage and loss of use of the Facility. The roofing removal and replacement caused debris, dust and other material to enter the building allegedly causing damage and loss of use to BMS. The old roof which was being removed may have contained asbestos materials, but the claim by BMS does not involve the use of asbestos in construction or manufacturing or the removal of asbestos from any good, product or structure.

12

Pursuant to the well settled principles of insurance policy construction requiring policy exclusions to be construed narrowly, the asbestos exclusion in the Scottsdale policy can not form the basis for denial of coverage under these circumstances. In addition, it became evident during the course of the discovery undertaken in the Arbitration process that while samples taken from the roofing material itself did contain asbestos, none of the air samples or vacuum samples taken afterwards within the interior of facility contained any asbestos requiring asbestos abatement.

The original sampling by Eagle in September, 2005 detected asbestos in only two of the four samples of roofing material collected, but significantly no asbestos was found in the air samples or in the vacuum samples. Results of air sampling done by Eagle in October, 2005 were all found to be "non-detected for asbestos structures." Subsequent sampling taken in December, 2005 by Eagle disclosed that there was "no airborne asbestos hazard" and the sampling of the roof material demolition debris found in the building at the time was "negative for asbestos content." These results are particularly significant in that the December collections of samples and analyses were undertaken during the course of the completion of the roof removal and replacement.

In short, these December tests revealed the absence of

asbestos containing materials or dust in the interior of the Facility. As such, at the time BEI undertook the phase two major cleanup in January there was no data to support the proposition that there was actual asbestos contamination in the interior of the Facility. According to the testimony of Barbara Owens, the associate director of environmental health and safety at BMS, the cleanup by BEI proceeded on **the assumption** that there was asbestos contamination present. The results of the December testing do not support this conclusion and, for that reason, it is apparent that the damages associated with the January-March 2006 cleanup were not the result of **the removal of asbestos from any good, product or structure or the manufacture, sale, transportation, storage or disposal of asbestos or goods or products containing asbestos.**

Based upon the results of the December evaluations by Eagle, it is obvious that the damages sought by BMS were for the cleanup and removal of dust and other materials which did not contain asbestos, replacement of damaged walls, ceilings and floors and boarding of the primates because the Facility could not be used. These items of alleged damages fall outside of the policy exclusions relied upon by Scottsdale and fall squarely within the four corners of the policy and, for that reason, Scottsdale should be compelled to undertake the defense and indemnification of Badger.

14

## POINT II

## BADGER IS ENTITLED TO COVERAGE AS FIDELCO ASSERTED A CLAIM SOUNDING IN NEGLIGENCE.

Scottsdale's argument that Badger is not entitled to coverage because the policy does not provide coverage for breach of contract is misguided. In its responsive pleadings to Scottsdale's Complaint, Fidelco asserted a Crossclaim against Badger. More specifically, in the Second Count of that Crossclaim, Fidelco alleged, *inter alia*, that "Badger was negligent and careless in performing the roof removal and breached its duty to Fidelco … by causing or permitting roofing debris to infiltrate the premises." Additionally, Fidelco alleges that it was "the negligent and careless conduct of Badger [that] was the direct and proximate cause of costs incurred by BMS to perform a comprehensive cleanup and … the negligent and careless conduct of Badger was likewise the direct and proximate cause of damages sustained by Fidelco for costs and fees incurred in the arbitration proceeding.

The allegations in the Second Count of the Crossclaim are not related to any breach of contract and clearly constitute an "occurrence" within the meaning of the policy as the infiltration of dust and debris into the interior of the Facility was unintended from the perspective of the insured. The inadvertent intrusion of debris and dust into the Facility,

15

allegedly causing disruption of operations and necessitating a cleanup of the Facility, is precisely the type of "accident" contemplated by the policy language.   Scottsdale should not be permitted to escape liability by selecting those causes of actions in Fidelco's crossclaim which, arguably, fall outside of the contract of insurance and ignoring those claims which fall squarely within the four corners of the policy.   Accordingly, Badger is entitled to coverage under the terms of the policy in effect at the time of the loss sustained herein.

**POINT III**

**BADGER IS ENTITLED TO COVERAGE FROM SCOTTSDALE AS THE "ON-GOING WORK" EXCLUSION DOES NOT APPLY.**

Scottsdale argues that the policy in question does not afford coverage to Badger for damages caused by Badger's work. The relevant exclusion states, in pertinent part, the following:

This insurance does not apply to:

j. Damage To Property

"Property Damage" to:

> (5)  That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations; if the "property damage" arises out of those operations; or

> (6)  That particular part of any property that must be restored repaired or replaced because "your work" was incorrectly preformed on it.

>   Paragraph (6) of this exclusion does not apply to
>   "property damage" included in the "products
>   completed operations hazard."

Scottsdale's reliance upon this provision is misplaced for the simple reason that there was no "property damage" to that particular part of real property – the roof – on which Badger was working directly or indirectly during the course of performing its operations.   There has been no allegation that Badger caused any property damage to the roof itself and, in fact, Badger was contracted to remove the roof.   To the contrary, it has been alleged that it was the infiltration of debris and dust into the interior of the Facility that caused the damages sustained by BMS.   There has been no allegation, or even a suggestion, that there was any property damage to the roof in question by Badger.

Further, and in a similar vein, there has been no allegation that there has been any "property damage" to that particular part of any property – again, the roof – that must be "restored, repaired or replaced because Badger's work was incorrectly performed" on it.   As noted above, it was the expectation of the parties to the contract (Fidelco and Badger) that the roof would be removed and replaced and this was accomplished by Badger.   No property damage was sustained by any

party due to the restoration, repair or replacement of the roof because of Badger.

As noted above in *Morrone, supra*, exclusionary clauses are enforceable only if *clearly applicable*, are narrowly read and any ambiguities are resolved in favor of the insured." Id. at 420.   Further, courts must construe exclusionary clauses strictly against the insurer.   *Ellmex, supra,* at 205.   Finally, the insurer has the burden of showing that the exclusion bars coverage and that the insured's interpretation of the exclusion is entirely unreasonable.   See Aetna Inc. So. V. Weiss, 174 N.J.Super. 292, 296 (App. Div.) *cert den'd*, 86 N.J. 127 (1980).

Applied here, the facts and applicable decisional authority do not support the position advanced by Plaintiff.   Assuming any ambiguity must be construed in favor of the insured, the conclusion ultimately must be for a finding of coverage in favor of Badger.

## CONCLUSION

For the reasons set forth above, Scottsdale is not entitled to summary judgment.   It is undisputed that Badger is an insured and that the policy was in effect at the time of the loss. Further, the cause of action asserted by Fidelco against Badger clearly sounds in negligence and, therefore, should fall squarely within the four corners of the contract of insurance. Although the Fidelco Crossclaim does contain claims for breach

of contract, Scottsdale should not be permitted to rely upon those claims which advance its position and ignore those claims which do not.

With respect to the asbestos exclusion, the results of the analytical testing by Eagle clearly support the proposition that the Facility was not characterized by asbestos contamination by the end of December of 2005.  The fact that BMS went forward with an extensive wipe-down cleanup was based upon the assumption that the Facility was contaminated with asbestos.  As noted above, the Eagle analysis does not support that conclusion.  Applied here, the assumptions made by BMS do not permit Scottsdale to avoid its contractual obligations under the policy of insurance issued to Badger.  The efforts undertaken by BEI between January and March of 2006 were not, in fact, an asbestos cleanup.  Accordingly, the asbestos exclusion does not apply and Badger is entitled to coverage from Scottsdale.

Finally, Scottsdale's argument that the damages sustained by BMS were the result of Badger's faulty workmanship on the roof is without merit.  As set forth above, there was no damage to the roof at any time herein.  In fact, it had been the intent of Fidelco and Badger that the roof would be removed and replaced.  Scottsdale can not be permitted to argue that Badger's conduct in the course of the roof removal somehow damaged the roof in question.

Under the circumstances, Badger is entitled to defense and indemnification from Scottsdale.   Scottsdale should be required to undertake the defense of Badger and to reimburse Badger for the reasonable fees and costs that it has incurred in the defense of this claim.

SODINI & SPINA, LLC
Attorneys for Defendant
Badger Roofing Company, Inc.

_____
MICHAEL T. COLLINS

DATED: 12/7/09