## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE COMPANY, | : | CIVIL ACTION NO. 3:07-cv-02763 |
| | : | (AET) (TJB) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| SOMERVILLE FIDELCO ASSOCIATES, | : | |
| L.P. and BADGER ROOFING CO., INC. | : | |
| | : | |
| Defendants. | : | |
| | : | |
| and | : | **LOCAL RULE 56.1 COUNTER-** |
| | | **STATEMENT OF MATERIAL** |
| | : | **FACTS IN OPPOSITION TO** |
| SOMERVILLE FIDELCO ASSOCIATES, | : | **SCOTTSDALE INSURANCE** |
| L.P. | | **COMPANY'S MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| Third Party Plaintiff, | | |
| | : | |
| v. | : | |
| | : | |
| QUINCY MUTUAL FIRE INSURANCE | | |
| COMPANY and AMERICAN HOME | : | |
| ASSURANCE COMPANY, | | |
| | : | |
| Third Party Defendants. | | |
| | : | |

---

In Opposition to the Motion for Summary Judgment submitted by Scottsdale Insurance

Company ("Scottsdale"), Defendant Somerville Fidelco Associates, L.P. ("Fidelco") submits the

following Counter-Statement of Material Facts[1]:

    1.     Undisputed.

    2.     Undisputed.

---

[1] Fidelco objects to the four page unannotated introductory narrative which Scottsdale includes at the beginning of its Statement of Material Facts as this does not comport with the court rules and should have been part of Scottsdale's brief. In addition, many of the factual statements are included which do not reference exhibits.

3.     Undisputed.

4.     Undisputed.

5.     Disputed. Fidelco entered into a written contract with Badger Roofing Co., Inc. ("Badger") to remove the existing roof and replace it. The contract consisted of Badger's written proposal which was signed and accepted by Barry Ages on behalf of Fidelco on July 14, 2005. In addition, Robert Hanley of Badger forwarded an AIA form Contract incorporating the proposal and the numerous terms and conditions of AIA Document A201-1997 to Mr. Ages under cover of a letter dated August 3, 2005. The general conditions include a requirement that the contractor obtain insurance. (Matloff Cert. and Exhibit 2, 3, and 4)

6.     Disputed, insofar as Fidelco asserts that the Certificates, together with the signed written proposal to perform the work, are indicative of an agreement in writing "that such person or organization be added as an additional insured on your policy" pursuant to policy endorsement CG2033(07/04) entitled Additional Insured – Owners, lessees or Contractors – Automatic Status When Required in a Construction Agreement with You." Fidelco contends that Badger did not gratuitously request that the insurance agent provide a Certificate of Insurance to Fidelco. In addition, the AIA contract general conditions clearly satisfy policy endorsement CG2033(07/04). (See Exhibits A, B and C to Gebauer Certification.)

7.     Disputed, insofar as there is a factual issue as to whether True & Associates had a actual or apparent authority to issue the Certificates thereby rendering them binding upon Scottsdale. See Exhibit C to Gebauer Cert.

8.     Undisputed.

9.     Undisputed.

10.     Disputed. It is unclear when each of the Certificates was issued, as some are undated although there is one dated June 29, 2006. However, the Arbitration Demand was not served until August 6, 2006. Thus no claim had been asserted and no damages had been determined when the certificate was issued. See Exhibit C to Gebauer Cert and Exhibit 8 to Matloff Cert.

11.     Disputed. It is unclear when each of the Certificates was issued, as some are undated although there is one dated June 29, 2006. See Exhibit C to Gebauer Cert.

12.     Disputed, it is unknown whether this fax sheet was the first request for issuance of a Certificate of Insurance and there have been no depositions of any Badger employees in this case. Hence, this is a disputed issue of fact.

13.     Undisputed.

14.     Undisputed.

15.     Undisputed.

16.     Disputed, Scottsdale is oversimplifying the applicable policy language.

17.     Undisputed.

18.     Undisputed.

19.     Undisputed.

20.     Undisputed.

21.     Undisputed.

22.     Undisputed.

23.     Undisputed.

24.     Undisputed.

25.     Disputed. Fidelco entered into a written contract with Badger Roofing Co., Inc. ("Badger") to remove the existing roof and replace it. The contract consisted of Badger's written proposal, which was signed and accepted by Barry Ages on behalf of Fidelco on July 14, 2005. In addition, Robert Hanley of Badger forwarded an AIA form Contract incorporating the proposal and the numerous terms and conditions of AIA Document A201-1997 to Mr. Ages under cover of a letter dated August 3, 2005. The general conditions include a requirement that the contractor obtain insurance. (Matloff Cert. and Exhibits 2, 3 and 4)

26.     Undisputed.

27.     Disputed insofar as this represents Scott Badgers testimony and it is unknown whether he would have acted differently.

28.     Undisputed.

29.     Undisputed.

30.     Disputed.  The testimony of Scott Badger referenced in this paragraph describe the methods taken by Badger to minimize dust infiltration and the tools he used but have no reference to whether or not these methods would prevent or not prevent asbestos contamination if indeed asbestos was present.

31.     Undisputed.

32.     Undisputed.

33.     Undisputed.

34.     Undisputed.

35.     Undisputed.

36.     Undisputed.

37.     Undisputed; however, Slavco's representative testified that he merely assumed that the roofing material contained asbestos and never tested to see whether or not it did. (See Matloff Cert. and Exhibit 9 ,Solakov dep. at 35-37)

38.     Undisputed; however, Slavco's representative testified that he merely assumed that the roofing material contained asbestos. (See Matloff Cert. and Exhibit 9)

39.     Undisputed.

40.     Undisputed.

41.     Undisputed.

42.     Undisputed.

43.     Undisputed.

44.     Undisputed.

45.     Undisputed, however the facts did not bear out BMS's concern that the Facility was contaminated with asbestos.

46.     Undisputed, however the facts did not bear out BMS's concern that the Facility was contaminated with asbestos.

47.     Disputed, Fidelco's retention of Slavco was motivated by the desire to maintain good relations with its tenant rather than any belief that there was a need for asbestos abatement. Fidelco indicated to the Tenant in a November 4, 2005 letter that: "It has been established that the debris that fell during the prior roof removal activity was interior dust dislodged during the removal. Such material did not contain asbestos and did not come from the exterior. Mr. Ages testified in deposition that the letter was prepared by Slavco and he signed it simply so the work could get underway. (Gebauer Cert. Exhibit K at pages 56-57; Matloff Cert. and Exhibits 5 and 6)

48.     Undisputed.

49.     Disputed, insofar as it was only two bulk debris samples that tested positive.

50.     Undisputed.

51.     Undisputed.

52.     Undisputed.

53.     Undisputed.

54.     Undisputed.

55.     Undisputed.

56.     Disputed, insofar as it is uncontested that any additional dust entering the building at that time did not test positive for asbestos. (Gebauer Cert. Exhibit Y, 35:21-36:5)

57.     Undisputed.

58.     Undisputed.

59.     Undisputed.

60.     Disputed, because it is clear that it was dust infiltration which prompted to actions taken by BMS. Barbara Owen was employed with the Environmental Health and Safety Department for BMS. She testified in a deposition taken in connection with the arbitration proceeding, regarding concerns expressed by John Deck, who was responsible for the overall operations of the site, stating: "It became an EHS issue when he saw the concentration of the dust and the extent of the debris that was falling in which he didn't anticipate. Then it became an EHS issue. Then he started thinking now we are talking about concentrations that could affect at this point he was worried about the people, concentrations that could affect the people. The monkey rooms again were hepa filtered and hopefully protected . . . Right, and then also you have the issue of what are they tracking into the monkey rooms and what are the monkeys being exposed to. He escalated it to EHS because it became a concern." Thus, although they took a conservative approach and assumed asbestos was throughout the building they began taking extraordinary measure before getting test results of any type. (See Exhibit X to Gebauer Cert Owen dep. p.18)

61.     Undisputed.

62.     Undisputed.

63.     Undisputed.

64.     Undisputed, but it should be noted that no asbestos was ever discovered in connection with the second phase cleaning.

65.     Disputed only insofar as Scottsdale attempts to characterize the events preceding the demand for arbitration.

66.     Disputed insofar as there was no exposure to asbestos; however, Scottsdale accurately quotes from BMS's letter.

67.     Undisputed.

68.     Undisputed.

69.     Undisputed.

70.     Undisputed, however it was only in two bulk samples and was non-friable.

71.     Disputed, insofar as SF repeatedly requested coverage and provided evidence as discovery continued during the arbitration that called for a reevaluation by Scottsdale of its coverage decision. However, Scottsdale never reevaluated. (See Matloff Cert. and Exhibits 14 through 28, especially Exhibit 20)

72.     Disputed, insofar as SF contends it had a written contract, and Scottsdale never indicated prior to litigation that it was denying on the basis that Scottsdale believed this was damages arising from a breach of contract.

73.     Undisputed.

74.     Undisputed.

75.     Undisputed insofar as Scottsdale is merely characterizing its pleading.

76.     Undisputed insofar as Scottsdale is merely characterizing its pleading.

77.     Undisputed insofar as Scottsdale is merely characterizing its pleading.

78.     Undisputed insofar as Scottsdale is merely characterizing its pleading.

79.     Undisputed insofar as Scottsdale is merely characterizing its pleading.

80.     Undisputed insofar as Scottsdale is merely characterizing its pleading.

81.     Disputed, insofar as Scottsdale characterization is incomplete because SF also filed a crossclaim against Badger set forth in three counts seeking damages against Badger for breach of its contract, negligence and indemnification. Badger is seeking coverage from Scottsdale with respect to this crossclaim which Scottsdale has also denied.

82.     Undisputed.

**Additional Material Facts in Dispute**

1.     Fidelco owns commercial property located at 76 Fourth Street which it leased to BMS pursuant to a written lease and various lease extensions. (Matloff Cert. and Exhibit 1)

2.     BMS used the facility for the housing of monkeys used in drug testing at other BMS facilities. (Matloff Cert. and Exhibit 13)

3.     The roof on the building was in need of repair and Fidelco entered into a written contract with Badger Roofing Co., Inc. ("Badger") to remove the existing roof and replace it. The contract consisted of Badger's written proposal, which was signed and accepted by Barry Ages on behalf of Fidelco on July 14, 2005. In addition, Robert Hanley of Badger forwarded an AIA form Contract incorporating the proposal and the numerous terms and conditions of AIA Document A201-1997 to Mr. Ages under cover of a letter dated August 3, 2005. The general conditions include a requirement that the contractor obtain insurance. (Matloff Cert. and Exhibits 2, 3, and 4)

4.     On September 22, 2005, just a short time after the work commenced, BMS demanded that Badger cease work because of the amount of dust and debris from the roof work that was entering the interior of the facility. (Matloff Cert. and Exhibits 5 and 12)

5.     Barbara Owen was employed with the Environmental Health and Safety Department for BMS. She testified in a deposition taken in connection with the arbitration proceeding, regarding concerns expressed by John Deck, who was responsible for the overall operations of the site, stating: "It became an EHS issue when he saw the concentration of the dust and the extent of the debris that was falling in which he didn't anticipate. Then it became an EHS issue. Then he started thinking now we are talking about concentrations that could affect at this point he was worried about the people, concentrations that could affect the people. The monkey rooms again were hepa filtered and hopefully protected . . . Right, and then also you have the issue of what are they tracking into the monkey rooms and what are the monkeys being exposed to. He escalated it to EHS because it became a concern." Thus it was clear that dust infiltration having nothing to do with asbestos prompted the measures taken by BMS. (See Exhibit X to Gebauer Cert., Owen dep. p.18)

6.     BMS was concerned that the dust might contain asbestos; Fidelco retained an asbestos abatement company known as Slavco Construction Inc. to complete the removal using state of the art methods and precautions approved by BMS, including asbestos abatement measures, air monitoring and plastic sheathing on the interior of the facility.  The remainder of the roof was removed and replaced Between December 16 and December 19, 2005. (Matloff Cert. and Exhibit 12)

7.     Fidelco's retention of Slavco was motivated by the desire to maintain good relations with its tenant rather than any belief that there was a need for asbestos abatement. Fidelco indicated to the Tenant in a November 4, 2005 letter that: "It has been established that the debris that fell during the prior roof removal activity was interior dust dislodged during the removal. Such material did not contain asbestos and did not come from the exterior. . . While

tenant has indicated its responsibility to clean the building, it has not yet done so." (Matloff Cert. and Exhibit 6)

8.     BMS responded in its November 11, 2005 letter, contesting its responsibility for cleaning the building and indicating that "adverse impacts, including costs and expenses, that have resulted from the debris and dust that is in the interior of the leasehold, which is affecting BMS's ability to use the leasehold for the purpose for which it was intended. . ." (Matloff Cert. and Exhibit 49)

9.     Air sampling done for BMS did not detect asbestos above permissible exposure limits. (Gebauer Cert. Exhibit X at p 52; Matloff Cert. and Exhibits 11 and 20)

10.     In an overabundance of caution, BMS undertook a complete cleaning and dust removal process using licensed asbestos workers and asbestos abatement protocols, which was done in two phases. In the second phase, BMS embarked on a massive cleanup and reconstruction of its facility which took from January until spring 2006 to complete and included the removal, disposal and reconstruction of interior ceilings, lighting, painting, etc. BMS claimed that it cost them $225,000 to "board" monkeys which they were supposed to take for delivery during this entire time period. In various letters BMS also sought rent abatement for a six month period. (Matloff Cert. and Exhibit 11 and 20)

11.     It is uncontested that despite continued testing no asbestos of any type, even in bulk samples, was discovered during the second phase of the cleanup. Barbara Owen testified that the second phase of the cleaning was premised on the assumption that the materials contained asbestos. ( Gebauer Cert. Exhibit X, p. 57-58; Matloff Cert. and Exhibits 11 and 12)

12.     Robert Post, who was a facility supervisor for BMS testified in a depositions taken in connection with the arbitration that, during the second phase of the clean up, the ceiling tiles and grids, lighting and ventilation system were all removed and replaced. (Post dep. at 37-40, 47-48) The security personnel were not permitted in the building during the cleanup so BMS rented an SUV for the security personnel to sit in front of the facility and paid for them to have cell phones. (See Exhibit 10 to Matloff Cert., Post dep. at 46-47)

13.     On August 6, 2006, BMS served Fidelco with a demand for arbitration seeking to recover the costs for damages to its property and loss of use of the property allegedly caused by Badger in removing the roof. BMS's initial demand sought $734,175 in damages. (Matloff Cert. and Exhibit 8)

14.     On August 17, 2006, Fidelco's counsel requested coverage, including defense and indemnification, from Scottsdale by way of letter enclosing the arbitration demand and letter under the Scottsdale policy BCS0010238 issued to Badger. (Matloff Cert. and Exhibit 14)

15.     No response was received, hence Fidelco's counsel followed up with a second request on October 17, 2006. (Matloff Cert. and Exhibit 15)

16.     On November 28, 2006 Fidelco's counsel wrote to Scottsdale again memorializing a telephone conversation wherein Mr. Kent Riggs of Scottsdale advised that he would review the file and get back to her. (Matloff Cert. and Exhibit 16)

17.     When no response was received Fidelco's counsel inquired in writing again on January 5, 2007. (Matloff Cert. and Exhibit 17)

18.     Another letter was sent to Mr. Riggs on January 30, 2007 by Fidelco's counsel because the prior requests had been ignored. (Matloff Cert. and Exhibit 18)

19.     Finally, on January 31, 2007 Mr. Riggs responded denying coverage claiming that Fidelco did not qualify as an additional insured and indicating that the policy excluded coverage for asbestos related claims. (Matloff Cert. and Exhibit 19)

20.     On March 14, 2007 counsel for Fidelco wrote back to Mr. Riggs requesting that he reconsider its coverage position based upon "information that has been learned in discovery regarding the plaintiff's alleged damages." (Matloff Cert. and Exhibit 20)

21.     This letter enclosed five exhibits produced during the arbitration by BMS's expert, Eagle Industrial Hygiene Associates, Inc. as well as a spreadsheet of plaintiff's alleged damages prepared by BMS and the Accord Certificate of Liability Insurance showing that Fidelco was an additional insured on Badger's policy. (Matloff Cert. and Exhibit 20)

22.     As explained to Scottsdale by Fidelco's counsel in this letter:
"It has been learned through discovery that while samples taken from the roofing material itself did contain asbestos, none of the air samples or vacuum samples taken within the building contained any asbestos requiring asbestos abatement. The original sampling in September 2005 detected asbestos in two out of four samples of the roofing material at levels of 5% and 10%, but significantly no asbestos was found in the air samples or in the vacuum samples. See letter dated September 29, 2005 annexed hereto as Exhibit 1. Results from air sampling that was done in October 2005 also were all found to be "non detected for asbestos structures." See letter dated November 15, 2005 annexed hereto as Exhibit 2. Sampling taken in December 2005, during the second phase of the roof replacement, air indicated that there was "no airborne asbestos hazard" and sampling of the roof material demolition debris found in the Building at that time was "negative for asbestos content". See letter dated January 26, 2006 annexed hereto as Exhibit 3. Based upon this information provided by Bristol-Myers, the majority of the damages sought by the plaintiff are for (1) clean-up and removal of dust and other materials, which did not contain asbestos and replacement of damaged walls, ceilings and floors, and (2) boarding of monkeys because the Building could not be used. While Bristol-Myers initially characterized this claim as one involving asbestos, the reality is that the materials that allegedly were released in the Building were dust, which did not contain asbestos." (Matloff Cert. and Exhibit 20)

23.     As part of this letter, Fidelco's counsel explained the items on the spreadsheet of damages provided by BMS, annexed to the letter as Exhibit 4. $214,878.80 was invoiced for "monkey boarding during November 2005 to March 2006 because the Building could not be used during the clean-up work which was necessary to remove the dust and not because of any

asbestos." Counsel also explained that "Other costs on plaintiff's spreadsheet are for trailers, replacement of tile, new ceiling grids, new ceilings, new tiles, painting, new air filters, diffusers, collars, dampers and ducts –one of which were required because of asbestos, but only because of alleged property damage from dust that did not contain asbestos." In this letter counsel explained that the insured had a reasonable expectation of coverage. Counsel also provided Scottsdale with an update as to upcoming dates for the arbitration hearing. (Matloff Cert. and Exhibit 20)

24.     No response was received from Scottsdale so Fidelco's counsel again requested reconsideration of the coverage decision and reminded Mr. Riggs that the arbitration was scheduled to commence on April 17, 2007 in a letter dated April 5, 2007. (Matloff Cert. and Exhibit 21)

25.     On April 24, 2007, coverage counsel for Scottsdale wrote to Fidelco's counsel indicating that the certificates of insurance did not demonstrate that Fidelco was an additional insured and requesting additional documentation. (Matloff Cert. and Exhibit 22)

26.     On April 26, 2007, counsel for Fidelco memorialized a voice mail message, advising Scottsdale that settlement was imminent and indicating that if no objection was received by Friday April 27, 2007 the settlement would be consummated. (Matloff Cert. and Exhibit 23)

27.     Coverage counsel wrote back that same date indicating that it could not consent. (Matloff Cert. and Exhibit 24)

28.     On April 27, 2007 Fidelco's counsel wrote back to Scottsdale indicating that it was only on April 24, 2007 that Scottsdale indicated that it was requesting a copy of a contract showing that Fidelco was an additional insured. She stated: "We do not understand your position. The Certificate of Insurance enclosed with my March 14,2007 letter itself qualifies as a written agreement that Fidelco was to be named as an additional insured on Badger's insurance policy. She again requested that Scottsdale confirm that they would not take the position that the settlement violated the insurance contract. (Matloff Cert. and Exhibit 25)

29.     On April 27, 2007 coverage counsel again indicated that it would not consent and stated: "It appears clear that Fidelco does not have the requisite contract or agreement. If that conclusion is incorrect please forward the relevant documents to Scottsdale immediately." (Matloff Cert. and Exhibit 26)

30.     On May 1, 2007 coverage counsel for Scottsdale wrote to Fidelco's counsel memorializing a telephone conversation wherein Fidelco's counsel indicated that a construction contract between Fidelco and Badger may exist. Coverage counsel then consented to the settlement under a reservation of rights. (Matloff Cert. and Exhibit 27)

31.     On May 3, 2007 counsel for Fidelco responded to each statement in Scottsdale's previous letter noting that it was only by letter dated April 24, 2007 received April 26, 2007 that Fidelco

was made aware that the Certificate of Insurance was being rejected as sufficient evidence of coverage by Scottsdale. (Matloff Cert. and Exhibit 28)

32.     In addition to the Certificates of Insurance, Fidelco had entered into a written contract with Badger consisting of Badger's written proposal which was signed and accepted by Barry Ages on behalf of Fidelco on July 14, 2005. In addition, Robert Hanley of Badger forwarded  an AIA form Contract incorporating the proposal and the numerous terms and conditions of AIA Document A201-1997 to Mr. Ages under cover of a letter dated August 3, 2005. The general conditions include a requirement that the contractor obtain insurance. These documents considered together clearly satisfy the requirement of the Scottsdale endorsement with respect to additional insurance. In addition, the Certificates of Insurance show that Badger agreed that Fidelco had the right to be an additional insured under Badger's policy with Scottsdale. (Matloff Cert. and Exhibit 2, 3 and 4)

33.     BMS settled with Fidelco and BMS was paid a total of $575,000 in settlement. Fidelco incurred approximately $122,862.41 in legal fees to defend itself in the arbitration proceeding. (Matloff Cert. and Exhibit 43 and 48)

34.     Scottsdale has continued with its refusal  to defend or indemnify and commenced the instant declaratory judgment action. Fidelco answered and counterclaimed, cross-claimed against Badger and third partied in Quincy and AHA.

35.     Despite numerous letters back and forth between Scottsdale and Fidelco's counsel the only basis for denial of Fidelco's claim ever raised was the asbestos exclusion and the additional insured issue. All the additional exclusions now raised by way of this litigation/summary judgment motion were not raised previously by Scottsdale.(See Matloff Cert. and Exhibits 19, 22, 24, 26 and 27)

NAGEL RICE, LLP
Attorneys for Somerville Fidelco LP

By:    _____
                JAY J. RICE

Dated: 12/7/09