UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>SOMERVILLE FIDELCO ASSOCIATES,<br>L.P. and BADGER ROOFING CO., INC.<br><br>Defendants.<br><br>and<br><br>SOMERVILLE FIDELCO ASSOCIATES,<br>L.P.<br><br>Third Party Plaintiff,<br><br>v.<br><br>QUINCY MUTUAL FIRE INSURANCE<br>COMPANY and AMERICAN HOME<br>ASSURANCE COMPANY,<br><br>Third Party Defendants. | CIVIL ACTION NO. 3:07-cv-02763<br>(AET) (TJB)<br><br><br><br><br><br><br><br><br>**LOCAL RULE 56.1 COUNTER-STATEMENT OF MATERIAL FACTS IN OPPOSITION TO QUINCY MUTUAL'S MOTION FOR SUMMARY JUDGMENT** |

In Opposition to the Motion for Summary Judgment submitted by Quincy Mutual Insurance Company, ("Quincy) Defendant Somerville Fidelco Associates, L.P. ("Fidelco") submits the following Counter-Statement of Material Facts:

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Undisputed.

6. Undisputed

7. Undisputed.

8. Undisputed.

9. Disputed insofar as Quincy attached an uncertified copy of the Policy to its motion papers and the Certified Copy of the Policy, supplied after several requests were made, does not contain all of the same exclusions. While Quincy's counsel has indicated in a telephone conversation that errors were made in the Certified copy of the policy the discrepancies have not been resolved. See Matloff Cert. ¶30 and Exhibit 29

10. Undisputed.

11. Disputed. The Certified Copy of the Quincy Policy does not contain any asbestos exclusion. See Matloff Cert. ¶30 and Exhibit 29.

12. Disputed, insofar as Bristol Myers Squibb's ("BMS") arbitration demand characterized the claim as indicated by Quincy; however, facts subsequently developed established that this was an inaccurate characterization. See Matloff Cert. and Exhibit 35.

13. Undisputed.

14. Disputed, insofar as Quincy implies that BMS's including an argument in its arbitration brief makes it so.

15. Disputed, insofar as Quincy implies that BMS's including an argument in its arbitration brief makes it so.

16. Disputed, insofar as Quincy implies that BMS's including an argument in its arbitration brief makes it so.

17. Disputed, insofar as Quincy implies that BMS's including an argument in its arbitration brief makes it so. Undisputed that Slavco was retained at BMS's insistence.

18. Disputed, insofar as Quincy implies that BMS's including an argument in its arbitration brief makes it so.

19. Disputed, insofar as Quincy implies that BMS's including an argument in its arbitration brief makes it so.

20. Disputed, insofar as Quincy implies that BMS's including an argument in its arbitration brief makes it so.

21.     Disputed, insofar as Quincy implies that BMS's including an argument in its arbitration brief makes it so.

22.     Disputed, insofar as Quincy implies that BMS's including an argument in its arbitration brief makes it so. Further the total amount actually invoiced for asbestos debris cleanup was $79,240. See Exhibit 35, at Atachment 4 to Matloff Cert.

23.     Undisputed; however, it must be noted that this cost would be incurred whether or not asbestos was present at the facility.

24.     Undisputed; however, it must be noted that this cost would be incurred whether or not asbestos was present at the facility.

25.     Disputed, insofar as these figures changed and are more accurately reflected in Exhibit 35 to Matloff Cert.

26.     Disputed, insofar as these figures changed and are more accurately reflected in Exhibit 35 to Matloff Cert.

27.     Disputed insofar as this letter was drafted by Slavco personnel and merely signed by Mr. Agee so that the roof could be finished. (See Exhibit 20 to Quincy Motion, Ages dep. at p. 56)

28.     Undisputed.

29.     Undisputed.

30.     Disputed. Quincy misstates the express conclusions of Eagle's report. Eagle actually indicates that: "<u>It is alleged</u> that asbestos-containing roofing materials contaminated the interior spaces of the Bristol Myers Squibb facility. . . ." Mr. Crawford of Eagle never opines that this allegation is confirmed. Rather, his expert opinion results in the conclusions that Badger and Fidelco deviated from the applicable standard of care and that BMS did not deviate from the standard of care because "it was appropriate for BMS to approve a scope of work that required BEI to treat all of the dust and debris that entered the facility as though they were materials that contained asbestos that was, or could be, rendered friable." (See Exhibit 10 to Quincy Motion, Eagle March 7, 2007 report at p. 14.)

31.     Disputed. Eagle states at page 4 of Exhibit 19: " Eagle Industrial Hygiene Associates, Inc. conducted an initial evaluation of 76 Fourth Street on September 24, 2005 at the request of Barbara Owen. At this time, areas contaminated with material consistent with roofing debris were identified and a variety of samples for the presence of asbestos collected. Six (6) air samples, seven (7) surface samples of settled dust and four (4) bulk samples of debris were collected during the evaluation. The air samples were collected during the initial clean-up of debris by Bristol Environmental. Eagle's sample analysis indicated that there was no asbestos detected above the laboratory quantification limit in any air sample or surface sample of settled dust. Two(2) of the four(4) samples of bulk roofing material debris were found to contain

Chrysotile asbestos." As noted in William Kerbel's report, roof material is considered non friable asbestos and is not hazardous in bulk form. (See Exhibit 11 to Matloff Cert.)

32. Disputed, insofar as Eagle's conclusion relate to whether or not BMS was going overboard in its clean-up of the facility, not concluding that friable asbestos was present in the facility.

33. Undisputed, that this was Eagle's conclusion.

34. Undisputed.

35. Undisputed.

36. Undisputed.

37. Undisputed.

38. Undisputed.

39. Undisputed.

40. Undisputed.

41. Undisputed.

42. Undisputed.

43. Disputed, insofar as the sampling testing positive for asbestos were bulk roofing samples which do not contain friable asbestos and are harmless. (Burkhardt dep at 17-21 attached as Exhibit 21 to Quincy Motion)

44. Undisputed, however, samples from the roof were on the roof, not in the facility.

45. Disputed, insofar as Mr. Burkhardt continued his answer to state: "That could potentially be dangerous. That's a relative type of –you know, it's dangerous when you go out and walk across the street too, but it's all relative." (Burkhardt dep at 40 attached as Exhibit 21 to Quincy Motion)

46. Undisputed that the cleaning procedures followed those used for hazardous material but that is irrelevant to this case.

47. Undisputed.

48. Disputed, insofar as the question of which party had the responsibility to fix the roof became an issue in the arbitration. (See Exhibit 14 to Quincy Motion at p. 17-19.)

49. Undisputed.

50. Undisputed.

51. Undisputed.

52. Undisputed.

53. Undisputed.

54. Undisputed.

55. Undisputed.

56. Disputed, insofar as the inability to house the monkeys had nothing to do with asbestos but rather had to do with the general cleanup of the facility. Mr. Deck testified, when asked why he could not take delivery of the 200 monkeys that had been ordered: "Because for the clean-up process we wouldn't, with rooms being torn down for clean-up, we wouldn't have space to house them." (See Deck Deposition, at p. 51, Exhibit 23 to Quincy Motion) This second phase of the cleanup did not take place until December 2005/January 2006 and it is uncontested that every test performed after September 2005 was negative for asbestos. (See Kerbel report annexed as Exhibit 11 to Matloff Cert.)

57. Undisputed.

58. Undisputed.

59. Undisputed.

60. Disputed, insofar as Ms. Owen clarified in her deposition that they called in Eagle Industrial and Bristol Environmental and instituted a full asbestos protocol based only upon the results of bulk samples of debris collected from the dumpster outside the facility. (See Exhibit 24 to Quincy Motion, Owen dep. p.18-21)

61. Undisputed.

62. Disputed, insofar as Fidelco's expert has opined that these procedures were unnecessary and this is merely Ms. Owen's testimony. (See Kerbel report annexed as Exhibit 11 to Matloff Cert.)

63. Disputed, insofar as Fidelco's expert has opined that these procedures were unnecessary and this is merely Ms. Owen's testimony. (See Kerbel report annexed as Exhibit 11 to Matloff Cert.)

64. Disputed, insofar as Fidelco's expert has opined that these procedures were unnecessary and this is merely Ms. Owen's testimony. (See Kerbel report annexed as Exhibit 11 to Matloff Cert.)

65. Disputed, insofar as Fidelco's expert has rendered a contrary opinion and this is merely Ms. Owen's testimony. (See Kerbel report annexed as Exhibit 11 to Matloff Cert.)

66. Disputed, insofar as Fidelco's expert has rendered a contrary opinion and this is merely Ms. Owen's testimony. (See Kerbel report annexed as Exhibit 11 to Matloff Cert.)

67. Disputed, insofar as Fidelco's expert has rendered a contrary opinion and this is merely Ms. Owen's testimony. (See Kerbel report annexed as Exhibit 11 to Matloff Cert.)

68. Disputed, insofar as Fidelco's expert has rendered a contrary opinion and this is merely Ms. Owen's testimony. (See Kerbel report annexed as Exhibit 11 to Matloff Cert.)

69. Undisputed.

70. Undisputed.

71. Undisputed.

72. Undisputed.

73. Disputed, insofar as Mr. Solakov indicated that they assumed there is asbestos they did not do any testing. (Exhibit 26 to Quincy Motion, Solakov dep. at 35-37)

74. Disputed, insofar as Mr. Solakov indicated that they assumed there is asbestos they did not do any testing. (Exhibit 26 to Quincy Motion, Solakov dep. at 35-37)

75. Disputed. When Quincy was first notified of this claim they denied coverage based upon "late notice" on August 10, 2006. When Fidelco's coverage counsel resubmitted the claim is was denied on November 17, 2006 based upon an asbestos exclusion and then denied a third time based upon the owned property exclusion. (See Matloff Cert. and Exhibits 31, 34, and 36)

76. Disputed. When Quincy was first notified of this claim they denied coverage based upon "late notice" on August 10, 2006. When Fidelco's coverage counsel resubmitted the claim is was denied on November 17, 2006 based upon an asbestos exclusion and then denied a third time based upon the owned property exclusion. (See Matloff Cert. and Exhibits 31, 34 and 36)

77. Undisputed.

78. Undisputed, as Fidelco has asserted a multi-count cross claim against Badger for, *inter alia*, its negligence.

79. Undisputed.

**Additional Material Facts in Dispute**

1. Fidelco owns commercial property located at 76 Fourth Street which it leased to BMS pursuant to a written lease and various lease extensions. (Matloff Cert. and Exhibit 1)

2. BMS used the facility for the housing of monkeys used in drug testing at other BMS facilities. (Matloff Cert. and Exhibit 13)

3. The roof on the building was in need of repair and Fidelco entered into a written contract with Badger Roofing Co., Inc. ("Badger") to remove the existing roof and replace it. (Matloff Cert. and Exhibit 13)The contract consisted of Badger's written proposal which was signed and accepted by Barry Ages on behalf of Fidelco on July 14, 2005. In addition, Robert Hanley of Badger forwarded an AIA form Contract incorporating the proposal and the numerous terms and conditions of AIA Document A201-1997 to Mr. Ages under cover of a letter dated August 3, 2005. The general conditions include a requirement that the contractor obtain insurance. (Matloff Cert. and Exhibits 2, 3, and 4)

4. On September 22, 2005, just a short time after the work commenced, BMS demanded that Badger cease work because of the amount of dust and debris from the roof work that was entering the interior of the facility. (Matloff Cert. and Exhibits 5 and 12)

5. Barbara Owen was employed with the Environmental Health and Safety Department for BMS. She testified in a deposition taken in connection with the arbitration proceeding, regarding concerns expressed by John Deck, who was responsible for the overall operations of the site, stating: "It became an EHS issue when he saw the concentration of the dust and the extent of the debris that was falling in which he didn't anticipate. Then it became an EHS issue. Then he started thinking now we are talking about concentrations that could affect at this point he was worried about the people, concentrations that could affect the people. The monkey rooms again were hepa filtered and hopefully protected . . . Right, and then also you have the issue of what are they tracking into the monkey rooms and what are the monkeys being exposed to. He escalated it to EHS because it became a concern." Thus, it is clear that dust infiltration having nothing to do with asbestos prompted the measures taken by BMS. (See Exhibit 24 to Quincy Motion, Owen dep. p.18)

6. BMS was concerned that the dust might contain asbestos; Fidelco retained an asbestos abatement company known as Slavco Construction Inc. to complete the removal using state of the art methods and precautions approved by BMS, including asbestos abatement

measures, air monitoring and plastic sheathing on the interior of the facility. The remainder of the roof was removed and replaced Between December 16 and December 19, 2005. (Matloff Cert. and Exhibit 12)

7. Fidelco's retention of Slavco was motivated by the desire to maintain good relations with its tenant rather than any belief that there was a need for asbestos abatement. Fidelco indicated to the Tenant in a November 4, 2005 letter that: "It has been established that the debris that fell during the prior roof removal activity was interior dust dislodged during the removal. Such material did not contain asbestos and did not come from the exterior. . . While tenant has indicated its responsibility to clean the building, it has not yet done so." (Matloff Cert. and Exhibit 6)

8. BMS responded in its November 11, 2005 letter, contesting its responsibility for cleaning the building and indicating that "adverse impacts, including costs and expenses, that have resulted from the debris and dust that is in the interior of the leasehold, which is affecting BMS's ability to use the leasehold for the purpose for which it was intended. . ." At some point BMS demanded a rent abatement for six months in the amount of $72,000. (Matloff Cert. and Exhibits 13 and 49)

9. Air sampling done for BMS did not detect asbestos above permissible exposure limits. (Matloff Cert. and Exhibit 11 and 35; Exhibit 24 to Quincy Motion, Owen dep. p52)

10. In an overabundance of caution, BMS undertook a complete cleaning and dust removal process using licensed asbestos workers and asbestos abatement protocols, which was done in two phases. In the second phase, BMS embarked on a massive cleanup and reconstruction of its facility which took from January until April 2006 to complete and included the removal, disposal and reconstruction of interior ceilings, lighting, painting, etc. BMS claimed that it cost them $225,000 to "board" monkeys which they were supposed to take for delivery during this entire time period. (Matloff Cert. and Exhibit 35)

11. It is uncontested that despite continued testing no asbestos of any type, even in bulk samples, was discovered during the second phase of the cleanup. Barbara Owen testified that the second phase of the cleaning was premised on the assumption that the materials contained asbestos. (Matloff Cert. and Exhibits 11 and 12; Exhibit 24 to Quincy Motion, Owen dep. p 57-58)

12. Robert Post, who was a facility supervisor for BMS testified in a depositions taken in connection with the arbitration that, during the second phase of the clean up, the ceiling tiles and grids, lighting and ventilation system were all removed and replaced. (Post dep. at 37-40, 47-48) The security personnel were not permitted in the building during the cleanup so BMS rented an SUV for the security personnel to sit in front of the facility and paid for them to have cell phones. (See Exhibit 25 to Quincy Motion, Post dep. at 46-47)

13. On August 6, 2006, BMS served Fidelco with a demand for arbitration seeking to recover the costs for damages to its property and loss of use of the property allegedly caused by

Badger in removing the roof. BMS's initial demand sought $734,175 in damages. (Matloff Cert. and Exhibit 8)

14. Quincy Mutual Fire Insurance Company ("Quincy") is Fidelco's insurer. Quincy issued an insurance policy to Schenkman/Kushner Affiliates, which covers the subject premises and incident, with an effective date of May 30, 2005 to May 30, 2006 at an annual premium of $15,508.00. This included Commercial Property Coverage and General Liability Coverage. The Certified copy of the Policy provided by Quincy's counsel on November 9, 2009 does not contain the Absolute Asbestos Exclusion which Quincy has relied upon in bringing its motion for summary judgment. When the absence of the asbestos exclusion was brought to his attention, counsel for Quincy indicated in a telephone conversation that the insurer made a mistake when it prepared the certified copy of the policy. (Matloff Cert ¶30 and Exhibit29.)

15. A formal notice of claim was filed with Quincy on or about August 4, 2006 wherein the occurrence was described as follows: "Claimant alleges that because of insureds negligence they sustained a business income loss. Insured denies any liability." This notice was prepared the same date as the formal demand for arbitration by BMS. (Matloff Cert. and Exhibit 30)

16. On August 10, 2006 Quincy acknowledged receipt of the notice of claim but indicated that it was reserving its right to deny coverage due to "late notice. (Matloff Cert. and Exhibit 31)

17. Counsel for Fidelco objected to this late notice contention by way of correspondence dated September 7, 2006 and requested defense and indemnification. (Matloff Cert. and Exhibit 32)

18. When no response was received, counsel for Fidelco followed up with another letter requesting defense and indemnification on October 17, 2006. (Matloff Cert. and Exhibit 33)

19. On November 17, 2006 Quincy's Senior Claims Examiner, Mark Bissanti, finally responded and denied coverage again, this time relying upon to the Absolute Asbestos Exclusion. (Matloff Cert. and Exhibit 34)

20. On March 14, 2007 counsel for Fidelco wrote back to Mr. Bissanti requesting that he reconsider its coverage position based upon "information that has been learned in discovery regarding the plaintiff's alleged damages." (Matloff Cert. and Exhibit 35)

21. This letter enclosed four exhibits produced during the arbitration by BMS's expert, Eagle Industrial Hygiene Associates, Inc. as well as a spreadsheet of plaintiff's alleged damages prepared by BMS. (Matloff Cert. and Exhibit 35)

22. As explained to Quincy by Fidelco's counsel in this letter:
"It has been learned through discovery that while samples taken from the roofing material itself did contain asbestos, none of the air samples or vacuum samples taken within the building

contained any asbestos requiring asbestos abatement. The original sampling in September 2005 detected asbestos in two out of four samples of the roofing material at levels of 5% and 10%, but significantly no asbestos was found in the air samples or in the vacuum samples. See letter dated September 29, 2005 annexed hereto as Exhibit 1. Results from air sampling that was done in October 2005 also were all found to be "non detected for asbestos structures." See letter dated November 15, 2005 annexed hereto as Exhibit 2. Sampling taken in December 2005, during the second phase of the roof replacement, air indicated that there was "no airborne asbestos hazard" and sampling of the roof material demolition debris found in the Building at that time was "negative for asbestos content". See letter dated January 26, 2006 annexed hereto as Exhibit 3. Based upon this information provided by Bristol-Myers, the majority of the damages sought by the plaintiff are for (1) clean-up and removal of dust and other materials, which did not contain asbestos and replacement of damaged walls, ceilings and floors, and (2) boarding of monkeys because the Building could not be used. While Bristol-Myers initially characterized this claim as one involving asbestos, the reality is that the materials that allegedly were released in the Building were dust, which did not contain asbestos." (Matloff Cert. and Exhibit 35)

23. As part of this letter, Fidelco's counsel explained the items on the spreadsheet of damages provided by BMS, annexed to the letter as Exhibit 4. $214,878.80 was invoiced for "monkey boarding during November 2005 to March 2006 because the Building could not be used during the clean-up work which was necessary to remove the dust and not because of any asbestos." Counsel also explained that "Other costs on plaintiff's spreadsheet are for trailers, replacement of tile, new ceiling grids, new ceilings, new tiles, painting, new air filters, diffusers, collars, dampers and ducts –one of which were required because of asbestos, but only because of alleged property damage from dust that did not contain asbestos." In this letter counsel explained that the insured had a reasonable expectation of coverage. Counsel also provided Quincy with an update as to upcoming dates for the arbitration hearing. (Matloff Cert. and Exhibit 35)

24. On March 23, 2007 Claims Counsel for Quincy responded to the aforesaid letter again denying coverage under the asbestos exclusion and adding exclusion "j" as an additional basis for the denial of coverage. (Matloff Cert. and Exhibit 36)

25. On April 26, 2007 Fidelco's counsel again wrote to Quincy and advised of the imminent settlement of the arbitration proceeding. (Matloff Cert. and Exhibit 37)

26. On April 27, 2007 Quincy indicated via telephone and in writing that it would not consider the settlement to be a breach of the insurance contract although it was standing by its decision to deny coverage. (Matloff Cert. and Exhibits 38 and 39)

27. On the eve of the arbitration hearing, BMS settled with Fidelco and BMS was paid a total of $575,000 in settlement. Fidelco incurred approximately $122,862.41 in legal fees to defend itself in the arbitration proceeding. (Matloff Cert. and Exhibits 43 and 48)

28. On July 6, 2007, Pat Antonacci of Stockbridge Risk Management, who was engaged by Fidelco with respect to the insurance claims wrote to Quincy and requested a contribution for that portion of the loss which would be covered under the policy. (Matloff Cert. and Exhibit 40)

29.     On August 1, 2007 Quincy's Claims Counsel responded seeking additional information including an outline of damages. It must be noted that the damages breakdown had been previously provided as Exhibit 4 to the March 2007 letter. (Matloff Cert. and Exhibit 41)

30.     On September 20, 2007 Ms. Antonacci responded with additional documentation. (Matloff Cert. and Exhibit 42)

31.     Quincy never agreed to contribute to the settlement; hence they were added as Third Party Defendant in this litigation.

 

NAGEL RICE, LLP
Attorneys for Somerville Fidelco LP

By: _____
JAY J. RICE

Dated: 12/7/09