## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SCOTTSDALE INSURANCE COMPANY, | CIVIL ACTION NO. 3:07-cv-02763 (AET) (TJB) |
| Plaintiffs, |  |
| v. |  |
| SOMERVILLE FIDELCO ASSOCIATES, L.P. and BADGER ROOFING CO., INC. |  |
| Defendants. |  |
| and | **CERTIFICATION OF RANDEE M. MATLOFF IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT FILED BY SCOTTSDALE INSURANCE CO., QUINCY MUTUAL FIRE INSURANCE CO. AND AMERICAN HOME ASSURANCE CO.** |
| SOMERVILLE FIDELCO ASSOCIATES, L.P. |  |
| Third Party Plaintiff, |  |
| v. |  |
| QUINCY MUTUAL FIRE INSURANCE COMPANY and AMERICAN HOME ASSURANCE COMPANY, |  |
| Third Party Defendants. |  |

Randee M. Matloff, of full age, does hereby certify:

1.      I am an attorney at law of the State of New Jersey and counsel to Nagel Rice, LLP, attorneys for defendant, third party plaintiff, Somerville Fidelco, L.P. ("Fidelco" or "SF") as such I am fully familiar with the facts and circumstances stated herein. I submit this document identifying certification in opposition to the following three motions for summary judgment: (1) Motion for summary judgment by Scottsdale Insurance Company ("Scottssdale") , (2) Motion

for summary judgment by Quincy Mutual Fire Insurance Company ("Quincy") , and (3) Motion for summary judgment by American Home Assurance Company ("AHA").

2.      Annexed hereto as **Exhibit 1** is a true and correct copy of Lease between Fidelco and Bristol-Myers Squibb Company ("BMS").

3.      Annexed hereto as **Exhibit 2** is a true and correct copy of the written agreement between co-defendant Badger Roofing Company, Inc. and Fidelco.

4.      Annexed hereto as **Exhibit 3** is a true and correct copy of the AIA contract provided by Badger to Barry Ages of Fidelco dated August 13, 2005.

5.      Annexed hereto as **Exhibit 4** is a true and correct copy of the applicable AIA general contract provisions with respect to the contractor's obligation to provide liability insurance to the owner.

6.      Annexed hereto as **Exhibit 5** is a true and correct copy of Barry Ages September 5, 2005 notes.

7.      Annexed hereto as **Exhibit 6** is a true and correct copy of Fidelco's November 4, 2005 letter to BMS.

8.      Annexed hereto as **Exhibit 7** is a true and correct copy of a letter from Martin Dollinger, Fidelco's attorney, to Jack Chapman of BMS dated May 12, 2006.

9.      Annexed hereto as **Exhibit 8** is a true and correct copy of Charles Vinicombe's August 4, 2006 letter to the American Arbitration Association together with the Arbirtration demand on behalf of BMS.

10.      Annexed hereto as **Exhibit 9** is a true and correct copy of the deposition of Michael Solakov of Slavco Construction taken on February 9, 2007 in connection with the Arbitration between BMS and Fidelco.

11.     Annexed hereto as **Exhibit 10** is a true and correct copy of deposition of Robert Post taken on January 26, 2007 in connection with the Arbitration between BMS and Fidelco.

12.     Annexed hereto as **Exhibit 11** is a true and correct copy of the expert report of William S. Kerbel of Environmental Health Investigations, Inc. dated March 19, 2007 prepared in connection with the Arbitration between BMS and Fidelco.

13.     Annexed hereto as **Exhibit 12** is a true and correct copy of Fidelco's March 30, 2007 Arbitration letter brief.

14.     Annexed hereto as **Exhibit  13** is a true and correct copy of BMS's March 29, 2007 Arbitration letter brief.

15.     Annexed hereto as **Exhibit 14** is a true and correct copy of Ellen Silver's August 17, 2006 letter to the Claims Department of Scottsdale enclosing the Arbitration Demand and requesting defense and indemnification from Scottsdale on behalf of Fidelco as an additional insured under Badger's Policy.

16.     Annexed hereto as **Exhibit 15** is a true and correct copy of Ellen Silver's October 16, 2006 letter to Kent Riggs of Scottsdale on behalf of Fidelco following up and against requesting coverage.

17.     Annexed hereto as **Exhibit 16** is a true and correct copy of Ellen Silver's November 28, 2006 letter to Kent Riggs of Scottsdale on behalf of Fidelco following up and against requesting coverage.

18.     Annexed hereto as **Exhibit 17** is a true and correct copy of Ellen Silver's January 5, 2007 letter to Kent Riggs of Scottsdale on behalf of Fidelco following up and against requesting coverage.

19.     Annexed hereto as **Exhibit 18** is a true and correct copy of Ellen Silver's January 30, 2006 letter to Kent Riggs of Scottsdale on behalf of Fidelco following up and against requesting coverage.

20.     Annexed hereto as **Exhibit 19** is a true and correct copy of Kent Riggs January 31, 2007 letter to Ellen Silver denying coverage to Fidelco on behalf of Scottsdale.

21.     Annexed hereto as **Exhibit 20** is a true and correct copy of Ellen Silver's March 14, 2007 letter to Kent Riggs of Scottsdale on behalf of Fidelco following up and against requesting coverage and requesting that Scottsdale reconsider based upon information learned during discovery. As attachments to this letter Ms. Silver enclosed: 1. Letter dated September 29, 2005 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 2. Letter dated November 15, 2005 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 3. Letter dated January 26, 2006 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 4. Spreadsheet of BMS's alleged damages; 5. Accord Certificate of Liability Insurance provided on behalf of Badger.

22.     Annexed hereto as **Exhibit 21** is a true and correct copy of Ellen Silver's April 5, 2007 letter to Kent Riggs of Scottsdale on behalf of Fidelco against requesting coverage and advising of the date for the upcoming arbitration hearing.

23.     Annexed hereto as **Exhibit 22** is a true and correct copy of an April 24, 2007 letter from Scottsdale's coverage counsel to Ellen Silver, Fidelco's counsel.

24.     Annexed hereto as **Exhibit 23** is a true and correct copy of Ellen Silver's April 26, 2007 letter to Kent Riggs of Scottsdale.

25.     Annexed hereto as **Exhibit 24** is a true and correct copy of an April 26, 2007 letter from Scottsdale's coverage counsel to Ellen Silver, Fidelco's counsel.

26.     Annexed hereto as **Exhibit 25** is a true and correct copy of Ellen Silver's April 27, 2007 letter to Scottsdale's coverage counsel.

27.     Annexed hereto as **Exhibit 26** is a true and correct copy of an April 27, 2007 letter from Scottsdale's coverage counsel to Ellen Silver, Fidelco's counsel.

28.     Annexed hereto as **Exhibit 27** is a true and correct copy of a May 1, 2007 letter from Scottsdale's coverage counsel to Ellen Silver, Fidelco's counsel.

29.     Annexed hereto as **Exhibit 28** is a true and correct copy of Ellen Silver's May 3, 2007 letter to Scottsdale's coverage counsel.

30.     Annexed hereto as **Exhibit 29** is a true and correct copy of the certified Quincy Policy provided by Fredric Gallin under cover of a November 9, 2009 letter. After reviewing this certified copy of the policy it was apparent that it did not contain any asbestos exclusion. I had a telephone conversation with Mr. Gallin and after checking with his client he indicated that they had made an error in preparing the certified copy of the policy as Quincy contends that the actual policy did have an asbestos exclusion. Mr. Gallin indicated that he would provide me with an affidavit explaining how the error was made. As of December 7, 2009 at noon I do not have this affidavit. To avoid delay Fidelco briefs the issue assuming that there is an asbestos exclusion but reserves its rights to pursue discovery on this issue as there is clearly a genuine dispute as to a material fact with respect to the certified policy.

31.     Annexed hereto as **Exhibit 30** is a true and correct copy of an Accord General Liability Notice of Occurrence Claim dated August 4, 2006 provided by The Feldman Agency on behalf of Fidelco to Quincy.

32. Annexed hereto as **Exhibit 31** is a true and correct copy of a letter dated August 10, 2006 from Mark Bissanti Senior Claims Examiner of Quincy to Jeff Persky on behalf of Fidelco denying coverage based upon late notice.

33. Annexed hereto as **Exhibit 32** is a true and correct copy of a letter dated September 7, 2006 from Ellen Silver on behalf of Fidelco to Mark Bissanti of Quincy requesting coverage.

34. Annexed hereto as **Exhibit 33** is a true and correct copy of a letter dated October 17, 2006 from Ellen Silver on behalf of Fidelco to Mark Bissanti of Quincy requesting coverage.

35. Annexed hereto as **Exhibit 34** is a true and correct copy of a letter dated November 17, 2006 from Mark Bissanti Senior Claims Examiner of Quincy to Ellen Silver on behalf of Fidelco changing the basis of its coverage denial to the asbestos exclusion.

36. Annexed hereto as **Exhibit 35** is a true and correct copy of Ellen Silver's March 14, 2007 letter to Mark Bissanti of Quincy on behalf of Fidelco following up and against requesting coverage and requesting that Quincy reconsider based upon information learned during discovery. As attachments to this letter Ms. Silver enclosed: 1. Letter dated September 29, 2005 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 2. Letter dated November 15, 2005 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 3. Letter dated January 26, 2006 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 4. Spreadsheet of BMS's alleged damages.

37. Annexed hereto as **Exhibit 36** is a true and correct copy of a letter dated March 23,2007 from Linda Eckman, Claim Counsel for Quincy to Ellen Silver on behalf of Fidelco

reasserting its denial of coverage based upon the asbestos exclusion and adding exclusion j as an additional basis for its denial.

38.     Annexed hereto as **Exhibit 37** is a true and correct copy of a letter dated April 26, 2007 from Ellen Silver on behalf of Fidelco to Mark Bissanti of Quincy advising that settlement of the arbitration was imminent and requesting consent.

39.     Annexed hereto as **Exhibit 38** is a true and correct copy of a memo to the file from Ellen Silver memorializing a voice mail from Mark Bissanti to the event that the settlement would not be considered a violation of the insurance contract.

40.     Annexed hereto as **Exhibit 39** is a true and correct copy of a letter dated April 27, 2007 from Mark Bissanti Senior Claims Examiner of Quincy to Ellen Silver on behalf of Fidelco.

41.     Annexed hereto as **Exhibit 40** is a true and correct copy of a letter dated July 6, 2007 from Pat Antonacci on behalf of Stockbridge Risk Management, Inc. a firm engaged by Fidelco to Mark Bissanti Senior Claims Examiner of Quincy.

42.     Annexed hereto as **Exhibit 41** is a true and correct copy of a letter dated August 1, 2007 from Linda Eckman, Claims Counsel for Quincy to Pat Antonacci on behalf of Stockbridge Risk Management, Inc.

43.     Annexed hereto as **Exhibit 42** is a true and correct copy of a letter dated September 20, 2007 from Pat Antonacci on behalf of Stockbridge Risk Management, Inc. a firm engaged by Fidelco to Linda Eckman, Claims Counsel for Quincy.

44.     Annexed hereto as **Exhibit 43** is a true and correct copy of a letter dated September 20, 2007 from David Kahan, General Counsel to Fidelco to Pat Antonacci of Stockbridge Risk Management, Inc.

45. Annexed hereto as **Exhibit 44** is a true and correct copy of Certificates of Insurance showing that Fidelco is an additional insured of BMS.

46. Annexed hereto as **Exhibit 45** is a true and correct copy of a March 14, 2007 letter from Ellen Silver counsel for Fidelco to the Claims Department of American Home Assurance Company enclosing the Arbitration Demand and requesting coverage as an additional insured of BMS.

47. Annexed hereto as **Exhibit 46** is a true and correct copy of an April 4, 2007 letter from Ellen Silver counsel for Fidelco to the Claims Department of American Home Assurance Company again requesting coverage as an additional insured of BMS and notifying AHA that the arbitration was scheduled to commence on April 17, 2007.

48. Annexed hereto as **Exhibit 47** is a true and correct copy of an April 26, 2007 letter from Ellen Silver counsel for Fidelco to the Claims Department of American Home Assurance Company again requesting coverage as an additional insured of BMS, notifying AHA that settlement of the arbitration was imminent and requesting an acknowledgement that the settlement would not violate the insurance contract. AHA again failed to respond to Ms. Silver.

49. Annexed hereto as **Exhibit 48** is a true and correct copy of Settlement Agreement, Releases and a copy of the check for $$575,000 paid by Fidelco to BMS in settlement of the arbitration.

50. Annexed hereto as **Exhibit 49** is a true and correct copy of a November 11, 2005 letter from BMS to Fidelco.

51. Annexed hereto as **Exhibit 50** is a true and correct copy of a November 11, 2005 letter from Robert Papa of BMS to Eugene Schenkman of Fidelco.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment.

Dated: December 7, 2009

RANDEE M. MATLOFF

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

---

|  |  |
|---|---|
| SCOTTSDALE INSURANCE COMPANY,  : | CIVIL ACTION NO. 3:07-cv-02763 |
|                                      : | (AET) (TJB) |
|         Plaintiffs, | |

v.                                                       :

SOMERVILLE FIDELCO ASSOCIATES,
L.P. and BADGER ROOFING CO., INC.     :

         Defendants.         :

and                                     :         **CERTIFICATION OF
                                                  RANDEE M. MATLOFF
SOMERVILLE FIDELCO ASSOCIATES,   :      IN OPPOSITION TO
L.P.                                              MOTIONS FOR SUMMARY
                                                  JUDGMENT FILED BY
                                         :        SCOTTSDALE INSURANCE CO.,
         Third Party Plaintiff,          QUINCY MUTUAL FIRE INSURANCE
                                         :        CO. AND AMERICAN HOME
v.                                                ASSURANCE CO.**
                                         :

QUINCY MUTUAL FIRE INSURANCE
COMPANY and AMERICAN HOME        :
ASSURANCE COMPANY,

         Third Party Defendants.         :

---

Randee M. Matloff, of full age, does hereby certify:

      1.      I am an attorney at law of the State of New Jersey and counsel to Nagel Rice,

LLP, attorneys for defendant, third party plaintiff, Somerville Fidelco, L.P. ("Fidelco" or "SF")

as such I am fully familiar with the facts and circumstances stated herein. I submit this document

identifying certification in opposition to the following three motions for summary judgment: (1)

Motion for summary judgment by Scottsdale Insurance Company ("Scottssdale") , (2) Motion

for summary judgment by Quincy Mutual Fire Insurance Company ("Quincy") , and (3) Motion

for summary judgment by American Home Assurance Company ("AHA").

2.       Annexed hereto as **Exhibit 1** is a true and correct copy of Lease between Fidelco

and Bristol-Myers Squibb Company ("BMS").

3.       Annexed hereto as **Exhibit 2** is a true and correct copy of the written agreement

between co-defendant Badger Roofing Company, Inc. and Fidelco.

4.       Annexed hereto as **Exhibit 3** is a true and correct copy of the AIA contract

provided by Badger to Barry Ages of Fidelco dated August 13, 2005.

5.       Annexed hereto as **Exhibit 4** is a true and correct copy of the applicable AIA

general contract provisions with respect to the contractor's obligation to provide liability

insurance to the owner.

6.       Annexed hereto as **Exhibit 5** is a true and correct copy of Barry Ages September

5, 2005 notes.

7.       Annexed hereto as **Exhibit 6** is a true and correct copy of Fidelco's November 4,

2005 letter to BMS.

8.       Annexed hereto as **Exhibit 7** is a true and correct copy of a letter from Martin

Dollinger, Fidelco's attorney, to Jack Chapman of BMS dated May 12, 2006.

9.       Annexed hereto as **Exhibit 8** is a true and correct copy of Charles Vinicombe's

August 4, 2006 letter to the American Arbitration Association together with the Arbirtration

demand on behalf of BMS.

10.      Annexed hereto as **Exhibit 9** is a true and correct copy of the deposition of

Michael Solakov of Slavco Construction taken on February 9, 2007 in connection with the

Arbitration between BMS and Fidelco.

11.     Annexed hereto as **Exhibit 10** is a true and correct copy of deposition of Robert Post taken on January 26, 2007 in connection with the Arbitration between BMS and Fidelco.

12.     Annexed hereto as **Exhibit 11** is a true and correct copy of the expert report of William S. Kerbel of Environmental Health Investigations, Inc. dated March 19, 2007 prepared in connection with the Arbitration between BMS and Fidelco.

13.     Annexed hereto as **Exhibit 12** is a true and correct copy of Fidelco's March 30, 2007 Arbitration letter brief.

14.     Annexed hereto as **Exhibit  13** is a true and correct copy of BMS's March 29, 2007 Arbitration letter brief.

15.     Annexed hereto as **Exhibit 14** is a true and correct copy of Ellen Silver's August 17, 2006 letter to the Claims Department of Scottsdale enclosing the Arbitration Demand and requesting defense and indemnification from Scottsdale on behalf of Fidelco as an additional insured under Badger's Policy.

16.     Annexed hereto as **Exhibit 15** is a true and correct copy of Ellen Silver's October 16, 2006 letter to Kent Riggs of Scottsdale on behalf of Fidelco following up and against requesting coverage.

17.     Annexed hereto as **Exhibit 16** is a true and correct copy of Ellen Silver's November 28, 2006 letter to Kent Riggs of Scottsdale on behalf of Fidelco following up and against requesting coverage.

18.     Annexed hereto as **Exhibit 17** is a true and correct copy of Ellen Silver's January 5, 2007 letter to Kent Riggs of Scottsdale on behalf of Fidelco following up and against requesting coverage.

19.     Annexed hereto as **Exhibit 18** is a true and correct copy of Ellen Silver's January 30, 2006 letter to Kent Riggs of Scottsdale on behalf of Fidelco following up and against requesting coverage.

20.     Annexed hereto as **Exhibit 19** is a true and correct copy of Kent Riggs January 31, 2007 letter to Ellen Silver denying coverage to Fidelco on behalf of Scottsdale.

21.     Annexed hereto as **Exhibit 20** is a true and correct copy of Ellen Silver's March 14, 2007 letter to Kent Riggs of Scottsdale on behalf of Fidelco following up and against requesting coverage and requesting that Scottsdale reconsider based upon information learned during discovery. As attachments to this letter Ms. Silver enclosed: 1. Letter dated September 29, 2005 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 2. Letter dated November 15, 2005 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 3. Letter dated January 26, 2006 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 4. Spreadsheet of BMS's alleged damages; 5. Accord Certificate of Liability Insurance provided on behalf of Badger.

22.     Annexed hereto as **Exhibit 21** is a true and correct copy of Ellen Silver's April 5, 2007 letter to Kent Riggs of Scottsdale on behalf of Fidelco against requesting coverage and advising of the date for the upcoming arbitration hearing.

23.     Annexed hereto as **Exhibit 22** is a true and correct copy of an April 24, 2007 letter from Scottsdale's coverage counsel to Ellen Silver, Fidelco's counsel.

24.     Annexed hereto as **Exhibit 23** is a true and correct copy of Ellen Silver's April 26, 2007 letter to Kent Riggs of Scottsdale.

25.     Annexed hereto as **Exhibit 24** is a true and correct copy of an April 26, 2007 letter from Scottsdale's coverage counsel to Ellen Silver, Fidelco's counsel.

26.     Annexed hereto as **Exhibit 25** is a true and correct copy of Ellen Silver's April 27, 2007 letter to Scottsdale's coverage counsel.

27.     Annexed hereto as **Exhibit 26** is a true and correct copy of an April 27, 2007 letter from Scottsdale's coverage counsel to Ellen Silver, Fidelco's counsel.

28.     Annexed hereto as **Exhibit 27** is a true and correct copy of a May 1, 2007 letter from Scottsdale's coverage counsel to Ellen Silver, Fidelco's counsel.

29.     Annexed hereto as **Exhibit 28** is a true and correct copy of Ellen Silver's May 3, 2007 letter to Scottsdale's coverage counsel.

30.     Annexed hereto as **Exhibit 29** is a true and correct copy of the certified Quincy Policy provided by Fredric Gallin under cover of a November 9, 2009 letter.

31.     Annexed hereto as **Exhibit 30** is a true and correct copy of an Accord General Liability Notice of Occurrence Claim dated August 4, 2006 provided by The Feldman Agency on behalf of Fidelco to Quincy.

32.     Annexed hereto as **Exhibit 31** is a true and correct copy of a letter dated August 10, 2006 from Mark Bissanti Senior Claims Examiner of Quincy to Jeff Persky on behalf of Fidelco denying coverage based upon late notice.

33.     Annexed hereto as **Exhibit 32** is a true and correct copy of a letter dated September 7, 2006 from Ellen Silver on behalf of Fidelco to Mark Bissanti of Quincy requesting coverage.

34.     Annexed hereto as **Exhibit 33** is a true and correct copy of a letter dated October 17, 2006 from Ellen Silver on behalf of Fidelco to Mark Bissanti of Quincy requesting coverage.

35.     Annexed hereto as **Exhibit 34** is a true and correct copy of a letter dated November 17, 2006 from Mark Bissanti Senior Claims Examiner of Quincy to Ellen Silver on behalf of Fidelco changing the basis of its coverage denial to the asbestos exclusion.

36.     Annexed hereto as **Exhibit 35** is a true and correct copy of Ellen Silver's March 14, 2007 letter to Mark Bissanti of Quincy on behalf of Fidelco following up and against requesting coverage and requesting that Quincy reconsider based upon information learned during discovery. As attachments to this letter Ms. Silver enclosed: 1. Letter dated September 29, 2005 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 2. Letter dated November 15, 2005 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 3. Letter dated January 26, 2006 from David Burkhardt of Eagle Industrial Hygiene Associates to Barbara Owen of BMS; 4. Spreadsheet of BMS's alleged damages.

37.     Annexed hereto as **Exhibit 36** is a true and correct copy of a letter dated March 23,2007 from Linda Eckman, Claim Counsel for Quincy to Ellen Silver on behalf of Fidelco reasserting its denial of coverage based upon the asbestos exclusion and adding exclusion j as an additional basis for its denial.

38.     Annexed hereto as **Exhibit 37** is a true and correct copy of a letter dated April 26, 2007 from Ellen Silver on behalf of Fidelco to Mark Bissanti of Quincy advising that settlement of the arbitration was imminent and requesting consent.

39.     Annexed hereto as **Exhibit 38** is a true and correct copy of a memo to the file from Elleln Silver memorializing a voice mail from Mark Bissanti to the event that the settlement would not be considered a violation of the insurance contract.

40.    Annexed hereto as **Exhibit 39** is a true and correct copy of a letter dated April 27, 2007 from Mark Bissanti Senior Claims Examiner of Quincy to Ellen Silver on behalf of Fidelco.

41.    Annexed hereto as **Exhibit 40** is a true and correct copy of a letter dated July 6, 2007 from Pat Antonacci on behalf of Stockbridge Risk Management, Inc. a firm engaged by Fidelco to Mark Bissanti Senior Claims Examiner of Quincy.

42.    Annexed hereto as **Exhibit 41** is a true and correct copy of a letter dated August 1, 2007 from Linda Eckman, Claims Counsel for Quincy to Pat Antonacci on behalf of Stockbridge Risk Management, Inc.

43.    Annexed hereto as **Exhibit 42** is a true and correct copy of a letter dated September 20, 2007 from Pat Antonacci on behalf of Stockbridge Risk Management, Inc. a firm engaged by Fidelco to Linda Eckman, Claims Counsel for Quincy.

44.    Annexed hereto as **Exhibit 43** is a true and correct copy of a letter dated September 20, 2007 from David Kahan, General Counsel to Fidelco to Pat Antonacci of Stockbridge Risk Management, Inc.

45.    Annexed hereto as **Exhibit 44** is a true and correct copy of Certificates of Insurance showing that Fidelco is an additional insured of BMS.

46.    Annexed hereto as **Exhibit 45** is a true and correct copy of a March 14, 2007 letter from Ellen Silver counsel for Fidelco to the Claims Department of American Home Assurance Company enclosing the Arbitration Demand and requesting coverage as an additional insured of BMS.

47.    Annexed hereto as **Exhibit 46** is a true and correct copy of an April 4, 2007 letter from Ellen Silver counsel for Fidelco to the Claims Department of American Home Assurance

Company again requesting coverage as an additional insured of BMS and notifying AHA that the arbitration was scheduled to commence on April 17, 2007.

48.    Annexed hereto as **Exhibit 47** is a true and correct copy of an April 26, 2007 letter from Ellen Silver counsel for Fidelco to the Claims Department of American Home Assurance Company again requesting coverage as an additional insured of BMS, notifying AHA that settlement of the arbitration was imminent and requesting an acknowledgement that the settlement would not violate the insurance contract. AHA again failed to respond to Ms. Silver.

49.    Annexed hereto as **Exhibit 48** is a true and correct copy of Settlement Agreement, Releases and a copy of the check for $$575,000 paid by Fidelco to BMS in settlement of the arbitration.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment.

Dated: December 7, 2009

RANDEE M. MATLOFF

# EXHIBIT 1

## LEASE EXTENSION AGREEMENT NO. 2

THIS AGREEMENT is made and entered into this~~25th~~ day of ~~August~~ November, 2002, by and between:

**SOMERVILLE FIDELCO ASSOCIATES L.P.**, having an office at 520 Route 22, P.O. Box 6872, Bridgewater, New Jersey 08807, hereinafter described as "Landlord",

and

**BRISTOL-MYERS SQUIBB COMPANY**, having an address at 76 Fourth Street, Somerville, New Jersey 08876, hereinafter described as "Tenant".

### WITNESSETH:

WHEREAS, E. R. Squibb and Sons, Inc. ("Squibb") entered into a Lease dated October 23, 1988; an Amendment to Lease dated June 30, 1988, for premises known as 76 Fourth Street, Somerville, New Jersey; and a Lease Extension Agreement No. 1 dated May 14, 1993 collectively, the "Lease"); and

WHEREAS, Tenant is Squibb's successor; and

WHEREAS, the parties desire to extend the said Lease term further.

**NOW, THEREFORE,** in consideration of the Lease and the mutual covenants and agreements therein contained, the parties hereto agree as follows:

1.   <u>Extension of Term.</u>

The premises covered by this Lease Extension Agreement No. 2 (the "Extension") are the same as the premises covered by the Lease. The term of the Lease is hereby extended to October 31, 2008, subject to the terms and conditions set forth herein.

G:\Legal\Gary\Address Properties\Fourth Street\76 Fourth Street\Squibb Extension 1.doc

**EXHIBIT**

tabbies®   72

SF01330

2.    Landlord's Work.

Landlord shall (i) repair the cracks in the parking lot; (ii) reseal the parking lot; (iii) repair the fence; and (iv) seal the cracks in the Building to prevent the infiltration by beetles.

3.    Rent.

The Basic Rent under the Lease shall be $960,000.00 payable at the rate of $192,000.00 per annum in equal monthly installments of $16,000.00 payable in advance on the first day of each month of the extended term hereof beginning November 1, 2003 through October 31, 2008.

4.    Right of Cancellation.

Provided this Lease has not been cancelled or terminated, the Tenant is not in default, and the Lease is in full force and effect, the Tenant, at its option, shall have the right to terminate the Lease ~~at~~ _Anytime After_ the end of the thirty-sixth (36th) month of the extended term by providing Landlord with no less than six (6) months prior written notice of its election to do so. Such notice shall be given as provided in Sections 20.1 and 20.2 of the Lease and, thereupon, this Lease shall be terminated effective on October 31, 2006 as though that were the date originally fixed for the termination of the term.

5.    Further Option to Renew.

Tenant is hereby granted one option to renew this Lease for one period, commencing November 1, 2008, upon the following terms and conditions:

(A)    At the time of the exercise of the option to renew and at the time of said renewal, the Tenant shall not be in default in accordance with the terms and provisions of this Lease, and shall be in possession of the Premises pursuant to this Lease.

- 2 -

SF01331

(B)     Notice of the exercise of the option shall be sent to the Landlord in writing at least nine (9) months before the expiration of the immediately preceding term.

(C)     The renewal term shall be for a period of five (5) years to commence on November 1, 2008, and all of the terms and conditions of this Lease, other than the basic rent, shall apply during any such renewal term.

(D)     Subject to the last sentence of this paragraph, the annual basic rent to be paid during the renewal term shall equal the fair market rental value of the Premises if the same were available for lease to the public. If the parties are unable to agree on the fair market rental value of the Premises, the parties shall each appoint one appraiser who shall in turn appoint a third independent appraiser and the determination of said three appraisers shall be binding on the parties. In no event, however, shall the annual basic rent payable by Tenant during the renewal period be less than the annual basic rent paid by Tenant during the final year of the immediately preceding term.

6.    Broker.

Tenant represents that no broker or other agent has shown the Leased Premises or the Building to the Tenant, or brought either to the Tenant's attention. Tenant shall defend and indemnify Landlord from and against any claims, demands and actions brought by any broker to recover a brokerage commission or any other damages on the basis of this transaction.

7.    Binding Effect.

The terms, covenants and conditions of this Extension shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

- 3 -

SF01332

8.     Counterparts.

This Extension may be executed in several counterparts each of which shall constitute an original for all purposes. This Extension, read in conjunction with the Lease, sets forth the entire agreement between the parties; and the Lease as thus extended and modified shall not be altered or modified in any particular except by a memorandum in writing signed by the parties hereto.

Except as amended by this Extension, all other terms and conditions of the Lease shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals as of the date first above written.

SOMERVILLE FIDELCO ASSOCIATES, L.P.
By:     SF Realty Corp., General Partner

By:
Name:     Murray Kushner, Vice President

BRISTOL-MYERS SQUIBB COMPANY

By:

- 4 -

SF01333

## LEASE EXTENSION AGREEMENT NO. 1

THIS AGREEMENT is made and entered into this /*/* day of /*/A-*Y* , 1993,  by and between

SOMERVILLE FIDELCO ASSOCIATES L.P., having an office at 981 Route 22, P.O. Box 6872, Bridgewater, New Jersey 08807, hereinafter described as "Landlord",

and

E.R. SQUIBB & SONS, INC., having an address at P.O. Box 4000, Princeton, New Jersey 08543-4000, hereinafter described as "Tenant".


### WITNESSETH:

WHEREAS, E. R. Squibb and Sons, Inc. entered into a Lease dated October 23, 1988 and an Amendment to Lease dated June 30, 1988, for premises known as 76 Fourth Street, Somerville, New Jersey;  and

WHEREAS, the parties desire to extend the said Lease.

NOW, THEREFORE, in consideration of the Lease and the mutual covenants and agreements therein contained, the parties hereto agree as follows:

1.      The premises covered by this Lease Extension Agreement are the same as the premises covered by the Lease dated October 23, 1988 and Amendment to Lease dated June 30, 1988.

2.      The term of the Lease dated October 23, 1987 as amended by the Amendment to Lease dated June 30, 1988, is hereby extended to October 31, 2003, subject to the terms and conditions set forth herein.

SF01334

3.     The Basic Rent under the Lease shall be $1,735,200.00 payable as follows:

(a) for years 1 through 7 inclusive, $165,600.00 per annum payable in equal monthly installments of $13,800.00 in advance on the first day of each month of the term hereof beginning November 1, 1993 through October 31, 2000; and

(b) for years 8 through 10 inclusive, $192,000.00 per annum payable in equal monthly installments of $16,000.00 in advance on the first day of each month of the term hereof beginning November 1, 2000 through October 31, 2003.

4. Right of Cancellation.

(a) Provided this Lease has not been cancelled or terminated, the Tenant is not in default, and the Lease is in full force and effect, the Tenant, at its option, shall have the right to terminate the Lease at the end of the seventh (7th) year of the ten (10) year term by providing Landlord with no less than nine (9) months prior written notice of its election to do so. Such notice shall be given as provided in Sections 20.1 and 20.2 of the Lease. The notice to cancel to be effective shall be accompanied by payment of the sum of $52,800.00. Upon such payment and upon expiration of the seventh (7th) year of the term hereof, this Lease shall be terminated and at an end. Any such termination shall be as of the last day of the effective month of termination. The payment of $52,800.00 shall be in addition to all Basic Rent and Additional Rent due during the occupancy as is provided in the Lease and this Lease Extension Agreement No. 1.

(b) Effective as of the date of cancellation, Landlord and Tenant agree that they will execute and deliver a Lease Termination Agreement in recordable form, and any adjustments of Annual Basic Rent and Additional Rent, if any,

DOC:SQUIBB.EXT

2

SF01335

shall be prorated to the date of cancellation as may be applicable, and Landlord and

Tenant shall exchange general releases in recordable form in order to establish the Lease expiration as of the date of cancellation as if the date were the expiration date of the Lease.

5.     Paragraphs D and E of the Amendment of Lease dated June 30, 1988 are amended as follows:

Tenant is hereby granted one option to renew this Lease for one period, commencing November 1, 2003, upon the following terms and conditions:

(A)  At the time of the exercise of the option to renew and at the time of said renewal, the Tenant shall not be in default in accordance with the terms and provisions of this Lease, and shall be in possession of the Premises pursuant to this Lease.

(B)  Notice of the exercise of the option shall be sent to the Landlord in writing at least nine (9) months before the expiration of the immediately preceding term.

(C)  The renewal term shall be for a period of five (5) years to commence at the expiration of the immediately preceding term, and all of the terms and conditions of this Lease, other than the basic rent, shall apply during any such renewal term.

(D)  Subject to the last sentence of this paragraph, the annual basic rent to be paid during the renewal term shall equal the fair market rental value of the Premises if the same were available for lease to the public.  If the parties are unable to agree on the fair market rental value of the Premises, the parties shall each appoint one appraiser who shall in turn appoint a third independent appraiser and the determination of said three appraisers shall be binding on the parties.  In no event, however, shall the annual basic rent payable by Tenant during the

DOC:SQUIBB.EXT

3

SF01336

renewal period be less than the annual non-discounted annual basic rent paid by Tenant during the final year of the immediately preceding term.

6. Environmental.

6.1 In the event that Tenant receives any notice, whether written or oral, from the time of the commencement of this lease through its conclusion, as to an act of the Tenant concerning the occurrence of any spill, discharge or cleanup of any "hazardous substances" or "hazardous wastes" as such terms are defined in the New Jersey Environmental Cleanup Responsibility Act, N.J.S.A. (13:1K-6, et seq.) and the regulations promulgated pursuant thereto and any successor legislation and regulations (hereinafter "ECRA"), or under the New Jersey Spill Compensation and Control Act (N.J.S.A. 58:10-23.11, et seq.) or other federal or state environmental laws, or other hazardous or toxic substances or waste, or any oil or pesticide, on or about the leased premises or into any sewer, septic system or waste treatment system servicing the leased premises (hereinafter collectively referred to as a "Hazardous Discharge") or of any complaint, order, citation or notice with regard to air emissions, water discharges, noise emissions or any other environmental, health or safety matter affecting Tenant or the operations of Tenant at the leased premises (hereinafter collectively referred to as an "Environmental Complaint") from any person, entity or governmental agency, including but not limited to the New Jersey Department of Environmental Protection and Energy ("DEPE") and the federal Environmental Protection Agency ("EPA"), then Tenant shall give immediate oral and written notice of same to Landlord, which notice shall set forth specifically and in detail all relevant facts and circumstances with respect thereto known to Tenant.

Further, said ECRA violation must have been something proved to have been caused or implemented by Tenant during its lease term. Failure to substantiate proof of same will operate to relieve Tenant of liability due to acts beyond its control. Tenant warrants to return said premises to Landlord in the same environmental condition in

DOC:SQUIBB.EXT

4

relation to ECRA as premises was on the date of commencement of this Lease, except for conditions that are due to acts beyond Tenant's control.

6.2  Upon the occurrence of a Hazardous Discharge or Environmental Complaint, Landlord shall have the right, but not the obligation, to exercise any and all rights provided to it pursuant to the terms of this Lease and to enter onto the leased premises and take any actions as it shall deem necessary or advisable to remove, cleanup, minimize the impact of, or otherwise deal with any Hazardous Discharge or any Environmental Complaint pertaining to the leased premises upon its receipt of any notice from Tenant or any person, entity or governmental agency, including but not limited to the DEPE or EPA. All costs and expenses incurred by Landlord in the exercise of any such rights shall be deemed to be additional rent hereunder and shall be immediately payable by Tenant to Landlord upon demand to the extent that said costs or expenses result from action, inaction or negligence of the Tenant.

Landlord shall exercise its rights under this Article 6.2 in such a manner as to minimize interruption and/or interference with the conduct of Tenant's business on, and Tenant's use of, the leased premises during the Lease term.

6.3  Notwithstanding any of the foregoing, the occurrence of any of the following shall constitute a default by Tenant and breach of this Lease:

(i)  If the DEPE, EPA or any other governmental agency places a lien upon the leased premises or any other part of the property of which the leased premises forms a part by reason of the occurrence of a Hazardous Discharge, by the filing of an Environmental Complaint or otherwise, or for any other reason whatsoever to the extent that such lien, Discharge or Complaint results from the action, inaction or negligence of the Tenant during the Lease term; or

(ii)  If any governmental agency asserts a claim against Landlord, Tenant, the leased premises, or any part of the property of which the leased premises forms a part, for fines, damages or cleanup costs related to the occurrence of any Hazardous Discharge or any

DOC:SQUIBB.EXT

5

SF01338

Environmental Complaint with respect to the leased premises to the extent that said claim, Discharge or Complaint results from the action, inaction or negligence of the Tenant during the Lease term; provided, however, that such claim shall not constitute an event of default hereunder if, within five (5) days after the occurrence giving rise to said claim: (a) Tenant proves to Landlord's satisfaction that Tenant has commenced and is diligently pursuing either: (1) cure or correction of the event which constitutes the basis for the claim, and that Tenant continues diligently to pursue such cure or correction to completion; or (2) proceedings for an injunction, a restraining order or other appropriate emergent relief preventing such entity or agency from asserting such claim have been instituted and relief pursuant thereto is granted within ten (10) days of the occurrence giving rise to said claim and such relief is not thereafter dissolved or reversed on appeal; and (b) Tenant has posted a bond, letter of credit or other security satisfactory in form, substance and amount to Landlord and the entity asserting the claim to secure the proper and complete cure or correction or the event which constitutes the basis of the claim.

6.4   Notwithstanding any of the foregoing, the termination of this Lease based upon any event of default set forth in this Lease shall in no way serve to relieve Tenant from the performance of all of its obligations under this Article 6.

6.5   Tenant shall, at Tenant's own expense, comply with the ECRA to the extent that Tenant's action or inaction trigger ECRA.  Tenant shall, at Tenant's own expense, make all submissions to, provide all information to, and comply with all requirements of, the Industrial Site Evaluation or its successor ("Element") of the DEPE.  In the event ECRA is triggered by acts of Landlord, Tenant agrees to cooperate with respect to filing of all required applications and affidavits with the DEPE, without cost or expense to Tenant for Tenant's co-operation and execution of any necessary documents.  Further, in no event shall Landlord be obligated to pay Tenant for any changes incurred by Tenant to

SF01339

accommodate Landlord's requirements in this Section, except as to Tenant's actual out of pocket costs.

6.6  Provided this Lease is not previously cancelled or terminated by either party or by operation of law, Tenant shall commence its submission to the Element in anticipation of the end of the lease term no later than six (6) months prior to the expiration of the lease term.  Tenant shall promptly furnish to Landlord true and complete copies of all documents, submissions, correspondence and oral or written communications provided by Tenant to the Element, and all documents, reports, directives, correspondence and oral or written communications by the Element to Tenant. Tenant shall also promptly furnish to Landlord true and complete copies of all sampling and test results and reports obtained and prepared from samples and tests taken at and around the leased premises.  Tenant shall notify Landlord in advance of all meetings scheduled between Tenant and DEPE, and Landlord may attend all such meetings.

6.7  Should the Element or any other division of DEPE determine that a cleanup plan be prepared and that a cleanup be undertaken, Tenant shall, at Tenant's own expense, promptly prepare and submit the required plans and financial assurances and shall promptly carry out the approved plans, to the extent that such plan or clean-up is required as a result of Tenant's actions or inaction during the Lease term.  ·

6.8  Should Tenant's operations at the premises be outside of those industrial operations covered by ECRA, Tenant shall, at Tenant's own expense, obtain a letter of non-applicability or de minimus quantity exemption from the Element ·prior to termination of the lease term and shall promptly provide Tenant's submission and the Element's exemption letter to Landlord.   Should Tenant obtain a letter of non-applicability or de minimus quantity exemption from the Element, then Landlord shall, at

DOC:SQUIBB.EXT

7

SF01340

Landlord's option, hire at Landlord's expense a consultant to undertake sampling at the leased premises sufficient to determine whether or not Tenant's operations have resulted in a spill or discharge of a hazardous substance or waste at or around the leased premises. Should the sampling reveal any spill or discharge of a hazardous substance or waste, resulting from the action, inaction or negligence of the Tenant during the Lease term, then Tenant shall, at Tenant's expense, promptly clean up the leased premises to the satisfaction of DEPE and Tenant shall be responsible for and promptly pay to Landlord, Landlord's environmental costs and expense fees for any investigation.

6.9   Tenant represents and warrants to Landlord that Tenant intends to use the leased premises for operations which have the following Standard Industrial Classification Major Group No. 2834 as defined by the most recent edition of the Standard Industrial Classification Manual published by the Federal Executive Office of the President, Office of Management and Budget: 42. Following the Commencement Date, Tenant shall notify Landlord in writing as to any changes in Tenant's operation, S.I.C. numbers or use or generation of hazardous substances and wastes, by way of a supplemental Officer's Affidavit. Tenant shall not commence or alter any operations at the leased premises prior to (i) obtaining all required operating and discharge permits or approvals, including but not limited to air pollution control permits and pollution discharge elimination system permits from DEPE, from all governmental or public authorities having jurisdiction over Tenant's operations or the leased premises, and (ii) providing copies of permits or approvals to Landlord.

6.10   Tenant shall permit, upon 48 hours prior notice, at least once each twelve (12) months, Landlord and Landlord's agents, servants and employees, including but not limited to legal counsel and environmental consultants and engineers, access to the leased premises for the purposes of environmental inspections and sampling during regular

DOC:SQUIBB.EXT

8

SF01341

business hours, or during other hours either by agreement of the parties, or immediate access in the event of any environmental emergency. In the event that Landlord's environmental inspection shall include sampling and testing of the leased premises, Landlord shall use its best efforts to avoid interfering with Tenant's use of the leased premises, and upon completion of sampling and testing shall repair and restore the affected areas of the leased premises from any damage caused by the sampling and testing.

Landlord shall exercise its rights under this Article 6.10 in such a manner as to minimize interruption and/or interference with the conduct of Tenant's business on, and Tenant's use of, the leased premises.

6.11 Tenant hereby agrees to defend, indemnify and hold Landlord harmless from and against any and all claims, losses, liabilities, damages and expenses, foreseen or unforeseen, including, without limitation, cleanup costs, environmental consultant's fees and attorneys' fees and costs whether such claims be governmental or private, under any theory of law or equity, arising directly or indirectly from, out of, or by reason of Tenant's breach of its obligations under this Article, or any Hazardous Discharge, any Environmental Complaint to the extent same results from Tenant's action, inaction or negligence during the Lease term, or the presence at the leased premises of any hazardous substances or wastes occurring by reason of Tenant's acts, omission or negligence at or with respect to the leased premises during the Lease term.

6.12 This Article 6 shall survive the expiration or earlier termination of this Lease. Tenant's failure to abide by the terms of this Article 6 shall be restrainable by injunction. In addition, if Tenant fails to comply in full with this Article 6, Landlord may, at its option, perform any or all of Tenant's obligations hereunder, and all costs and

DOC:SQUIBB.EXT

9

SF01342

expenses incurred by Landlord in the exercise of this right shall be deemed to be additional rent under this Lease and shall be payable by Tenant upon demand.

This Lease Extension Agreement, read in conjunction with the Indenture of Lease and Amendment to Lease aforementioned, sets forth the entire agreement between the parties; and the Lease as thus extended and modified shall not be altered or modified in any particular except by a memorandum in writing signed by the parties hereto.

All other terms and conditions of the Lease Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals as of the date first above written.

SOMERVILLE FIDELCO ASSOCIATES, L.P.

Witness:

By: _____

E.R. SQUIBB & SONS, INC., Tenant

Witness:

By: _____
        Vice President

APPROVED AS
TO LEGAL FORM

<u>AMENDMENT TO LEASE</u>

     This Amendment to Lease dated October 23, 1988, is made and entered into this  30<u>th</u>  day of June, 1988, by and between

     SOMERVILLE FIDELCO ASSOCIATES, a New Jersey limited partnership, as "Landlord",

and

     E. R. SQUIBB & SONS, INC., a Delaware corporation, as "Tenant".

W I T N E S S E T H :

The option to renew contained in Schedule "C" of the above-described Lease is amended as follows:

Tenant is hereby granted three (3) options to renew this Lease for three (3) periods upon the following terms and conditions:

    (A)  At the time of the exercise of the option to renew and at the time of said renewal, the Tenant shall not be in default in accordance with the terms and provisions of this Lease, and shall be in possession of the Premises pursuant to this Lease.

    (B)  Notice of the exercise of the option shall be sent to the Landlord in writing at least nine (9) months before the expiration of the immediately preceding term.

    (C)  The first option shall be for a period of three (3) years to commence at the expiration of the immediately preceding term and shall be at an annual rent of $165,600.00, payable monthly at the rate of $13,800.00.  All of the terms and conditions of this Lease other than the basic rent shall apply during said renewal term.

    (D) The second renewal term shall be for a period of five (5) years to commence at the expiration of the immediately preceding term and shall be at an annual rent of $192,000.00, payable monthly at the rate of $16,000.00.  All of the terms and conditions of this Lease other than the basic rent shall apply during said renewal term.

    (E)  The third renewal term shall be for a period of five (5) years and subject to the last sentence of this paragraph, the annual basic rent to be paid during the renewal term shall equal the fair market rental value of the Premises if the same were available for lease to the public.  If the parties are unable to agree on the fair market rental value of the Premises, the parties shall each appoint one appraiser who shall in turn appoint a third independent appraiser and the determination of said three appraisers shall be binding on the

SF01344

parties.  In no event, however, shall the annual basic rent payable by Tenant during the renewal period be less than the annual non-discounted annual basic rent paid by Tenant during the immediately preceding term.

All other terms and conditions shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the date first above written.

Witness:                                   SOMERVILLE FIDELCO ASSOCIATES

_____            By: _____
                                               Eugene Schenkman

Attest:                                    E. R. SQUIBB & SONS, INC.

                                           By: _____

DOC: 3018.ES

SF01345

SOMERVILLE FIDELCO ASSOCIATES, Landlord

and

E.R. SQUIBB & SONS, INC. Tenant

---

LEASE

---

Premises:
76 Fourth Street
Somerville, New Jersey

SF01346

AGREEMENT, made as of this 23nd      day of October ,
1987 , by and between SOMERVILLE FIDELCO ASSOCIATES, a Limited
Partnership, having its principal place of business at 981 Route 22,
P.O. Box 6872, Bridgewater Township, Somerset County, State of New
Jersey (hereinafter called "Landlord")

and

E.R. SQUIBB & SONS, INC., a Delaware corporation, having an address at
P.O. Box 4000, Princeton, NJ  08543-4000 (hereinafter called "Tenant")

## W I T N E S S E T H :

Premises

**Section 1.1**  That the Landlord, for and in consideration of the rents,
terms, covenants and conditions hereinafter reserved, mentioned and
contained on the part of the Tenant, its successors and assigns to be
paid, kept and performed does hereby demise and lease to the Tenant,
and the Tenant does hereby take and hire from the Landlord, upon and
subject to the terms, covenants and conditions hereinafter, the
building and all of that certain lot, tract or parcel of land more
particularly described in Schedule "A" hereto annexed and made a part
hereof, together with all the rights, privileges, easements and
appurtenances, if any, belonging to or in any way pertaining to said
premises (hereinafter the building, land and improvements referred to
as "premises" or "demised premises").

October 26,

Original
Terms

**Section 1.2**  The term of this lease shall commence on ~~October 1,~~
1987 ("Commencement Date"), and terminate on ~~September 30, 1996.~~October 31,1990.
If Landlord shall be unable to give possession of the premises on the
Commencement Date because the prior tenant has not vacated the
building or because of any other reason whatsoever, Landlord shall not
be subject to any liability for such failure.  Under such
circumstances, the rent reserved and covenanted to be paid herein
shall not commence until the possession of the premises is given
(provided Tenant is not responsible for inability to obtain
possession).  No such failure to give possession on the Commencement
Date shall in any wise affect the validity of this Lease or the
obligations of Tenant hereunder, except that the Commencement Date
shall be deemed to be postponed until the date Premises are available
for Tenant's occupancy.

Landlord &
Tenant to
Execute
Agreement
as to
Commence-
ment
of Term

**Section 1.3**  Landlord and Tenant agree to execute and acknowledge
an instrument evidencing the commencement and expiration
dates of said initial demised term, which instrument shall state
that the Tenant has accepted the demised premises.

"Basic"
or "Fixed"
Rent
to be paid
Tenant

**Section 1.4**  Tenant covenants and agrees to pay to the Landlord,
for and throughout each year of the initial term (sometimes referred
to as "initial" or "demised" term) of this Lease, without demand,
or deduction of any nature whatsoever, the net annual minimum basic
rental specified on Schedule "B" attached hereto (hereinafter
sometimes referred to as "Basic" or "Fixed" rent or the "net rent
expressly reserved hereunder"), which said sum shall be paid in
addition to all other sums and additional rentals to be made by the
Tenant as in this Lease hereinafter provided.  Said basic or fixed
rent shall be paid in equal monthly installments as set forth in
Schedule B, at the Landlord's

SF01347

place of business as set forth on Page One of this Lease, or such other place as may be designated by the Landlord in writing.  In the event that the term commences on a day other than the first day of a month, then the rental for that period of less than a month and the rental for the corresponding period at the end of the term shall be adjusted pro rata.

**Tenant covenants to pay rent, etc.**

<u>Section 2.1</u>  Tenant covenants to pay to the Landlord the basic rent herein reserved and all other sums and additional rentals to be made by Tenant as hereinafter provided, which may become due hereunder, or be payable by Tenant hereunder, at the time and in the manner as in this Lease provided, in legal tender without any deduction, diminution, abatement or rebate of whatsoever kind, except as in this Lease otherwise provided.

**Use and Occupancy of Premises by Tenant**

<u>Section 3.1</u>  Tenant covenants and agrees to use and occupy the demised premises for any light industrial use permitted under the provisions of the Zoning Ordinance of the Borough of Somerville during the initial or demised term hereof and any extended or renewed term thereof, and such other uses and purposes as shall be necessary or incidental to the conduct of its business, all of which uses and purposes are to be subject to and in accordance and compliance with all Federal, State, County, City, Borough and Municipal Statutes, Laws, ordinances, codes, orders, rules and regulations of said governmental authorities, their Boards, Bureaus, Commissions, Departments and the officials thereof, and for no other uses and purposes, without first having obtained the written consent of the Landlord under penalty of forfeiture of this Lease and damages.

**Taxes, Expenses**

<u>Section 4.1</u>  The Landlord shall furnish all tax bills to the Tenant 20 days before payment on said tax bills are due and the Tenant shall pay as additional rent at least three (3) days before the last day on which they may be paid without penalty or interest, all taxes (real and personal), water rents, sewer rents and charges, duties, impositions, license and permit fees, charges for public utilities of any kind, payments and other charges of every kind and nature whatsoever.  The parties hereto acknowledge and agree that the basic rent reserved herein shall be received and enjoyed by Landlord as a net sum free from all taxes and all costs and expenses incident to the ownership, use and occupancy of the leased premises, except as otherwise expressly provided in this Lease.  Notwithstanding the foregoing, Tenant shall not be required to pay the following:  municipal, state, federal, or any other income, profit or excise taxes assessed or imposed against Landlord under any present or future laws, including also capital levy, estate, succession, devolution, inheritance or transfer taxes of Landlord, corporate franchise, capital stock, loans and bonus taxes imposed upon any corporate owner of the fee of the demised premises, or with respect to the rent received by the Landlord hereunder, or upon the right of the Landlord to receive such rent hereunder or to do business, or any tax or charge in replacement or substitution of the foregoing or of a similar character.

Notwithstanding anything to the contrary, if at any time during the terms of this Lease there shall be levied, assessed and imposed in substitution in whole or in part of real estate taxes, a tax, charge or capital levy or otherwise (other than a general gross receipts or income tax) on the rents received from said real estate or the rents reserved herein, and said tax shall be imposed upon Landlord, Tenant will pay same as hereinabove provided.

**Tenant's Failure to Pay Taxes, etc.**

<u>Section 4.2</u>  If the Tenant shall fail to pay the impositions as hereinabove set forth, the Landlord shall have the right, without being obligated to do so, to pay the amount or amounts thereof, for and on behalf of Tenant, and Tenant agrees to repay said amount or amounts to Landlord, upon demand, and if not so paid, the same shall be considered as "additional rent", after ten (10) days' notice to the Tenant from the Landlord.

2

SF01348

Apportion-
ment of
Taxes

**Section 4.3**  At the commencement and expiration of the initial
term of this Lease and of all renewals or extensions thereof,
impositions required to be paid by the Tenant hereunder shall be
apportioned, and Landlord shall pay that portion thereof applicable to
the period prior to the commencement of the initial term of this Lease
and after the expiration of term thereof, if not renewed, but if the
term of said Lease is renewed or extended, then after the expiration
of the last renewal or extended period.

**Section 4.4**  The Tenant covenants to furnish to the Landlord, within
thirty (30) days after request by the Landlord, the date upon which
any such imposition is payable by the Tenant as in this Article
provided, official receipts of the appropriate taxing authority, or
other proof satisfactory to the Landlord, evidencing the payment
thereof.

Contesting
Tax

**Section 4.5**  The Tenant shall have the right to contest or
appeal at its own cost and expense, the amount or validity of
any such imposition by appropriate legal proceedings but this shall
not be deemed or construed in any way as relieving, modifying or
extending the Tenant's covenant to pay any such imposition at the time
and in the manner in this Article Provided.

**Section 4.6**  The Landlord shall cooperate, and testify, if necessary,
in any proceedings described in Section 4.5. Nor shall the Landlord be
subject to any liability for the payment of any costs or expenses in
connection with any proceedings brought by the Tenant, and the Tenant
covenants to indemnify and save harmless the Landlord from any costs
or expenses.

**Section 4.7**  The Certificate, advise or bill of the appropriate
official designated by law to make or issue the same or to receive
payment of such imposition, or the nonpayment of any such imposition,
shall be prima facie evidence that such imposition is due and unpaid
at the time of the making or issuance of such certificate, advise or
bill.

Repairs

**Section 5.1**  Landlord shall make the necessary structural repairs to
the roof and walls of the building of which the Premises are a part
(such obligation not to include operating parts such as overhead ducts
or fans or skylights).  Except for the above and for what may
otherwise be specifically provided for in this Lease, Tenant shall be
responsible for all maintenance and repairs of and to the premises,
including but not limited to the following responsibilities:  Tenant
shall take good care of the premises and the fixtures, appurtenances
and systems in or affecting the premises (including but not limited to
plumbing, sewers, gutters, downspouts, doors, painting, windows,
electrical heating and sprinkler and air conditioning, if any), and
shall make all repairs thereto or replace as and when needed to
preserve them in good working order and condition, and shall maintain
the premises in a clean, neat condition; and Tenant shall maintain the
parking area and other outside portions of the premises, including but
not limited to landscaping, all necessary removal of snow, ice and
debris, and maintenance of lawns, shrubbery and entranceways.  Tenant
shall not permit or suffer the premises to fall to such low
temperature as would cause freezing of the water lines or sprinkler
servicing the premises; and, in default hereof, Tenant shall promptly
effect and pay for all repairs the need for which shall arise from
such freezing, and shall hold Landlord harmless from any loss, damage
or liability caused by or arising out of such freezing.
Notwithstanding anything above to the contrary, all damage or injury
to the premises or to any other part of the said building, or to its
fixtures, equipment and appurtenances, whether requiring structural or
non-structural repairs caused by or resulting from carelessness,
omission, neglect or improper conduct of Tenant, its servants,
employees, invitees or licensees, shall be repaired promptly by Tenant
at its sole cost and expense, to the reasonable satisfaction of
Landlord.  Tenant shall also repair all damage to the premises caused
by the moving of Tenant's fixtures, furniture or equipment.  All the

3

SF01349

aforesaid repairs shall be of quality or class at least equal to the
original work or construction.  If Tenant fails after ten (10) days'
notice to proceed with due diligence to make repairs required to be
made by Tenant, the same may be made by Landlord, at Landlord's option
(in which event Landlord shall not be liable for any injury to
persons, damage to property or loss of business arising out of the
making of such repairs) at the expense of Tenant, and the expenses
thereof incurred by Landlord (together with interest at the Lease
Interest Rate, as hereinafter defined) shall be collectible as
additional rent with ten (10) days of demand therefor.  There shall be
no allowance to Tenant for a diminution of rental value and no
liability on the part of Landlord by reason of inconvenience,
annoyance or injury to business arising from the making or failing to
make by Landlord, Tenant or others, of any repairs, alterations,
additions or improvements in or to the fixtures, appurtenances or
equipment thereof.

Insurance    **Section 6.1**  The Tenant shall throughout the demised term, at its own
expense, keep the demised premises, together with the fixtures therein
and the fixtures, appurtenances and equipment used in the operation
thereof (the aforementioned shall apply only to those attached to the
realty), insured against loss or damage by fire, extended coverage and
vandalism and malicious mischief, to the full insurable value thereof,
as appraised from time to time for that purpose by a competent
appraiser to be appointed by Landlord, but in no event less than
$1,000,000.00 coverage for the demised premises, with a deductible not
to exceed $1,000.00, and will deliver the insurance certificates
therefor to the Landlord with proof of the payment of the premiums
thereon.  All such fire and casualty insurance policies shall contain
the usual extended coverage endorsement and shall inure and be made
payable to the Landlord and Tenant, as their interests may appear,
excepting however, that the Landlord at its sole option may direct
that the loss under any such policy of fire and casualty insurance
shall be made payable to holder(s) of any mortgage(s) on the fee of
the demised premises which under and subject to the provisions of this
Lease may then be superior in lien to this Lease, as well as to the
Landlord, as their respective interests may appear.

**Section 6.2**  Tenant, at its sole cost and expense, but for the mutual
benefit of Landlord and Tenant, shall maintain:

(a)  personal injury and property damage liability insurance against
claims, for bodily injury, death or property damage, occurring
thereon, in or about the demises premises or the elevators or any
escalator therein and on, in or about the adjoining streets, property
and passageways, such insurance to afford minimum protection, during
the term of this Lease, of not less that $500,000.00 in respect of
bodily injury or death to any one person, and of not less than,
$2,000,000.00 in respect of any one accident, and of not less than
$100,000.00 for property damage;

                    (b)  plate glass insurance;

                    (c)  rent insurance against loss of rent due to fire
and the risks now or hereafter embraced by "Extended Coverage" for the
full rental value of the Demised Premises, and in the event that the
building shall be damaged, in whole or in part, Landlord shall receive
so much of the proceeds of such insurance as shall equal the net rent
and additional rent and to the extent same is received by Landlord,
such amount shall be applied against the payment of such net rental
and additional rent hereunder; and

                    (d)  the Tenant shall furnish to the Landlord or its
mortgagee such evidence of insurance, as called for herein, as the
Landlord or its mortgagee may, from time to time, request.

**Section 6.4**  All insurance provided for in this Article 6 shall be
effected under valid and enforceable policies issued by insurers of

4

SF01350

recognized responsibility which are licensed to do business in the state in which the demised premises are located.

Section 6.5  All policies of insurance provided for in this Article 6 shall name Landlord and Tenant as insureds, as their respective interests may appear. Such policies shall also be payable, if required by mortgagee, to a mortgagee, as the interest of such mortgagee may appear. The loss, if any, under any policies provided for in this Article 6 shall be adjusted with the insurance companies by Landlord, and its mortgagee, if any. Each such policy shall contain a provision, that no act or omission of Tenant shall affect or limit the obligations of the insurance company to pay to Landlord the amount of any loss sustained.

Section 6.6  In the event that the Tenant carries a blanket fire insurance policy, then said policy shall specifically set forth the amount of insurance for the demised premises, which amount shall be determined in accordance with Section 6.1.

Section 6.7  In addition to the foregoing, Tenant covenants and agrees to indemnify and save harmless the Landlord of and from any and all claims, demands, liability, suits, actions, proceedings, judgments, executions, levies, costs, expenses and attorney's fees arising from or in connection with any breach of this Lease by Tenant or the use or operation of the demised premises by Tenant or the conduct of Tenant's business (unless caused solely by negligence of the Landlord, its employees or agents).

Section 6.8  Possession of Policies; Cancellation: All policies shall provide that they shall not be cancellable without at least 10 days written notice to Landlord. At least fifteen (15) days prior to commencement of the term, a certificate evidencing coverage of such policies therefor shall be delivered by Tenant to Landlord and at least thirty (30) days before each of such policies shall expire Tenant shall deliver a certificate evidencing renewal of such coverage.

Section 6.9  Nothing in this Article contained shall affect or limit Tenant's obligations under Article 7 hereof.

Section 7.1  Whenever Tenant is required to make any payments to the Landlord hereunder in addition to the basic rent, or whenever Landlord makes any payments hereunder required to be made by Tenant, or whenever Landlord makes any repair or replacement which Tenant is required to make hereunder and fails to make, all such payments shall be considered to be "additional" rent" and shall be paid to the Landlord in addition to the payment of "basic" rent next becoming due, and Landlord shall have the same rights and remedies against the Tenant for the collection and payment of said "additional" rent as it has in the case of nonpayment of "basic" rent by Tenant, and this right shall be in addition to and not in limitation of any other rights and remedies that the Landlord may have as in this Lease provided and by law.

Tenant's
Compliance
with Laws
and
Ordinances

Section 8.1  The Tenant covenants throughout the term of this Lease, at the Tenant's sole cost and expense to promptly comply with all present and future statutes and ordinances and orders, rules and regulations and requirements of all Federal, State, County and Municipal governments, and all legally constituted authorities and all appropriate departments, bureaus, commissions, boards and officers thereof, and with any directions or orders of any public officer or officers, which shall impose any duty or obligation upon the Tenant with respect to the demised premises or the use or occupancy thereof, and the orders, rules and regulations of the Board of Fire Underwriters where the demised premises are situate, or any other governmental body now or hereafter constituted, exercising similar functions. The Tenant will likewise observe and comply with the requirements of all policies of public liability, fire and all other policies of insurance at any time in force with respect to the

5

SF01351

buildings and improvements on the demised premises and the equipment thereof.

**Section 9.1**  In the event that any repairs or replacements which the Landlord is obligated to make pursuant to the provisions of Section 5.1 hereof are not completed as soon as the same can reasonably be done, Tenant shall have the right, to be exercised by twenty (20) days' prior notice in writing, by Certified Mail, Return Receipt Requested, to the Landlord, to make such repairs or replacements for the account and at the expense of the Landlord.

**Section 9.2**  In the event that the Tenant elects, under such circumstances, to make such repairs or replacements for the account and at the expense of the Landlord, the Landlord shall promptly reimburse the Tenant for the amount of any expenditures so made for any such repairs or replacements.  This shall not limit the Tenant's other rights and the Tenant may deduct the said sum from the rent.

**Section 9.3**  In the event that at the expiration or sooner termination of this Lease, the Tenant shall not have been fully reimbursed on account of all such expenditures so made, the Landlord shall remain liable to the Tenant for any such deficiency.

**Tenant Not to Make any Structural Changes**

**Section 10.1**  Tenant covenants and agrees not to injure the building, or to make any changes, alterations, additions, or improvements of any structural nature or character in, upon or to the demised premises or any part thereof, without first having obtained the written consent of the Landlord, which written consent the Landlord covenants will not be unreasonably withheld. Such written consent, if given by the Landlord, shall set forth the terms and conditions under and upon which said changes, alterations, additions or improvements of a structural nature or character may be made by the Tenant, all of which shall be the property of the Landlord and the same shall be made and done at the sole expense of the Tenant and said consent shall not be construed to suffer or permit any Mechanic's Notices of Intention, Mechanic's Liens, or any other lien or encumbrance to be filed against the demised premises or any part thereof, and if any are filed or recorded, the same to be discharged of record or the Landlord secured as provided in Section 10.2.

**No Mechanic's Liens**

**Right of Tenant to Make Alterations**

**Section 10.2**  Tenant shall have the right at any time and from time to time, during the term of this Lease, at its own cost and expense, to make alterations as may be necessary in connection with the requirements of the Tenant's business, other than structural alterations, to the building of the demised premises, but this right of consent shall not be construed to permit any Mechanic's Notice of Intention, Mechanic's Liens, or any other liens or encumbrances to be filed against the demised premises or any part thereof, and if any are filed, Tenant covenants and agrees, at its own cost and expense, to have the same discharged of record within thirty (30) days after the filing or recording of same, excepting that Tenant shall have the right to contest the validity of any said Notice or lien in which event, Tenant shall furnish Landlord with sufficient and satisfactory security by cash, bond or otherwise, as the Landlord's title insurance company may reasonably request, to protect Landlord against all losses, damages, injury, penalties, fines, costs, expenses, counsel fees and foreclosure of any mortgage by reason of such non-compliance and upon failure to do so Landlord shall have the same rights as provided in paragraph 19.

**Section 10.3**  No alterations by the Tenant shall be undertaken until Tenant shall have procured and paid for, so far as the same may be required from time to time, all municipal permits of authorization of all Governmental authorities, Bureaus, Departments, Boards, Commissions, and officials thereof, having jurisdiction.

**Landlord's Right to Inspect**

**Section 11.1**  Tenant agrees to permit the Landlord and the authorized representatives of the Landlord at its option to enter the demised premises at all reasonable times, during usual

6

SF01352

and To
Make
Repairs

business hours for the purpose of inspecting the same and making any repairs to the demised premises that Tenant is obligated to make under this Lease, subject to Article 5 hereof, as the case may be, and also to perform any work therein that may be necessary to comply with any laws, ordinances, rules and regulations or requirements of any public authority or of the Board of Fire Underwriters or any similar body that Tenant is obligated to make or that the Landlord may reasonably deem necessary to prevent waste or deterioration in connection with the demised premises, all of which shall be at the cost and expense of the Tenant. Nothing herein shall be deemed to amplify the duty of the Tenant to repair or maintain as called for in this agreement.

Section 11.2  All sums so paid by the Landlord and all necessary and incidental costs and expenses in connection with the performance of any such act by the Landlord shall be deemed additional rent hereunder.

Section 11.3  Nothing herein shall imply any duty upon the part of the Landlord to do any such work, which under any provisions of this Lease; the Tenant may be required to perform and the performance thereof by the Landlord shall not constitute a waiver of the Tenant's default in failing to perform the same, or obligate the Landlord to make the same at any time.

Section 11.4  The Landlord may, during the progress of any work in the demised premises, keep and store all necessary materials, tools and equipment in such manner upon the demised premises as not to unreasonably interfere with Tenant's business operations, at such places that the Tenant may designate.  The Landlord shall not in any event be liable for inconvenience, annoyance, disturbance, loss of business or any damages that Tenant may suffer or sustain by reason of making any repairs or the performance of any work in the demised premises, on or account of bringing or storing any materials, supplies and equipment into or upon the demised premises during usual business hours and obligations of the Tenant under this Lease shall not thereby be affected in any manner whatsoever.  The Landlord agrees to do all such work at all reasonable times during usual business hours and in connection with the doing of any such work to cause as little inconvenience, annoyance, disturbance, loss of business or other damage to the Tenant as may reasonably be possible in the circumstances, and in the event the Landlord shall cause any damage to Tenant's property or if damage caused by Landlord's or its agents or contractor's negligence, Landlord shall be liable for the damage.

No Rights
Obtained
Under
Operation
of Law of
Judicial Sale

Section 12.1  It is covenanted and agreed that if anyone shall acquire any right, title or interest in, to, or under this Lease, under and by virtue of any judicial sale, process, suits, actions, levies, executions, sales under legal proceedings of any kind, nature or description whatsoever, without first having obtained the written

consent of the Landlord, which consent the Landlord covenants and agrees not to withhold unreasonably, the Landlord shall have the right to cancel and terminate this Lease and options herein mentioned as if that were the date originally fixed for the expiration of the demised term and the Tenant shall be and remain liable for the performance of the provisions of this Lease, notwithstanding anything herein contained or any law or statute to the contrary.  Mergers, consolidations, inter-company transactions shall not apply to the above.

Tenant to
Permit
Landlord
to Exhibit
Premises
to Purchaser
Purchaser
or Tenant

Section 13.1  Landlord shall have the right and privilege to enter the demised premises at reasonable times during business hours, to inspect the demised premises for the purpose of determining the conditions of the said premises, but shall not be obligated to do so.  Tenant also agrees to permit the Landlord or its authorized agents and representatives to show the demised premises at reasonable times during business hours to persons wishing to hire and purchase the same within six (6) months prior to the

7

SF01353

expiration of this Lease.

| | |
|---|---|
| "To Let" or "For Sale" Signs | **Section 13.2**  Tenant further agrees that on and after six (6) months next preceding the expiration of the initial term or of any extended or renewed term, if any, hereby granted or the sooner termination thereof, in the event Tenant shall not have served notice of its election to exercise the options to extend the initial term of the Lease, if any, the Landlord or its agents shall have the right to place "To Let" and "For Sale" signs or notices on the front of said premises, or any part thereof, offering the premises for rent or for sale, and Tenant hereby agrees to permit the same to remain thereon without hindrance or molestation, same not to interfere with signs maintained by Tenant. |
| Tenant to Replace Glass | **Section 14.1**  In case of any damages or injury occurring to any of the glass in the demised premises, the Tenant shall cause said damage or injury to be repaired and replaced as speedily as possible at its own cost and expense. |
| Tenant to Pay all Elec. Power, Water, & Indemnify Landlord against Liens, etc. | **Section 15.1**  Tenant covenants and agrees to pay for all electric current, light, power, gas, water, sewer and other services furnished to, used or consumed in or upon the demised premises from and after the commencement date hereof, including, but not limited to, the water used for drinking, toilets, sprinkler, ventilation, air-conditioning and fire purposes and all service charges in connection therewith. |
| Charges for Water, etc. not to become Liens | **Section 15.3**  Tenant covenants and agrees that the above mentioned costs and charges shall not become liens against the demised premises or any part thereof, and to pay or cause to be discharged any liens against the demised premises resulting from the Tenant's failure, to pay, when due, the above mentioned costs and charges, or for any charges for utility services furnished it, and agrees to indemnify and save harmless the Landlord from and against the payment of said items, costs, charges and services hereinabove mentioned. The Tenant may contest the validity of such liens and in such event, shall post a bond or other security as provided in Section 10.2 hereof, and the Landlord will cooperate and testify, if necessary. |
| Tenant to Supply & Pay for Fuel, Heat & Maintain Sprinkler System & Keep From Freezing | **Section 15.4**  Tenant agrees to furnish and supply at its own cost and expense, its own heat and fuel to the demised premises and to and for the air-conditioning, sprinkler, cooling and ventilating systems, during the original term and any renewal and extension thereof.

**Section 15.5**  Tenant agrees to and shall, at its own cost and expense, keep and maintain the sprinkler and sprinkler system from freezing during the term hereof.

**Section 15.6**  Tenant shall also pay for all telephone service installed and used by the Tenant in the demised premises. |
| Tenant Not to Permit Waste Nuisance, to Encumber Sidewalks,etc. | **Section 16.1**  Tenant, at its own cost and expense, throughout the initial term and any extensions or renewals thereof shall suffer no waste nuisance or injury to any part of the demised premises and shall keep the sidewalks in front of the demised premises and the driveways and the platform of the building reasonably free, clear and clean of dirt and rubbish. |
| Tenant shall have the right to install furniture, | **Section 17.1**  Tenant shall have the right to install, at its own expense, such equipment, furniture and fixtures, as it considers necessary or advisable in the conduct of its business.  The Tenant shall have the right to remove all such equipment, furniture and fixtures used in the conduct of the Tenant's business, (as distinguished from fixtures and equipment used in connection |

8

SF01354

fixtures,etc.

with the operation and maintenance of the building and its improvements and affixed to and made a part of the realty), at any time and from time to time during the term hereof and upon the expiration or other termination of this Lease.

Section 17.2  In the event that the Tenant removes any or all of said equipment, furniture and fixtures, the Tenant shall pay all costs and expenses of any such removal and shall leave the demised premises in as good a state and condition as they were at the commencement of the initial term of this Lease, reasonable wear and tear, damage by fire, casualty and the elements excepted.  Any damages caused to the demised premises and the building by the removal of such equipment, furniture and fixtures shall be repaired by the Tenant, at its own cost and expense, to as near its original state and condition of said premises as is reasonably possible, subject to reasonable wear and tear and other conditions hereinbefore set forth, and for the failure of Tenant to make such repairs, Landlord shall have the right to do so for and on behalf of and at the expense of the Tenant and the Tenant covenants and agrees to forthwith fully pay on demand to the Landlord the cost of all such expenditures so made by the Landlord.

Section 17.3  In the event that the Tenant abandons any such equipment, furniture and fixtures, in whole or in part, upon the expiration or sooner termination of this Lease, such equipment, furniture and fixtures so abandoned or any part thereof so abandoned, shall, at the election of the Landlord, become the property of the Landlord, or in the event that the Landlord elects not to retain said equipment, furniture and fixtures, or any part thereof, the Landlord shall have the right to remove the same or any part thereof and charge the Tenant the reasonable costs of such removal.

Subordination to Mortgages

Section 18.1  This Lease is hereby made and shall be subject and subordinate to all mortgages which may now or hereafter affect the Premises, and to all renewals, modifications, consolidations, replacements or extensions thereof.

Tenant's Certificate

Section 18.2  Notwithstanding the automatic applicability, as to all current and future mortgages, of the subordination of this Lease, Tenant shall, upon request of Landlord, execute any instrument which may be deemed necessary or desirable by Landlord to confirm such subordination or as otherwise required for mortgage financing or sale of the Premises including, but not limited to, certified financial statements and estoppel certificates executed and acknowledged to any mortgagee or purchaser, or any proposed mortgage lender or purchaser, including but not limited to, certifications that this Lease is in full force and effect or, if not, in what respect it is not; that this Lease has not been modified, or the extent to which it has been modified; and that there are no existing defaults hereunder to the best of Tenant's knowledge, or specifying the defaults, if any.  If Tenant fails to respond after due notice within seven (7) days, it shall automatically constitute affirmation of the items contained in the estoppel statement.

Tenant shall have the right to cure default of any mortgage

Section 18.3  In the event that the Landlord or any subsequent Mortgagor or Owner of the demised premises shall fail to make any payment required by any such mortgage or mortgages, or shall fail to perform any covenant contained therein, the Tenant shall have the right to make such payments to the holder or holders thereof or to cure any such default, and, in such event, the Landlord shall reimburse the Tenant in the amount of any expenditure so made, or Tenant may deduct the same from the basic rent payable under this Lease.  In the event that, at the date of expiration or other termination of this Lease, the Tenant shall not have been fully reimbursed on account of all expenditures so made, the Landlord shall remain liable to the Tenant for any such deficiency.

Mechanic's Notice of Intention

Section 19.1  Tenant covenants and agrees, that if the Tenant shall fail to discharge of record any Notice of Intention to file a Mechanic's Lien or any Mechanics' Liens that may be filed during the

9

SF01355

and
Mechanic's
Liens

term of this Lease against the demised premises, or any part thereof, by reason of any work performed, serviced rendered or material furnished to the demised premises on behalf of the Tenant then, in addition to any other right or remedy of the Landlord, the Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such Notices and Liens by deposit in court or by giving security or in such other manner as is, or may be prescribed by Law. Any amounts paid by the Landlord for any of the aforesaid purposes, and all reasonable legal and other expenses of the Landlord, including reasonable counsel fees, in or about procuring the discharge of such Notices and Liens, with all necessary disbursements in connection therewith, shall be repaid by the Tenant to the Landlord on demand and if unpaid may be treated as additional rent. Nothing herein contained shall imply any consent or agreement on the part of the Landlord to subject the Landlord's estate to liability under any Mechanics' Lien law. The Tenant shall have the right to contest any such Notice of Intention of Mechanics' Lien in the manner provided in Section 10.2 hereof, and post bond or security as provided therein and if the Tenant should so contest the validity, the Landlord will not interfere.

Notices

Section 20.1 All notices, demands and requests provided for by this Lease which may or are required to be given by either party to the other shall be in writing and shall be sent by United States Certified Mail, Return Receipt Card Requested, postage prepaid, to the Landlord or Tenant, as the case may be, addressed to such address as set forth on Page One of this Lease or to such other place as Landlord or Tenant may from time to time designate in writing sent to the other in the same manner as herein provided for giving of notice.

Section 20.2 The date of giving of said notices, demands and requests shall be deemed the date stamped by any General or Branch of United States Post Office on the envelope or wrapper enclosing said notice, demand and request and which shall be served upon the Landlord or the Tenant in the manner aforesaid and shall be deemed sufficiently served or given for all purposes hereunder at the time such notice, demand or request shall be mailed as aforesaid mentioned. In addition to the notice, demand or request being given in the manner stated, all such notices, demands or requests shall be given to the Tenant by Telegram.

Tenant not
to Assign
Sub-Let,
Mortgage,
etc.,Lease

Section 21.1 It is covenanted and agreed that the Tenant shall have no right to and shall not give, sell, assign, transfer, mortgage, chattel mortgage, pledge, lien, encumber or otherwise dispose of this Lease, in whole or in part, or of the Leasehold interest of the Tenant, or any part thereof, or any interest therein or any part or parts thereof, in any manner whatsoever including, but not limited to, by operation of law, judicial sale, process, suits, actions, levies, executions, sales or proceedings or otherwise,nor sublet, underlet, or underlease the demised premises or any part thereof, without first having obtained in each and every instance thereof, the written consent of the Landlord and its mortgagee, if any, under a penalty of forfeiture of this Lease and damages, provided, however, Landlord covenants that it will not withhold said written consent unreasonably.

Section 21.2 Any gift, sale, assignment, transfer, mortgaging, chattel mortgaging, subletting, underletting or underleasing to which Landlord's and Mortgagee's consent has been given shall be subject to the payment of the rents, additional rents, sums of money, impositions and the performance of all the terms, covenants and conditions of this Lease, and in the case of gift, sale, assignment, or transfer of this Lease, or the subletting, underletting or underleasing of the demised premises or any part thereof the purchaser, grantee, assignee, or sublease or undertenant shall first execute and deliver to Landlord a recordable instrument assuming the performance of all the Tenant's obligations under this Lease. Any required consent given by the Landlord and Mortgagee shall not be deemed to waive or affect the requirement of the Tenant to procure the Landlord's and Mortgagee's consent to any subsequent gift, sale,

10

SF01356

assignment, transfer, mortgaging or chattel mortgaging, subletting, underletting, or underleasing and shall not be deemed to waive or affect the further and future requirements of the Landlord's and Mortgagee's consent for any of the purposes as in this Article mentioned. No consent at any time given by the Landlord and mortgagee for any of the purposes in this Article mentioned shall relieve the Tenant from any of the Tenant's obligations in this Lease contained. A copy of all said instruments shall be delivered to the Landlord and mortgagee.

Section 21.3  Notwithstanding anything in this Lease contained to the contrary, any gift, sale, transfer, disposition, assignment, subletting, mortgaging, chattel mortgaging or subletting or underleasing made by the Tenant, or any assignee, transferee, subtenant or undertenant, except as in this Article 21 mentioned, shall be null and void and of no force and effect.

Section 21.4  If this Lease be assigned with the consent of the Landlord and Mortgagee or if the whole or any part of the demised premises are sublet as in this Lease provided, or occupied by anyone other than the Tenant, the Landlord may collect the rents and other sums to be paid as in this Lease mentioned from said assignee, subtenant, or occupant or anyone else, and apply the net amount collected to the rents and other sums, payments and impositions therein reserved to be paid by the Tenant, and the Tenant shall be and remain liable for the payment of any deficiency arising under the terms, covenants, conditions, agreements and provisions as in this Lease provided, and the collection by the Landlord of any rents and other sums, payments and impositions as in this Lease mentioned from any assignee, subtenant, occupancy or anyone else, shall not be deemed a waiver of this covenant or release or discharge the Tenant from its obligation to pay said rents and other sums specified in this Lease.

Section 21.5  Notwithstanding anything contained in Section 21.1 through 21.4 inclusive of this Lease, the Tenant shall be permitted to assign this Lease or to sublet to any parent, subsidiary or financially affiliated or spin-off corporation, all without first obtaining the Landlord's consent.

Damage by Fire or Casualty and Abatement of Rent

Section 22.1  In the event that during the demised term, the demised premises shall be damaged or destroyed by fire, explosion or other casualty, Tenant shall give prompt written notice thereof to the Landlord.

Section 22.2  Subject to the provisions set forth in this Lease, including without limitation, Section 22.3, in the event that during the demised term, the demised premises shall be partially damaged by fire, explosion or other casualty, Landlord shall as soon as reasonable proceed to repair such damage without any abatement of rent.

Damage by Fire or Casualty and Abatement of Rent

Section 22.3  In the event of the damage or destruction of the demised premises by fire or other cause, Landlord will promptly repair and restore, as the case may be, the premises, so that the premises after such work shall be substantially the same as prior to such damage.  It is agreed that in the event of such damage or destruction this Lease shall continue in full force and effect.  It is expressly agreed that if a partial destruction, as above described, shall occur, the rent, additional rent and other charges to be paid by Tenant shall not abate unless the premises shall be thereby rendered untenantable so as to totally preclude the conduct of Tenant's business therein. If the premises should be thus rendered untenantable, the rent shall abate until the premises can again be used for Tenant's usual business.  The requirement that Landlord act promptly in repairing and restoring the premises is subject to a reasonable opportunity by Landlord to adjust the loss with Tenant's respective insurance companie(s), as well as the receipt by Landlord of the agreed upon insurance proceeds to effect such repair and restoration and the amount of the deductible which shall be paid by Tenant to Landlord.

SF01357

In the event that the demised premises shall be partially damaged or destroyed by fire or other cause so as effectively to limit the use of a portion of the premises for the business of Tenant, then the rent shall abate in proportion to the size of the area rendered untenantable until such time as effective use of said area is restored.  Notwithstanding anything herein to the contrary, in the event the demised premises shall be destroyed or so damaged by fire or other casualty as to be untenantable, and to such an extent that they cannot be repaired or restored with reasonable diligence within one hundred twenty (120) days of such damage, Landlord at its option by written notice may terminate this Lease (setting forth in said notice the date of termination); and in such case the rent shall be apportioned to the date of the damage, and Tenant shall immediately surrender possession of the demised premises to the Landlord, and the within Lease shall be considered null and void and at an end.  Other than as set forth herein, no compensation or claim will be allowed by Landlord to Tenant by reason of inconvenience or annoyance arising from the said damage or other casualty.  In the event the premises are repaired, all improvements or betterments placed by Tenant on the demised premises shall be repaired and restored by Tenant at its own expense and not at the expense of Landlord.  Tenant expressly waives such rights as it might otherwise have by law or by statute in the event of damage or destruction by fire or other cause which differ from its rights in such cases as specified in this Article, but this waiver shall not affect Tenant's express rights under the provisions of this Lease.  Anything to the contrary notwithstanding, if the building and improvements on the demised premises are destroyed or damaged during the last two years of the term of this Lease or of any extension thereof to the extent of fifty (50%) percent or more of the then value of the said building and improvements, then the Landlord may terminate this Lease as of the date of such damage or destruction by giving written notice to the Tenant within thirty (30) days thereafter of his election to do so, unless within such thirty day period Tenant shall give notice of its intention to extend the term or renew the Lease in accordance with any option, which it may have, in which case the Lease shall not be terminated although notice of termination may previously have been given.  The Tenant shall have a like option to cancel, as is given herein to the Landlord, if repair cannot be completed and a new certificate of occupancy delivered within the 120 day period.

Section 22.4  No penalty or liability shall accrue against the Landlord for reasonable delays which may arise by reason of adjustment and collection of insurance.

Condemnation | Section 23.1

    (a)  It is covenanted and agreed that if at any time during the term hereof, the whole of said demised premises shall be taken, condemned or sold or purchased under, in or by virtue or as a result of or growing out of the exercise of the power of condemnation or eminent domain, or under threat of condemnation or right of eminent domain, action, suit, sale, settlement or compromise, under any law, general, special or otherwise, by any governmental authority or any agency thereof or by any person or corporation, public, private or otherwise, having the power of condemnation or eminent domain, or as a result of any sale, or of the settlement or compromise of any suit, action, proceeding, taking or condemnation, or threat of condemnation, or right of threat of eminent domain, herein and hereinafter referred to as "proceedings", to any governmental authority or any agency thereof, or to any said person, or corporation, public, private or otherwise, having the power of condemnation or eminent domain, the Landlord shall be entitled to, and shall receive the entire proceeds and payment of any sum or sums of money, award, compensation, settlement, compromise, purchase price and damages paid or to be paid in connection with any of the foregoing;

    (b)  If such "proceedings" shall result in the taking of the whole of the demised premises, then this Lease and term thereof shall terminate and come to an end on the date set for hearing in the

12

SF01358

event of litigation by the Landlord.  In such event the Tenant shall then become a month to month Tenant under the terms hereof.  The Tenant shall pay all "basic" and "additional" rents and all additional and other sums of money, impositions, losses and damages that may be due or to become due to the Landlord from the Tenant or that are payable by the Tenant under and pursuant to the terms and provisions of this Lease and to the date of said vesting of title and the vacation of the premises by Tenant.  Any rent paid in advance shall be apportioned as of said date and the Landlord shall promptly pay to the Tenant the portion of any such rent so found to be due the Tenant.  There shall be an accounting between the parties as to the rents and other sums payable by the Tenant.

(c)  In the event that such "proceedings" shall result in the taking of a part of the demised premises, this Lease shall terminate as to the portion taken and shall only be effective as to the part of the demised premises remaining, except as hereinafter set forth, and there shall be an accounting between the parties as to the rents and other sums payable by the Tenant to the Landlord and as to the "basic" and "additional" rents and other sums to be paid by the Tenant for the part remaining for the balance of the original term of this Lease, shall be agreed upon between the parties hereto.  In the event of a disagreement by the parties in regard thereto, then the amounts are to be fixed by two Appraisers to be appointed for that purpose, one by the Landlord and the other by the Tenant and the parties hereto severally agree to appoint its respective Appraiser within thirty (30) days after such disagreement.  The amounts shall be fixed, apportioned and based on the rent actually payable under this Lease immediately prior to such taking.  In case said Appraisers cannot agree upon such rental and other sums within thirty (30) days after their appointment, then they will choose and appoint an Umpire to act as a third Appraiser with them, and the decision of any two of them, the said Appraisers and Umpire shall be binding, final and conclusive on both the Landlord and the Tenant.  If, however, the said two Appraisers shall fail within thirty (30) days after their appointment to select an Umpire, as herein provided, then application can be made to a Judge of the Superior Court of the State of New Jersey, presiding in Somerset County, or if he shall fail or refuse to act, then to such other judicial officer who may have jurisdiction in said County in the matter for the purpose of appointing or choosing such Umpire.

In the event that such "proceedings" shall result in the taking of a part of the demised premises, the Landlord shall promptly make, at its own expense, such alterations in the portion of the demised premises not taken pursuant to said proceedings as shall be reasonably necessary in order to adapt said portion of the demised premises to the use of the Tenant.

(d)  Notwithstanding anything in Subdivision (c) of this Section 23.1 contained to the contrary, it is agreed that in the event that more than 35% of the demised premises shall be taken as a result of any such "proceedings" as in this Article mentioned during the demised term or any extension or renewal thereof, and in the event that the Tenant in the reasonable exercise of its judgment determines that, that portion of the demised premises so taken affects and renders the remainder of the demised premises reasonably unusable by the Tenant and by reason thereof the Tenant desires to terminate this Lease, then this Lease shall terminate and come to an end as provided above.  Any rent paid in advance shall be apportioned as of said date and the Landlord shall promptly pay to the Tenant the portion of any such rent so found to be due the Tenant.  Upon the termination of this Lease by the Tenant as herein set forth there shall be an accounting between the parties hereto as to the rents and other sums, impositions and amounts payable by the Tenant to the Landlord.  Any rent paid in advance shall be apportioned between the parties as of the date herein mentioned.

13

SF01359

(e)  Tenant shall not be entitled to receive any part of the judgment or award granted to Landlord.  Nothing herein contained shall prohibit Tenant from filing a claim in said proceeding and from receiving and retaining an award if said award be specifically awarded to Tenant and does not reduce the award to which Landlord would be entitled if said claim had not been filed by Tenant.

(f)  Notwithstanding anything to the contrary, the Tenant shall be entitled to claim in any condemnation proceedings its losses for improvements, property and business.

(g)  Any such taking, condemnation, settlement, compromise, sale or purchase as in this Article 23 mentioned, shall not be considered or construed to be a breach or violation of the Landlord's covenant of quite enjoyment as in this Lease provided.

**Bankruptcy and Insolvency, etc.**

Section 24.1  It is agreed that if at any time during the term of this Lease a petition, bill, or complaint, voluntary or involuntary in bankruptcy or insolvency shall be filed by or against the Tenant and it shall be adjudicated a bankrupt or declared insolvent, or if said petition, bill or complaint shall have for its purpose the extension of the time of payment, composition, adjustment, modification, settlement or satisfaction of the liabilities of the Tenant or if any suit, actions or proceeding be instituted by or against the Tenant for its reorganization under any bankruptcy or insolvency act or law, and if a Receiver or Trustee shall be appointed or elected upon such adjudication of bankruptcy or declaration of insolvency, or if a Receiver or Liquidator be appointed or Trustee elected of the Tenant's estate in any State Court or in any Federal Court in bankruptcy or in Federal Equity, or in any reorganization action, suit or proceeding under any Bankruptcy or Insolvency Laws of the United States, or any State Court, or any other law, or if the Tenant shall be left in possession of its estate or any part thereof, or by any Court order, and if said appointments and elections of said Receiver - Trustee or Liquidator, or said actions, suits or proceedings are not vacated within thirty (30) days after such appointment or election, actions, suits or proceedings, or if said Tenant shall make an Assignment for the benefit of creditors, or if the Tenant takes advantage of any insolvency law or action, or if the Tenant shall compound its debts or assigns either the Tenant's estate or effects for the payment therefor, or if a Writ of Attachment shall issue or if any judgment shall be entered and remain unpaid or unbonded for a period of thirty (30) days after notice to the Tenant, or if said judgment shall not be appealed and security for the payment of said judgment posted, whereby an execution might be levied against Tenant's leasehold estate under this Lease or against any part of the demised premises, or if this Lease shall be transferred by operation of law or by judicial sale devolve upon or pass to any person or persons other than in the manner permitted by and under the provisions of this Lease, without the written consent of the Landlord first had or obtained, then, in the event the Tenant fails to pay such judgment within the time aforesaid or take an appeal therefrom and post security on appeal so as to prevent execution, or if said attachment proceedings shall not be vacated or if any involuntary bankruptcy or insolvency proceedings against Tenant is not dismissed as herein mentioned, and if the Tenant shall fail during such proceedings to pay the rent, additional rent and other sums and obligations assumed by or which the Tenant is obligated to pay under the provisions of this Lease, then in any such event, this Lease shall thereupon be deemed to have been breached and terminated, and shall not be considered as a part of the Tenant's property or estate, and the term of this Lease any any extended and renewed term thereof, and the respective options to renew this Lease and to purchase the demised premises shall cease and terminate and the Tenant, its Receivers, Trustees and Liquidators shall not be liable to the Landlord for all losses and damages sustained by the Landlord, and the Landlord shall have the right of immediate re-entry to the demised premises as hereinafter set forth.

14

SF01360

Section 24.2  If this Lease is terminated as set forth in Section 24.1 hereof, no right, title or interest in this Lease shall vest in or pass to any Receiver, Trustee, Assignee or Liquidator, or in any other person or persons hereinabove mentioned, and it shall be lawful for the Landlord, its successors and assigns, and its agents, attorneys and representatives, at its election at any time thereafter to re-enter into and upon the said premises or property or any part thereof, the owner shall have the right to re-enter, either by force or otherwise, and the same to have again, repossess, hold and enjoy the same as of the Landlord's first and former estate, aside from these presents and the demise intended to be hereby made as aforesaid, without being liable to any prosecution or damages therefor for said re-entry, and to relet the said premises or any part thereof for any period equal to or greater or less than the remainder of the demised term and for any extension and renewals thereof either with options or otherwise, for and upon rentals, sums, terms and conditions that to the Landlord may be reasonable, to receive any of the rents thereof and to apply the same to the payment of all damages, expenses and disbursements of every kind, character and description that the Landlord may be put to by reason of any of the foregoing or for the default, or of the violation or breach of this Lease, including Broker's Commission, disbursements, expenses, counsel fees, and costs of repairing, altering, improving, dividing and changing the demised premises by virtue of said re-entry or of said re-rental and to apply the balance of the payment of all "basic" and "additional" rent, impositions and sums then due or thereafter to become due or that would have become due for the balance of the demised term, together with any and all other losses and damages suffered or sustained or that my be suffered or sustained by the Landlord, and the Landlord shall be entitled to recover from the said Tenant or its property or estate, its Receiver, Trustee, Assignee and Liquidator, and such other person or persons above-mentioned, an amount equal to the amount of rent reserved in this Lease for the residue of the term hereof, together with the sums above-mentioned, or for any deficiency as the case may be, and the aforesaid mentioned parties shall be liable for the payment of same, and that neither said Tenant, nor any Receiver, Trustee, Assignee or Liquidator, person or persons above-mentioned shall be entitled to any surplus arising as a result of said letting, but the same shall belong to the Landlord, notwithstanding any acts, suits, actions or proceedings, instituted by the Landlord and notwithstanding anything herein contained or by law or statute to the contrary.

Landlord's right to sue Tenant, Receiver, etc.

Section 24.3  Separate actions may be maintained by the Landlord at such time and times as the Landlord may deem advisable against the Tenant's Receiver, Trustee, Liquidator and Assignee, from time to time to recover any rent, sums of money and damages, which at the commencement of any such action, suit or proceeding, Landlord is entitled to recover, without waiting until the end of the term hereof.

Breach, Violation or default of covenants, etc. by Tenant

Section 25.1  It is covenanted and agreed that if the Tenant shall, during the term of this Lease, fail or neglect to keep or perform any of the terms, covenants or conditions of this Lease or shall default in, or breach or violate any of the same which on the part of the Tenant are or ought to be observed, kept or performed; other than the provisions as to the non-payment of "basic" rent or "additional" rent hereby reserved, or any taxes or assessments, water charges, impositions and insurance premiums required to be paid by the Tenant as in this Lease provided), then in any such event, Landlord shall give to Tenant notice of such default, breach or violation.  If such default, breach or violation is not cured, corrected or remedied within sixty (60) days after the giving of such notice or if the same cannot be cured; corrected or remedied within said sixty (60) days and the Tenant fails to diligently commence and continue to cure, correct and remedy said default, breach or violation within said period and to prosecute expeditiously whatever may be necessary to be done to cure, correct and remedy said default, breach or violation or if any such default, breach or

15

SF01361

violations causes or creates a condition or emergency in character that is likely to be harmful to life or property, and within 7 days after notice given by the Landlord to the Tenant of said default, breach or violation, the same is not cured, corrected and remedied by the Tenant within said time (excepting however, that the Landlord shall be obligated to give ten (10) days notice of the non-payment of the above-mentioned rents, taxes and assessments, impositions, water charges and insurance premiums, then it shall be and may be lawful for the Landlord, at its option, to enter into and upon the demised premises and property without being liable to any damages, suit or prosecution thereof and to endeavor to cure, correct or remedy any of said defaults, breach or violations hereinabove mentioned, for and on behalf of and at the cost and expense of the Tenant and the Tenant covenants and agrees to be and to remain liable and to pay for the costs and expenses thereof to the Landlord on demand, and if not paid as aforesaid, the said costs and expenses shall be considered "additional" rent and this right shall be in addition to any other rights and remedies the Landlord may have, including but not in limitation of, the right of the Landlord to terminate this Lease and the estate hereby created, upon a day fixed either in the notice aforesaid, or in any subsequent notice given by the Landlord, and the terms of this Lease shall terminate and come to an end on the day so fixed as if this Lease had by its term expired at the time and Tenant shall be and remain liable for all damages that Landlord has and may suffer and sustain by reason thereof.

Section 25.2  In the event that the Landlord shall terminate this Lease, it shall be lawful for the Landlord to enter into and upon the demised premises or property without being liable to damages, suit or prosecution therefor and to re-enter and repossess the same either by force, summary proceedings, or otherwise, and to remove all persons and property therefrom and again to have, hold and enjoy the said premises as of its first and former estate and interest therein as if this Lease had not been granted or made, nor if the term herein granted had expired by limitation.

Tenant's
Failure
to pay
"Basic"
and
"Additional"
rent, etc.

Section 25.3  Notwithstanding anything contained in Section 25.1 to the contrary, it is agreed that in the event the Tenant shall neglect, fail or refuse to pay any impositions, or insurance premiums required to be paid by it as and when the same shall be due and payable under the provisions of this Lease, the Landlord shall, before taking any action or proceedings in connection with the non-payment of said rents, or impositions; and insurance premiums give a twenty (20) day notice to the Tenant at any time after the time fixed for the payment of said rents, impositions and insurance premiums, and in the event that the Tenant does not pay said rents, impositions, and insurance premiums prior to or at the expiration of said twenty (20) days, then in any such event, it shall be lawful for the Landlord in addition to any other rights and remedies which the Landlord may have, to enter into and upon the demised premises or property, without being liable to damages, suit or prosecution therefor, and without instituting any action or proceeding for the recovery or repossession of said demised premises, either by force or otherwise, and again to have, hold and enjoy the said premises as and of its first and former estate and interest therein, as if this Lease had not been granted or made, or as if the term herein granted had expired by limitation, without being liable to prosecution or damages therefor, and to deal with or rent said demised premises under the same terms and conditions as set forth in Section 25.1 hereof, which section for said purposes shall be considered incorporated herein and a part hereof, as if the same were actually and fully at length herein set forth, and the Tenant shall be and remain liable for all damages that the Landlord has and may suffer and sustain by reason thereof.

Tenant
Liable in
Event
Landlord
Terminates

Section 25.4  In the event that this Lease and the term thereof is terminated, or the Landlord re-enters the premises as in this Article provided, the Landlord shall have the right to re-let said premises or any part thereof for any period equal to or greater or less than the remainder of the demised term for any

16

SF01362

Lease and
Re-enters
Premises

reasonable sum to any Tenant suitable and satisfactory to the
Landlord for any purpose or use which the Landlord may deem
appropriate and to receive the rents thereof and apply the same to the
payment of all damages, expenses and disbursements of every kind,
character and description that the Landlord may be put to by reason of
said termination or re-entry, including Broker Commissions, Counsel
fees, costs of repairing, altering, dividing, improving and changing
the demised premises and to apply the balance to the payment of all
"basic" and "additional" rents and other sums then due or thereafter
to become due or that would have become due for the balance of the
demised term, together with any and all other losses and damages
suffered or sustained or that may be suffered or sustained by the
Landlord, and the Landlord shall be entitled to recover from said
Tenant because of such termination or re-entry, an amount equal to the
amount of rent reserved to be paid as in this Lease provided for the
balance of the term thereof, together with all rentals and sums of
money to be paid by the Tenant, and in the event of any deficiency,
the Tenant shall be liable for the payment of the same but that the
Tenant shall not be entitled to any surplus arising as a result of
said termination and re-letting, but the same shall belong to the
Landlord, notwithstanding any acts, suits, actions or proceedings
instituted by the Landlord against the Tenant and notwithstanding
anything herein contained or any law or statute to the contrary.

No Space
Demised
Lying in
or under
any public
streets,etc.

Section 26.1  No space appurtenant to or attached or connected with
the demised premises, lying in, upon or under any public street, road,
or highway or other public or quasi public property is included in
this demise.

Threatened
Breach
restrained
by
Injunction

Section 27.1  Any breach or threatened breach by Tenant of any of
the terms, covenants and conditions or provisions hereby may be
restrained by Landlord by injunction, and Landlord shall have the
right to invoke any other remedy allowed at law or in equity as
if re-entry, summary proceedings and other remedies were not herein
provided for, in addition to any and all other rights and remedies
Landlord may have under the provisions of this Lease.  Mention in this
agreement of any particular remedy shall not  preclude Landlord from
pursuing any other remedy at Law or in equity.

Landlord
Not Obligated
to Re-enter
or Make
Repairs

Section 28.1  Such entry, or said compliance with the within
mentioned statutes, laws, ordinances, orders, rules, requirements
and regulations, or the making of any said repairs by the Landlord
shall not have obligated or imposed any duty on the Landlord
then to have made the same, or in the future to make any repairs or
or compliance as aforesaid, notwithstanding anything
herein contained or any law or statute to the contrary.

Tenant's
right to
contest
ordinances,
etc.

Section 28.2  The Tenant shall have the right, at its own cost
and expense, to contest or review by appropriate legal proceedings,
the validity or legality of any statute, ordinance, order, rule,
regulation or requirement providing compliance therewith may
legally be held in abeyance without subjecting the Tenant or the
Landlord to any penalty or liability of whatsoever nature for failure
so to comply therewith. The Tenant may postpone compliance therewith
until the final determination of any such proceedings, provided that
all such proceedings shall be prosecuted with due diligence and
dispatch.

Non-liability
of Landlord
for injury
or damage

Section 29.1  From and after the commencement of the initial
or demised term, Landlord shall not be liable or responsible in
damages during the term of this Lease for any personal injury, death,
damages or losses to person or property, of every kind, nature and
description from any source or cause whatsoever that may be suffered
or sustained by the Tenant, its agents, servants, employees, patrons,
customers, invitees, visitors or licensees, or to any other person in,
on, or about the demised premises or any part thereof, including all

17

SF01363

streets, curbs, sidewalks and roadways adjoining or abutting the demised premises or appurtenances thereto, unless such damage or injury is caused by the sole negligence of the Landlord, its agents, servants or employees.

**Tenant to hold Landlord harmless for damages for personal injuries and property damages**

Section 29.2  The Tenant agrees to and does hereby indemnify and save harmless the Landlord against and from any and all claims, demands, actions, suits, proceedings, judgments, levies, costs, expenses and counsel fees by or on behalf of any person or persons, firm or firms, corporation or corporations, arising out of or in connection with Tenant's maintenance or use of the demised premises or the operation of its business which may be conducted therein by said Tenant or any person and persons.

**Arbitration**

Section 29.3  Any controversy or claim arising out of or relating to this agreement or the breach thereof, shall be settled by arbitration, in accordance with the rules, then obtaining, of the American Arbitration Association, and judgment upon the award rendered may be entered in the highest court of the forum, state or federal, having jurisdiction.

**Modification writing**

Section 30.1  Any and all agreements hereafter made by the parties in hereto to amend, change, revise, extend or discharge this Lease in whole or in part on one or more occasions, shall not be invalid or unenforceable because of the lack of consideration, provided that such agreement, or agreements to amend, change, revise, extend or discharge said Lease shall be in writing and executed by the parties hereto.

**Action by Landlord no bar to future actions**

Section 31.1  Maintenance by Landlord of any actions, suits or proceedings to recover possession of the demised premises or of any installment or installments of "basic" and "additional" rents for the demised term or any part thereof, or of any extended or renewed term, or any other sums or moneys that the Tenant is obligated to pay under this Lease shall not preclude Landlord from thereafter instituting and maintaining any action, suit or proceeding for a subsequent installment or installments of the "basic" and "additional" rents or any other sums and moneys that may be due or become due from Tenant to Landlord.

**Parties to execute short form memoranda for recording**

Section 32.1  The parties hereto agree that each, if requested by the other, will execute a short form Memorandum or Agreement as to this Lease for recording purposes.

**No Representations**

Section 33.1  This Lease contains all agreements made between the parties hereto.  No representative or agent of Landlord or Tenant is authorized to make any representations in, or to alter or modify this Lease and any of the options in this Lease contained and provided for in any way.  Any additions, alterations, changes or modifications to or in this Agreement or any other agreements hereinafter made or conditions created, to be binding upon the parties hereto, must be in writing and signed by said parties, and it is agreed that none of the provisions of this Lease, including this provision, can be waived, excepting by writing duly signed by the parties hereto.

**Lease controlled by by laws of New Jersey**

Section 34.1  This Lease shall be governed exclusively by the provisions hereof and by the Laws of the State of New Jersey.

**Security**

Section 34.2  Prior to the inception of this Lease, Tenant shall have deposited with Landlord in cash the sum of Twelve Thousand Dollars ($12,000.00) to be held by Landlord as security, to be returned to Tenant, without interest, at the termination of this Lease provided there has been no breach of the undertakings of Tenant under this Lease.  In no instance shall the amount of such security deposit be considered a measure of liquidated damages.  All or any part of the said deposit may be applied by Landlord in total or partial satisfaction of any default by Tenant and said application shall not

18

SF01364

deprive Landlord of any other rights or remedies Landlord may have nor shall such application by Landlord constitute a waiver by Landlord. If all or any part of the security deposit is applied to an obligation of Tenant hereunder, Tenant agrees to restore the said security deposit to its original amount.  It is agreed that should Landlord convey its interest under this Lease, the security deposit may be turned over by Landlord to Landlord's grantee or transferee, and upon any such delivery of the deposit, Tenant hereby releases Landlord herein named of any and all liability with respect to the deposit, its application and return, and Tenant agrees to look solely to such grantee or transferee, and it is further understood that this provision shall also apply to subsequent grantees and transferees.

Tenant hereby agrees not to look to the mortgagee, as mortgagee, mortgagee in possession, or successor in title to the property, for accountability for any security deposit required by the Landlord hereinunder, unless said sums have actually been received by said mortgagee as security for the tenant's performance of this lease.

**Waivers**

**Section 35.1**  Failure of either party to complain of any act or omission on the part of the other party, no matter how long same may continue, shall not be deemed a waiver by said party of any of its rights hereunder.  No waiver by either party at any time expressed or implied, of breach of any provision of this Lease shall be deemed waiver of breach of any other provision or a consent to any subsequent breach of the same or any other provision.  The consent to or approval of any action on any one occasion by either party hereto shall not be deemed a consent to or approval of said action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion.  Any and all rights and remedies which either party may have under this Lease or by operation of law, either at law or in equity, by reason of a breach by the other party shall be distinct, separate, and cumulative and shall not be deemed inconsistent with any other right or remedy and any two or more or all of such rights and remedies may be exercised at the same time. Acceptance by either party of any of the benefits of this Lease with knowledge of any breach thereof by the other party shall not be deemed a waiver by the party receiving the benefit of any rights or remedies to which it is entitled hereunder or by law.

**Section 36.1**  Whenever the consent of any party is required hereunder the same shall not be unreasonably withheld.

**Expressed Termination of Lease, etc.; No violation of covenant of quiet possession**

**Section 37.1**  It is covenanted and agreed between the parties hereto that in the event that this Lease shall be terminated under or pursuant to any of the terms, covenants, conditions or provisions of this Lease, that the same shall not be considered a breach or violation of the Landlord's covenant of quiet possession as in this Lease contained.

**Tenant to peaceably quit and surrender premises at expiration of Lease or renewal thereof.**

**Section 38.1**  Tenant covenants and agrees that at the expiration or sooner termination of this Lease or of the term thereof, it will quietly and peaceably without fraud, waste or delay, quit and surrender possession and yield and deliver up to the Landlord the demised premises and all buildings, structures, improvements, fixtures and building equipment upon the demised premises, together of with any and all additions, improvements, alterations and replacements thereof (except the Tenant's personal property, fixtures and equipment as set forth in Sections 17.1 and 17.2) in a good order, state and condition, reasonable use and normal wear and tear and damage by fire, casualty and the elements excepted.

**Landlord relieved of performance of Lease and covenant**

**Section 39.1**  It is agreed that, if at any time the Landlord shall sell the demised premises, Landlord shall be entirely free, relieved and released and discharged of all future obligations and liabilities for the performance of the terms, covenants, conditions, and provisions of this Lease, for the balance of the term of this

19

SF01365

|  |  |
|---|---|
| of quiet enjoyment on sale of demised premises | Lease and any renewals or extensions thereof, and of and under the covenant of quiet enjoyment, effective from the date of said sale and the assumption in writing by the Purchaser of Landlord's obligations under this Lease, a copy of which assumption document shall be provided to Tenant, and the said Purchaser or Purchasers do hereby covenant and agree to perform all the terms, covenants and conditions of this Lease that the Landlord hereunder has agreed to perform under the terms of this Lease. |
| Acknowledge-ment by Tenant that Lease is in full force and effect | Section 40.1  The Tenant agrees at any time and from time to time at the written request by the Landlord that it will execute, acknowledge and deliver to the Landlord a statement in writing, certifying that this Lease in unmodified and in full force and effect (or if there have been modifications that the same is in full force and effect as modified and stating the modifications), and the dates to which the basic rent and other charges have been paid in advance, if any, it being intended that any such statement delivered pursuant to this Article, may be relied upon by any prospective purchaser of the fee or mortgagee or assignee of any mortgage upon the fee of the demised premises. |
| Agreement can be signed in Counterparts | Section 41.1  This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and such instruments for convenience and recital purposes shall be deemed to have been made, executed and delivered as of the date hereof irrespective of the time or times when the same or any of the counterparts thereof may be made, executed and delivered. |
| Captions or Marginal Notes | Section 42.1  The captions or marginal notes in the margin of this Agreement are inserted only as a matter of convenience and reference and are not to be construed as a part of this Lease, nor in any way to define, amplify, limit or describe the scope or intent of this Lease, or the terms, conditions and provisions thereof, nor as affecting the meaning of the text of any Article in any way. |
| No Estate in Land | Section 43.1  This Lease shall only create the relationship of Landlord and Tenant between Landlord and Tenant and no estate shall pass out of Landlord.  Tenant only has a usufruct, not subject to levy and sale, and not assignable, transferable or to be disposed of or the premises sublet by Tenant except by Landlord's written consent as in this Lease provided. |
| Quiet Possession | Section 44.1  The Landlord covenants and agrees that the Tenant upon paying the "basic" or "fixed" rent and "additional rents", and all additional and other payments, sums and impositions and all other charges herein provided for and upon observing and keeping the covenants, terms, agreements and conditions of this Lease and any extensions or renewals thereof on its' part to be kept and performed, shall have and enjoy the demised premises during the initial or demised term of this Lease and any renewals or extensions thereof, except and subject however, to the terms, covenants and conditions of this Lease and except as in this Lease otherwise provided. |

Section 45.1  The reference herein contained to successors and assigns of Tenant is not intended to constitute a consent to any assignment or to any subletting or underletting by Tenant to any assignee, subtenant, and undertenant of this Lease, but has reference only to those instances in which Landlord may have given its written consent to a particular assignment subletting and underletting, as in this Lease, provided, and if this Lease be validly assigned or sublet, the words "Landlord" and "Tenant" shall also include Tenant's assignes and subtenants or subleasees as to the premises covered by such assignment or sublease, all of which is subject, however, to the payment of the rents and other sums and the performance of all the terms, covenants, conditions and provisions of this Lease, as in this Lease provided.

Section 46.1  In the event that a mortgagee of the demised premises requires any impositions as defined in Article 4.1 to be paid in

20

SF01366

monthly or other periodic installments, Tenant agrees to make such payments to Landlord or its mortgagee as additional rent.

Section 47.1  As used in this Lease the terms "section" and "article" are interchangeable.

Section 48.1  Tenant covenants and agrees that it will store no materials or matter of an objectionable kind on the outside of the building unless the same shall be screened from public view, so as not to detract from the overall appearance of the industrial park and said screening shall be approved by the Landlord in writing; said approval not to be unreasonably withheld.

Section 48.2  Tenant further covenants and agrees that it will maintain the grounds and landscape in a neat and attractive condition replacing such shrubs and other ground cover as may be required from time to time to keep the premises in an attractive and aesthetically pleasing condition.

Section 49.1  Neither Tenant nor its agents, servants or employees shall park on the street or streets adjacent to the demised premises but shall use off-street parking areas on the demised premises.

Section 50.1  It is agreed that the terms, covenants, conditions and provisions herein contained shall extend to and be binding upon and inure to the benefit of the Landlord, their heirs, executors, administrators and legal representatives and the Tenant and its respective successors and assigns.

Section 51.1  Schedules A through D are hereby incorporated into and made an integral part of this Lease.

IN WITNESS WHEREOF, the parties have caused these presents to be signed by their proper corporate officers and have caused their proper corporate seals to be hereto affixed, the day and year first above written.

Witness:

SOMERVILLE FIDELCO ASSOCIATES

By: _____

E.R. SQUIBB & SONS, INC.

Attest:

By: _____

R. C. Johnston                     J. M. Z. Kaczmarek

Vice President

DOC: 1902.ES

21

SF01367

SCHEDULE "A".

All that certain tract or parcel of land and premises, situate, lying and being in the BOROUGH OF SOMERVILLE in the COUNTY of SOMERSET, and STATE OF NEW JERSEY, more particularly described as follows:

BEGINNING at a point in the southerly line of Fourth Street, said point being distance 325.0 feet on a course of South 70 degrees 30 minutes East from the intersection of the aforesaid southerly sideline of Fourth Street with the easterly sideline of Center Street and said beginning, running:

THENCE   (1)   along the southerly sideline of Fourth Street aforesaid, South 70 degrees 30 minutes East a distance of 275.0 feet to a point in the southerly sideline of Fourth Street;

THENCE   (2)   South 19 degrees 30 minutes West a distance of 140.0 feet to a point;

THENCE   (3)   North 70 degrees 30 minutes West a distance of 275.0 feet to a point;

THENCE   (4)   North 19 degrees 30 minutes East a distance of 140.0 feet to the point and place of BEGINNING, also known as 76 Fourth Street, Somerville, New Jersey, comprising Building B as shown on the plot plan annexed hereto as a part of Schedule A.

SF01368



SF01369

STATE OF New Jersey )
                    ) ss.:
COUNTY OF Mercer    )

      BE IT REMEMBERED, that on this twenty-third day
of October , 1987 , before me, the subscriber,
Barbara A. Harrison , personally appeared,
Jan M.Z. Kaczmarek who, being by me duly sworn, on his oath,
deposes and does make proof to my satisfaction, that he is the
Vice President of E.R. Squibb & Sons, Inc. , and that the
execution as well as the making of this Instrument, has been duly
authorized by the Board of Directors of said Corporation; that deponent
well knows the Corporate Seal of said Corporation and the seal affixed
to said Instrument is such Corporate Seal, and was thereto affixed and
said Instrument signed and delivered by the said Vice President
as his voluntary act and deed and as and for the voluntary act and deed
of said Corporation, in the presence of deponent, who thereupon
subscribed his name thereto as witness.

SWORN AND SUBSCRIBED
before me this twenty-third day
of October , 19 87

J. M. Z. Kaczmarek

Barbara A. Harrison

BARBARA A. HARRISON
Notary Public of New Jersey
My Commission Expires Aug. 31, 1992
I.D. No. 2031931

SF01370

STATE OF NEW JERSEY)
                   ) ss.:
COUNTY OF SOMERSET )


    BE IT REMEMBERED, that on this 26th      day
of October      , 1987 , before me, the subscriber, a Notary
Public            personally appeared Eugene Schenkman,
who, I am satisfied, is the person named in and who executed the within
Instrument, and thereupon he acknowledged that he signed, sealed and
delivered the same as his act and deed, for the uses and purposes
therein expressed.


                              MAUREEN SEPE
                       A Notary Public of New Jersey.
                       My Commission Expires June 13, 1990


SF01371

SCHEDULE "B"

RENTALS

For the period beginning the 26th day of October, 1987, and ending on the 31st day of

October, 1990, the sum of ONE HUNDRED AND FORTY FOUR THOUSAND ($144,000.00)

DOLLARS per year payable in equal monthly installments of TWELVE THOUSAND ($12,000.00)

DOLLARS in advance on the first day of each and every month during the said period,

commencing November 1, 1987.

SF01372

SCHEDULE "C"

OPTION TO RENEW

Tenant is hereby granted one option to renew this Lease for one period upon the following terms and conditions:

(A)  At the time of the exercise of the option to renew and at the time of said renewal, the Tenant shall not be in default in accordance with the terms and provisions of this Lease, and shall be in possession of the Premises pursuant to this Lease.

(B)  Notice of the exercise of the option shall be sent to the Landlord in writing at least nine (9) months before the expiration of the immediately preceding term.

(C)  The renewal term shall be for a period of three (3) years to commence at the expiration of the immediately preceding term, and all of the terms and conditions of this Lease, other than the basic rent, shall apply during any such renewal term.

(D)  Subject to the last sentence of this paragraph, the annual basic rent to be paid during the renewal term shall equal the fair market rental value of the Premises if the same were available for lease to the public.  If the parties are unable to agree on the fair market rental value of the Premises, the parties shall each appoint one appraiser who shall in turn appoint a third independent appraiser and the determination of said three appraisers shall be binding on the parties.  In no event, however, shall the annual basic rent payable by Tenant during the renewal period be less than the annual non-discounted annual basic rent paid by Tenant during the immediately preceding term.

SF01373

"Exhibit D"

1.  If Tenant received any notice of the happening of any event
    involving the use, spill, discharge or cleanup of any hazardous or
    toxic substances or waste, or any oil or pesticide on or about the
    demised premises or into the sewer, septic system or waste
    treatment system servicing the demised premises (any such event is
    hereinafter referred to as a "Hazardous Discharge") or of any
    complaint, order, citation, or notice with regard to air emissions,
    water discharges, noise emission or any other environmental,
    health or safety matter affecting the Tenant (an "Environmental
    Complaint") from any person, entity, including the DEP and the EPA,
    then the Tenant shall give immediate oral and written notice of
    same to the Landlord, detailing all relevant facts and
    circumstances.

2.  Without limitation of the foregoing, Landlord shall have the right,
    but not the obligation, to exercise any of its rights or to enter
    onto the Premises or to take such actions as it deems necessary or
    advisable to cleanup, remove, resolve or minimize the impact of or
    otherwise deal with any Hazardous Discharge or Environmental
    Complaint upon its receipt of any notice from any person or entity,
    including without limitation the DEP and the EPA, asserting the
    happening of a Hazardous Discharge or an Environmental Complaint on
    or pertaining to the demised premises.  All costs and expenses
    incurred by Landlord in the exercise of any such rights shall be
    deemed to be additional rent hereunder and shall be payable by the
    Tenant to the Landlord upon demand.

3.  The occurrence of any of the following events shall constitute an
    Event of Default under this lease:

        (a)  If Landlord received its first notice of a Hazardous
        Discharge or an Environmental Complaint, of which Tenant has
        knowledge, or should reasonably have knowledge, on or
        pertaining to the demised premises other than from Tenant, and
        Landlord does not receive a notice (which may be given in any
        oral or written form, provided same is followed with all due
        dispatch by written notice given by certified mail, return
        receipt requested) of such Hazardous Discharge or
        Environmental Complaint from Tenant within twenty-four (24)
        hours of the time Landlord first receives said notice other
        than from the Tenant; or

        (b)  If the DEP, EPA or any other state or federal agency
        asserts a claim against Tenant, the demised premises or
        Landlord for damages or cleanup costs related to a Hazardous
        Discharge or an Environmental Complaint on or pertaining to
        the demised premises provided, however, such claim shall not
        constitute a default if, within five (5) days of notice to
        Tenant of the occurrence giving rise to the claim:

            (i)  Tenant can prove to Landlord's satisfaction that
            Tenant has commenced and is diligently pursuing either:
            (x) cure or correction of the event which constitutes the
            basis for the claim, and continues diligently to pursue
            such cure or correction to completion, or (y) proceedings
            for an injunction, a restraining order or other
            appropriate emergent relief preventing such agency or
            agencies from asserting such claim, which relief is
            granted within ten (10) days of the occurrence giving
            rise to the claim and the emergent relief is not
            thereafter dissolved or reversed on appeal; and

            (ii)  In either of the foregoing events, Tenant has
            posted a bond, letter of credit or other security

SF01374

satisfactory in form, substance and amount to Landlord and the agency or entity asserting the claim to secure the proper and complete cure or correction of the event which constitutes the basis for the claim.

4.      (a)  If Tenant's operations on the Premises now or hereafter constitute an "Industrial Establishment" subject to the requirements of the New Jersey Environmental Cleanup Responsibility Act, N.J.S.A. 13:1k-6 et seq., and the regulations pertaining thereto, N.J.A.C. 7:1-3.1 et seq. ("ECRA"), then prior to the expiration or sooner termination of this lease and upon any and every condemnation, casualty, assignment or sublease (if permitted), change in ownership or control of Tenant or any other closure or transfer by Landlord or Tenant covered by ECRA, Tenant shall comply with all requirements of ECRA pertaining to an Industrial Establishment closing or transferring operations, at its sole cost and expense, to the satisfaction of the DEP and Landlord. Without limitation of the foregoing, Tenant's obligations shall include (i) the proper filing of the initial notice to the DEP required by N.J.A.C. 7:1-3.7, (ii) the performance to DEP's and Landlord's satisfaction of all air, soil, ground water and surface water sampling and testing required by N.J.A.C. 7:1-3.9 and (iii) either (x) the filing of a "negative declaration" with DEP under N.J.A.C. 7:1-3.11 which has been approved by DEP or (y) the performance of a proper and approved cleanup plan to the full satisfaction of DEP and Landlord in accordance with N.J.A.C. 7:1-3.12. Tenant shall immediately provide Landlord with copies of all correspondence, reports, notices, orders, findings, declarations and other materials pertinent to Tenant's compliance and DEP's requirements under ECRA, as any of same are issued or received by Tenant from time to time.

(b)  In the event that ECRA does not apply to Tenant's operations on the Premises, at Landlord's option, request and expense, Tenant shall cooperate with Landlord's compliance with ECRA, and, in the event that said compliance discloses the occurrence of a Hazardous Discharge by Tenant, Tenant shall promptly cleanup and remove said Hazardous Discharge at Tenant's sole cost and expense.

5.    In the event of Tenant's failure to comply in full with this Article, Landlord may, at its option, perform any or all of Tenant's obligations as aforesaid and all costs and expenses incurred by Landlord in exercise of this right shall be deemed to be additional rent payable on demand.

6.    This Article shall survive the expiration or sooner termination of the Lease.

DOC: 1904.ES

SF01375

# EXHIBIT 2

FROM :AKRON ROOFING CO. ED CHRYSTAL      FAX NO. :973 467 5035        Jun. 20 2005 02:51PM  P2

JUN-16-05 01:35P                                                             P.02

# *Badger Roofing Company, Inc.*

(732) 424-9495
(732) 424-9784 FAX

5 Smalley Ave
Middlesex NJ 08846

| Submitted to: | Job Location: | Proposal # 00003822 |
|---|---|---|
| Schenkman & Kuehner | Bristol Myers Squibb | Date:  5/16/2005 |
| 881 Route 22 | 76 4th Street | |
| P/O Box 6372 | Somerville, NJ | |
| Bridgewater, NJ 08807 | | |

EXHIBIT
BMS-3
2/5/07

Attn:  Barry Agee

Subject:  Roofing proposal
           Bristol Myers Squibb
           76 4th Street
           Somerville, NJ

Mr. Agee,

We offer the following for the above:

* Remove and dispose existing roofing to structural deck
* Provide and install 1.5" polyisocyanurate roof insulation
* Provide and install 1/2" overlay insulation
* Provide and install 4 plies Type 6 roofing felt in hot asphalt.  Each ply to be
  embedded in hot asphalt
* Provide smooth surface asphalt mat coating
* Provide and install new scuppers and leaders
* Provide and install crickets between drains to facilitate drainage
* Flash all walls, drains, pipes and curbs per manufacturer's specifications
* Provide and install new metal coping on parapet walls (standard color, baked
  enamel finish)
* Provide manufacturer's 20-year no dollar limit warranty
* Provide all necessary permits

Quotation for the above:  $117,650.00

Alternate #1:  Add for aluminum roofing  -  add $4,235.00

Unit price #1:  Metal deck replacement  -  $5.25 per square foot

Please contact our office if you require further information.

Sincerely,

Robert Haney
Manager, Estimating

7/14/05
Somerville Relco

All material specified is for us specified, and the above work to be performed in accordance
with the specifications submitted by the above work and constitutes a satisfactory and
workmanlike manner.
Any alteration or deviation from above specifications involving extra costs, will be
executed only upon written orders, and will become and extra charge over and above the
estimate.
All work to be covered under the terms of the Badger Roofing Company, Inc warranty program.
All invoices have a delinquency charge of 1 1/2% per month on the outstanding balance. Proposal
good for 30 days.

Proposal Amount:        $117,650.00

SF00245

EXHIBIT
21

# EXHIBIT 3



**BADGER**
*Roofing Company*

August 3, 2005

Mr. Barry Ages
Schenkman/Kushner Affiliates, Inc.
520 Route 22
P. O. Box 6622
Bridgewater, NJ  08807

Subject:  76 4th Street
          Somerville, NJ

Mr. Ages,

Enclosed are two (2) copies of AIA Contract for the above referenced project.
Please sign and return both copies to us and we will return one fully executed
contract to you.

Thank you.

Sincerely,



Robert Haney

5 Smalley Avenue, Middlesex, NJ 08846
Phone 732-424-9498
Fax 732-424-9764
Toll Free 1-866-432-3434
web site www.badgerroofing.com

RECEIVED
AUG  8 2005

SF00246

1997 Edition -Electronic Format

# AIA Document A101-1997

## *Standard Form of Agreement Between Owner and Contractor*
### *where the basis of payment is a STIPULATED SUM*

AGREEMENT made as of the 26 day of   July   in the year of   2005
(In words, indicate day, month and year)

BETWEEN the Owner:
(Name, address and other information)

Schenkman/Kushner Affiliates, Inc.
520 Route 22
P. O. Box 6622
Bridgewater, NJ   08807
and the Contractor:
(Name, address and other information)
Badger Roofing Co., Inc.
5 Smalley Avenue
Middlesex, NJ 08846

The Project is:
(Name and location)

Roof Replacement
76 4th Street
Somerville, NJ

The Architect is:
(Name, address and other information)

N/A

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

The Owner and Contractor agree as follows.

## ARTICLE 1 THE CONTRACT DOCUMENTS
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

## ARTICLE 2 THE WORK OF THIS CONTRACT
The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

©1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.   WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: 02163 a101 st. peters - badger -- 12/2/2003. AIA License Number 1006326, which expires on 3/5/2004.

SF00247

## ARTICLE 3 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

**3.1**    The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

On or about September 5th, 2005

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

**3.2**    The Contract Time shall be measured from the date of commencement.

**3.3**    The Contractor shall achieve Substantial Completion of the entire Work not later than  days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*

60 days

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*

## ARTICLE 4 CONTRACT SUM

**4.1**    The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be Dollars ($ 117,650, subject to additions and deductions as provided in the Contract Documents.

**4.2**    The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires)*

**4.3**    Unit prices, if any, are as follows:

Metal deck replacement:    $5.25 per square foot

## ARTICLE 5 PAYMENTS

**5.1      PROGRESS PAYMENTS**

**5.1.1**    Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

**5.1.2**    The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

**5.1.3**    Provided that an Application for Payment is received by the Architect not later than the 15th day of a month, the Owner shall make payment to the Contractor not later than the 30th day of the month. If an Application for Payment is received by the Architect after the

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

AIA Document A101-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

©1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: 02163 a101 st. peters - badger -- 12/2/2003. AIA License Number 1006326, which expires on 3/5/2004.

2

SF00248

application date fixed above, payment shall be made by the Owner not later than ___ days after the Architect receives the Application for Payment.

5.1.4   Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

5.1.5   Applications for Payment shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

5.1.6   Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1   Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of ___ percent (10%). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Subparagraph 7.3.8 of AIA Document A201-1997.

.2   Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of ___ percent ( ___ %);

.3   Subtract the aggregate of previous payments made by the Owner; and

.4   Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Paragraph 9.5 of AIA Document A201-1997.

5.1.7   The progress payment amount determined in accordance with Subparagraph 5.1.6 shall be further modified under the following circumstances:

.1   Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Architect shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and

*(Subparagraph 9.8.5 of AIA Document A201-1997 requires release of applicable retainage upon Substantial Completion of Work with consent of surety, if any.)*

.2   Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Subparagraph 9.10.3 of AIA Document A201-1997.

5.1.8   Reduction or limitation of retainage, if any, shall be as follows:
*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Clauses 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)*

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by the Associated General Contractors of America.



©1997 AIA
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987; © 1997 by the American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: 02163 a1OT st. peters - badger -- 12/1/2003. AIA License Number 1006326, which expires on 3/5/2004.

3

SF00249

**5.1.9**    Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

**5.2    FINAL PAYMENT**

**5.2.1**    Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

    .1    the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Subparagraph 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and

    .2    a final Certificate for Payment has been issued by the Architect.

**5.2.2**    The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

## ARTICLE 6 TERMINATION OR SUSPENSION

**6.1**    The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201-1997.

**6.2**    The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997.

## ARTICLE 7 MISCELLANEOUS PROVISIONS

**7.1**    Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

**7.2**    Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*
NA·

*Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**7.3**    The Owner's representative is:
*(Name, address and other information)*

    Barry Ages
    908-725-8100

**7.4**    The Contractor's representative is:
*(Name, address and other information)*

    Scott Badger
    732-424-9498

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

©1997 AIA®
**AIA DOCUMENT A101-1997**
**OWNER-CONTRACTOR AGREEMENT**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. ·WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: 02763 a101 st. peters - badger -- 12/2/2003. AIA License Number 1006326, which expires on 3/5/2004.

4

7.5     Neither the Owner's nor the Contractor's representative shall be changed without ten days written notice to the other party.

7.6     Other provisions:

## ARTICLE 8 ENUMERATION OF CONTRACT DOCUMENTS

8.1     The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

8.1.1     The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997.

8.1.2     The General Conditions are the 1997. edition of the General Conditions of the Contract for Construction, AIA Document A201-1997.

8.1.3     The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated     and are as follows:

| Document | Title | Pages |
|---|---|---|
| | | |

8.1.4     The Specifications are those contained in the Project Manual dated     as in Subparagraph 8.1.3, and are as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

| Section | Title | Pages |
|---|---|---|
| See Exhibit A – Proposal H – Dated 6/18/2005 | | |

8.1.5     The Drawings are as follows, and are dated         unless a different date is shown below: None
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*

| Number | Title | Date |
|---|---|---|
| | | |

8.1.6     The Addenda, if any, are as follows:     None

| Number | Date | Pages |
|---|---|---|
| | | |

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 8.

8.1.7     Other documents, if any, forming part of the Contract Documents are as follows:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

©1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: 02763 a101 st. peters – badger – 12/2/2003. AIA License Number 1006326, which expires on 3/5/2004.

5

This Agreement is entered into as of the day and year first written above and is executed in at

least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

**OWNER** *(Signature)*                    **CONTRACTOR** *(Signature)*

                                    Scott Badger, Vice Pres

*(Printed name and title)*              *(Printed name and title)*

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: 02163 a101 st. peters - badger -- 12/2/2003. AIA License Number 1006326, which expires on 3/5/2004.

6

# EXHIBIT 4

# ▉AIA® Document A201™ – 1997

## *General Conditions of the Contract for Construction*

## For use with A121™CMc–2003 and A131™CMc–2003 only.

*NOTE: AIA Document A201–1997 is replaced by A201™–2007 and is retired on May 31, 2009. Because AIA Documents A121™CMc–2003 and A131™CMc–2003 contain references to A201–1997, this version of A201–1997 in Portable Document Format (PDF) is made available for use with A121CMc–2003 and A131CMc–2003.*

**for the following PROJECT:**
*(Name and location or address)*

This document has important
legal consequences.
Consultation with an attorney
Is encouraged with respect to
its completion or modification.

**THE OWNER:**
*(Name, legal status and address)*

This document has been
approved and endorsed by The
Associated General Contractors
of America

**THE ARCHITECT:**
*(Name, legal status and address)*

**TABLE OF ARTICLES**

1        GENERAL PROVISIONS

2        OWNER

3        CONTRACTOR

4        ADMINISTRATION OF THE CONTRACT

5        SUBCONTRACTORS

6        CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7        CHANGES IN THE WORK

8        TIME

9        PAYMENTS AND COMPLETION

10       PROTECTION OF PERSONS AND PROPERTY

11       INSURANCE AND BONDS

12       UNCOVERING AND CORRECTION OF WORK

13       MISCELLANEOUS PROVISIONS

14       TERMINATION OR SUSPENSION OF THE CONTRACT

AIA Document A201™ – 1997. Copyright © 1888, 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by
The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International
Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal
penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are not permitted to reproduce this document. To
report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

This A201–1997 PDF file is made available for use with A121CMc–2003 and A131CMc–2003 only.

## § 10.3 HAZARDOUS MATERIALS

§ 10.3.1 If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing.

§ 10.3.2 The Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor and the Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Contractor or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor and the Architect have no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

§ 10.3.3 To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

§ 10.4 The Owner shall not be responsible under Section 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

§ 10.5 If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

## § 10.6 EMERGENCIES

§ 10.6.1 In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Section 4.3 and Article 7.

## ARTICLE 11   INSURANCE AND BONDS
## § 11.1 CONTRACTOR'S LIABILITY INSURANCE

§ 11.1.1 The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

 .1 Claims under workers' compensation, disability benefit and other similar employee benefit acts which are applicable to the Work to be performed;
 .2 Claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;
 .3 Claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;
 .4 Claims for damages insured by usual personal injury liability coverage;
 .5 Claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

AIA Document A201™ – 1997 Copyright © 1888, 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are not permitted to reproduce this document. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

This A201–1997 PDF file is made available for use with A121CMc–2003 and A131CMc–2003 only.

.6     Claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle;

.7     Claims for bodily injury or property damage arising out of completed operations; and

.8     Claims involving contractual liability insurance applicable to the Contractor's obligations under Section 3.18.

**§ 11.1.2** The insurance required by Section 11.1.1 shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment.

**§ 11.1.3** Certificates of insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work. These certificates and the insurance policies required by this Section 11.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment and are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment as required by Section 9.10.2. Information concerning reduction of coverage on account of revised limits or claims paid under the General Aggregate, or both, shall be furnished by the Contractor with reasonable promptness in accordance with the Contractor's information and belief.

## § 11.2 OWNER'S LIABILITY INSURANCE
**§ 11.2.1** The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.

## § 11.3 PROJECT MANAGEMENT PROTECTIVE LIABILITY INSURANCE
**§ 11.3.1** Optionally, the Owner may require the Contractor to purchase and maintain Project Management Protective Liability insurance from the Contractor's usual sources as primary coverage for the Owner's, Contractor's and Architect's vicarious liability for construction operations under the Contract. Unless otherwise required by the Contract Documents, the Owner shall reimburse the Contractor by increasing the Contract Sum to pay the cost of purchasing and maintaining such optional insurance coverage, and the Contractor shall not be responsible for purchasing any other liability insurance on behalf of the Owner. The minimum limits of liability purchased with such coverage shall be equal to the aggregate of the limits required for Contractor's Liability Insurance under Sections 11.1.1.2 through 11.1.1.5.

**§ 11.3.2** To the extent damages are covered by Project Management Protective Liability insurance, the Owner, Contractor and Architect waive all rights against each other for damages, except such rights as they may have to the proceeds of such insurance. The policy shall provide for such waivers of subrogation by endorsement or otherwise.

**§ 11.3.3** The Owner shall not require the Contractor to include the Owner, Architect or other persons or entities as additional insureds on the Contractor's Liability Insurance coverage under Section 11.1.

## § 11.4 PROPERTY INSURANCE
**§ 11.4.1** Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.4 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.

**§ 11.4.1.1** Property insurance shall be on an "all-risk" or equivalent policy form and shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's and Contractor's services and expenses required as a result of such insured loss.

**AIA Document A201™ – 1997 Copyright** © 1888, 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®** Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are not permitted to reproduce this document. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

This A201–1997 PDF file is made available for use with A121CMc–2003 and A131CMc–2003 only.

**§ 11.4.1.2** If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work. The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor in writing, then the Owner shall bear all reasonable costs properly attributable thereto.

**§ 11.4.1.3** If the property insurance requires deductibles, the Owner shall pay costs not covered because of such deductibles.

**§ 11.4.1.4** This property insurance shall cover portions of the Work stored off the site, and also portions of the Work in transit.

**§ 11.4.1.5** Partial occupancy or use in accordance with Section 9.9 shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

**§ 11.4.2 Boiler and Machinery Insurance.** The Owner shall purchase and maintain boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner; this insurance shall include interests of the Owner, Contractor, Subcontractors and Sub-subcontractors in the Work, and the Owner and Contractor shall be named insureds.

**§ 11.4.3 Loss of Use Insurance.** The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Contractor for loss of use of the Owner's property, including consequential losses due to fire or other hazards however caused.

**§ 11.4.4** If the Contractor requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Owner shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.

**§ 11.4.5** If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Section 11.4.7 for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

**§ 11.4.6** Before an exposure to loss may occur, the Owner shall file with the Contractor a copy of each policy that includes insurance coverages required by this Section 11.4. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire, and that its limits will not be reduced, until at least 30 days' prior written notice has been given to the Contractor.

**§ 11.4.7 Waivers of Subrogation.** The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a

**AIA Document A201™ – 1997 Copyright** © 1888, 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** Purchasers are not permitted to reproduce this document. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

*This A201–1997 PDF file is made available for use with A121CMc–2003 and A131CMc–2003 only.*

person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

**§ 11.4.8** A loss insured under Owner's property insurance shall be adjusted by the Owner as fiduciary and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and of Section 11.4.10. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

**§ 11.4.9** If required in writing by a party in interest, the Owner as fiduciary shall, upon occurrence of an insured loss, give bond for proper performance of the Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The Owner shall deposit in a separate account proceeds so received, which the Owner shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Section 4.6. If after such loss no other special agreement is made and unless the Owner terminates the Contract for convenience, replacement of damaged property shall be performed by the Contractor after notification of a Change in the Work in accordance with Article 7.

**§ 11.4.10** The Owner as fiduciary shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing within five days after occurrence of loss to the Owner's exercise of this power; if such objection is made, the dispute shall be resolved as provided in Sections 4.5 and 4.6. The Owner as fiduciary shall, in the case of arbitration, make settlement with insurers in accordance with directions of the arbitrators. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

**§ 11.5 PERFORMANCE BOND AND PAYMENT BOND**
**§ 11.5.1** The Owner shall have the right to require the Contractor to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder as stipulated in bidding requirements or specifically required in the Contract Documents on the date of execution of the Contract.

**§ 11.5.2** Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall permit a copy to be made.

**ARTICLE 12   UNCOVERING AND CORRECTION OF WORK**
**§ 12.1 UNCOVERING OF WORK**
**§ 12.1.1** If a portion of the Work is covered contrary to the Architect's request or to requirements specifically expressed in the Contract Documents, it must, if required in writing by the Architect, be uncovered for the Architect's examination and be replaced at the Contractor's expense without change in the Contract Time.

**§ 12.1.2** If a portion of the Work has been covered which the Architect has not specifically requested to examine prior to its being covered, the Architect may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

**§ 12.2 CORRECTION OF WORK**
**§ 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION**
**§ 12.2.1.1** The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense.

**§ 12.2.2 AFTER SUBSTANTIAL COMPLETION**
**§ 12.2.2.1** In addition to the Contractor's obligations under Section 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Contract Documents,

AIA Document A201™ – 1997 Copyright © 1888, 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are not permitted to reproduce this document. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

# EXHIBIT 5

Notes: (September 22, 2005)
Janet Copley (609) 897-2661 Health & Safety office calls from Bristol-Myers to update roofing scenario. First couple of days weren't too bad but starting yesterday there was a lot of dust and people complained of itching eyes and scratchy throats. All were sent home and subsequently today told not to report. She voiced fears that there was asbestos in the dust settling and the tear-off from the roof. They called air quality people in to test (and going forward keep monitoring up) and the results ill be available tomorrow. She wants no work done until those results are in. She queried me on whether we tested for Asbestos prior to the work (unknown).

I made sure that Steph/Cheryl were present on most or part of calls to get lay of land.

I apologized for the inconvenience to her company and will speak with her tomorrow.

In the meantime:

- Spoke with Ed Crystal and told him of the situation. Told him to go down and remedy as best he can. He told me that when he spoke with the on-site guy, John Deck (908) 722-1764 that he told him of noise, dust and dislocation but Jon told him not to be concerned as it would be handled. He will go down and also reach out for Badger
- Spoke with Mike Levy who had surveyed the roof for me. Told me point blank that a 30 yr. old roof would probably have asbestos but it was encapsulated and unlikely to be of concern. I mentioned the monitoring and he told me that they used to do this on all jobs but was abandoned some time ago as they results were nationally and uniformly negative. He will also go down to look and will call Badger
- Spoke with Rob Haney of Badger (732) 424-9498. Understood the issue that it was my tenant and that is where my loyalties lie. Has closed down job and buttoned up roof at least until Monday when he says he needs work. I told him unless and until the hygienist report comes back he can't work. He said point blank that it wouldn't be a problem. WE will reach out tomorrow
- Finally had Cheryl reach out for Susan of the Feldman Agency to advise her of the situation.



SF00213

EXHIBIT
23

# EXHIBIT 6

**SOMERVILLE FIDELCO ASSOCIATES, L.P.**
520 US Highway 22 East
P.O. Box 6872
Bridgewater, NJ 08807

Telephone: (908) 725-8100                                                   Facsimile: (908) 575-2237

November 4, 2005

EXHIBIT
BMS-17
21.5/07

**Federal Express**
Mr. John J. Chapman
Bristol Meyers Squibb Company
Route 206 and Provinceline Road
Princeton, NJ 08543

RE:    76 Fourth Street
Somerville, NJ

Dear Mr. Chapman:

In order to protect the building and respond to your concerns, Landlord intends to complete the roof removal and replacement on the above-referenced property in the following and expeditious manner.

While Landlord understands your concerns about alleged asbestos in the roofing, Landlord desires to move forward promptly and will comply with all applicable OSHA and DEP regulations. Further delays resulting from having to deal with various levels of personnel at BMS can no longer be countenanced.

In furtherance thereof, enclosed is a Procedure for the Removal of Roofing that will be followed. Also enclosed is a copy of the Safety Operation Procedures Handbook of Slavco Construction, Inc., the company which will be removing the suspect roofing material.

To the extent that there are any remaining questions or concerns regarding the process, they must be provided to Landlord by close of business on Monday, November 7, 2005, as it is our intent to complete replacement of the roof beginning the week of November 7, 2005.

Finally, one precaution requested by tenant was to have plastic sheeting installed on the interior underside of the roof deck. It has been established that the debris that fell during the prior roof removal activity was interior dust dislodged during the removal. Such material did not contain asbestos and did not come from the exterior. Although we believe that the installation of plastic sheeting is unnecessary, in order to accommodate you, we will provide same. However, we are receiving conflicting directives from tenant. Tenant advises it does not want us to install the sheeting until the building is cleaned. While tenant has indicated its responsibility to clean

EXHIBIT
tabbies
35

BMS00780

November 4, 2005
Page 2

the building, it has not yet done so.  The roof repair was started the week of October 7, 2005, and we cannot delay any longer.

Very truly yours,

Eugene Schenkman

ES:lm

Enclosures

cc:     James K. Harbough
        Robert Papa
        Ellen Radow Sadat, Esq. (via fax @ (609) 799-7000)

BMS00781

## Procedures For The Removal Of Roofing
## 76 Fourth Street

The following is an overview of the procedures to be employed for the removal of roof materials from 76 Fourth Street.

Although removal of asbestos containing roofing materials as part of a roof replacement project are exempted from the requirements of the New Jersey Department of Labor Asbestos Licensing Requirements, a New Jersey licensed removal contractor Slavco Construction has been retained to conduct the work.

Slavco Construction will conduct the work in accordance with the requirements of the current EPA Regulation, National Emission Standard for Asbestos relating to Category One Non Friable Materials.

Slavco Construction will adhere to the OSHA Asbestos in Construction Standard 29 CFR 1926.1101 requirements pertaining to operations of this nature.

The removal operation will be conducted as follows:

A.   **Personal Protection:**

   1.   Appropriate personal protective equipment will be worn as dictates by OSHA Regulations

   2.   Persons entering the work area shall be provided with well-tractioned and correctly fitting boots.

B.   **Background Conditions:**

   1.   Preliminary examination shall be conducted and precautions shall be taken to prevent damage to the interior of the building and to ensure no adverse effect on the structural stability of the roof due to the abatement activity.

   2.   Abatement shall not be carried out during adverse weather conditions (e.g., precipitation, heavy winds, etc.)

   3.   The work area on the roof shall be cordoned off, and only authorized persons shall have access to the "designated" work area.

C.   **Removal Procedures**

   1.   Electric power in the work area shall be shut down and isolated.

BMS00782

2.    Moveable objects shall be removed from the work area, or kept in place and wrapped in one sheet of 6-mil plastic sheeting. Fixed objects including duct intakes, and other rooftop appurtenances shall be covered in one sheet of plastic.

3.    The worker decontamination unit shall be constructed at a remote location with at least a shower room and a clean room.

4.    Prior to actual removal the built-up roofing shall be blanketed and wetted with a coating of Bullseye High Performance Foaming Agent which shall be maintained for the duration of the removal until the material is bagged. The foam shall be confined to the work area. The foam is designated to be used as supressant for dusts.

5.    A roof warrior with a slicing attachment specifically designed for asbestos roof removal work will be employed.

6.    Portable HEPA vacuums shall be available during abatement.

7.    Cleanup procedures shall involve removal and bagging of:

      a.    the asbestos containing roofing material (ACRM)
      b.    visible accumulations of asbestos containing waste
      c.    all excess foam or liquid
      d.    all debris

8.    All bagged waste will be brought to an enclosed chute. The chute will be positioned near or in a polyethylene plastic lined dumpster.

9.    All tools shall be wet cleaned and HEPA vacuumed, and then be removed from the work area upon completion.

10.   The work area shall be allowed to dry completely before the visual inspection is conducted. This inspection, to be performed by the independent third party air monitoring firm/consultant, shall confirm the absence in the work area of:

      a.    ACM or ACW bags or debris,
      b.    excess foam or other liquid

11.   When the visual inspection is successful, all plastic will be removed.

BMS00783

Nov 03 05 11:40a    Bill Kerbel    973-729-7613    p.1
11/03/2005  18:52    9734707877    SLAVCO CONSTRUCTION    PAGE 02/03
                                   BULLSEYE                 @002



## BULLSEYE
### Safety, Industrial and Environmental Supplies

## TECHNICAL DATA SPECIFICATION SHEET

# FOAMER  HIGH PERFORMANCE FOAMING AGENT

### PHYSICAL DATA

| | |
|---|---|
| Type | Surfactant |
| Color | Clear |
| Odor | None |
| Flashpoint | >200°F, PMCC |
| Boiling Point | >212°F. |
| pH | Neutral |
| Evaporation Rate | Slower than ether |
| Shipping Weight | 5 gallon pail ... 45 lbs |
| | 55 gallon drum ... 500 lbs |
| DOT Hazard Class | Not Regulated |
| DOT Shipping Name | Cleaning Compound |
| HMIS Rating | 1-1-0-B |

Coverage......Coverage will range depending on conditions of use. When used with foaming equipment, FOAMER will expand, 2-3 times its volume. With ideal conditions, FOAMER will cover up to 20,000 square ft. of area, for as long as 30 minutes. Physical conditions like wind, rain and sun will greatly reduce coverage and create situations where product will need to be reapplied.

### PRODUCT DESCRIPTION

*FOAMER HIGH PERFORMANCE FOAMING AGENT* is a unique formula designed to be used as a suppressant for dusts including materials such as asbestos, mold and lead. It can also be use for increasing foaming or sudsing properties of cleaning detergents.

**Application**

Be sure to read the Material Safety Data Sheet before using this material.

Mix 1/2 gallon of FOAMER to 4 1/2 gallons of water. Apply mixture with approved foaming equipment. Allow foam to soak and penetrate for up to 30 minutes. Depending on the concentration of mixture and air and environmental conditions, foam will typically maintain its structure for up to 30 minutes before dissipating.

To remove foam, rinse with water under pressure, mop or wet vac (foam may re-expand with introduction of air from wet vac).

**DISPOSAL**

Evaluation of resulting waters or mixtures, at the time of disposal, is required to dispose of according to local, county, state and federal regulations.

### CAUTIONS

For Industrial Use Only. Keep out of reach of children. Avoid contact with eyes and skin. Avoid breathing of vapor or mist, especially for those with asthma or allergies. Do not transfer to unmarked containers. Refer to Material Safety Data Sheet before using.

### DISTRIBUTED BY

## BULLSEYE
### Safety, Industrial and Environmental Supplies

7900 North Radcliff St. Tullytown, PA 19007
**800-692-8557**
53-35 74th St.  Elmhurst, NY 11373-4108
**718-552-9723**

BMS00784