# EXHIBIT 7

# GREENBAUM, ROWE, SMITH & DAVIS LLP

COUNSELORS AT LAW

ROBERT S. GREENBAUM
ARTHUR M. GREENBAUM
PAUL A. ROWE
WENDELL A. SMITH
ALAN E. DAVIS
DAVID L. BRICK
MICHAEL A. BACKER
MARTIN E. DOLLINGER
DEAN A. GAVER
ROBERT C. SCHACHTER
MARTIN L. LEPELSTAT
DENNIS A. ESTIS
WILLIAM D. GRAND
ALAN S. NAAR
STEPHEN K. RHEE
ROBERT M. GOODMAN
DOUGLAS K. WOLFSON
MARK H. SOBEL
HAL M. MANDEL
BARRY S. GOODMAN
LAWRENCE R. NAHER
THOMAS J. DEMITRIO, JR.
ROBERT S. GOLDSMITH
JOHN D. NORTH
KENNETH T. BILLS

THOMAS C. SENTER
MARGARET GOODZEIT
W. RAYMOND FELTON
CHRISTINE F. LI
HERIN A. G. CORCORAN
MICHAEL R. FEINBERG
CARLTON T. SPILLER
JOSEPH H. ORIOLO
ARON M. SCHWARTZ
SABRINA A. KOGEL
JACQUELINE H. PRINTZ
STEVEN C. DELINKO
GARY K. WOLINETZ
KEVIN T. MCNAMARA
RICHARD L. HERTZBERG
ELLEN A. SILVER
ANDREA J. SULLIVAN
MARC D. POLICASTRO
MARC J. GROSS
LUKE J. KEALY
C. BRIAN KORNBREK
CIPORA S. WINTERS
GALIT KIERKUT
BRIAN M. SELVIN
PETER D. CRAWFORD, JR.

WM. L. GREENBAUM (1914-1983)
ALLEN RAVIN (1957-1997)

METRO CORPORATE CAMPUS ONE
P.O. BOX 5600
WOODBRIDGE, N.J. 07095-0988
(732) 549-5600
FAX (732) 549-1881

DELIVERY ADDRESS:
99 WOOD AVE. SOUTH
ISELIN, NEW JERSEY 08830-2712

6 BECKER FARM RD.
ROSELAND, NEW JERSEY 07068-1735
(973) 535-1600
FAX (973) 535-1698

EMAIL: INFO@GREENBAUMLAW.COM
WWW.GREENBAUMLAW.COM

OF COUNSEL
FRANKLIN M. SACHS
J. WARREN WOOD III

COUNSEL
CHRISTINE F. MARKS        HOWARD B. HARDER
ROBERT S. UNDERHILL       LORA L. FONG
STEVEN FINKSER            KEVIN J. CONNELL
ALLEN V. BROWN

MICHELE GIBSON            DAVID S. SCHECHTER
JODI L. ROSENBERG         ADAM B. KAPLAN
ROSEMARY CIRCASI          JONATHAN J. WALZMAN
CHELY A. KALLER           MARJORIE E. KLEIN
ARRON S. SALOMON          JESSICA F. BATTAGLIA
DARREN C. BARRIDRO        JENI M. GOURLAN
OLIVER SALVAGNO           JOHN B. HANCE
STEVEN NUGELMAN           MICHELLE M. SEKOWSKI
DINA M. VANHOES           JEFFREY A. SHOT
HART A. MAWLA             JOHN WHITING ROESER
ERIC M. HELZER            MICHAEL A. GOROKHOVICH
GINA H. PONTORIERO        LISA J. CLAPP
MARINA SOLO               CHERYLYN WARBEL
ROBERT BECKELMAN          LISA B. DIPASQUA
MAJA M. OBRADOVIC         MEGHAN D. MURRAT
JANE J. FELTON            ERNEST E. D'ANGELO
STACEY M. COHEN           JORDAN A. STERN
MICHAEL A. KLEIN          LAURA H. BILOTTA
DEAN E. LOVENTHAL         MICHAEL DINGER
SCHWAM AKNTAR             JAMIE A. YORKS
BRYAN D. PLOCKER          JEANETTE TANNER
DAVID T. SHIVAS

May 12, 2006

**VIA FACSIMILE and REGULAR MAIL**
Mr. Jack Chapman
Associate Director Corporate Real Estate
Bristol-Myers Squibb Company
Post Office Box 4000
Princeton, New Jersey 08845-4000

RE:   Lease dated October 23, 1987 between Somerville Fidelco Associates, L.P., as Landlord, and Bristol-Myers Squibb Company, as Tenant, as further amended by Lease Extension Agreement No. 1 dated May 14, 1993 and Lease Extension Agreement No. 2 dated November 25, 2002 (the "Lease")

Dear Mr. Chapman:

Please be advised that I represent Somerville Fidelco Associates, L.P. I have reviewed the file in connection with this matter, the Lease between my client and yourselves, and your March 24, 2006 letter to Mr. Jeffrey Persky. Suffice it to say, we are surprised by the position seemingly asserted by yourselves. The delays and resulting costs incurred by Bristol-Myers Squibb were the result of requirements imposed upon the Landlord by Bristol-Myers, which unnecessarily delayed completion of the roof membrane and added to the cost of the job. The reasonableness of those requests is open to serious question.

Without getting into specifics, it seems apparent that any materials that may have been dislodged originated beneath the underside of the decking. Therefore, they could not be coming from the old roof membrane which was being replaced. The structural integrity of the deck system, which supported the membrane, was never compromised. The new roof was placed on top of the existing decking. Even if, for the sake of argument, the materials consisted in part of roof membrane debris, any asbestos, to the extent it existed, was non-friable and the system being employed to remove the membrane was one that did not require governmental oversight.

805800.02 5/12/2006 11:20 AM

EXHIBIT

138

BMS01669

GREENBAUM, ROWE, SMITH & DAVIS LLP

Mr. Jack Chapman
May 12, 2006
Page 2 of 2

Furthermore, and notwithstanding any of the above, the Lease, at Sections 5.1 and 29.1, precludes any claim related to the Landlord's actions that, under the circumstances, occurred.

Finally, may I call your attention to the fact that pursuant to Section 5.1 of the Lease, the clear responsibility for, and cost of, replacing the roof membrane belonged to the Tenant. The Landlord's obligations relate only to the "structure," which does not include the roof membrane, but only the roof decking.

Consequently, I have been advised to notify you that the Landlord rejects your request for compensation and as well specifically reserves the right to backcharge Bristol-Myers for the total cost of replacing the roof membrane, inclusive of all of the added costs generated by the delays imposed upon the Landlord by Bristol-Myers.

Very truly yours,

Martin E. Dollinger

MED/hjb

cc:    David Kahan, Esq.

805800.03 5/12/2006 11:20 AM

BMS01670

# EXHIBIT 8

# DrinkerBiddle&Reath
A Pennsylvania Limited Liability Partnership  L L P

Charles J. Vinicombe
609-716-6562
charles.vinicombe@dbr.com

*Law Offices*

05 College Road East
Suite 300
P.O. Box 627
Princeton, NJ
08542-0627

609-716-6500
609-799-7000 fax
w.drinkerbiddle.com

PHILADELPHIA
NEW YORK
WASHINGTON
LOS ANGELES
SAN FRANCISCO
CHICAGO
FLORHAM PARK
BERWYN
WILMINGTON

August 4, 2006

<u>Via Federal Express</u>

Ms. Catherine Shanks
Vice President-Case Management Center
American Arbitration Association
950 Warren Ave.
East Providence, RI 02914

Re:   **Bristol-Myers Squibb Company v. Somerville Fidelco Associates, L.P.**

Dear Ms. Shanks:

        Please find enclosed for filing with the American Arbitration Association the Arbitration Demand of Bristol-Myers Squibb Company ("BMS").  By copy of this letter, we are providing a copy of this Demand to Somerville Fidelco Associates, L.P. and its legal counsel, Mr. Dollinger.  I have also enclosed a check in the amount of $325.00 for the filing fee.  I thank you for your assistance in this matter.

                                        Sincerely yours,

                                        Charles J. Vinicombe

CJV/sds

cc:     Martin E. Dollinger, Esq.
        Somerville Fidelco Associates, LP
        (via certified mail return receipt
        requested and ordinary mail
        with demand)

*Jonathan I. Epstein,*
*Partner responsible for*
*Princeton Office*

<u>Established</u>
*1849*

PR\482418\1

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| Name of Respondent | Name of Representative (if known) |
|---|---|
| Somerville Fidelco Associates, L.P. | Martin E. Dollinger |
| Address | Name of Firm (if applicable) |
| 520 U.S. Highway 22 East | Greenbaum, Rowe, Smith & Davis LLP |
| P.O. Box 6872 | Representative's Address |
| | Metro Corporate Center, P.O. Box 5600 |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Bridgewater | N.J. | 08807 | Woodbridge | N.J | 07095-0988 |
| Phone No. | Fax No. | | Phone No. | | Fax No. |
| (908) 725-8100 | (908) 575-2237 | | (732) 549-5600 | | (732) 549-1881 |
| Email Address: | | | Email Address: mdollinger@greenbaum.com | | |

The named claimant, a party to an arbitration agreement dated <u>October 23, 1987</u>, which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration. ✱

**THE NATURE OF THE DISPUTE**
Claim for breach of commercial lease by tenant against landlord arising out of asbestos contamination at leased premises (located in Somerville, New Jersey) caused by landlord's roofing contractor

| Dollar Amount of Claim $734,175.00 | Other Relief Sought: ☐ Attorneys Fees   ☐ Interest ☐ Arbitration Costs  ☐ Punitive/ Exemplary ☐ Other |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $ 325.00

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Commercial lease experience

Hearing locale <u>Somerville, NJ</u> (check one) ☒ Requested by Claimant  ☐ Locale provision included in the contract

| Estimated time needed for hearings overall: _____ hours or  2-3  days | Type of Business: Claimant  Property owner<br>Respondent Pharmaceutical Company |
|---|---|

Is this a dispute between a business and a consumer? ☐Yes☒ No Does this dispute arise out of an employment relationship? ☐ Yes☒ No
If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐ Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☐ Atlanta, GA  ☐ Dallas, TX  ☒ East Providence, RI ☐ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)   Date: | Name of Representative |
|---|---|
| | Charles J. Vinicombe |
| Name of Claimant | Name of Firm (if applicable) |
| Bristol-Myers Squibb Company | DRINKER BIDDLE & REATH LLP |
| Address (to be used in connection with this case) | Representative's Address |
| P.O. Box 4000 | 105 College Road East, SDite 300 |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Princeton | N.J | 08845-4000 | Princeton | N.J | 08542 |
| Phone No. | Fax No. | | Phone No. | | Fax No. |
| (609) 252-5546 | | | (609)716-6562 | | (609) 799-7000 |
| Email Address: john.chapman@bms.com | | | Email Address: charles.vinicombe@dbr.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the A.A.A.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

✱ The arbitration clause is contained in the original October 23, 1987 lease, which has amendments and extensions dated June 3, 1988, May 14, 1993 and November 25, 2002.

# EXHIBIT 9

1

```
 1          BEFORE THE AMERICAN ARBITRATION ASSOCIATION

 2                  CASE NO. 18115Y0107106

 3                      -   -   -

 4     BRISTOL-MYERS SQUIBB,

 5          Claimant,

 6          v.

 7     SOMERVILLE FIDELCO ASSOCIATES,

 8          Respondent.

 9                      -   -   -

10

11          DEPOSITION UNDER ORAL EXAMINATION OF

12                  MICHAEL SOLAKOV

13               Clifton, New Jersey

14               February 9, 2007

15                      -   -   -

16

17

18          REPORTED BY:  MARGO HRONCICH, CSR

19                      -   -   -

20

21

            ESQUIRE DEPOSITION SERVICES

22            90 Woodbridge Center Drive

            Woodbridge, New Jersey 07095

23               (732) 283-1060

24

25     JOB #59648
```

EXHIBIT

tabbies

9

**Page 2**

1      Transcript of the deposition of
2    MICHAEL SOLAKOV, called for Oral Examination in the
3    above-captioned matter, said deposition taken
4    pursuant to Superior Court Rules of Practice and
5    Procedure by and before MARGO A. HRONCICH, a
6    Certified Shorthand Reporter and Notary Public for
7    the State of New Jersey, at the offices of DRINKER,
8    BIDDLE & REATH, LLP, 500 Campus Drive, Florham Park,
9    New Jersey, on Friday, February 9, 2007, commencing
10   at 9:50 a.m.
11
12                    - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1                    - - -
2                   INDEX
3                    - - -
4
     Testimony of: MICHAEL SOLAKOV
5
               Direct Cross Redirect Recross
6
     By Mr. Vinicombe     6
7
     By Mr. Maher         63
8
9                    - - -
10
11               EXHIBITS
12   (BMS exhibits)          - - -
13   NO.    DESCRIPTION                 PAGE
14   31    Certification of Service and
           Subpoena Ad Testificandum and
15         Duces Tecum served upon Slavco
           Construction, Inc.          12
16
17   32    Collection of documents produced
           by Slavco Construction, Inc.,
18         facing page entitled "Job
           Scheduling Timeline"         15
19
20   33    Fax from Heather at Slavco
           Construction, Inc., to Scott
21         Badger, dated October 20, 2005,
           w/attached Asbestos Abatement
22         Proposal, Bates stamped SF00214 -
           216                          21
23   34    Document entitled "Work Plan &
           Schedule, 76 Fourth Street,
24         Somerville, New Jersey," Bates
           stamped SF00258              39
25

**Page 3**

1    APPEARANCES:
2
3       DRINKER, BIDDLE & REATH, LLP
        BY:  CHARLES J. VINICOMBE, ESQUIRE
4       105 College Road East
        Suite 300
5       Princeton, New Jersey 08452
        (609) 716-6562
6       Counsel for the Claimant
7
8       GREENBAUM, ROWE, SMITH & DAVIS, LLP
        BY:  LAWRENCE P. MAHER, ESQUIRE
9       Metro Corporate Campus One
        P.O. Box 5600
10      Woodbridge, New Jersey 07095
        (732) 549-5600
11      Counsel for the Respondent
12
13   ALSO PRESENT:
14      MARGO HRONCICH, CSR
        Esquire Deposition Services
15
16              - - -
17
18
19
20
21
22
23
24
25

**Page 5**

1                    - - -
2         EXHIBITS (CONTINUED)
3
     (BMS exhibits)
4
     NO.    DESCRIPTION                 PAGE
5
6    35    Document entitled "Procedures
           For The Removal Of Roofing,
7          76 Fourth Street," Bates
           stamped SF00641 - 643        40
8    36    Document entitled "Slavco
           Construction, Inc., Standard
9          Operating Procedures," Bates
           stamped SF00001 - 192        41
10
11   37    Slavco Construction, Inc.,
           Closeout Package, Bates
           stamped SF00413 - 507        49
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**6**

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line   Page Line   Page Line
None

Request for Production of Documents
Page Line   Page Line   Page Line
None

Stipulations
Page Line   Page Line   Page Line
None

Question Marked
Page Line   Page Line   Page Line
None

**7**

1  MICHAEL SOLAKOV, c/o Slavco
2  Construction, Inc., 164 Getty Avenue, Clifton, New
3  Jersey, 07011, called as a witness, after having
4  been duly sworn, was examined and testified as
5  follows:
6  DIRECT EXAMINATION BY MR. VINICOMBE:
7      Q.    Good morning, Mr. Solakov.
8      A.    Good morning.
9      Q.    I introduced myself off the record,
10  but let me just put on the record, my name is
11  Charles Vinicombe.  I represent Bristol-Myers
12  Squibb.  Bristol-Myers Squibb is the tenant at a
13  facility that has brought an arbitration proceeding
14  against the landlord, Somerville Fidelco Associates
15      We're here this morning to take your
16  deposition.  Have you ever been deposed before?
17      A.    Yes.
18      Q.    Approximately how many times?
19      A.    A couple times.
20      Q.    Okay.  Let me just go over sort of a
21  few of the ground rules, even though some of them
22  may be familiar to you.
23      It's important that we not speak at
24  the same time, otherwise it makes the court
25  reporter's life difficult; so I will wait until you

**8**

1  finish your answer before I ask you a question, and,
2  by the same token, if you can just wait until I've
3  completed my question before you start answering the
4  question.
5      It's also important that you answer
6  verbally and not just give a nod of the head or say
7  "uh-huh" because the court reporter can't interpret
8  what you mean by that.
9      If you don't understand a question,
10  please let me know that.  I want to make sure you
11  understand every question I ask you, so if there's
12  some portion of it that you don't understand, let me
13  know and I'll attempt to rephrase it in a way that
14  you can understand it.
15      .Do you have any questions about how
16  we're going to proceed this morning?
17      A.    No questions.
18      Q.    Where are you currently employed?
19      A.    Slavco Construction.
20      Q.    And what is your position with
21  Slavco?
22      A.    General manager.
23      Q.    What are your duties and
24  responsibilities as a general manager?
25      A.    To oversee all operations, every

**9**

1  operation, from estimating to bidding, to completion
2  of the job.
3      Q.    And how long have you been with
4  Slavco?
5      A.    Three years.
6      Q.    What business is Slavco in?  How
7  would you describe its business?
8      A.    We're an environmental company doing
9  from selective demolition to demolition to
10  environmental issues, from asbestos to mercury
11  contaminated soil.
12      Q.    Before joining Slavco, were you in
13  the environmental field at all, in the business?
14      A.    A long time.  In the late '80s, prior
15  to Slavco, '80 to '92.
16      Q.    Who did you work for during that time
17  period?
18      A.    My father's company.
19      Q.    What's the name of that company?
20      A.    Mace, M-a-c-e, Construction.
21      Q.    Was that also an environmental
22  business?
23      A.    That was a construction business, but
24  back then, that's when asbestos was coming out,
25  lead.

SOLAKOV - Direct

**10**

1    Q.    And where did you work between '92
2   and when you joined Slavco?
3    A.    I worked for my father's companies,
4   either a construction company in the states, or we
5   also resided in Europe, in the Republic of
6   Macedonia.
7    Q.    So would it be accurate to say that
8   since 1980 you've been in the construction and/or
9   environmental business up through today?
10   A.    Yes.
11   Q.    Are there any certifications or
12  licenses that you hold in the environmental business
13  or the construction business?
14   A.    Certified asbestos supervisor in
15  Virginia, New Jersey, New York State, Connecticut,
16  Pennsylvania, OSHA 40-hour Haz-WOPER.
17   Q.    Forty-hour?
18   A.    H-a-z-W-O-P-E-R, Haz-WOPER. It's for
19  hazardous materials.
20   Q.    To become a certified asbestos
21  supervisor and to obtain those certifications in
22  each of the states that you mentioned, what are the
23  requirements to obtain that certification?
24   A.    A minimum of 40-hour classes that's
25  recognized by the EPA. In New Jersey you have to

**11**

1   follow up with the test; in other states you just --
2   that's proof enough.
3    Q.    When did you first become a certified
4   asbestos supervisor, and do you recall which state
5   you first obtained that certification?
6    A.    Connecticut.
7    Q.    Do you recall what year?
8    A.    2004.
9    Q.    When did you obtain your
10  certification in New Jersey?
11   A.    2004. All about in the same time,
12  2004.
13   Q.    And the OSHA Haz-WOPER certification
14  when did you obtain that?
15   A.    February 2005.
16   Q.    What does that allow you to do?
17   A.    Contaminated soil, PCBs, mercury, you
18  know. If there's a hazardous spill, oil spill
19  cleanup, we'll oversee it.
20   Q.    The certification as an asbestos
21  supervisor, what does that qualify you to do?
22   A.    To perform asbestos work, also to
23  supervise all asbestos work on-site.
24   Q.    Does Slavco, the business, the
25  company, hold any certifications or licenses?

**12**

1    A.    Yes.
2    Q.    What are those?
3    A.    We are certified to perform asbestos
4   in New Jersey, Connecticut, New York State,
5   Pennsylvania, that's it.
6    Q.    Do you recall when Slavco obtained
7   that certification? Did it predate your joining
8   Slavco --
9    A.    Yes.
10   Q.    -- or was it recent?
11       And what does that asbestos
12  certification allow Slavco to do?
13   A.    To perform asbestos abatement in each
14  state.
15   Q.    Do you know how long Slavco has been
16  in business?
17   A.    Since 1992.
18   Q.    And you are here today in response to
19  a subpoena that we served on you; is that correct?
20   A.    Yes.
21       (Exhibit BMS-31, Certification of
22  Service and Subpoena Ad Testificandum and Duces
23  Tecum served upon Slavco Construction, Inc., is
24  received and marked for Identification.)
25   Q.    Let me hand you what I've had marked

**13**

1   as BMS-31.
2       The first page is just a
3   certification of service, but if you turn to the
4   second page where the subpoena starts, do you
5   recognize this as a subpoena that you were provided
6   with on behalf of Slavco?
7    A.    Yes.
8    Q.    And did you have an opportunity to
9   review the subpoena?
10   A.    Yes.
11   Q.    And did you discuss it with your
12  supervisor at Slavco?
13   A.    Discussed it with only the owner.
14   Q.    And who is that?
15   A.    Slavco.
16   Q.    What's his first name?
17   A.    Slavco.
18   Q.    Slavco is the first name?
19   A.    Yes.
20   Q.    What's his last name?
21   A.    Madzarov, M-a-d-z-a-r-o-v.
22   Q.    I can pronounce "Slavco" better than
23  I can his last name, so did you have a chance to
24  review the subpoena with Slavco?
25   A.    We just glanced over it.

SOLAKOV - Direct

**14**

1    Q.    And did he ask you to appear on
2  behalf of the company in response to the subpoena --
3    A.    Yes.
4    Q.    -- at this deposition?
5    A.    Yes.
6    Q.    Now, you'll see in the first page
7  there are a number of subject matters listed in the
8  subpoena. It has paragraph numbers 1 through 8.
9         Did you and Slavco review those
10  paragraphs and come to the conclusion that you were
11  the most knowledgeable person on those subjects --
12    A.    Yes.
13    Q.    -- for this project?
14    A.    Yes.
15    Q.    And you'll see a little bit further
16  back on page 5, where it says "Document Request,"
17  and then there's a list of paragraphs 1 through 14.
18         Did you have the opportunity to
19  review those document requests with Slavco before
20  you appeared today?
21    A.    I did not review them with Slavco. I
22  just gave a brief explanation of what was needed
23  and -- you know.
24    Q.    And did you collect any materials in
25  response to that subpoena?

**15**

1    A.    Yes.
2    Q.    And do you have any of those
3  materials with you today?
4    A.    Yes, I have them all.
5    Q.    Okay. Are those originals or an
6  extra set of copies?
7    A.    I have to check. They should all be
8  copies.
9    Q.    I just want to make sure I'm not
10  going to be taking your only copy from the company,
11  so that's the reason I ask. I also want to mark
12  them as well, so.
13    A.    I'll double-check.
14         (Brief pause.)
15         They're all copies.
16         (There is a discussion off the
17  record.)
18         (Exhibit BMS-32, collection of
19  documents produced by Slavco Construction, Inc.,
20  facing page entitled "Job Scheduling Timeline," is
21  received and marked for Identification.)
22    Q.    I take it you made one copy for us,
23  correct?
24    A.    Yes.
25    Q.    So what I'll do when we have a break,

**16**

1  or at the end, I'll make a copy for Mr. Maher.
2         What I've marked BMS-32, we were just
3  talking about documents that you had arranged to be
4  gathered in response to the subpoena, and I've now
5  marked that as BMS-32.
6         Did you direct somebody at Slavco to
7  gather these materials for you?
8    A.    I gathered a majority of them and
9  then I had the final copies made today.
10    Q.    And did you review them and come to
11  the conclusion that you had gathered all the
12  materials that were responsive to the particular
13  requests that were listed in this subpoena?
14    A.    Yes.
15    Q.    And I see, certainly, in the first
16  page, and when we have an opportunity, I'll glance
17  through some of the other pages and see if I have
18  any questions, but essentially on the first page it
19  appears to be a list which is entitled "Job
20  Scheduling Timeline," and then it has various dates
21  and events listed to next to it, correct?
22    A.    Yes.
23    Q.    Is this a document you prepared to
24  refresh your recollection of the events that had
25  occurred at the site while Slavco was working there?

**17**

1    A.    I had our controller, previous
2  controller, Phyllis Jones, prepare them.
3    Q.    Okay. And as we go through my
4  questions, certainly, if you need to review this
5  document to refresh your memory, feel free to do so.
6  And like I said, later on I'll go through it and if
7  I have any specific questions, I'll let you know,
8  but I want to make sure you have that available to
9  you.
10         And my understanding is that, and
11  correct me if I'm wrong, Slavco was hired to do a
12  roof removal job at 76 Fourth Street in Somerville,
13  New Jersey; is that correct?
14    A.    Correct.
15    Q.    And for purposes of this deposition,
16  I'll refer to that site as the Somerville facility
17  or the Somerville site, just so we both are on the
18  same page as far as what job we're talking about.
19  Is that okay?
20    A.    Okay.
21    Q.    Do you recall when Slavco was
22  retained to provide services at the Somerville
23  facility?
24    A.    We were -- there was -- first Badger
25  Roofing called us in September to give us a price

SOLAKOV - Direct

**18**

1  for asbestos abatement of a roof, and we forwarded a
2  proposal to them. Then SK Properties -- how do you
3  call their name? What's their name?
4      Q.    SK Associates, SK Properties.
5      A.    They signed a contract. That
6  proposal was forwarded to them and they signed a
7  contract, or a proposal, on 10/12, 2005.
8      Q.    Do you recall who it was from Badger
9  that had contacted your office?
10     A.    It was -- I think his last name was
11 Badger.
12     Q.    Scott Badger?
13     A.    That's it, Scott Badger.
14     Q.    Had you known Scott Badger before
15 that phone call was made to your office?
16     A.    No.
17     Q.    And do you know who he contacted at
18 Slavco initially, was it you or somebody else?
19     A.    It went through our receptionist and
20 it came to us -- and it came to me, and back then we
21 had a field manager, Mike Petrovic.
22     Q.    How do you spell this last name?
23     A.    P-e-t-r-o-v-i-c.
24     Q.    And did you eventually speak to Scott
25 Badger?

**19**

1      A.    We first went and took a look at the
2  job, we typed up a proposal and we forwarded it to
3  Badger Roofing, that's what our proposal is made out
4  to.
5      Q.    And you actually went out to the site
6  at that time?
7      A.    Yes.
8      Q.    And who did you meet with?
9      A.    Nobody.
10     Q.    So you just went out and did a
11 walk-through of the site --
12     A.    Yes.
13     Q.    -- to get an idea of what the job
14 would involve?
15     A.    Yes.
16     Q.    You didn't meet with anybody from
17 Badger or from the tenant, Bristol Meyer Squibb, or
18 from the landlord, SKA, or Somerville Fidelco, at
19 the time?
20     A.    No. We arrived at the site. There
21 was no access, so we drove right across the street
22 so we could try to get an elevated view of the roof,
23 but we were never on the roof.
24     Q.    You said you generated a proposal at
25 some point in time; is that correct?

**20**

1      A.    Yes.
2      Q.    Did you go back to the site after
3  that initial visit but before you generated your
4  proposal or did you just make that initial visit and
5  then generate the proposal?
6      A.    Initial visit, generated the
7  proposal.
8      Q.    At some point in time did you speak
9  to Scott Badger about what services were being
10 requested of Slavco?
11     A.    Well, what happened, I think
12 everything after that was forwarded -- I assume was
13 forwarded to Barry Ages' office.
14     Q.    Did you speak to Mr. Ages?
15     A.    Yes.
16     Q.    Did he describe for you what services
17 he was seeking to retain from --
18     A.    Yes.
19     Q.    And what was that description? What
20 did he tell you?
21     A.    To remove approximately 7,000 -- I'm
22 sorry. Scott Badger did state to remove 70 squares
23 of asbestos roofing.
24     Q.    Did they describe for you, either
25 Mr. Badger or Mr. Ages, what the status of the

**21**

1  project was at that point?
2      A.    No.
3      Q.    Did either of them convey to you that
4  Badger had started to do the roof removal and then
5  had stopped the roof removal when it became apparent
6  that asbestos was encountered at the site?
7      A.    When the proposal was generated, no.
8  Immediately following the generation of the
9  proposal.
10     MR. VINICOMBE: I realize some of
11 these documents may have been marked before, but I
12 don't have the marked versions. I'll re-mark these
13 as additional exhibits.
14     (Exhibit BMS-33, fax from Heather at
15 Slavco Construction, Inc., to Scott Badger, dated
16 October 20, 2005, with attached Asbestos Abatement
17 Proposal, is received and marked for
18 Identification.)
19     Q.    I'll hand you what's been marked
20 BMS-33.
21     This is what appears to be a fax from
22 Heather at your office to Scott Badger, dated
23 October 20, 2005, with an Asbestos Abatement
24 Proposal attached to it.
25     Is that the proposal you were talking

ESQUIRE DEPOSITION SERVICES

SOLAKOV - Direct

**22**

1 about earlier?

2    A.    Yes.

3    Q.    And was this proposal accepted?

4    A.    **This proposal was not accepted by**

5 **Badger Roofing.**

6    Q.    Was it accepted by somebody else?

7    A.    **Yes.  Let me just...**

8         **It was accepted by Somerville Fidelco**

9 **Associates.**

10    Q.    Okay.  Let me hand you what was

11 previously marked as Exhibit BMS-9, which appears to

12 be another copy of the proposal, signed by

13 Somerville Fidelco Associates on the second page.

14    A.    Yes.

15    Q.    Okay.  So it was accepted by

16 Somerville Fidelco Associates, even though the

17 proposal was addressed to Badger Roofing Company; is

18 that correct?

19    A.    Yes.

20    Q.    Now, what was the scope of services

21 that Slavco was proposing to perform on this

22 project?

23    A.    **Removal of approximately 7,000 square**

24 **feet of asbestos-containing roofing material.**

25    Q.    And at the time that you generated

**23**

1 this proposal, did you have an understanding that

2 Badger had been originally retained by Somerville

3 Fidelco Associates to do the roof removal?

4    A.    Yes.

5    Q.    So would it be fair to say it was

6 your understanding at that time that Slavco was

7 basically proposing to provide services to take over

8 the roof removal from Badger?

9    A.    Yes.

10    Q.    Was Slavco proposing to have any

11 involvement with the roof replacement on this

12 project?

13    A.    No.

14    Q.    So your services were limited to

15 completing the roof removal project that Badger had

16 started, is that accurate?

17    A.    **Just the asbestos portion of the roof**

18 **removal.**

19    Q.    Was there another aspect of the

20 removal other than what you just said was asbestos

21 removal?

22    A.    **Just roofing material.**

23    Q.    Just so I'm clear, was the scope of

24 Slavco's services to do a complete roof removal or

25 to at least complete the roof removal or just to

**24**

1 participate in some portion of the roof removal?

2    A.    **To remove the asbestos-containing**

3 **roofing material, the foam -- above the foam, the**

4 **roofing layer, the roofing material.**

5    Q.    Were you ever provided with lab

6 results that indicated the presence of asbestos

7 materials on the roof?

8    A.    No.

9    Q.    Were you informed that somebody had

10 received lab results confirming the presence of

11 asbestos in the roofing material?

12    A.    Yes.

13    Q.    Did you ever arrange for any testing,

14 any testing for asbestos, to be done yourself?

15    A.    No.

16    Q.    So would it be fair to say you were

17 relying upon the information they provided to you

18 that asbestos was present; is that accurate?

19    A.    Yes.

20    Q.    And you treated the material as if it

21 contained asbestos; is that accurate?

22    A.    Yes.

23    Q.    The pricing on this proposal was for

24 $32,000, correct?

25    A.    Yes.

**25**

1    Q.    It was to include a deposit of $6400,

2 and then the balance to be paid later on, correct?

3    A.    Yes.

4    Q.    And was Slavco paid in full for the

5 $32,000?

6    A.    Yes.

7    Q.    Now, the proposal states, under

8 "Scope of Work," that "Slavco will utilize NJ

9 licensed asbestos handlers and supervisors on this

10 project."

11         Were licensed asbestos handlers and

12 supervisors utilized on the project?

13    A.    Yes.

14    Q.    And I think I know the answer to this

15 question, but I'll ask, who was the supervisor?

16    A.    **Nikola Paunovski, N-i-k-o-l-a,**

17 **P-a-u-n-o-v-s-k-i.**

18    Q.    It's easier for me to say "Nikola"

19 so I'll refer to him that way.

20         So you were not the supervisor on the

21 project --

22    A.    No.

23    Q.    -- at any time?

24    A.    No.

25    Q.    If you know, who were the licensed

SOLAKOV - Direct

26

1  asbestos handlers that were used on the project?
2      A.    I don't have all their names.
3      Q.    But they were licensed, to your
4  knowledge?
5      A.    Yeah, all of them.
6      Q.    And do you recall approximately how
7  many employees were used on the job?
8      A.    Anywhere from eight to twelve.
9      Q.    Now, prior to this job, personally,
10 how many asbestos abatement or removal projects had
11 you personally been involved in?
12     A.    Prior to this?
13     Q.    Yes, if you can estimate.  I realize
14 you can't --
15     A.    At least over 50.
16     Q.    And if Nikola was serving as the
17 supervisor on the project, how would you describe
18 what your role or involvement was with the project?
19     A.    I was the field manager.
20     Q.    What tasks did you personally
21 perform in that capacity?
22     A.    Direct communications with the owner.
23 We also had to make sure the material was on the
24 site, all disposal, everybody was licensed, their
25 medical, their fit tests, all proper documents and

27

1  respirators and material needed to complete the job.
2      Q.    Do you recall how many times you were
3  actually at the site?
4      A.    I was there a minimum of four to five
5  times.
6      Q.    And were you at the site continuously
7  during the time period that the Slavco employees
8  were doing the roof removal?
9      A.    For a portion of the work, yes.
10     Q.    I'm going to hand you what was
11 previously marked BMS-14.
12          This appears to be a Slavco invoice
13 dated December 27, 2005, for the job; is that
14 correct?
15     A.    Yes.
16     Q.    And it makes reference to a $6400
17 deposit and a $25,600 balance, correct?
18     A.    Yes.
19     Q.    And, to your knowledge, was this bill
20 paid in its entirety?
21     A.    Yes.
22     Q.    Do you have any understanding whether
23 an asbestos license issued by the State of New
24 Jersey is required to remove asbestos materials from
25 a roof?

28

1      A.    In the State of New Jersey you do not
2  need to have an asbestos license to remove a roof as
3  long as you're replacing it and removing under, I
4  think it was 5,200 square feet a day, something like
5  that.
6      Q.    Do you also have to use certain
7  methodologies or equipment for you not to be
8  required to have an asbestos license in New Jersey
9  to do an asbestos removal job on a roof?
10     A.    I'm not familiar with that because we
11 are qualified.
12     Q.    And NESHAP is National Emission
13 Standards For Hazard Air Pollutants, correct?
14     A.    Yes.
15     Q.    When you made the original proposal
16 on this project, did you have any understanding at
17 that time whether Badger was going to continue to
18 play any role on the project if Slavco's services
19 were retained?
20     A.    We had no clue.
21     Q.    At some point was it brought to your
22 attention that Badger would continue to participate
23 and that their role would be to do the roof
24 replacement after you did the asbestos removal?
25     A.    Yes.

29

1      Q.    And how was that brought to your
2  attention?
3      A.    I spoke to Barry, and we had a
4  meeting to go over the work procedures that we were
5  going to implement and then to have -- after we were
6  completed, to have Badger Roofing behind us, laying
7  down the roof.
8      Q.    And on the job did the Badger
9  employees work alongside the Slavco employees at the
10 same time on the project?
11     A.    While we were working?
12     Q.    Yes.
13     A.    Yes.
14     Q.    And at any time, to your knowledge,
15 was Slavco supervising or directing any of the work
16 of the Badger employees --
17     A.    No.
18     Q.    -- on the job?
19     A.    No.
20     Q.    Now, the tenant at this facility is
21 Bristol-Myers Squibb Company.
22          At some point in time was it brought
23 to your attention that Bristol-Myers was a tenant at
24 the facility?
25     A.    Yes.

SOLAKOV - Direct

30

1    Q.    Did Mr. Ages bring that to your
2  attention? Or, let me ask, how did you learn that?
3    A.    I spoke to a field manager from
4  Squibb, I still have his card, when we were at the
5  job site. So from Barry we knew that there was a
6  tenant there.
7    Q.    Who was that field manager?
8    A.    I don't have his name.
9    Q.    Let me give you a couple of names. I
10  don't want you to guess, but if any of these names
11  jog your recollection as the person you spoke to,
12  you can let me know.
13       John Deck?
14    A.    I don't know.
15    Q.    Bob Papa?
16    A.    I don't know.
17    Q.    Bob Post?
18    A.    I don't have a recollection.
19    Q.    You said you still have the business
20  card. Do you have the business card here?
21    A.    No. It's probably in my computer
22  somewhere.
23    Q.    When you met with that Bristol-Myers
24  representative, what did you discuss?
25    A.    We walked through the building prior

31

1  to starting, it could have been the end of November,
2  beginning of September, to see the TuffWrap was
3  installed, so he walked me through the building.
4    Q.    What's TuffWrap?
5    A.    TuffWrap is -- it's a plastic. It's
6  a company that puts up plastic, so if there's any
7  asbestos abatement or any kind of work above, that
8  that dust doesn't fall down, to keep the area
9  dust-free.
10    Q.    Other than the TuffWrap that had been
11  installed, to your knowledge, were any measures
12  taken to limit or prevent dust or debris from the
13  completion of the roof removal project from entering
14  the building?
15    A.    When we started?
16    Q.    Yes.
17    A.    Okay. When we started, we went
18  beyond the regulations of New Jersey, and we have a
19  work plan that I sent to them. And in the work plan
20  we stated that we were going to remove the roof
21  without crumbling, pulverizing or reducing to any
22  kind of powder, we're going to keep it wet,
23  adequately wet, and dispose of it properly.
24    Q.    Now, you said that your plan went
25  above the regulatory requirements by the State of

32

1  New Jersey, correct?
2    A.    Yes.
3    Q.    What aspect of that exceeded the
4  requirements of the regulations?
5    A.    In the State of New Jersey you don't
6  have to -- we used a foam material, like a shave
7  cream foam, and you spray it, and we blanketed the
8  roofing material so that when you're scraping and
9  pulling it up, the dust doesn't go airborne.
10    Q.    Have you used that method before on
11  other properties?
12    A.    Yes.
13    Q.    Is it common for you to use that
14  method on other projects?
15    A.    For New York City.
16    Q.    At any time were you asked to make
17  arrangements to have core samples taken of any of
18  the roof materials?
19    A.    Can you repeat that?
20    Q.    Yes. At any time after Slavco was
21  retained on this project, were you asked by anybody
22  to make arrangements for core samples to be taken of
23  the roof materials?
24    A.    No.
25    Q.    After Slavco was retained on this

33

1  job, are you aware of anybody else having taken core
2  samples of the roofing materials?
3    A.    There was a phone call made that
4  there was a sample taken, I think it was from EHI,
5  Environmental Health Investigations, that they took
6  a test and it came back positive, asbestos.
7    Q.    Let me hand you what's been
8  previously marked as exhibits BMS-15 and BMS-16.
9       BMS-15 appears to be a draft of a
10  letter that Heather from Slavco forwarded to
11  Mr. Ages, and BMS-16 appears to be a signed copy of
12  that letter, dated October 26, 2005, sent to the New
13  Jersey Department of Labor.
14       With regard to BMS-15, the draft
15  letter that Heather forwarded, did you have any
16  involvement in the drafting of that letter?
17    A.    Drafting the letter, no.
18    Q.    Do you know who, if anybody, at
19  Slavco was involved in drafting that document?
20    A.    It would be only Heather.
21    Q.    What is Heather's position at Slavco?
22    A.    She current -- she no longer works
23  with us. She was an administrative assistant.
24    Q.    And do you have any understanding as
25  to why Heather forwarded a draft of a letter

SOLAKOV - Direct

34

1  addressed to the New Jersey Department of Labor to
2  Barry Ages?
3      A.    Yes.
4      Q.    And what's that understanding?
5      A.    In the state of New Jersey, to apply
6  for your -- to submit a notification -- you have ten
7  days, ten calendar days to perform the work.  To
8  bypass that and to start to work immediately, you
9  have to forward a reason why you want to start the
10 work.
11     Q.    And in this letter it appears to be
12 requesting a waiver of the ten-day notification
13 period, correct?
14     A.    Yes.
15     Q.    Do you have an understanding why
16 notice has to be given to the New Jersey Department
17 of Labor before doing an asbestos removal job?
18     A.    So they have enough time to properly
19 manage -- to oversee the job, because their
20 inspectors do come out.
21     Q.    On this job do you recall any
22 inspector from the New Jersey Department of Labor
23 coming to the site?
24     A.    No.
25     Q.    Were you ever informed that a

35

1  representative of the New Jersey Department of Labor
2  had ever been to the site?
3      A.    No.
4      Q.    With regard to this letter which is
5  requesting a waiver of the ten-day notification
6  period, have you seen this type of letter used on
7  other asbestos removal jobs that you've been
8  involved in in New Jersey?
9      A.    Yes.
10     Q.    Are there any circumstances on an
11 asbestos removal job in New Jersey where you don't
12 either have to give a ten-day notification or
13 request a waiver of the ten-day notification period?
14     A.    If the project is less than 1 linear
15 foot of asbestos, you don't have to give a
16 notification.
17     Q.    And other than that, you do have to
18 give notification?
19     A.    Yes.
20     Q.    At any point did you, or, to your
21 knowledge, anybody else at Slavco ever ask Barry
22 Ages or Badger if core samples had ever been taken
23 of the roof at the Somerville facility?
24     A.    No.
25     Q.    Were you ever provided with a report

36

1  from Harry H. Leavy Associates suggesting that core
2  samples be taken of the roof at the Somerville
3  facility?
4      A.    I have to go back one question.  Were
5  you saying during the -- after our work was
6  performed or prior?
7      Q.    At any time.
8      A.    At any time?  There was a meeting
9  where there was -- somebody did discuss samples,
10 samples being taken, not core samples, roof samples.
11     Q.    To your knowledge, were any core
12 samples taken of the roofing materials before Badger
13 performed its work on the site?  Were you ever
14 informed of that?
15     A.    I don't know, I don't know.
16     Q.    On other roofing jobs where Slavco is
17 retained to do the roof removal -- and I recognize
18 in this instance you were taking over a portion of a
19 job that another contractor had started -- but on
20 other roof removal jobs where you're the only
21 contractor that's retained to do a roof removal,
22 does Slavco have a practice of making inquiries as
23 to whether core samples have already been taken of
24 roofing materials before conducting its own removal
25 activities?

37

1      A.    Since -- we do not ask that.  If the
2  term -- if the word comes up, "asbestos," and
3  somebody states to us there's asbestos on the roof,
4  we assume and we just proceed with asbestos removal.
5      Q.    But if you're making a proposal on a
6  roofing job where somebody doesn't mention the
7  presence of asbestos, do you typically make
8  inquiries of the owner as to whether the roof has
9  been tested for asbestos or whether core samples
10 have been taken of any roofing materials?
11     A.    Yes, we do.
12     Q.    Do you do that on every job where
13 you're proposing to provide services for a roof
14 removal?
15     A.    Yes.
16     Q.    And why is that?
17     A.    There's different procedures if
18 you're removing construction debris compared to
19 asbestos.  There's different disposal sites, higher
20 costs, so we have to make sure -- plus there's laws
21 that we have to remove the roof the proper way.
22     Q.    And what is the difference in those
23 procedures between an ordinary roofing job and a
24 roofing job where you encounter asbestos?
25     A.    Lots of differences.  First, the

SOLAKOV - Direct

**38**

1  people you can use, they do not have to be asbestos
2  certified if the roof is non-asbestos. The disposal
3  site, construction debris you can dispose of at any
4  local site in New Jersey that accepts roofing
5  material. The price is completely different.
6  There's, you know, numerous aspects.
7      Q.    What about in terms of the equipment
8  that's used or the methods of removal that are used,
9  are there any differences in that?
10     A.    Yes, in removing a non-asbestos roof,
11  you're allowed to cut it. You can do anything to
12  it, cut it, rip it, you know, the easiest way to
13  remove it.
14          When it is an asbestos roof, you
15  cannot pulverize it; you have to limit the dust.
16     Q.    And is that to prevent non-friable
17  asbestos from becoming friable?
18     A.    Yes.
19     Q.    And if there is dust, does that
20  indicate to you that it's friable asbestos?
21     A.    No.
22     Q.    What would be an indication that
23  non-friable asbestos has become friable?
24     A.    An air sample.
25     Q.    Is my understanding correct that a

**39**

1  service was retained to do air sampling during
2  Slavco's roof removal in this project?
3      A.    Yes.
4      Q.    And do you know what the results of
5  any of that testing were?
6      A.    No.
7      Q.    So you don't know whether or not that
8  testing indicated the presence of asbestos or not?
9      A.    During the -- there was Environmental
10  Health Investigations. After the completion of the
11  project, we did speak to them and they said
12  everything looked good, but I don't recall physical
13  records.
14     Q.    Did Slavco retain EHI's services or
15  was it SK Associates that did that?
16     A.    It was not Slavco.
17     Q.    On other jobs where Slavco is
18  proposing to do a roof removal, if the building is
19  older than 25 years, is it Slavco's practice to
20  inquire whether asbestos is present of the owner?
21     A.    We inquire -- well, I wouldn't even
22  say 25 years, say, you know, 15 years, going back,
23  we always inquire if there's asbestos present.
24          (Exhibit BMS-34, document entitled
25  "Work Plan & Schedule, 76 Fourth Street, Somerville

**40**

1  New Jersey," Bates Stamped SF00258, is received and
2  marked for Identification.)
3      Q.    I'm handing you what's been marked
4  BMS-34.
5          Can you identify what this document
6  is?
7      A.    Yes.
8      Q.    What is it?
9      A.    It's the work plan that we used to
10  remove the roof at the Somerville project.
11     Q.    And was this work plan followed at
12  the site?
13     A.    Yes.
14          (Exhibit BMS-35, document entitled
15  "Procedures For The Removal Of Roofing, 76 Fourth
16  Street," Bates stamped SF00641 through 643, is
17  received and marked for Identification.)
18     Q.    I've handed you what's been marked
19  BMS-35.
20          Can you identify what that document
21  is?
22     A.    Procedures for removal of roofing at
23  76 Fourth Street.
24     Q.    These are Slavco's procedures?
25     A.    These are our procedures, yes.

**41**

1      Q.    Again, were these followed at the
2  site?
3      A.    Yes.
4      Q.    Comparing BMS-34 to BMS-35, is BMS-35
5  just a more detailed description of the procedures
6  and work plan that Slavco was following at the site?
7      A.    Yes.
8          (Exhibit BMS-36, document entitled
9  "Slavco Construction, Inc., Standard Operating
10  Procedures," Bates stamped SF00001 through 192, is
11  received and marked for Identification.)
12     Q.    I've handed you what's been marked
13  BMS-36.
14          Can you identify what this document
15  is?
16     A.    This is our standard operating
17  procedures, Slavco Construction standard operating
18  procedures.
19     Q.    Now, BMS-34 and 35, the work plan and
20  schedule and the procedures for the removal of the
21  roof, these documents were generated specifically
22  for the Somerville project, correct?
23     A.    Yes.
24     Q.    BMS-36, was this generated
25  specifically for the Somerville project or is this

SOLAKOV - Direct

42

1  just a general set of standard operating procedures
2  that Slavco references on all projects?
3      A.    **Just a general.**
4      Q.    So this document was not generated
5  just for the Somerville job, correct?
6      A.    **Correct.**
7      Q.    Now, with regard to the Somerville
8  job, are there certain portions of the standard
9  operating procedures that applied to that job, or
10 was it the entire set of standard operating
11 procedures?
12     A.    **It was not the entire set.  The**
13 **portions that would be would be the respirator**
14 **protection program.**
15     Q.    That's number 3.
16     A.    **Medical examinations.**
17     Q.    Okay.  Let me just back up.  This is
18 a very long document, so I want to make sure we're
19 all referencing the same page.
20          Are you looking at SF00002?
21     A.    **Yes.**
22     Q.    Then there's what appears to be an
23 index, correct?
24     A.    **Correct.**
25     Q.    The first one you mentioned is item

43

1  3, Respiratory Protection Program, correct?
2      A.    **Correct.**
3      Q.    What's the next section that applied
4  to this project?
5      A.    **Medical Examinations, number 2.**
6      Q.    Okay.  Any other sections?
7      A.    **Number 4, number 5 -- number 4 being**
8  **Energy Preparedness Procedures -- Emergency -- I'm**
9  **sorry; number 5, Engineering Controls and Work**
10 **Practices; number 6, Abatement Procedures; number 7,**
11 **Contamination Procedures, and then number 10,**
12 **Construction Safety Employee Handbook.**
13     Q.    Now, are any of these standard
14 operating procedures that you just went through, are
15 any of these required by law if you're doing an
16 asbestos removal project?
17     A.    **Yes.**
18     Q.    Which of those, all of them or just
19 some portion of those, to your knowledge?
20     A.    **To my knowledge, it would be the**
21 **Medical Examinations, number 2, the Respiratory**
22 **Protection Program, number 3, number 6, Abatement**
23 **Procedures.  That's it.**
24     Q.    Okay.  Now, on this job what measures
25 were taken with regard to respiratory protection?

44

1      A.    **All our workers have a fit test.**
2      Q.    A what?
3      A.    **A fit test.**
4      Q.    What's that?
5      A.    **It's a test to make sure the mask**
6  **properly adheres to the face.**
7      Q.    To your knowledge, the Slavco
8  employees who were involved in this asbestos removal
9  project, did they wear masks when they were on the
10 job?
11     A.    **Yes.**
12     Q.    Other than the mask, is there any
13 other respiratory protection measures that are
14 taken?
15     A.    **No.**
16     Q.    Abatement procedures, what abatement
17 procedures were used on this project?
18     A.    **The ones outlined in BMS-35.**
19     Q.    To your knowledge, were all those
20 measures taken on this job?
21     A.    **Yes.**
22     Q.    Is there another section of the
23 manual that you said was legally required for
24 asbestos abatement?
25     A.    **Number 2, Medical Examinations.**

45

1      Q.    What was done with regard to Medical
2  Examinations on this project?
3      A.    **All our employees, prior to hiring,**
4  **they have a medical, full medical exam, X-ray, to**
5  **make sure, you know, they're fit to perform the**
6  **duties.**
7      Q.    Is there any other section or did we
8  go through all the ones that you believe are legally
9  required?
10     A.    **I think we went through all of them.**
11     Q.    Okay.  Can you describe for me in as
12 much detail as you can recall what methods were used
13 by Slavco to remove and dispose of the asbestos
14 materials on the roof?
15     A.    **The methods that we used?**
16     Q.    Yes.
17     A.    **They would -- Friday night, when we**
18 **started the job, we mobilized our trailer, our**
19 **container.  We set up our ladder.  The workers went**
20 **on the roof, started prepping the roof, wetting it**
21 **down adequately, cutting the roof in sections so**
22 **they can be put through the chute, straight into our**
23 **container.**
24     Q.    What type of equipment or tools were
25 used to cut the material?

SOLAKOV - Direct

**46**

1    A.    There was a roof warrior.
2    Q.    Roof warrior?
3    A.    Yes.  It's a machine that has a blade
4  so it can slice through the roof.
5    Q.    Do you know what type of blade it
6  has?
7    A.    Exactly... it's a ripper blade.
8    Q.    Other than the roof warrior, was any
9  other equipment or tools used to slice the asbestos
10  material?
11    A.    Yes, a roofing slicing machine,
12  cutting machine.
13    Q.    Any other tools that were used?
14    A.    Axes, shovels, crowbars.  That's it.
15    Q.    I believe you said earlier the
16  materials, once it was sliced and cut up, were
17  placed in chutes?
18    A.    Yes.
19    Q.    What's a chute?
20    A.    Here's a chute (indicating).  It's a
21  plastic piece from the roof that extends down, an
22  enclosed piece that extends down maybe 15 feet.
23    Q.    Okay.  You've made reference to a
24  photograph contained in the materials marked BMS-32,
25  correct?

**47**

1    A.    Yes.
2    Q.    Let me do this, since each page,
3  there's no markings, I'm just going to put a letter
4  next to each photo so we all know what we're talking
5  about, and then I'll ask you some questions about
6  that, if that's okay with you.
7          I've put letters next to these
8  photos.
9          The photos that are in this package
10  of materials, are these photographs that you took at
11  the Somerville site during the job?
12    A.    Yes.
13    Q.    And could you just go through each
14  photo and tell us what the letter is and describe
15  for us what's been shown in each of those pictures?
16    A.    Letter A, there's a picture of a
17  building with a chute, ladder and Badger Roofing
18  bringing our equipment on the roof.
19          B, the roof cutter with the HEPA
20  filtration unit.
21    Q.    The roof cutter with the HEPA
22  filtration, is there a reason why there's HEPA
23  filtration?
24    A.    Yes.
25    Q.    Why is that?

**48**

1    A.    As the roof is being cut, to suck up
2  the dust, to vacuum the dust.
3          The roof warrior is letter C.  That
4  was to bring the roof up, to bring the roof up after
5  being sliced.
6          D, that's our roof warrior being
7  brought onto the roof.
8          E, same thing, Badger Roofing, our
9  chute, the project at Somerville and our container.
10          F, just continuous, the Badger
11  Roofing truck hoisting our equipment up to the roof.
12          G, a picture of the chute with
13  plastic behind the wall and the workers on the roof.
14          H, our container with our New Jersey
15  sign, license.
16          I, Badger Roofing truck, our
17  container, the chute.
18    Q.    And the materials, I take it from
19  those photos, the materials were transferred from
20  the roof to the dumpster through the use of the
21  chute; is that correct?
22    A.    Yes.
23    Q.    And the dumpster that contained the
24  materials, how was that disposed of?
25    A.    How was it disposed?

**49**

1    Q.    Correct.
2    A.    It was taken to Grows Landfill.
3    Q.    Is that a special site designated for
4  asbestos materials or is that just a general
5  landfill?
6    A.    For asbestos.  It could be a general
7  landfill, but we utilize that for asbestos.
8    Q.    Now, the chute that you used, is that
9  required by regulations, to use a chute if you're
10  transferring asbestos materials from a roof to the
11  ground?
12    A.    Yes.
13    Q.    Is it appropriate to take roofing
14  materials that contain asbestos and throw it off the
15  side of the building into a dumpster?
16    A.    You can do that.
17          (Exhibit BMS-37, Slavco Construction,
18  Inc., Closeout Package, Bates stamped SF00413
19  through 507, is received and marked for
20  Identification.)
21    Q.    I hand you what's been marked BMS-37
22          Can you identify what this document
23  is?
24    A.    This is our closeout package.
25    Q.    And what is a closeout submittal?

SOLAKOV - Direct

50

1    A.    After the completion of the project,
2 we supply the customer with the documentation: our
3 asbestos license, our insurance certificate, our
4 waste hauler license and notification, logbooks,
5 sign-off sheets, OSHA samples, waste manifests and
6 employee information.
7    Q.    Before working on this project, were
8 you familiar with Badger Roofing Company?
9    A.    No.
10    Q.    I take it you had never worked with
11 them before on other projects; is that accurate?
12    A.    Correct.
13    Q.    Do you know if Badger had recommended
14 Slavco's services to the owner?
15    A.    Don't know.
16    Q.    Do you know how it came to be that
17 Slavco was contacted for this job? Did anybody ever
18 explain that to you?
19    A.    In detail, no, but my understanding
20 is that through Environmental Health Investigations,
21 they wanted -- the air monitor that was on-site.
22    Q.    So it was EHI or somebody from EHI
23 that --
24    A.    Yes.
25    Q.    At any time, either during this

51

1 project or afterwards, were you ever informed about
2 the methods or equipment Badger had used to do the
3 partial roof removal at the site?
4    A.    Not in detail.
5    Q.    What was your understanding, if any,
6 as to what methods and equipment they had used?
7    A.    Just -- no methods, no equipment,
8 just the project went wrong.
9    Q.    The project went wrong?
10    A.    Yeah, something went wrong. They
11 found asbestos and they removed a portion of the
12 roof that contained asbestos.
13    Q.    At any point did Barry Ages or
14 anybody else associated with SK, or Somerville
15 Fidelco, did anybody ever ask you whether Badger had
16 been using proper methods or equipment for the
17 removal of asbestos?
18    A.    Yes.
19    Q.    Who asked you that?
20    A.    I don't recall the person's name. It
21 was a meeting that -- at SK with EHI, with Badger
22 Roofing and myself and I guess a couple of partners.
23    Q.    What did you tell them when that
24 question was asked of you?
25    A.    How it was removed properly or --

52

1    Q.    No. My question was, at any point
2 did anybody ask you if Badger had used proper
3 methods or equipment for the removal of asbestos,
4 and I understood your answer to be that issue did
5 come up at a meeting that you attended. Did you
6 respond to that question in any way?
7    A.    Well, their methodology was -- the
8 way they used it, the roof warrior and everything,
9 was proper, it's just that the -- how can I explain
10 it? It's just suppressing the dust was not right,
11 that's all I'm saying.
12    Q.    What do you mean by that?
13    A.    They didn't wet down the material
14 because there was a lot of dust -- they said there
15 was a lot of dust going inside the building.
16    Q.    Who told you that?
17    A.    Somebody at the table. I don't
18 recall their names.
19    Q.    Other than the suppressing of the
20 dust, was there anything else you said in terms of
21 Badger not using the right methods or equipment?
22    A.    No.
23    Q.    From your earlier answer, I
24 understand that you're not familiar with the details
25 in terms of the equipment and method that Badger had

53

1 used, correct?
2    A.    Correct.
3    Q.    Let me hand you what was previously
4 marked as BMS-27. These are copies of photos that
5 were produced to us by Somerville Fidelco.
6         My question for you is whether any of
7 the equipment that Slavco used at the site, is that
8 depicted in any of these photographs.
9    A.    Yes.
10    Q.    Let's start with the first page,
11 which is 300.
12         Is that a piece of Slavco equipment?
13    A.    Yes.
14    Q.    And what is that piece of equipment?
15    A.    Roof warrior.
16    Q.    How about 301?
17    A.    The ripper blade attached to the roof
18 warrior.
19    Q.    302?
20    A.    Ripper blade attached to the roof
21 warrior.
22    Q.    So this is all Slavco equipment shown
23 there?
24    A.    Looks like it. The picture's not...
25    Q.    Okay. Let me hand you what's been

SOLAKOV - Direct

54

1 previously marked BMS-28.
2        These are what have been previously
3 identified as photographs of the roof reflecting the
4 time period when Badger was doing the roof removal
5 and replacement, so I understand that this does not
6 depict Slavco's equipment, but I have a few
7 questions for you.
8        The piece of equipment that's shown
9 in BMS 1212, do you recognize what that piece of
10 equipment is?
11        I don't want you to guess, but if you
12 have any understanding based upon looking at the
13 photo, if you could answer that.
14        A.   I'm not sure. I can assume. It
15 looks like a roof cutter and a roof warrior, but
16 this picture's not...
17        Q.   Can you tell what type of roof cutter
18 that is?
19        A.   I don't know.
20        Q.   How about BMS 1214?
21        A.   Looks like a roof cutter.
22        Q.   From the photo can you tell what type
23 of roof cutter that is?
24        A.   No.
25        Q.   How about 1215?

55

1        A.   It looks like the back of a roof
2 warrior.
3        Q.   In terms of the roof cutter that you
4 used, is there a certain type of roof cutter you're
5 supposed to use if you're removing
6 asbestos-containing roofing material?
7        A.   Our procedures are, you know, when
8 we're cutting the roof, we always use -- our
9 company, we use Garlock, and we always have a HEPA
10 vacuum attached to it.
11        Q.   Are you familiar with a piece of
12 equipment called a Panther saw?
13        A.   No.
14        Q.   Do you know what an RB roof cutter
15 is?
16        A.   I don't know what RB is. I know what
17 a roof cutter is.
18        Q.   When Slavco was providing its roof
19 removal services and doing the work on the roof, did
20 you notice if any of the Badger employees were using
21 respiratory protective gear of any type?
22        A.   When we were working on the roof?
23        Q.   Yes.
24        A.   We kept Badger Roofing employees 25
25 feet away from us, but I don't recall any of them

56

1 using any respiratory -- I don't recall.
2        Q.   And what was the reason for that,
3 keeping them 25 feet away?
4        A.   Usually, in our standard operations,
5 we like keeping the work area 25 feet away when
6 we're working with asbestos.
7        Q.   And why is that?
8        A.   It's just our procedure.
9        Q.   And is that to prevent other people
10 from being exposed to asbestos?
11        A.   Yes, if an accident does occur.
12        Q.   You had mentioned earlier, you had
13 used the term NESHAP, which is the National Emission
14 Standards for Hazardous Air Pollutants, correct?
15        A.   Yes.
16        Q.   Are you familiar with the
17 requirements under NESHAP for asbestos removal?
18        A.   Generally familiar with them.
19        Q.   Is there somebody else at Slavco that
20 you rely upon as having greater knowledge or
21 expertise with the requirements of NESHAP?
22        A.   If we need to know in detail, we will
23 call an environmental company, an air-monitoring
24 company or the Department of Labor, because, you
25 know, it depends how you read it.

57

1        Q.   Do you know if this roofing job
2 qualified for an exemption from NESHAP's asbestos
3 removal notification requirement?
4        A.   No, I can't answer that.
5        Q.   Were you ever informed whether,
6 before Badger began its work on the project, whether
7 any notifications were provided to any governmental
8 agency for the roof job?
9        A.   No. I don't know. It wasn't
10 mentioned to us.
11        Q.   Do you know what an asbestos survey
12 is?
13        A.   Yes.
14        Q.   Were you ever informed whether an
15 asbestos survey had ever been performed at the
16 Somerville facility before Badger started its
17 roofing job?
18        A.   No.
19        Q.   Were you ever provided a copy of an
20 asbestos survey for the Somerville facility?
21        A.   No.
22        Q.   What is an asbestos survey?
23        A.   It's a survey stating the samples
24 that were taken at a project. And a positive
25 sample's greater than 1 percent -- greater than 1

58

1  percent of the material contains asbestos.
2      Q.    Do you know if the work that Slavco
3  did at the site qualifies as renovations under the
4  NESHAP regulations?
5      A.    Yes.
6      Q.    It did qualify?
7      A.    It's a renovation.
8      Q.    Do you know what the regulatory
9  definition is of asbestos-containing material?
10      A.    No.
11      Q.    Do you know the difference between
12  friable and non-friable asbestos-containing
13  material?
14      A.    Yes.
15      Q.    And what is that difference?
16      A.    Non-friable is basically floor
17  tile -- material that cannot become airborne: floor
18  tile, Transite panels, roofing material.  Friable
19  materials is material that can easily, easily become
20  airborne: pipe, piping insulation, boiler, boiler
21  breach, stuff like that.
22      Q.    In your experience, can non-friable
23  asbestos material become friable?
24      A.    Can it?  Yes.
25      Q.    How?

59

1      A.    If you're grinding non-friable
2  without having -- well, that's it.
3      Q.    If clouds of roofing material dust or
4  powder are created when a contractor performs the
5  removal of asbestos-containing material, is that an
6  indication that non-friable removal methods are not
7  being used by the contractor?
8      A.    It could be, because under the
9  roofing material you also have insulation which can
10  become very airborne that's non-asbestos, so it's --
11  without a sample you cannot, you cannot state.
12      Q.    Do you know if any
13  asbestos-containing materials at the Somerville
14  facility would be classified as regulated
15  asbestos-containing material?
16      A.    Regulated?
17      Q.    Yes.
18      A.    Well, the roofing material?
19      Q.    Correct.
20      A.    If it's asbestos, but under NESHAP,
21  if they're going to state regulate it, I'm not sure.
22      Q.    Did you ever encounter on this job
23  any non-friable asbestos-containing material that
24  became friable?
25      A.    No.

60

1      Q.    Was any of the material that Slavco
2  removed during the project sanded, ground, cut or
3  abraded?
4      A.    No.
5      Q.    Was any of the material that Slavco
6  encountered during the job crumbled, pulverized or
7  reduced to powder, to your knowledge?
8      A.    No.
9      Q.    Do you know what the OSHA regulatory
10  classification was for the Slavco roofing job?
11      A.    No.
12      Q.    Were you familiar with the different
13  classes under OSHA for asbestos, class 1, class 2?
14      A.    Yes, friable, non-friable.
15      Q.    And do you know what regulatory
16  classification this Slavco roofing job fell into
17  under those classes?
18      A.    No.
19      Q.    The standard operating procedures
20  that were referred to earlier, are they periodically
21  reviewed and updated by Slavco?
22      A.    I can't answer that.  I don't know
23  when the last time is they were updated.
24      Q.    Do you believe that they're current
25  in terms of complying with governmental regulations

61

1  for asbestos removal?
2      A.    Yes.
3          MR. VINICOMBE:  I think I'm done.  I
4  just want to look through the documents while
5  Mr. Maher has any questions for you.
6          MR. MAHER:  If possible, let's take a
7  quick break.
8          MR. VINICOMBE:  Sure.  Why don't we
9  do that?
10          (There is a brief recess.)
11          MR. VINICOMBE:  I just have a couple
12  of questions about the documents that you produced
13  to us today.
14  BY MR. VINICOMBE:
15      Q.    There is one document that has
16  "Friday, 12/16/05" at the top, and it's in
17  handwriting and it's a total of five pages.
18          Is this a log of some sort?
19      A.    That's what the supervisor on-site
20  would do, just general log entries.
21      Q.    Does this appear to be Nikola's
22  handwriting?
23          Do you recognize his handwriting?
24      A.    I do not recognize his handwriting.
25  His signature should be...

SOLAKOV - Direct

**62**

1    Q.    On the last page?
2    A.    Yes.
3    Q.    So this is the supervisor from the
4  job?
5    A.    Yes.
6    Q.    The only other question I had is
7  there appears to be a fax cover sheet, it says "From
8  Phyllis Jones for Mike Solakov to Scott Badger,"
9  dated March 8, 2006. And it starts with "Dear
10  Scott, Our position remains that this bill is
11  grossly overstated from the agreement that was made
12  on-site between Alan and Mike." And then later on
13  in the fax it talks about "If we agree to $2,880..."
14         Was this some sort of dispute? Was
15  Badger billing fees to Slavco?
16    A.    Yes.
17    Q.    Can you explain to me what that is
18  referring to?
19    A.    The billing was -- when we originally
20  got to the site, he had a crane there, so he
21  assisted us to bring our pieces of equipment to the
22  roof. Then after the first night of work, we had to
23  slow down a little bit because of the temperature,
24  so we did not have a complete night shift. We
25  waited till the morning and we started again. And

**63**

1  for Badger Roofing, they thought we were behind
2  schedule. So they had some of their guys lift up
3  the bulkheads for us so we can proceed a little
4  quicker, so that's the bill.
5    Q.    And they were billing you for the use
6  of that equipment?
7    A.    No, to lift up the bulkheads.
8    Q.    And in terms of what Badger billed to
9  you, did you pass that cost on to the owner or did
10  you increase your bill in any way to reflect those
11  expenses?
12    A.    No.
13         MR. VINICOMBE: Thank you.
14  CROSS-EXAMINATION BY MR. MAHER:
15    Q.    Good morning, Mr. Solakov. My name
16  is Lawrence Maher. I'm with the firm of Greenbaum
17  Rowe, Smith & Davis. We represent Somerville
18  Fidelco, which is the landlord in the Somerville
19  facility that is the subject of this arbitration.
20         The instructions that Mr. Vinicombe
21  gave you regarding the procedure of the deposition
22  still apply, and I'll just ask you a few questions.
23         I think you testified that
24  approximately October 26 the proposal was accepted
25  by Somerville Fidelco and you were hired to do this

**64**

1  roof removal; is that accurate?
2         Do you want to see your index?
3    A.    October -- October 12th.
4    Q.    October 12th?
5    A.    Yes.
6    Q.    I think your proposal -- do you have
7  BMS-33 there, Mr. Solakov? It's your original
8  proposal.
9    A.    Yes.
10    Q.    Isn't that dated October 20th?
11    A.    Let me see. BMS --
12    Q.    BMS-33 --
13    A.    There were two proposals.
14    Q.    -- it was a fax cover sheet with your
15  proposal.
16    A.    Here we are.
17         Yes. I'm sorry.
18    Q.    So your original proposal was October
19  20th?
20    A.    Yes.
21    Q.    And I heard you testify that that was
22  addressed to Badger Roofing, but actually accepted
23  by Somerville Fidelco as the owner of the facility;
24  is that right?
25    A.    Yes.

**65**

1    Q.    So it would probably be at some time
2  after October 20th that that proposal was accepted?
3         MR. VINICOMBE: Off the record.
4         (Discussion off the record.)
5    Q.    In the file you presented today, do
6  you have a copy of that proposal?
7    A.    Yes. Because the actual -- the
8  proposal is dated -- the date is October 12th.
9    Q.    You know what? Mr. Vinicombe advised
10  me off the record, and I think that there might have
11  been some confusion about the dates in the document
12  that was produced.
13         So it's your testimony that October
14  12th the proposal was accepted by the owner?
15    A.    Yes.
16    Q.    And once the proposal was accepted,
17  were you ready to start work?
18    A.    Yes.
19    Q.    Can you tell me what Slavco
20  Construction did once the proposal was accepted on
21  October 12th?
22    A.    Barry wanted us to start immediately,
23  so we had to file the ten-day emergency waiver to
24  waive the ten-day notification, and we filed that.
25  We were approved.

SOLAKOV - Cross

66

1    Q.    Was that the waiver that was drafted
2    by Heather and signed by Barry on October 26th?
3    A.    Yes.
4    Q.    So that was submitted to the
5    Department of Labor?
6    **A.    And I think it was the Department of**
7    **Health and Human Services.**
8    Q.    And did you start right away?
9    A.    No.
10   Q.    Why not?
11   **A.    Barry called us, put the job on hold**
12   **because the tenants were not ready for us to come to**
13   **the site.**
14   Q.    Now, prior to that, had you or anyone
15   else at Slavco Construction met with the tenants at
16   the site?
17   A.    No.
18   Q.    And when Barry Ages told you to put
19   the job on hold, did he tell you what was the
20   holdup?
21   **A.    In detail, no, just there was some**
22   **issues that had to be resolved with the tenants.**
23   Q.    And what was the next thing that you
24   recall that occurred with the job and the tenant?
25   **A.    Within a couple week period there was**

67

1    **no communication, and then, again, we tried to start**
2    **to do the roof, and Barry put the job on hold**
3    **again. He said, wait, the tenant's still not ready.**
4    **So that might have happened two or three times, and**
5    **then one time for weather.**
6    Q.    Now, during this period of time that
7    you were told the tenant wasn't ready, do you recall
8    being asked to provide information that the tenant
9    was requesting about the procedures you were going
10   to use?
11   A.    Yes.
12   Q.    And is that information something
13   that you worked on?
14   **A.    For a work plan?**
15   Q.    For anything that was requested by
16   the tenant.
17   **A.    Well, just for our work plan, the**
18   **procedures that we were going to implement to...**
19   Q.    Do you recall receiving a list of
20   questions that the tenant had asked?
21   A.    Yes.
22   Q.    And is that something that you
23   participated in responding to?
24   A.    Yes.
25   Q.    Is this typical on a job, that you

68

1    would be questioned as to what your procedures and
2    plans are?
3    A.    No, it's not typical.
4    Q.    Were you asked to provide the copy of
5    this thick document that is your standard operating
6    procedures that has been marked BMS-36 --
7    A.    Yes.
8    Q.    And who did you provide that to?
9    **A.    Handed it in to Barry Ages.**
10   Q.    And was it your understanding this
11   was requested by the tenant as well?
12   **A.    I don't recall that.**
13   Q.    Would you typically present this
14   standard operating procedures manual to someone when
15   you were going to do a roof removal job?
16   A.    No.
17   Q.    Now, did there come a point in time
18   when you actually met with representatives of the
19   tenant at the site?
20   A.    Yes.
21   Q.    And I think you testified that you
22   walked through the facility; is that correct?
23   **A.    Through a portion of it, yes.**
24   Q.    And when you walked through, why did
25   you do that?

69

1    **A.    Just to, I think -- TuffWrap was**
2    **installed and to see the sections where we were**
3    **going to remove the roof to make sure there was no**
4    **voids between the building, you know, to make sure**
5    **no pieces can fall in or something like that.**
6    Q.    Now, was that just before you started
7    the work in December of 2005?
8    A.    Yes.
9    Q.    And do you recall whether there were
10   any voids?
11   **A.    No, it was all wrapped in plastic**
12   **very well.**
13   Q.    When you made that walk-through, did
14   you see any dust or debris inside the facility from
15   previous work on the roof?
16   A.    No.
17   Q.    Did anybody point out anyplace that
18   had been affected by previous work on the roof?
19   A.    No.
20   Q.    Now, do you know whether --
21   **A.    I'm sorry. I'm sorry. I have to go**
22   **back to that question.**
23   **The representative that walked me**
24   **through, he actually gave me a dust mask to put**
25   **on -- well, not a dust mask.**

SOLAKOV - Cross

70

1    Q.    A surgical mask?
2    A.    A PP-100, which is -- that means
3  there's a possibility of airborne asbestos, so he
4  told me to put that on. And then we walked through
5  the final area, which was not wrapped in plastic.
6    Q.    And, again, when you made the
7  walk-through, did you see any evidence of dust or
8  debris from the previous roof work inside the
9  facility?
10   A.    No.
11   Q.    Did you have occasion to go back
12 inside the facility after you completed your work on
13 the roof?
14   A.    No.
15   Q.    Did anyone from Slavco Construction
16 go inside after you completed the roof removal?
17   A.    No.
18   Q.    Do you have an understanding of why
19 the plastic was put up by TuffWrap?
20   A.    As extra precautionary procedures
21 so -- just in case there's any kind of dust or
22 anything that falls down, to keep it away from their
23 work stations or whatever they have.
24   Q.    So if the work on the roof were to
25 cause any dust or debris to enter the inside of the

71

1  facility, the expectation would be that the plastic
2  that TuffWrap put up would catch that?
3    A.    Yes.
4    Q.    And, then, do you have any idea what
5  TuffWrap does once it has all this plastic full of
6  dust and debris, theoretically?
7    A.    TuffWrap should, if it's asbestos,
8  should out-source it and have somebody clean the
9  top, or, you know, as it's coming down, have
10 negative air units to trap any kind of airborne
11 material if anything went through the roof.
12   Q.    Now, did you observe whether, while
13 your work was ongoing, any dust was getting inside
14 the premises?
15   A.    We had no complaints. There was air
16 monitoring, I think from Eagle and also from EHI,
17 and there were no complaints.
18   Q.    About the quality of the air?
19   A.    Yes.
20   Q.    Did anybody tell you that dust or any
21 kind of debris from the roof was entering the
22 facility?
23   A.    At that point, no.
24   Q.    Did they tell you afterwards that any
25 dust or debris entered the facility as a result of

72

1  the work that Slavco did?
2    A.    I don't recall that.
3    Q.    You don't recall?
4    A.    I don't recall.
5    Q.    You testified that Slavco used a roof
6  cutter that has a vacuum with a HEPA filter; is that
7  correct?
8    A.    Yes.
9    Q.    And that's also for the purpose of
10 containing the dust that might be created by the
11 roof removal?
12   A.    Yes.
13   Q.    So that's another precaution in
14 addition to the TuffWrap that is taken to keep the
15 dust from getting inside?
16   A.    Yes.
17   Q.    And I think you testified that the
18 methods that you used on this roof removal were
19 actually in excess of the requirements by the New
20 Jersey standards; is that true?
21   A.    Yes.
22   Q.    Well, why did you use different or
23 excessive procedures?
24   A.    My understanding is to make the
25 client happy, basically. They wanted to make sure

73

1  you know, there would be no dust issues inside the
2  building. And at that meeting that we had where EHI
3  was there, Badger Roofing, Barry and
4  representatives, somebody brought up a question, you
5  know, is there anything, you know, you can do
6  better; so we told them about New York City
7  regulations. I walked out to my car, got out the
8  New York City regulations and brought it in, which
9  is a better standard; it's a higher standard.
10   Q.    And that's what you were authorized
11 to do?
12   A.    Yes.
13   Q.    And, again, that was an attempt to
14 restrict or prevent any dust or debris from getting
15 inside the facility?
16   A.    Yes.
17   Q.    Now, I think before, in response to a
18 question, you said that whenever you encounter a
19 roof removal on a roof that's 15 years or older, you
20 inquire as to whether it contains asbestos
21 materials; is that correct?
22   A.    Yes.
23   Q.    And why is that?
24   A.    Just to make sure we implement the
25 proper procedures, we file notification, you know,

SOLAKOV - Cross

74

1  we use -- you know respiratory programs.
2      Q.    I understand that, and I guess I
3  didn't ask the right question.
4          Why does it make a difference if a
5  roof is 15 years old or older?
6      A.    Well, roofing -- I think asbestos
7  roofing was stopped producing in the late '70s, and
8  somebody had a grandfather clause, so if the roof
9  is -- if it is an older roof, it has the possibility
10 of containing asbestos.  If it's a newer roof, you
11 know, a shingle roof or plywood roof within the last
12 five or ten years, it has a possibility of not
13 containing asbestos.  Can it?  There's still a
14 possibility.
15     Q.    If a roof is 25 or 30 years old, is
16 it likely that it contains some sort of asbestos
17 material?
18     A.    Yes.
19     Q.    And is that common knowledge in your
20 industry?
21     A.    Yes.
22     Q.    Would you undertake a roof removal
23 project of a roof that's 25 or 30 years old without
24 determining whether it contains asbestos material?
25     A.    No, unless somebody states it's

75

1  asbestos and that's it, there's no survey, and we
2  already assume it's asbestos.
3      Q.    But if an owner or an architect or an
4  engineer were to retain you to remove a roof and not
5  tell you, or, in fact, not mention at all whether it
6  contained asbestos, would you just remove it or
7  would you make the necessary inquiries?
8      A.    Necessary inquiries.
9          MR. MAHER:  I have no further
10 questions, thank you.
11         MR. VINICOMBE:  Thank you.
12         (The witness is excused.)
13         (The deposition is concluded at
14 approximately 11:29 a.m.)
15
16
17
18
19
20
21
22
23
24
25

76

1                  CERTIFICATE
2
3          I, MARGO HRONCICH, a Notary Public
4  and Certified Shorthand Reporter of the State of New
5  Jersey, do hereby certify that prior to the
6  commencement of the examination, MICHAEL SOLAKOV was
7  duly sworn by me to testify to the truth, the whole
8  truth and nothing but the truth.
9          I DO FURTHER CERTIFY that the
10 foregoing is a verbatim transcript of the testimony
11 as taken stenographically by and before me at the
12 time, place and on the date hereinbefore set forth,
13 to the best of my ability.
14         I DO FURTHER CERTIFY that I am
15 neither a relative nor employee nor attorney nor
16 counsel of any of the parties to this action, and
17 that I am neither a relative nor employee of such
18 attorney or counsel, and that I am not financially
19 interested in the action.
20
21
22    _____
23    MARGO HRONCICH
      Certified Shorthand Reporter and
24    Notary Public of the State of
      New Jersey
25

77

1              LAWYER'S NOTES
2  PAGE LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____
25 ____ ____ _____

**A**

abatement 4:21
   12:13 18:1 21:16
   21:23 26:10 31:7
   43:10,22 44:16,16
   44:24
ability 76:13
above-captioned 2:3
abraded 60:3
accepted 22:3,4,6,8
   22:15 63:24 64:22
   65:2,14,16,20
accepts 38:4
access 19:21
accident 56:11
accurate 10:7 23:16
   24:18,21 50:11
   64:1
action 76:16,19
activities 36:25
actual 65:7
Ad 4:14 12:22
addition 72:14
additional 21:13
addressed 22:17
   34:1 64:22
adequately 31:23
   45:21
adheres 44:6
administrative
   33:23
advised 65:9
agency 57:8
Ages 20:13,14,25
   30:1 33:11 34:2
   35:22 51:13 66:18
   68:9
agree 62:13
agreement 62:11
air 28:13 38:24 39:1
   50:21 56:14 71:10
   71:15,18
airborne 32:9 58:17
   58:20 59:10 70:3
   71:10
air-monitoring
   56:23
Alan 62:12
allow 11:16 12:12
allowed 38:11
alongside 29:9
AMERICAN 1:1
and/or 10:8
answer 6:3 8:1,5
   25:14 52:4,23
   54:13 57:4 60:22
answering 8:3
anybody 19:16
   32:21 33:1,18

35:21 50:17 51:14
   51:15 52:2 69:17
   71:20
anyplace 69:17
apparent 21:5
appear 14:1 61:21
APPEARANCES
   3:1
appeared 14:20
appears 16:19 21:21
   22:11 27:12 33:9
   33:11 34:11 42:22
   62:7
applied 42:9 43:3
apply 34:5 63:22
appropriate 49:13
approved 65:25
approximately 7:18
   20:21 22:23 26:6
   63:24 75:14
arbitration 1:1 7:13
   63:19
architect 75:3
area 31:8 56:5 70:5
arrange 24:13
arranged 16:3
arrangements 32:17
   32:22
arrived 19:20
asbestos 4:21 9:10
   9:24 10:14,20 11:4
   11:20,22,23 12:3
   12:11,13 18:1
   20:23 21:6,16,23
   23:17,20 24:6,11
   24:14,18,21 25:9
   25:11 26:1,10
   27:23,24 28:2,8,9
   28:24 31:7 33:6
   34:17 35:7,11,15
   37:2,3,4,7,9,19,24
   38:1,14,17,20,23
   39:8,20,23 43:16
   44:8,24 45:13 46:9
   49:4,6,7,10,14
   50:3 51:11,12,17
   52:3 56:6,10,17
   57:2,11,15,20,22
   58:1,23 59:20
   60:13 61:1 70:3
   71:7 73:20 74:6,10
   74:13,16,24 75:1,2
   75:6
asbestos-containing
   22:24 24:2 55:6
   58:9,12 59:5,13,15
   59:23
asked 32:16,21
   51:19,24 67:8,20
   68:4

aspect 23:19 32:3
aspects 38:6
assistant 33:23
assisted 62:21
associated 51:14
Associates 1:7 7:14
   18:4 22:9,13,16
   23:3 36:1 39:15
ASSOCIATION 1:1
assume 20:12 37:4
   54:14 75:2
attached 21:16,24
   53:17,20 55:10
attempt 8:13 73:13
attended 52:5
attention 28:22 29:2
   29:23 30:2
attorney 76:15,18
authorized 73:10
available 17:8
Avenue 7:2
aware 33:1
Axes 46:14
a.m 2:10 75:14

**B**

B 4:10 5:2 47:19
back 9:24 14:16
   18:20 20:2 33:6
   36:4 39:22 42:17
   55:1 69:22 70:11
Badger 4:20 17:24
   18:8,11,12,13,14
   18:25 19:3,17 20:9
   20:22,25 21:4,15
   21:22 22:5,17 23:2
   23:8,15 28:17,22
   29:6,8,16 35:22
   36:12 47:17 48:8
   48:10,16 50:8,13
   51:2,15,21 52:2,21
   52:25 54:4 55:20
   55:24 57:6,16 62:8
   62:15 63:1,8 64:22
   73:3
balance 25:2 27:17
Barry 20:13 29:3
   30:5 34:2 35:21
   51:13 65:22 66:2
   66:11,18 67:2 68:9
   73:3
based 54:12
basically 23:7 58:16
   72:25
Bates 4:21,24 5:6,9
   5:11 40:1,16 41:10
   49:18
becoming 38:17
began 57:6
beginning 31:2

behalf 13:6 14:2
believe 45:8 46:15
   60:24
bee 76:13
best 76:13
better 13:22 73:6,9
beyond 31:18
bidding 9:1
BIDDLE 2:8 3:3
bill 27:19 62:10 63:4
   63:10
billed 63:8
billing 62:15,19 63:5
bit 14:15 62:23
blade 46:3,5,7 53:17
   53:20
blanketed 32:7
BMS 4:12 5:3 54:9
   54:20 64:11
BMS-14 27:11
BMS-15 33:8,9,14
BMS-16 33:8,11
BMS-27 53:4
BMS-28 54:1
BMS-31 12:21 13:1
BMS-32 15:18 16:2
   16:5 46:24
BMS-33 21:14,20
   64:7,12
BMS-34 39:24 40:4
   41:4,19
BMS-35 40:14,19
   41:4,4 44:18
BMS-36 41:8,13,24
   68:6
BMS-37 49:17,21
BMS-9 22:11
Bob 30:15,17
boiler 58:20,20
Box 3:9
breach 58:21
break 15:25 61:7
brief 14:22 15:14
   61:10
bring 30:1 48:4,4
   62:21
bringing 47:18
Bristol 19:17
Bristol-Myers 1:4
   7:11,12 29:21,23
   30:23
brought 7:13 28:21
   29:1,22 48:7 73:4
   73:8
building 30:25 31:3
   31:14 39:18 47:17
   49:15 52:15 69:4
   73:2
bulkheads 63:3,7
business 9:6,7,13,22
   9:23 10:9,12,13

11:24 12:16 30:19
   30:20
bypass 34:8

**C**

C 5:2 48:3
calendar 34:7
call 18:3,15 33:3
   56:23
called 2:2 7:3 17:25
   55:12 66:11
Campus 2:8 3:9
capacity 26:21
car 73:7
card 30:4,20,20
case 1:2 70:21
catch 71:2
cause 70:25
Center 1:22
certain 28:6 42:8
   55:4
certainly 16:15 17:4
certificate 50:3 76:1
certification 4:14
   10:23 11:5,10,13
   11:20 12:7,12,21
   13:3
certifications 10:11
   10:21 11:25
certified 2:6 10:14
   10:20 11:3 12:3
   38:2 76:4,23
certify 76:5,9,14
chance 13:23
Charles 3:3 7:11
check 15:7
chute 45:22 46:19
   46:20 47:17 48:9
   48:12,17,21 49:8,9
chutes 46:17
circumstances 35:10
City 32:15 73:6,8
Claimant 1:5 3:6
class 60:13,13
classes 10:24 60:13
   60:17
classification 60:10
   60:16
classified 59:14
clause 74:8
clean 71:8
cleanup 11:19
clear 23:23
client 72:25
Clifton 1:13 7:2
closeout 5:11 49:18
   49:24,25
clouds 59:3
clue 28:20
collect 14:24

collection 4:16
  15:18
College 3:4
come 14:10 16:10
  34:20 52:5 66:12
  68:17
comes 37:2
coming 9:24 34:23
  71:9
commencement 76:6
commencing 2:9
common 32:13
  74:19
communication 67:1
communications
  26:22
companies 10:3
company 9:8,18,19
  10:4 11:25 14:2
  15:10 22:17 29:21
  31:6 50:8 55:9
  56:23,24
compared 37:18
Comparing 41:4
complaints 71:15,17
complete 23:24,25
  27:1 62:24
completed 8:3 29:6
  70:12,16
completely 38:5
completing 23:15
completion 9:1
  31:13 39:10 50:1
complying 60:25
computer 30:21
concluded 75:13
conclusion 14:10
  16:11
conducting 36:24
confirming 24:10
confusion 65:11
Connecticut 10:15
  11:6 12:4
construction 4:15
  4:17,20 5:8,10 7:2
  8:19 9:20,23 10:4
  10:8,13 12:23
  15:19 21:15 37:18
  38:3 41:9,17 43:12
  49:17 65:20 66:15
  70:15
contacted 18:9,17
  50:17
contain 49:14
contained 24:21
  46:24 48:23 51:12
  75:6
container 45:19,23
  48:9,14,17
containing 72:10

74:10,13
contains 58:1 73:20
  74:16,24
contaminated 9:11
  11:17
Contamination
  43:11
continue 28:17,22
continuous 48:10
continuously 27:6
contract 18:5,7
contractor 36:19,21
  59:4,7
controller 17:1,2
Controls 43:9
convey 21:3
copies 15:6,8,15
  16:9 53:4
copy 15:10,22 16:1
  22:12 33:11 57:19
  65:6 68:4
core 32:17,22 33:1
  35:22 36:1,10,11
  36:23 37:9
Corporate 3:9
correct 12:19 15:23
  16:21 17:11,13,14
  19:25 23:18 24:24
  25:2 27:14,17
  28:13 32:1 34:13
  38:25 41:22 42:5,6
  42:23,24 43:1,2
  46:25 48:21 49:1
  50:12 53:1,2 56:14
  59:19 68:22 72:7
  73:21
cost 63:9
costs 37:20
counsel 3:6,11 76:16
  .76:18
couple 7:19 30:9
  51:22 61:11 66:25
court 2:4 7:24 8:7
cover 62:7 64:14
crane 62:20
cream 32:7
created 59:4 72:10
Cross 4:5
CROSS-EXAMIN...
  63:14
crowbars 46:14
crumbled 60:6
crumbling 31:21
CSR 1:18 3:14
current 33:22 60:24
currently 8:18
customer 50:2
cut 38:11,12 45:25
  46:16 48:1 60:2
cutter 47:19,21

54:15,17,21,23
  55:3,4,14,17 72:6
cutting 45:21 46:12
  55:8
c/o 7:1

————————
        D
————————
D 4:2 5:2 48:6
date 65:8 76:12
dated 4:20 21:15,22
  27:13 33:12 62:9
  64:10 65:8
dates 16:20 65:11
Davis 3:8 63:17
day 28:4
days 34:7,7
Dear 62:9
debris 31:12 37:18
  38:3 69:14 70:8,25
  71:6,21,25 73:14
December 27:13
  69:7
Deck 30:13
definition 58:9
demolition 9:9,9
Department 33:13
  34:1,16,22 35:1
  56:24 66:5,6
depends 56:25
depict 54:6
depicted 53:8
deposed 7:16
deposit 25:1 27:17
deposition 1:11,21
  2:1,3 3:14 6:1 7:16
  14:4 17:15 63:21
  75:13
describe 9:7 20:16
  20:24 26:17 45:11
  47:14
description 4:13 5:4
  20:19 41:5
designated 49:3
detail 45:12 50:19
  51:4 56:22 66:21
detailed 41:5
details 52:24
determining 74:24
difference 37:22
  58:11,15 74:4
differences 37:25
  38:9
different 37:17,19
  38:5 60:12 72:22
difficult 7:25
direct 4:5 7:6 16:6
  26:22
directing 29:15
Direction 6:3
discuss 13:11 30:24

36:9
Discussed 13:13
discussion 15:16
  65:4
disposal 26:24 37:19
  38:2
dispose 31:23 38:3
  45:13
disposed 48:24,25
dispute 62:14
document 4:23 5:5,8
  14:16,19 16:23
  17:5 33:19 39:24
  40:5,14,20 41:8,14
  42:4,18 49:22
  61:15 65:11 68:5
documentation 50:2
documents 4:16 6:5
  15:19 16:3 21:11
  26:25 41:21 61:4
  61:12
doing 9:8 27:8 34:17
  43:15 54:4 55:19
double-check 15:13
draft 33:9,14,25
drafted 66:1
drafting 33:16,17,19
DRINKER 2:7 3:3
Drive 1:22 2:8
drove 19:21
Duces 4:15 12:22
duly 7:4 76:7
dumpster 48:20,23
  49:15
dust 31:8,12 32:9
  38:15,19 48:2,2
  52:10,14,15,20
  59:3 69:14,24,25
  70:7,21,25 71:6,13
  71:20,25 72:10,15
  73:1,14
dust-free 31:9
duties 8:23 45:6

————————
        E
————————
E 4:2,10 5:2,24 48:8
Eagle 71:16
earlier 22:1 46:15
  52:23 56:12 60:20
easier 25:18
easiest 38:12
easily 58:19,19
East 3:4
EHI 33:4 50:22,22
  51:21 71:16 73:2
EHI's 39:14
eight 26:8
either 10:4 20:24
  21:3 35:12 50:25
elevated 19:22

emergency 43:8
  65:23
Emission 28:12
  56:13
employed 8:18
employee 43:12 50:6
  76:15,17
employees 26:7 27:7
  29:9,9,16 44:8
  45:3 55:20,24
enclosed 45:22
encounter 37:24
  59:22 73:18
encountered 21:6
  60:6
Energy 43:8
engineer 75:4
Engineering 43:9
enter 70:25
entered 71:25
entering 31:13
  71:21
entire 42:10,12
entirety 27:20
entitled 4:17,23 5:5
  5:8 15:20 16:19
  39:24 40:14 41:8
entries 61:20
environmental 9:8
  9:10,13,21 10:9,12
  33:5 39:9 50:20
  56:23
EPA 10:25
equipment 28:7 38:7
  45:24 46:9 47:18
  48:11 51:2,6,7,16
  52:3,21,25 53:7,12
  53:14,22 54:6,8,10
  55:12 62:21 63:6
Esquire 1:21 3:3,8
  3:14
essentially 16:18
estimate 26:13
estimating 9:1
Europe 10:5
events 16:21,24
eventually 18:24
everybody 26:24
evidence 70:7
Exactly 46:7
exam 45:4
examination 1:11
  2:2 7:6 76:6
examinations 42:16
  43:5,21 44:25 45:2
examined 7:4
exceeded 32:3
excess 72:19
excessive 72:23
excused 75:12

exemption 57:2
Exhibit 12:21 15:18
    21:14 22:11 39:24
    40:14 41:8 49:17
exhibits 4:12 5:3
    21:13 33:8
expectation 71:1
expenses 63:11
experience 58:22
expertise 56:21
explain 50:18 52:9
    62:17
explanation 14:22
exposed 56:10
extends 46:21,22
extra 15:6 70:20

**F**

F 48:10
face 44:6
facility 7:13 17:16
    17:23 29:20,24
    35:23 36:3 57:16
    57:20 59:14 63:19
    64:23 68:22 69:14
    70:9,12 71:1,22,25
    73:15
facing 4:17 15:20
fact 75:5
fair 23:5 24:16
fall 31:8 69:5
falls 70:22
familiar 7:22 28:10
    50:8 52:24 55:11
    56:16,18 60:12
far 17:18
father's 9:18 10:3
fax 4:19 21:14,21
    62:7,13 64:14
February 1:14 2:9
    11:15
feel 17:5
fees 62:15
feet 22:24 28:4
    46:22 55:25 56:3,5
fell 60:16
Fidelco 1:7 7:14
    19:18 22:8,13,16
    23:3 51:15 53:5
    63:18,25 64:23
field 9:13 18:21
    26:19 30:3,7
file 65:5,23 73:25
filed 65:24
filter 72:6
filtration 47:20,22
    47:23
final 16:9 70:5
financially 76:18
finish 8:1

firm 63:16
first 11:3,5 13:2,16
    13:18 14:6 16:15
    16:18 17:24 19:1
    37:25 42:25 53:10
    62:22
fit 26:25 44:1,3 45:5
five 27:4 61:17
    74:12
floor 58:16,17
Florham 2:8
foam 24:3,3 32:6,7
follow 11:1
followed 40:11 41:1
following 21:8 41:6
follows 7:5
foot 35:15
foregoing 76:10
forth 76:12
Forty-hour 10:17
forward 34:9
forwarded 18:1,6
    19:2 20:12,13
    33:10,15,25
found 51:11
four 27:4
Fourth 4:23 5:6
    17:12 39:25 40:15
    40:23
free 17:5
friable 38:17,20,23
    58:12,18,23 59:24
    60:14
Friday 2:9 45:17
    61:16
full 25:4 45:4 71:5
further 14:15 75:9
    76:9,14

**G**

G 48:12
Garlock 55:9
gather 16:7
gathered 16:4,8,11
gear 55:21
general 8:22,24 42:1
    42:3 49:4,6 61:20
Generally 56:18
generate 20:5
generated 19:24
    20:3,6 21:7 22:25
    41:21,24 42:4
generation 21:8
getting 71:13 72:15
    73:14
Getty 7:2
give 8:6 17:25 30:9
    35:12,15,18
given 34:16
glance 16:16

glanced 13:25
go 7:20 17:3,6 20:2
    29:4 32:9 36:4
    45:8 47:13 69:21
    70:11,16
going 8:16 15:10
    27:10 28:17 29:5
    31:20,22 39:22
    47:3 52:15 59:21
    67:9,18 68:15 69:3
good 7:7,8 39:12
    63:15
governmental 57:7
    60:25
grandfather 74:8
greater 56:20 57:25
    57:25
Greenbaum 3:8
    63:16
grinding 59:1
grossly 62:11
ground 7:21 49:11
    60:2
Grows 49:2
guess 30:10 51:22
    54:11 74:2
guys 63:2

**H**

H 4:10 5:2 36:1
    48:14
hand 12:25 21:19
    22:10 27:10 33:7
    49:21 53:3,25
Handbook 43:12
handed 40:18 41:12
    68:9
handing 40:3
handiwriting 61:17
    61:22,23,24
happened 20:11
    67:4
happy 72:25
Harry 36:1
hauler 50:4
Hazard 28:13
hazardous 10:19
    11:18 56:14
Haz-WOPER 10:16
    10:18 11:13
head 8:6
Health 33:5 39:10
    50:20 66:7
heard 64:21
Heather 4:19 21:14
    21:22 33:10,15,20
    33:25 66:2
Heather's 33:21

HEPA 47:19,21,22
    55:9 72:6
hereinbefore 76:12
higher 31:19 73:9
hired 17:11 63:25
hiring 45:3
hoisting 48:11
hold 10:12 11:25
    66:11,19 67:2
holdup 66:20
HRONCICH 1:18
    2:5 3:14 76:3,23
Human 66:7
H-a-z-W-O-P-E-R
    10:18

**I**

idea 19:13 71:4
Identification 12:24
    15:21 21:18 40:2
    40:17 41:11 49:20
identified 54:3
identify 40:5,20
    41:14 49:22
immediately 21:8
    34:8 65:22
implement 29:5
    67:18 73:24
important 7:23 8:5
include 25:1
increase 63:10
index 6:1 42:23 64:2
indicate 38:20
indicated 24:6 39:8
indicating 46:20
indication 38:22
    59:6
industry 74:20
information 24:17
    50:6 67:8,12
informed 24:9 34:25
    36:14 51:1 57:5,14
initial 20:3,4,6
initially 18:18
inquire 39:20,21,23
    73:20
inquiries 36:22 37:8
    75:7,8
inside 15:25 69:14
    70:8,12,16,25
    71:13 72:15 73:1
    73:15
inspector 34:22
inspectors 34:20
installed 31:3,11
    69:2
instance 36:18
instructions 63:20
insulation 58:20
    59:9

insurance 50:3
interested 76:19
interpret 8:7
introduced 7:9
Investigations 33:5
    39:10 50:20
invoice 27:12
involve 19:14
involved 26:11
    33:19 35:8 44:8
involvement 23:11
    26:18 33:16
issue 52:4
issued 27:23
issues 9:10 66:22
    73:1
item 42:25

**J**

J 3:3
Jersey 1:13,22 2:7,9
    3:5,10 4:24 7:3
    10:15,25 11:10
    12:4 17:13 27:24
    28:1,8 31:18 32:1
    32:5 33:13 34:1,5
    34:16,22 35:1,8,11
    38:4 40:1 48:14
    72:20 76:5,24
job 1:25 4:17 9:2
    15:20 16:19 17:12
    17:18 19:2,13 26:7
    26:9 27:1,13 28:9
    29:8,18 30:5 33:1
    34:17,19,21 35:11
    36:19 37:6,12,23
    37:24 42:5,8,9
    43:24 44:10,20
    45:18 47:11 50:17
    57:1,8,17 59:22
    60:6,10,16 62:4
    66:11,19,24 67:2
    67:25 68:15
jobs 35:7 36:16,20
    39:17
jog 30:11
John 30:13
joined 10:2
joining 9:12 12:7
Jones 17:2 62:8

**K**

keep 31:8,22 70:22
    72:14
keeping 56:3,5
kept 55:24
kind 31:7,22 70:21
    71:10,21
knew 30:5
know 8:10,13 11:18

12:15 14:23 17:7
18:17 25:14,25
30:12,14,16 33:18
36:15,15 38:6,12
39:4,7,22 45:5
46:5 47:4 50:13,15
50:16 54:19 55:7
55:14,16,16 56:22
56:25 57:1,9,11
58:2,8,11 59:12
60:9,15,22 65:9
69:4,20 71:9 73:1
73:5,5,25 74:1,11
**knowledge** 26:4
27:19 29:14 31:11
35:21 36:11 43:19
43:20 44:7,19
56:20 60:7 74:19
**knowledgeable**
14:11
**known** 18:14

**L**

**lab** 24:5,10
**Labor** 33:13 34:1,17
34:22 35:1 56:24
66:5
**ladder** 45:19 47:17
**landfill** 49:2,5,7
**landlord** 7:14 19:18
63:18
**late** 9:14 74:7
**law** 43:15
**Lawrence** 3:8 63:16
**laws** 37:20
**LAWYER'S** 77:1
**layer** 24:4
**laying** 29:6
**lead** 9:25
**learn** 30:2
**Leavy** 36:1
**legally** 44:23 45:8
**letter** 33:10,12,15,16
33:17,25 34:11
35:4,6 47:3,14,16
48:3
**letters** 47:7
**let's** 53:10 61:6
**license** 27:23 28:2,8
48:15 50:3,4
**licensed** 25:9,11,25
26:3,24
**licenses** 10:12 11:25
**life** 7:25
**lift** 63:2,7
**limit** 31:12 38:15
**limited** 23:14
**Line** 6:3,3,3,6,6,6,8
6:8,8,11,11,11
77:2

**linear** 35:14
**list** 14:17 16:19
67:19
**listed** 14:7 16:13,21
**little** 14:15 62:23
63:3
**LLP** 2:8 3:3,8
**local** 38:4
**log** 61:18,20
**logbooks** 50:4
**long** 9:3,14 12:15
28:3 42:18
**longer** 33:22
**look** 19:1 61:4
**looked** 39:12
**looking** 42:20 54:12
**looks** 53:24 54:15,21
55:1
**lot** 52:14,15
**Lots** 37:25

**M**

**Mace** 9:20
**Macedonia** 10:6
**machine** 46:3,11,12
**Madzarov** 13:21
**Maher** 3:8 4:7 16:1
61:5,6 63:14,16
75:9
**majority** 16:8
**making** 36:22 37:5
**manage** 34:19
**manager** 8:22,24
18:21 26:19 30:3,7
**manifests** 50:5
**manual** 44:23 68:14
**March** 62:9
**MARGO** 1:18 2:5
3:14 76:3,23
**mark** 15:11
**marked** 6:10 12:24
12:25 15:21 16:2,5
21:11,12,17,19
22:11 27:11 33:8
40:2,3,17,18 41:11
41:12 46:24 49:19
49:21 53:4 54:1
68:6
**markings** 47:3
**mask** 44:5,12 69:24
69:25 70:1
**masks** 44:9
**material** 22:24
23:22 24:3,4,11,20
26:23 27:1 32:6,8
38:5 45:25 46:10
52:13 55:6 58:1,9
58:13,17,18,19,23
59:3,5,9,15,18,23
60:1,5 71:11 74:17

74:24
**materials** 10:19
14:24 15:3 16:7,12
24:7 27:24 32:18
32:23 33:2 36:12
36:24 37:10 45:14
46:16,24 47:10
48:18,19,24 49:4
49:10,14 58:19
59:13 73:21
**matter** 2:3
**matters** 14:7
**mean** 8:8 52:12
**means** 70:2
**measures** 31:11
43:24 44:13,20
**medical** 26:25 42:16
43:5,21 44:25 45:1
45:4,4
**meet** 19:8,16
**meeting** 29:4 36:8
51:21 52:5 73:2
**memory** 17:5
**mention** 37:6 75:5
**mentioned** 10:22
42:25 56:12 57:10
**mercury** 9:10 11:17
**met** 30:23 66:15
68:18
**method** 32:10,14
52:25
**methodologies** 28:7
**methodology** 52:7
**methods** 38:8 45:12
45:15 51:2,6,7,16
52:3,21 59:6 72:18
**Metro** 3:9
**Meyer** 19:17
**MICHAEL** 1:12 2:2
4:4 7:1 76:6
**Mike** 18:21 62:8,12
**minimum** 10:24
27:4
**mobilized** 45:18
**monitor** 50:21
**monitoring** 71:16
**morning** 7:7,8,15
8:16 62:25 63:15
**M-a-c-e** 9:20
**M-a-d-z-a-r-o-v**
13:21

**N**

**N** 4:2 5:2,2
**name** 7:10 9:19
13:16,18,20,23
18:3,3,10,22 30:8
51:20 63:15
**names** 26:2 30:9,10
52:18

**National** 28:12
56:13
**necessary** 75:7,8
**need** 17:4 28:2 56:22
**needed** 14:22 27:1
**negative** 71:10
**neither** 76:15,17
**NESHAP** 28:12
56:13,17,21 58:4
59:20
**NESHAP's** 57:2
**never** 19:23 50:10
**New** 1:13,22 2:7,9
3:5,10 4:24 7:2
10:15,15,25 11:10
12:4,4 17:13 27:23
28:1,8 31:18 32:1
32:5,15 33:12 34:1
34:5,16,22 35:1,8
35:11 38:4 40:1
48:14 72:19 73:6,8
76:4,24
**newer** 74:10
**night** 45:17 62:22,24
**Nikola** 25:16,18
26:16
**Nikola's** 61:21
**NJ** 25:8
**nod** 8:6
**non-asbestos** 38:2
38:10 59:10
**non-friable** 38:16,23
58:12,16,22 59:1,6
59:23 60:14
**Notary** 2:6 76:3,24
**NOTES** 77:1
**notice** 34:16 55:20
**notification** 34:6,12
35:5,12,13,16,18
50:4 57:3 65:24
73:25
**notifications** 57:7
**November** 31:1
**number** 14:7 42:15
43:5,7,7,7,9,10,10
43:11,21,22,22,22
44:25
**numbers** 14:8
**numerous** 38:6
**N-i-k-o-l-a** 25:16

**O**

**O** 5:2
**observe** 71:12
**obtain** 10:21,23 11:9
11:14
**obtained** 11:5 12:6
**occasion** 70:11
**occur** 56:11
**occurred** 16:25

66:24
**October** 4:20 21:16
21:23 33:12 63:24
64:3,3,4,10,18
65:2,8,13,21 66:2
**office** 18:9,15 20:13
21:22
**offices** 2:7
**oil** 11:18
**okay** 7:20 15:5 17:3
17:19,20 22:10,15
31:17 42:17 43:6
43:24 45:11 46:23
47:6 53:25
**old** 74:5,15,23
**older** 39:19 73:19
74:5,9
**once** 46:16 65:16,20
71:5
**ones** 44:18 45:8
**ongoing** 71:13
**on-site** 11:23 50:21
61:19 62:12
**operating** 5:9 41:9
41:16,17 42:1,9,10
43:14 60:19 68:5
68:14
**operation** 9:1
**operations** 8:25 56:4
**opportunity** 13:8
14:18 16:16
**Oral** 1:11 2:2
**ordinary** 37:23
**original** 28:15 64:7
64:18
**originally** 23:2
62:19
**originals** 15:5
**OSHA** 10:16 11:13
50:5 60:9,13
**outlined** 44:18
**out-source** 71:8
**oversee** 8:25 11:19
34:19
**overstated** 62:11
**owner** 13:13 26:22
37:8 39:20 50:14
63:9 64:23 65:14
75:3

**P**

**P** 3:8
**package** 5:11 47:9
49:18,24
**page** 4:13,17 5:4 6:3
6:3,3,6,6,6,8,8,8
6:11,11,11 13:2,4
14:6,16 15:20
16:16,18 17:18
22:13 42:19 47:2

53:10 62:1 77:2
pages 16:17 61:17
paid 25:2,4 27:20
panels 58:18
Panther 55:12
Papa 30:15
paragraph 14:8
paragraphs 14:10
14:17
Park 2:8
partial 51:3
participate 24:1
28:22
participated 67:23
particular 16:12
parties 76:16
partners 51:22
pass 63:9
Paunovski 25:16
pause 15:14
PCBs 11:17
Pennsylvania 10:16
12:5
people 38:1 56:9
percent 57:25 58:1
perform 11:22 12:3
12:13 22:21 26:21
34:7 45:5
performed 36:6,13
57:15
performs 59:4
period 9:17 27:7
34:13 35:6,13 54:4
66:25 67:6
periodically 60:20
person 14:11 30:11
personally 26:9,11
26:20
person's 51:20
Petrovic 18:21
phone 18:15 33:3
photo 47:4,14 54:13
54:22
photograph 46:24
photographs 47:10
53:8 54:3
photos 47:8,9 48:19
53:4
Phyllis 17:2 62:8
physical 39:12
picture 47:16 48:12
pictures 47:15
picture's 53:24
54:16
piece 46:21,22 53:12
53:14 54:8,9 55:11
pieces 62:21 69:5
pipe 58:20
piping 58:20
place 76:12

placed 46:17
plan 4:23 31:19,19
31:24 39:25 40:9
40:11 41:6,19
67:14,17
plans 68:2
plastic 31:5,6 46:21
48:13 69:11 70:5
70:19 71:1,5
play 28:18
please 8:10
plus 37:20
plywood 74:11
point 19:25 20:8
21:1 28:21 29:22
35:20 51:13 52:1
68:17 69:17 71:23
Pollutants 28:13
56:14
portion 8:12 23:17
24:1 27:9 36:18
43:19 51:11 68:23
portions 42:8,13
position 8:20 33:21
62:10
positive 33:6 57:24
possibility 70:3 74:9
74:12,14
possible 61:6
Post 30:17
powder 31:22 59:4
60:7
PP-100 70:2
practice 2:4 36:22
39:19
Practices 43:10
precaution 72:13
precautionary 70:20
predate 12:7
premises 71:14
prepare 17:2
prepared 16:23
Preparedness 43:8
prepping 45:20
presence 24:6,10
37:7 39:8
present 3:13 24:18
39:20,23 68:13
presented 65:5
prevent 31:12 38:16
56:9 73:14
previous 17:1 69:15
69:18 70:8
previously 22:11
27:11 33:8 53:3
54:1,2
price 17:25 38:5
pricing 24:23
Princeton 3:5
prior 9:14 26:9,12

30:25 36:6 45:3
66:14 76:5
probably 30:21 65:1
procedure 2:5 56:8
63:21
procedures 5:5,9
29:4 37:17,23
40:15,22,24,25
41:5,10,17,18,20
42:1,9,11 43:8,10
43:11,14,23 44:16
44:17 55:7 60:19
67:9,18 68:1,6,14
70:20 72:23 73:25
proceed 8:16 37:4
63:3
proceeding 7:13
produced 4:16
15:19 53:5 61:12
65:12
producing 74:7
Production 6:5
program 42:14 43:1
43:22
programs 74:1
project 14:13 21:1
22:22 23:12,15
25:10,12,21 26:1
26:17,18 28:16,18
29:10 31:13 32:21
35:14 39:2,11
40:10 41:22,25
43:4,16 44:9,17
45:2 48:9 50:1,7
51:1,8,9 57:6,24
60:2 74:23
projects 26:10 32:14
42:2 50:11
pronounce 13:22
proof 11:2
proper 26:25 37:21
51:16 52:2,9 73:25
properly 31:23
34:18 44:6 51:25
properties 18:2,4
32:11
proposal 4:21 18:2,6
18:7 19:2,3,24
20:4,5,7 21:7,9,17
21:24,25 22:3,4,12
22:17 23:1 24:23
25:7 28:15 37:5
63:24 64:6,8,15,18
65:2,6,8,14,16,20
proposals 64:13
proposing 22:21
23:7,10 37:13
39:18
protection 42:14
43:1,22,25 44:13

protective 55:21
provide 17:22 23:7
37:13 67:8 68:4,8
provided 13:5 24:5
24:17 35:25 57:7
57:19
providing 55:18
Public 2:6 76:3,24
pulling 32:9
pulverize 38:15
pulverized 60:6
pulverizing 31:21
purpose 72:9
purposes 17:15
pursuant 2:4
put 7:10 45:22 47:3
47:7 66:11,18 67:2
69:24 70:4,19 71:2
puts 31:6
P-a-u-n-o-v-s-k-i
25:17
P-e-t-r-o-v-i-c 18:23
P.O 3:9

Q

qualified 28:11 57:2
qualifies 58:3
qualify 11:21 58:6
quality 71:18
question 6:10 8:1,3
8:4,9,11 25:15
36:4 51:24 52:1,6
53:6 62:6 69:22
73:4,18 74:3
questioned 68:1
questions 8:15,17
16:18 17:4,7 47:5
54:7 61:5,12 63:22
67:20 75:10
quick 61:7
quicker 63:4

R

RB 55:14,16
read 56:25
ready 55:17 66:12
67:3,7
realize 21:10 26:13
reason 15:11 34:9
47:22 56:2
REATH 2:8 3:3
recall 11:4,7 12:6
17:21 18:8 26:6
27:2 34:21 39:12
45:12 51:20 52:18
55:25 56:1 66:24
67:7,19 68:12 69:9
72:2,3,4
received 12:24
15:21 21:17 24:10

40:1,17 41:11
49:19
receiving 67:19
receptionist 18:19
recess 61:10
recognize 13:5
36:17 54:9 61:23
61:24
recognized 10:25
recollection 16:24
30:11,18
recommended 50:13
record 7:9,10 15:17
65:3,4,10
records 39:13
Recross 4:5
Redirect 4:5
reduced 60:7
reducing 31:21
refer 17:16 25:19
reference 27:16
46:23
references 42:2
referencing 42:19
referred 60:20
referring 62:18
reflect 63:10
reflecting 54:3
refresh 16:24 17:5
regard 33:14 35:4
42:7 43:25 45:1
regarding 63:21
regulate 59:21
regulated 59:14,16
regulations 31:18
32:4 49:9 58:4
60:25 73:7,8
regulatory 31:25
58:8 60:9,15
relative 76:15,17
rely 56:20
relying 24:17
remains 62:10
removal 5:6 17:12
21:4,5 22:23 23:3
23:8,15,18,20,21
23:24,25 24:1
26:10 27:8 28:9,24
31:13 34:17 35:7
35:11 36:17,20,21
36:24 37:4,14 38:8
39:2,18 40:15,22
41:20 43:16 44:8
51:3,17 52:3 54:4
55:19 56:17 57:3
59:5,6 61:1 64:1
68:15 70:16 72:11
72:18 73:19 74:22
remove 20:21,22
24:2 27:24 28:2

31:20 37:21 38:13 40:10 45:13 69:3 75:4,6
removed 51:11,25 60:2
removing 28:3 37:18 38:10 55:5
renovation 58:7
renovations 58:3
repeat 32:19
rephrase 8:13
replacement 23:11 28:24 54:5
replacing 28:3
report 35:25
REPORTED 1:18
reporter 2:6 8:7 76:4,23
reporter's 7:25
represent 7:11 63:17
representative 30:24 35:1 69:23
representatives 68:18 73:4
Republic 10:5
request 6:5 14:16 35:13
requested 20:10 67:15 68:11
requesting 34:12 35:5 67:9
requests 14:19 16:13
required 27:24 28:8 43:15 44:23 45:9 49:9
requirement 57:3
requirements 10:23 31:25 32:4 56:17 56:21 72:19
resided 10:5
resolved 66:22
respirator 42:13
respirators 27:1
respiratory 43:1,21 43:25 44:13 55:21 56:1 74:1
respond 52:6
Respondent 1:8 3:11
responding 67:23
response 12:18 14:2 14:25 16:4 73:17
responsibilities 8:24
responsive 16:12
restrict 73:14
result 71:25
results 24:6,10 39:4
retain 20:17 39:14 75:4

retained 17:22 23:2 28:19 32:21,25 36:17,21 39:1
review 13:9,24 14:9 14:19,21 16:10 17:4
reviewed 60:21
re-mark 21:12
right 19:21 52:10,21 64:24 66:8 74:3
rip 38:12
ripper 46:7 53:17,20
Road 3:4
role 26:18 28:18,23
roof 17:12 18:1 19:22,23 21:4,5 23:3,8,11,15,17,24 23:25 24:1,7 27:8 27:25 28:2,9,23 29:7 31:13,20 32:18,23 35:23 36:2,10,17,20,21 37:3,8,13,21 38:2 38:10,14 39:2,18 40:10 41:21 45:14 45:20,20,21 46:1,2 46:4,8,21 47:18,19 47:21 48:1,3,4,4,6 48:7,11,13,20 49:10 51:3,12 52:8 53:15,17,20 54:3,4 54:15,15,17,21,23 55:1,3,4,8,14,17 55:18,19,22 57:8 62:22 64:1 67:2 68:15 69:3,15,18 70:8,13,16,24 71:11,21 72:5,11 72:18 73:19,19 74:5,8,9,10,11,11 74:15,22,23 75:4
roofing 5:6 17:25 19:3 20:23 22:5,17 22:24 23:22 24:3,4 24:4,11 29:6 32:8 33:2 36:12,16,24 37:6,10,23,24 38:4 40:15,22 46:11 47:17 48:8,11,16 49:13 50:8 51:22 55:6,24 57:1,17 58:18 59:3,9,18 60:10,16 63:11 64:22 73:3 74:6,7
Rowe 3:8 63:17
rules 2:4 7:21

_____ S _____

S 4:10 5:2
Safety 43:12

sample 33:4 38:24 59:11
samples 32:17,22 33:2 35:22 36:2,9 36:10,10,10,12,23 37:9 50:5 57:23
sample's 57:25
sampling 39:1
sanded 60:2
saw 55:12
saying 36:5 52:11
says 14:16 62:7
schedule 4:3 39:25 41:20 63:2
Scheduling 4:18 15:20 16:20
scope 22:20 23:23 25:8
Scott 4:20 18:12,13 18:14,24 20:9,22 21:15,22 62:8,10
scraping 32:8
second 13:4 22:13
section 43:3 44:22 45:7
sections 43:6 45:21 69:2
see 14:6,15 16:15,17 31:2 64:2,11 69:2 69:14 70:7
seeking 20:17
seen 35:6
selective 9:9
sent 31:19 33:12
September 17:25 31:2
served 4:15 12:19,23
service 4:14 12:22 13:3 39:1
services 1:21 3:14 17:22 20:9,16 22:20 23:7,14,24 28:18 37:13 39:14 50:14 55:19 66:7
serving 26:16
set 15:6 42:1,10,12 45:19 76:12
SF0001 5:9 41:10
SF00002 42:20
SF00214 4:21
SF00258 4:24 40:1
SF00413 5:11 49:18
SF00641 5:7 40:16
shave 32:6
sheet 62:7 64:14
sheets 50:5
shift 62:24
shingle 74:11
Shorthand 2:6 76:4 76:23

shovels 46:14
shown 47:15 53:22 54:8
side 49:15
sign 48:15
signature 61:25
signed 18:5,6 22:12 33:11 66:2
sign-off 50:5
site 16:25 17:16,17 19:5,11,20 20:2 21:6 26:24 27:3,6 30:5 34:23 35:2 36:13 38:3,4 40:12 41:2,6 47:11 49:3 51:3 53:7 58:3 62:20 66:13,16 68:19
sites 37:19
SK 18:2,4,4 39:15 51:14,21
SKA 19:18
Slavco 4:15,17,19 5:8,10 7:1 8:19,21 9:4,6,12,15 10:2 11:24 12:6,8,12,15 12:23 13:6,12,15 13:17,18,22,24 14:9,19,21 15:19 16:6,25 17:11,21 18:18 20:10 21:15 22:21 23:6,10 25:4 25:8 27:7,12 29:9 29:15 32:20,25 33:10,19,21 35:21 36:16,22 39:14,16 39:17 41:6,9,17 42:2 44:7 45:13 49:17 50:17 53:7 53:12,22 55:18 56:19 58:2 60:1,5 60:10,16,21 62:15 65:19 66:15 70:15 72:1,5
Slavco's 23:24 28:18 39:2,19 40:24 50:14 54:6
slice 46:4,9
sliced 46:16 48:5
slicing 46:11
slow 62:23
Smith 3:8 63:17
soil 9:11 11:17
Solakov 1:12 2:2 4:4 7:1,7 62:8 63:15 64:7 76:6
somebody 16:6 18:18 22:6 24:9 36:9 37:3,6 50:22 52:17 56:19 71:8

73:4 74:8,25
Somerville 1:7 4:24 7:14 17:12,16,17 17:22 19:18 22:8 22:13,16 23:2 35:23 36:2 39:25 40:10 41:22,25 42:5,7 47:11 48:9 51:14 53:5 57:16 57:20 59:13 63:17 63:18,25 64:23
sorry 20:22 43:9 64:17 69:21,21
sort 7:20 61:18 62:14 74:16
speak 7:23 18:24 20:8,14 39:11
special 49:3
specific 17:7
specifically 41:21,25
spell 18:22
spill 11:18,18
spoke 29:3 30:3,11
spray 32:7
square 22:23 28:4
squares 20:22
Squibb 1:4 7:12,12 19:17 29:21 30:4
stamped 4:21,24 5:7 5:9,11 40:1,16 41:10 49:18
standard 5:8 41:9 41:16,17 42:1,8,10 43:13 56:4 60:19 68:5,14 73:9,9
standards 28:13 56:14 72:20
start 8:3 34:8,9 53:10 65:17,22 66:8 67:1
started 21:4 23:16 31:15,17 36:19 45:18,20 57:16 62:25 69:6
starting 31:1
starts 13:4 62:9
state 2:7 10:15 11:4 12:4,14 20:22 27:23 28:1 31:25 32:5 34:5 59:11,21 76:4,24
stated 31:20
states 10:4,22 11:1 25:7 37:3 74:25
stating 57:23
stations 70:23
status 20:25
stenographically 76:11
Stipulations 6:8

stopped 21:5 74:7
straight 45:22
street 4:23 5:6 17:12
    19:21 39:25 40:16
    40:23
stuff 58:21
subject 14:7 63:19
subjects 14:11
submit 34:6
submittal 49:25
submitted 66:4
subpoena 4:14
    12:19,22 13:4,5,9
    13:24 14:2,8,25
    16:4,13
suck 48:1
suggesting 36:1
Suite 3:4
Superior 2:4
supervise 11:23
supervising 29:15
supervisor 10:14,21
    11:4,21 13:12
    25:15,20 26:17
    61:19 62:3
supervisors 25:9,12
supply 50:2
SUPPORT 6:1
supposed 55:5
suppressing 52:10
    52:19
sure 8:10 15:9 17:8
    26:23 37:20 42:18
    44:5 45:5 54:14
    59:21 61:8 69:3,4
    72:25 73:24
surgical 70:1
survey 57:11,15,20
    57:22,23 75:1
sworn 7:4 76:7

_____ T _____
T 4:10 5:2,2
table 52:17
take 7:15 15:22 23:7
    48:18 49:13 50:10
    61:6
taken 2:3 31:12
    32:17,22 33:1,4
    35:22 36:2,10,12
    36:23 37:10 43:25
    44:14,20 49:2
    57:24 72:14 76:11
talking 16:3 17:18
    21:25 47:4
talks 62:13
tasks 26:20
Tecum 4:15 12:23
tell 20:20 47:14
    51:23 54:17,22

65:19 66:19 71:20
    71:24 75:5
temperature 62:23
ten 34:6 74:12
tenant 7:12 19:17
    29:20,23 30:6
    66:24 67:7,8,16,20
    68:11,19
tenants 66:12,15,22
tenant's 67:3
ten-day 34:12 35:5
    35:12,13 65:23,24
term 37:2 56:13
terms 38:7 52:20,25
    55:3 60:25 63:8
test 11:1 33:6 44:1,3
    44:5
tested 37:9
Testificandum 4:14
    12:22
testified 7:4 63:23
    68:21 72:5,17
testify 64:21 76:7
testimony 4:4 65:13
    76:10
testing 24:13,14
    39:5,8
tests 26:25
thank 63:13 75:10
    75:11
theoretically 71:6
thick 68:5
thing 48:8 66:23
think 18:10 20:11
    25:14 28:4 33:4
    45:10 61:3 63:23
    64:6 65:10 66:6
    68:21 69:1 71:16
    72:17 73:17 74:6
thought 63:1
three 9:5 67:4
throw 49:14
tile 58:17,18
till 62:25
time 7:24 9:14,16
    11:11 19:6,19,25
    20:8 22:25 23:6
    25:23 27:7 28:17
    29:10,14,22 32:16
    32:20 34:18 36:7,8
    50:25 54:4 60:23
    65:1 67:5,6 68:17
    76:12
Timeline 4:18 15:20
    16:20
times 7:18,19 27:2,5
    67:4
today 10:9 12:18
    14:20 15:3 16:9
    61:13 65:5

token 8:2
told 52:16 66:18
    67:7 70:4 73:6
tools 45:24 46:9,13
top 61:16 71:9
total 61:17
trailer 45:18
transcript 2:1 76:10
transferred 48:19
transferring 49:10
Transite 58:18
trap 71:10
treated 24:20
tried 67:1
truck 48:11,16
true 72:20
truth 76:7,8,8
try 19:22
TuffWrap 31:2,4,5
    31:10 69:1 70:19
    71:2,5,7 72:14
turn 13:3
twelve 26:8
two 64:13 67:4
type 35:6 45:24 46:5
    54:17,22 55:4,21
typed 19:2
typical 67:25 68:3
typically 37:7 68:13

_____ U _____
U 5:2
uh-huh 8:7
understand 8:9,11
    8:12,14 52:24 54:5
    74:2
understanding
    17:10 23:1,6 27:22
    28:16 33:24 34:4
    34:15 38:25 50:19
    51:5 54:12 68:10
    70:18 72:24
understood 52:4
undertake 74:22
unit 47:20
units 71:10
updated 60:21,23
use 28:6 32:13 38:1
    48:20 49:9 55:5,8
    55:9 63:5 67:10
    72:22 74:1
Usually 56:4
utilize 25:8 49:7
utilized 25:12

_____ V _____
v 1:6
vacuum 48:2 55:10
    72:6
various 16:20

verbally 8:6
verbatim 76:10
versions 21:12
view 19:22
Vinicombe 3:3 4:6
    7:6,11 21:10 61:3
    61:8,11,14 63:13
    63:20 65:3,9 75:11
Virginia 10:15
visit 20:3,4,6
voids 69:4,10

_____ W _____
wait 7:25 8:2 67:3
waited 62:25
waive 65:24
waiver 34:12 35:5
    35:13 65:23 66:1
walked 30:25 31:3
    68:22,24 69:23
    70:4 73:7
walk-through 19:11
    69:13 70:7
wall 48:13
want 8:10 15:9,11
    17:8 30:10 34:9
    42:18 54:11 61:4
    64:2
wanted 50:21 65:22
    72:25
warrior 46:1,2,8
    48:3,6 52:8 53:15
    53:18,21 54:15
    55:2
wasn't 57:9 67:7
waste 50:4,5
way 8:13 25:19
    37:21 38:12 52:6,8
    63:10
wear 44:9
weather 67:5
week 66:25
went 18:19 19:1,5
    19:10 31:17,24
    43:14 45:10,19
    51:8,9,10 71:11
wet 31:22,23 52:13
wetting 45:20
we'll 11:19
we're 7:15 8:16 9:8
    17:18 31:22 42:18
    47:4 55:8 56:6
witness 6:3 7:3
    75:12
Woodbridge 1:22
    1:22 3:10
word 37:2
work 4:23 9:16 10:1
    11:22,23 25:8 27:9
    29:4,9,15 31:7,19

31:19 34:7,8,10
    36:5,13 39:25 40:9
    40:11 41:6,19 43:9
    55:19 56:5 57:6
    58:2 62:22 65:17
    67:14,17 69:7,15
    69:18 70:8,12,23
    70:24 71:13 72:1
worked 10:3 50:10
    67:13
workers 44:1 45:19
    48:13
working 16:25
    29:11 50:7 55:22
    56:6
works 33:22
wouldn't 39:21
wrapped 69:11 70:5
wrong 17:11 51:8,9
    51:10
w/attached 4:21

_____ X _____
X 4:2,10 5:2
X-ray 45:4

_____ Y _____
Yeah 26:5 51:10
year 11:7
years 9:5 39:19,22
    39:22 73:19 74:5
    74:12,15,23
York 10:15 12:4
    32:15 73:6,8

_____ $ _____
$2,880 62:13
$25,600 27:17
$32,000 24:24 25:5
$6400 25:1 27:16

_____ # _____
#59648 1:25

_____ 0 _____
07011 7:3
07095 1:22 3:10
08452 3:5

_____ 1 _____
1 14:8,17 35:14
    57:25,25 60:13
10 43:11
10/12 18:7
105 3:4
11:29 75:14
12 4:15
12th 64:3,4 65:8,14
    65:21
12/16/05 61:16

**1212** 54:9
**1214** 54:20
**1215** 54:25
**14** 14:17
**15** 4:18 39:22 46:22
  73:19 74:5
**164** 7:2
**18115Y0107106** 1:2
**192** 5:9 41:10
**1980** 10:8
**1992** 12:17

**2**

**2** 43:5,21 44:25
  60:13
**20** 4:20 21:16,23
**20th** 64:10,19 65:2
**2004** 11:8,11,12
**2005** 4:20 11:15
  18:7 21:16,23
  27:13 33:12 69:7
**2006** 62:9
**2007** 1:14 2:9
**21** 4:22
**216** 4:22
**25** 39:19,22 55:24
  56:3,5 74:15,23
**26** 33:12 63:24
**26th** 66:2
**27** 27:13
**283-1060** 1:23

**3**

**3** 42:15 43:1,22
**30** 74:15,23
**300** 3:4 53:11
**301** 53:16
**302** 53:19
**31** 4:14
**32** 4:16
**33** 4:19
**34** 4:23
**35** 5:5 41:19
**36** 5:8
**37** 5:10
**39** 4:24

**4**

**4** 43:7,7
**40** 5:7
**40-hour** 10:16,24
**41** 5:9
**49** 5:11

**5**

**5** 14:16 43:7,9
**5,200** 28:4
**50** 26:15
**500** 2:8
**507** 5:11 49:19

**549-5600** 3:10
**5600** 3:9

**6**

**6** 4:6 43:10,22
**609** 3:5
**63** 4:7
**643** 5:7 40:16

**7**

**7** 43:10
**7,000** 20:21 22:23
**70** 20:22
**70s** 74:7
**716-6562** 3:5
**732** 1:23 3:10
**76** 4:23 5:6 17:12
  39:25 40:15,23

**8**

**8** 14:8 62:9
**80** 9:15
**80s** 9:14

**9**

**9** 1:14 2:9
**9:50** 2:10
**90** 1:22
**92** 9:15 10:1

# EXHIBIT 10

**Bristol vs. Somerville:   Dep. of Robert Post:   1-26-07**


**Robert Cirillo, Inc.**


**Page 1 to Page 61**


CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: ROBERT J. CIRILLO, CSR

*ROBERT CIRILLO, INC.*
*182 Columbia Turnpike*
*Florham Park, NJ    07932*
*Phone:   973-740-1331*
*FAX:   973-992-7568*

**EXHIBIT**

tabbies

*8*

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 39 of 93

BSA                    Bristol vs. Somerville: Dep. of Robert Post: 1-26-07                    XMAX(1/1)

Page 1

```
( 1) AMERICAN ARBITRATION ASSOCIATION
( 2) - - - - - - - - - - - - - - - - - -
( 3) BRISTOL-MYERS SQUIBB COMPANY,:   DEPOSITION UPON
( 4)          Claimant,           :
( 5)       v.                     :   ORAL EXAMINATION
( 6) SOMERVILLE FIDELCO            :
( 7) ASSOCIATES, L.P.,            :   ROBERT POST
( 8)          Respondent.         :
( 9) - - - - - - - - - - - - - - - - - -
(10)
(11)      TRANSCRIPT of the deposition of ROBERT
(12) POST, witness called for Oral Examination in the
(13) above-entitled action, said proceedings being
(14) conducted pursuant to Rules Governing the American
(15) Arbitration Association, by and before DONNA
(16) BRUNCK, Notary Public and Certified Shorthand
(17) Reporter, License No. XI01487, at the offices of
(18) DRINKER, BIDDLE & REATH, LLP, 105 College Road
(19) East, P.O. Box 627, Princeton, New Jersey
(20) 08542-0627, on January 26, 2007, commencing at
(21) 10:00 a.m.
(22)
(23)          ROBERT CIRILLO, INC.
              Certified Shorthand Reporters
(24)          182 Columbia Turnpike
              Florham Park, New Jersey  07932
(25)              (973) 740-1331
```

Page 2

```
( 1) A P P E A R A N C E S :
( 2)
( 3) DRINKER, BIDDLE & REATH, LLP
( 4)     105 College Road East
( 5)     P.O. Box 627
( 6)     Princeton, New Jersey  08542-0627
( 7)     BY:  CHARLES J. VINICOMBE, ESQ.
( 8)     Attorneys for the Claimant
( 9)
(10) GREENBAUM, ROWE, SMITH & DAVIS LLP
(11)     Metro Corporate Campus One
(12)     P.O. Box 5600
(13)     Woodbridge, New Jersey  07095
(14)     BY:  LAWRENCE P. MAHER, ESQ.
(15)     Attorneys for the Respondent
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

Page 3

(1) ROBERT POST, 457 Barrymore Place, North Brunswick,

(2) New Jersey 08902, having been first duly sworn,

(3) according to law, testifies as follows:

(4)

(5) DIRECT EXAMINATION BY MR. MAHER:

(6)     Q.   Good morning, Mr. Post. My name is

(7) Lawrence Maher. I'm with the law firm of

(8) Greenbaum, Rowe, Smith & Davis. We represent

(9) Somerville Fidelco in this arbitration proceeding

(10) with Bristol Myers Squibb. We are here to conduct

(11) your deposition.

(12) Have you ever been deposed before, Mr. Post?

(13)     A.   No, I have not.

(14)     Q.   I'll give you a few instructions and

(15) if you have any questions about the instructions,

(16) by all means, let me know, but I'll be asking you

(17) questions and you'll be responding to the best of

(18) your ability. The court reporter will be taking

(19) down the questions and the answers and will create

(20) a transcript, a verbatim transcript of what we say

(21) here. As a result, I have to let you finish your

(22) answers before I speak and you need to let me

(23) finish my questions before you respond. Otherwise,

(24) the transcript will get garbled or the court

(25) reporter will run screaming out of the room or

Page 4

(1) something like that.

(2) If you don't understand a question or if you

(3) would like me to rephrase it or explain it, by all

(4) means let me know. Otherwise, when I ask you a

(5) question and you respond, I'll assume that you

(6) understood the question and you are responding to

(7) the best of your ability.

(8) Obviously you are under oath and anything

(9) that you say in this transcript can be used later

(10) on in the proceedings and, you know, you need to be

(11) aware of that.

(12) Is there any reason, do you have any physical

(13) infirmities or anything that would keep you from

(14) being able to understand my questions, hear my

(15) questions and respond to them?

(16)     A.   No.

(17)     Q.   Mr. Post, you are employed currently

(18) at Bristol-Myers Squibb?

(19)     A.   Yes.

(20)     Q.   How long have you been there?

(21)     A.   39 years.

(22)     Q.   What did you do before that?

(23)     A.   United States Marine.

(24)     Q.   What's your current position?

(25)     A.   Facilities supervisor.

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 40 of 93

BSA

Bristol vs. Somerville:   Dep. of Robert Post:  1-26-07

XMAX(2/2)

Page 5

(1)    Q.    At any particular location?

(2)    A.    Somerville, Hamilton and Hillside.

(3)    Q.    And do you have a specific office

(4)  that you work from?

(5)    A.    I have an office at the Plainsboro

(6)  facility.

(7)    Q.    But you are in charge of the other

(8)  three facilities that you've described?

(9)    A.    The other three facilities, yes.

(10)    Q.    Now, generally what is your

(11)  responsibility as facilities coordinator?

(12)    A.    I'm responsible for the physical

(13)  facility, the operation, maintenance, just the

(14)  general facility itself.

(15)    Q.    The building?

(16)    A.    Yes, and dealing with the people that

(17)  work in the building.

(18)    Q.    Well, specifically with respect to

(19)  the Somerville facility, that's the building that's

(20)  located at 76 Fourth Street in Somerville; is that

(21)  correct?

(22)    A.    Yes, it is.

(23)    Q.    And that's a building that you, that

(24)  Bristol-Myers rents from my client, Somerville

(25)  Fidelco; is that correct?

Page 6

(1)    A.    That's correct.

(2)    Q.    Now, do you have any dealings at all

(3)  with representatives of Somerville Fidelco in your

(4)  capacity at Bristol-Myers?

(5)    A.    No, I do not.

(6)    Q.    Were you involved at all in

(7)  negotiating any aspects of the lease or any

(8)  extensions of the lease?

(9)    A.    No.

(10)    Q.    Do you recall when Bristol-Myers

(11)  first occupied the Somerville facility?

(12)    A.    No, I do not.

(13)    Q.    Were you in charge of the Somerville

(14)  facility when Bristol-Myers first took occupancy?

(15)    A.    No.

(16)    Q.    How long have you been responsible

(17)  for that facility?

(18)    A.    Approximately two years.

(19)    Q.    Approximately two years. Would that

(20)  be approximately January of 2005?

(21)    A.    I was given the assignment

(22)  approximately two weeks before the incident

(23)  happened.

(24)    Q.    So the incident we are talking about

(25)  is the September 2005 roof removal that's the

Page 7

(1)  subject of this arbitration?

(2)    A.    Yes.

(3)    Q.    So approximately two weeks before

(4)  that, you were assigned to the Somerville facility?

(5)    A.    That's correct.

(6)    Q.    Who was responsible for that facility

(7)  before you?

(8)    A.    Dan Mutter. He was from the, a

(9)  supervisor from the Hillside facility.

(10)    Q.    And do you have any idea how long he

(11)  was responsible for Somerville before you were

(12)  assigned there?

(13)    A.    No, I do not.

(14)    Q.    Did you visit the Somerville facility

(15)  before the incident in September of 2005?

(16)    A.    Yes, I did.

(17)    Q.    How often?

(18)    A.    I believe it was three visits. I had

(19)  to get a TB test and I had to take a physical to

(20)  wear a respirator before I could physically work in

(21)  the facility, because it's a vivarium.

(22)    Q.    Excuse me, it's a what?

(23)    A.    Vivarium.

(24)    Q.    Can you spell that, please?

(25)    A.    V-I-V-A-R-I-U-M, vivarium.

Page 8

(1)    Q.    Can you tell me what that is? I

(2)  apologize. I'm not familiar with the word.

(3)    A.    It's an animal facility.

(4)    Q.    Do you know what Bristol-Myers does

(5)  in that facility?

(6)    A.    Houses monkeys.

(7)    Q.    As some sort of test animals or

(8)  something?

(9)    A.    It's a quarantine facility. That's

(10)  all I know.

(11)    Q.    Who would know more about what goes

(12)  on at that facility, what – strike that.

(13)  What representative of Bristol-Myers would

(14)  know more about what goes on in that facility?

(15)    A.    The manager that's there, John Deck.

(16)    Q.    So before you were permitted to go

(17)  into the premises, you had to be tested medically?

(18)    A.    That's correct.

(19)    Q.    You mentioned a respirator. What was

(20)  the requirement for a respirator?

(21)    A.    Requirement for the respirator is I

(22)  have to have a physical in the BMS medical

(23)  department before I could wear any respirator at

(24)  any facility. It's company policy.

(25)    Q.    Why would you wear a respirator, if

Page 9

(1) you know?

(2)    A.    If I failed the TB test, I would have

(3) to wear a respirator any time that I'm in the

(4) facility.

(5)    Q.    I'm sorry. I'm probably confusing

(6) you because I know I'm confusing myself. I think

(7) you testified that after you were assigned the

(8) responsibility of the Somerville facility, you

(9) visited it two or three times prior to the incident

(10) in September of 2005. Is that what you said?

(11)    A.    That's correct.

(12)    Q.    And I think you also said that you

(13) had to take a TB test; is that correct?

(14)    A.    That's correct.

(15)    Q.    That was administered at

(16) Bristol-Myers?

(17)    A.    Yes.

(18)    Q.    And I thought you said that you had

(19) to wear a respirator. Is that what you testified

(20) to?

(21)    A.    Once I'm TB tested, it takes three

(22) days for the test. If I come back positive, I

(23) would have to wear a respirator any time I'm in

(24) that facility. If it comes back negative, I do not

(25) have to wear a respirator. If I go into any animal

Page 10

(1) room that's occupied with animals for any

(2) facilities reason, I have to wear a respirator in

(3) the room.

(4)    Q.    And that's some sort of a Bristol

(5) Myers policy?

(6)    A.    That's correct.

(7)    Q.    With respect to that laboratory?

(8)    A.    Yes.

(9)    Q.    Would Mr. Deck know more about that?

(10)    A.    Yes, his group sets policy.

(11)    Q.    So prior to the roof incident in

(12) September of 2005, did you make any kind of an

(13) inspection of the facility in Somerville?

(14)    A.    No.

(15)    Q.    What was the purpose of any of your

(16) visits prior to the roof incident?

(17)    A.    Introduction to John Deck, to know

(18) physically where the facility is, and to meet the

(19) outgoing Dan Mutter.

(20)    Q.    And you did those things?

(21)    A.    That's correct.

(22)    Q.    Now, once you took the responsibility

(23) for this facility, did you have responsibility for

(24) security there?

(25)    A.    No, that's a separate department

Page 11

(1) within Bristol-Myers Squibb.

(2)    Q.    Did you have responsibility for the

(3) parking lot – let me rephrase that.

(4) Would you be responsible for the maintenance

(5) and repair of the parking lot at that facility once

(6) you took over the Somerville property?

(7)    A.    No.

(8)    Q.    Would that be somebody else's

(9) responsibility?

(10)    A.    I believe it would be the landlord's

(11) responsibility.

(12)    Q.    Do you know that for a fact?

(13)    A.    No, I do not.

(14)    Q.    Would you know whether you personally

(15) would be responsible for maintaining the interior

(16) of the property? Would that be your responsibility

(17) as facilities supervise or –

(18)    A.    Interior we keep it up to BMS

(19) standards.

(20)    Q.    Is that your responsibility?

(21)    A.    That would be my responsibility.

(22)    Q.    How would you do that? Would you

(23) personally make inspections or would somebody just

(24) tell if you there were maintenance or repair

(25) requirements?

Page 12

(1)    A.    It would be either generated by the

(2) customer in the building or my observations.

(3)    Q.    Do you know whether you had

(4) responsibility for the roof at the building?

(5)    A.    No.

(6)    Q.    Do you know whether you had

(7) responsibility for the windows and doors at the

(8) building?

(9)    A.    I would say no.

(10)    Q.    So if a window were broken by

(11) accident, you don't know whether – strike that.

(12) If the window were broken by accident, would

(13) Bristol-Myers have the responsibility to replace

(14) the window?

(15)    A.    I don't know. I would have to make

(16) calls.

(17)    Q.    In September of 2005, were you

(18) informed that the roof at that facility was going

(19) to be replaced?

(20)    A.    I had heard about it through the

(21) occupants of the facility.

(22)    Q.    Were you included in any way in the

(23) arrangements to replace the roof other than hearing

(24) about it?

(25)    A.    No.

BSA

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 42 of 93

Bristol vs. Somerville:  Dep. of Robert Post:  1-26-07

XMAX(4/4)

Page 13

(1)    Q.    Do you know who was involved in

(2) making arrangements to replace the roof?

(3)    A.    I would say our realty group.

(4)    Q.    What is the realty group?

(5)    A.    It's a separate entity with, inside

(6) Bristol-Myers. The one that actually talks to the

(7) landlord, renews the contracts.

(8)    Q.    So there's a separate group that

(9) deals with the lease and the landlord and repairs

(10) and things like that that are going to happen at

(11) your facility?

(12)    A.    Of the structure, yes.

(13)    Q.    And who in the realty group do you

(14) know that would have been dealing with the roofer?

(15)    A.    I don't know. I wasn't involved in

(16) that, so I don't know.

(17)    Q.    Who is the head of the realty group

(18) in New Jersey, if you know?

(19)    A.    I don't know.

(20)    Q.    Is there – do you have a contact at

(21) the realty group that you deal with?

(22)    MR. VINICOMBE:    With respect to that

(23) facility?

(24)    MR. MAHER:    Yes.

(25)    A.    I would say Jack Chapman.

Page 14

(1)    Q.    Is Mr. Chapman in the realty group?

(2)    A.    Yes.

(3)    Q.    So other than hearing from the

(4) occupants, you didn't have any role in arranging

(5) the roof repair on the Somerville facility?

(6)    A.    No, none whatsoever.

(7)    Q.    Did you know the roofer was coming on

(8) an appointed date?

(9)    A.    I was advised by e-mail.

(10)    Q.    Now, is that something that you would

(11) supervise as part of your responsibility for that

(12) facility?

(13)    A.    No, because –

(14)    MR. VINICOMBE:    Objection to the form

(15) of the question. Go ahead. I just want to give my

(16) objection to the form of the question. You can

(17) answer it.

(18)    A.    No, because it wasn't my

(19) responsibility. The roof was not my

(20) responsibility.

(21)    Q.    So –

(22)    A.    It wasn't my project. Let me

(23) rephrase that. It wasn't my project.

(24)    Q.    It wasn't your project. Someone else

(25) at Bristol-Myers would have been responsible to

Page 15

(1) coordinate for the replacement of that roof?

(2)    A.    Yes.

(3)    Q.    Would that have been Mr. Chapman, do

(4) you know?

(5)    A.    That, I don't know.

(6)    Q.    Who's Robert Pappa?

(7)    A.    He's a manager in the facilities

(8) group in Princeton or in Plainsboro.

(9)    Q.    Now, is that your group?

(10)    A.    Yes.

(11)    Q.    Do you know whether he would have had

(12) any responsibility for involvement in the roof

(13) replacement?

(14)    A.    I don't believe he had any, because

(15) we were taken by surprise when the facility was,

(16) you know, the roof project started.

(17)    Q.    So your group and you personally had

(18) no involvement in coordinating or supervising the

(19) roof project?

(20)    A.    No.

(21)    Q.    Are you responsible for cleaning

(22) crews or regular maintenance people at that

(23) facility?

(24)    A.    Regular maintenance people.

(25)    Q.    How about the people who come in –

Page 16

(1) let me withdraw that.

(2) Are there outside contractors that come in

(3) and do any cleaning at that facility?

(4)    A.    Yes, there is an outside contractor

(5) that performs the cleaning at the facility.

(6)    Q.    Is that a regular function?

(7)    A.    Yes, it is.

(8)    Q.    Is that outside contractor someone

(9) that you are responsible for?

(10)    A.    I'm responsible for the product. I

(11) do not negotiate the contract for them. For

(12) cleanliness in the facility, I am responsible. I

(13) do not negotiate the contract.

(14)    Q.    So if it's determined that they are

(15) not doing a good job, you find out about it and you

(16) interact with that outside contractor. Is that

(17) fair to say?

(18)    A.    That's correct.

(19)    Q.    Is it also fair to say that you

(20) really were not or are not familiar with what the

(21) overall condition of that facility was prior to the

(22) September roof project?

(23)    A.    I would say yes. I was informed the

(24) roof leaked.

(25)    Q.    No, I don't mean the roof and if I

## Page 17

(1) confused you I apologize. It wasn't a great
(2) question. But as I understand it, since you were
(3) only recently assigned the facility, is it fair to
(4) say that you didn't make any kind of a
(5) comprehensive inspection of the inside of the
(6) property before the roof incident?
(7)     **A.   Yes.**
(8)     Q.    So you really wouldn't be familiar
(9) with the general cleanliness in all the nooks and
(10) crannies of that facility prior to September of
(11) 2005?
(12)     **A.   Yes.**
(13)     Q.    Yes, you would not?
(14)     **A.   I would not.**
(15)     Q.    When you make an inspection or visit
(16) the facility, do you make any sort of notes or
(17) written reports?
(18)     **A.   No.**
(19)     Q.    Now, when did you first become aware
(20) of a problem with respect to the roof removal at
(21) that property?
(22)     **A.   I was in Plainsboro and we received a**
(23) **phone call that the facility was full of dust.**
(24)     Q.    Do you recall who made that call?
(25)     **A.   John Deck.**

## Page 18

(1)     Q.    And as a result of that call, did you
(2) personally take any action?
(3)     **A.   I got in my car, drove from**
(4) **Plainsboro up to Somerville.**
(5)     Q.    And what did you find there?
(6)     **A.   Dust.**
(7)     Q.    Was the roofer still on the job?
(8)     **A.   Yes, they were.**
(9)     Q.    And what sort of dust did you see?
(10)     **A.   It was dust in the air and dust all**
(11) **over the rear of the facility.**
(12)     Q.    Now, can you generally describe this?
(13) Is this a multi-floor facility?
(14)     **A.   It's a single story.**
(15)     Q.    And when you say the rear of the
(16) facility, how much of the facility would that
(17) involve?
(18)     **A.   Approximately 25 percent.**
(19)     MR. MAHER:    Off the record.
(20)     (Discussion off the record.)
(21)     Q.    I am going to show you a document
(22) that was produced by counsel for Bristol-Myers. It
(23) contains a Bates stamp number and I want to refer
(24) to this and any other exhibits probably that I show
(25) you by that Bates stamp number.

## Page 19

(1)     This has been stamped BMS 16666. It appears
(2) to be some sort of a floor plan. Can you tell me
(3) whether that is generally a floor plan of the
(4) Somerville facility?
(5)     **A.   This is a floor plan of the facility.**
(6)     Q.    Have you seen this before?
(7)     **A.   Yes, I have.**
(8)     Q.    Do you know where this came from?
(9)     **A.   I was given this when I took over the**
(10) **responsibilities of the facility.**
(11)     Q.    So you testified that a percentage of
(12) the facility was affected by dust. Is there a way
(13) that you can describe or delineate on this floor
(14) plan what portion of the facility was covered by
(15) the dust? Do you want to draw on it?
(16)     **A.   I can name things or we can draw on**
(17) **it. It's your choice.**
(18)     Q.    Whatever is easier for you.
(19)     MR. VINICOMBE:    Would you like to
(20) draw?
(21)     THE WITNESS:    No.
(22)     **A.   The loading dock.**
(23)     Q.    Where are we starting? Which corner,
(24) bottom left?
(25)     **A.   Right where BMS 01666 is. The**

## Page 20

(1) **loading dock small room labeled storage, 107**
(2) **corridor, 106 corridor, that was the area.**
(3)     Q.    Now, what about some of the boxed off
(4) rooms. There's a bedding and feed storage and a
(5) lunchroom and things like that. Do you know
(6) whether those were affected by the dust?
(7)     **A.   The bedding and feed storage has a**
(8) **roof on top of it with inside the facility.**
(9) **Without going up there and looking, I didn't go up**
(10) **there and look.**
(11)     Q.    It has like a drop ceiling?
(12)     **A.   It's like a room built within the**
(13) **warehouse, a box within the warehouse.**
(14)     Q.    I understand. How about the
(15) lunchroom?
(16)     **A.   The lunchroom has a drop ceiling.**
(17)     Q.    And these other areas, the loading
(18) dock and the storage and the corridors, they do not
(19) have a drop ceiling or any other ceiling beneath
(20) the building's ceiling?
(21)     **A.   That's correct. You can see the roof**
(22) **deck if you look up.**
(23)     Q.    How would you describe the dust that
(24) you saw there?
(25)     **A.   It was just dust all over and then**

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 44 of 93

BSA                Bristol vs. Somerville:  Dep. of Robert Post:  1-26-07                XMAX(6/6)

Page 21

(1) there was chunks and pieces of what I thought was
(2) roofing materials.
(3)    Q.    When you talk about dust, are we
(4) talking about run of the mill grey industrial dust
(5) or was there some other consistency to it?
(6)    A.    A heavier brown dust.
(7)    Q.    And then you described some other
(8) matter?
(9)    A.    There was pieces that looked like
(10) they had asphalt, black tar chunks out, especially
(11) in the storage room that is open to the deck also,
(12) and there were shelves in there, and everything
(13) that was on the shelves was covered with this dust
(14) and chunks of roofing.
(15)    Q.    Did you ever determine, you
(16) personally or did you ever obtain any reports or
(17) opinions from anybody as to where the dust came
(18) from?
(19)    A.    When I arrived there, I was standing
(20) in the loading dock area and I could see daylight
(21) up through the decking, so that means that there
(22) was holes in the decking.
(23)    Q.    There were holes in the decking over
(24) the loading dock?
(25)    A.    Yes, and over the storage room and

Page 22

(1) over the lunchroom.
(2)    Q.    How would you describe the holes?
(3)    A.    All I remember is seeing daylight.
(4)    Q.    But I mean are we talking about pin
(5) holes or talking about gaping holes in the decking?
(6)    A.    Small holes.
(7)    Q.    And you wouldn't know whether those
(8) were there or how long those holes were there?
(9)    A.    No.
(10)    Q.    When you looked up and saw that there
(11) were holes over these rooms, did you see whether
(12) there was any dust or matter coming in at the time?
(13)    A.    No. The roofing contractor had
(14) finished stripping the roof.
(15)    Q.    And what, if anything else, did you
(16) observe when you first got there and made your
(17) inspection?
(18)    A.    That's all I observed was the dust
(19) and pieces of roofing that was in the facility on
(20) the floors and on the shelving.
(21)    Q.    At that time did you speak to the
(22) roofing contractor?
(23)    A.    Yes, I did.
(24)    Q.    And do you recall who you spoke with?
(25)    A.    I went up on the roof and I believe I

Page 23

(1) asked for the lead or who was running the project
(2) and I spoke to him. My concern was seeing
(3) daylight. I was concerned about making the
(4) facility waterproof in case we had rain. They said
(5) they were not going to strip anymore. They were
(6) going to put down the new insulation and put down
(7) the new waterproof barrier and we would be
(8) watertight. That was my main concern.
(9)    Q.    Did they acknowledge at that point
(10) that the holes were there?
(11)    A.    I didn't discuss it. I just was
(12) concerned about no dust in the facility and making
(13) the building watertight.
(14)    Q.    But in that conversation, did you say
(15) that you noticed there are holes in the decking?
(16)    A.    No, I did not.
(17)    Q.    Did they continue and put on the new
(18) barrier and cover up the holes?
(19)    A.    Yes, they did.
(20)    Q.    Was that done that same day?
(21)    A.    Yes, it was.
(22)    Q.    How long did you stay there that day?
(23)    A.    Probably until it got dark.
(24)    Q.    Do you recall what day that was?
(25)    A.    No, I do not.

Page 24

(1)    Q.    But it was September 2005?
(2)    A.    Yes.
(3)    Q.    Did you take any action with respect
(4) to the existence of the dust and the other material
(5) that had infiltrated the property?
(6)    A.    I did not. Our EH&S department was
(7) informed of the dust and they were going to sample
(8) it. They made a recommendation that everybody
(9) inside the facility put on the proper PPE.
(10)    Q.    Now, what department is that, EHS?
(11)    A.    Environmental health and safety.
(12)    Q.    Is that a department within
(13) Bristol-Myers?
(14)    A.    Yes, it is.
(15)    Q.    Who notified them of the existence of
(16) this dust?
(17)    A.    John Deck.
(18)    Q.    And did they send somebody out there?
(19)    A.    Yes, they did.
(20)    Q.    Do you know who that was?
(21)    A.    Barbara Owen.
(22)    Q.    You mentioned PPE. What does that
(23) stand for?
(24)    A.    Personal protective equipment.
(25)    Q.    Is that a respirator?

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 45 of 93

BSA                    Bristol vs. Somerville:   Dep. of Robert Post:   1-26-07                    XMAX(7/7)

Page 25

(1)  A.   That was a Tyvek suit.

(2)  Q.   One of those white suits?

(3)  A.   One of those white suits, mask,

(4) gloves, so we were 100 percent protected.

(5)  Q.   And did that happen the day you were

(6) there?

(7)  A.   Yes, it did.

(8)  Q.   How many people were in the building

(9) that day?

(10)  A.   I do not know how many people were in

(11) the building that day. When I arrived it was John

(12) Deck, the manager, myself who was in the building.

(13) It was only two of us.

(14)  Q.   There were no employees there at that

(15) time?

(16)  A.   Not at that time.

(17)  Q.   Do you know whether they had been

(18) sent home?

(19)  A.   I believe they had been sent home.

(20)  Q.   Do you know who made that decision?

(21)  A.   No, I do not.

(22)  Q.   So you were notified that there was

(23) dust and you drove to the facility. When you got

(24) there, had the employees already been sent home?

(25)  A.   They weren't on the facility, so I'm

Page 26

(1) assuming they were sent home.

(2)  Q.   Did you have a role, after that day,

(3) did you have a continuing role at the facility over

(4) the next few days?

(5)  A.   Yes.

(6)  Q.   Did you go there?

(7)  A.   Every day.

(8)  Q.   And what was the situation there

(9) every day?

(10)  A.   The roof work was suspended.

(11)  Q.   Who made that decision?

(12)  A.   I don't know. I believe it was EH&S

(13) department. Plans were made to clean up the

(14) facility, remove the dust from the facility and to

(15) sample the dust.

(16)  Q.   Was that function your

(17) responsibility?

(18)  A.   No, it was not.

(19)  Q.   Whose responsibility was that?

(20)  A.   Environmental health and safety.

(21)  Q.   That's Barbara Owen?

(22)  A.   Yes.

(23)  Q.   Were the employees told to stay home

(24) each of those days?

(25)  A.   No.

Page 27

(1)  Q.   Did they come in?

(2)  A.   Yes, they did. Gowned up in moon

(3) suits, took care of their responsibilities.

(4)  Q.   Now, approximately how many people

(5) were -- strike that.

(6) Did you continue going there each day after

(7) this incident?

(8)  A.   Yes, I did.

(9)  Q.   For how long?

(10)  A.   Until a clean-up was completed and

(11) the building was certified asbestos free.

(12)  Q.   Do you know when that was?

(13)  A.   The exact date, I do not know.

(14)  Q.   Do you know the month?

(15)  A.   Probably February or March of '06.

(16)  Q.   What did you do in Somerville every

(17) day when you went there?

(18)  A.   I was responsible for running the

(19) clean-up at the facility during that period.

(20)  Q.   And how did you do that?

(21)  A.   Bristol-Myers had hired contractors

(22) to come in and clean up the interior facility.

(23)  Q.   Did that start right away after the

(24) incident?

(25)  A.   Within two to three weeks.

Page 28

(1)  Q.   And do you know who the contractors

(2) were?

(3)  A.   I need a list, but the main

(4) contractor was Bristol Environmental.

(5)  Q.   So were they on promises within a few

(6) weeks after the September roof incident?

(7)  A.   Yes, they were.

(8)  Q.   And was it your responsibility to

(9) oversee their clean-up?

(10)  A.   Yes, it was.

(11)  Q.   Was Barbara Owen involved in that at

(12) all?

(13)  A.   Yes, she was.

(14)  Q.   What did the clean-up consist of?

(15) Did they vacuum up the dust?

(16)  A.   The floors and ceilings were removed.

(17)  Q.   The floors --

(18)  A.   I'm sorry, the ceilings were removed.

(19)  Q.   Why were the ceilings removed?

(20)  A.   Because the ceilings had debris on

(21) top of them, dust on top of them, so all the

(22) ceilings were removed. They came in with lifts and

(23) started cleaning from the decking on down.

(24)  Q.   Now, when you say the ceilings were

(25) removed, were these drop ceilings that were some

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 46 of 93

BSA                    Bristol vs. Somerville:   Dep. of Robert Post:  1-26-07                    XMAX(8/8)

## Page 29

(1) sort of, forgive me, but, you know, the typical
(2) tiles that you just lift out?
(3)    A.    Typical two by four tiles.
(4)    Q.    So those were taken down?
(5)    A.    In some areas they were.
(6)    Q.    And the clean-up crew then went up
(7) inside the ceiling?
(8)    A.    Yes, they did.
(9)    Q.    And what did they do up there?
(10)    A.    With hepa vacuums and wet rags and
(11) everything started cleaning out the facility,
(12) cleaning areas.
(13)    Q.    Whatever dust was up there, they
(14) cleaned it out?
(15)    A.    Yes.
(16)    Q.    Do you know whether that dust was
(17) dust that was caused by the roof replacement?
(18)    A.    Yes.
(19)    Q.    You do know that?
(20)    A.    I took pictures in a lot of areas.
(21)    Q.    How do you know that that was dust
(22) that was cause from the work on the roof?
(23)    A.    Because it was the same brown dust
(24) and roofing particles.
(25)    Q.    Now you said you took pictures. Did

## Page 30

(1) you take a lot of pictures?
(2)    A.    Quite a few.
(3)    Q.    I have a lot of pictures that I
(4) didn't know where it came from, so I'm going to ask
(5) you and I don't know if they've been – they have.
(6) They have been Bates stamped as well, I'm going to
(7) ask you first of all whether these are the pictures
(8) that you described?
(9)    MR. VINICOMBE:    Maybe we can give a
(10) range of the Bates numbers if that's okay.
(11)    MR. MAHER:    Yes.
(12)    MR. VINICOMBE:    The range is BMS
(13) 01216. Appears that the beginning of the Bates
(14) range is BMS 01166 and the end of the range is –
(15) strike that too.
(16)    MR. MAHER:    I thought they were in
(17) order.
(18)    MR. VINICOMBE:    No, they weren't.
(19) I'll straighten it out. Try it one more time. BMS
(20) 1165 through BMS 1249.
(21)    Q.    Now, Mr. Post you are looking at some
(22) colored pictures that were provided to us by
(23) counsel. Did you take these pictures?
(24)    A.    I took some of them. I physically
(25) took some of them. I was aware that, I'm aware

## Page 31

(1) that the other ones were taken.
(2)    Q.    Do you know when they were taken?
(3)    A.    There are dates on the front of the
(4) photos and every photo that I took had a date on
(5) it. I'm just looking through and seeing where my
(6) photos start. BMS 01212 to BMS 01249.
(7)    Q.    You took the photos that you just
(8) described in that Bates stamp range?
(9)    A.    That's correct.
(10)    Q.    What was the purpose for taking those
(11) photos?
(12)    A.    To show what was in the facility,
(13) what was going on at the facility.
(14)    Q.    Do you mind if I come around to your
(15) side since I only have the one set of photos?
(16)    A.    All right, sorry. This is the
(17) roofer's equipment on the roof, the mechanical
(18) strippers that they used.
(19)    MR. VINICOMBE:    Just for the record.
(20)    MR. MAHER:    BMS 1212 through BMS
(21) 1215.
(22)    Q.    Did you say there are dates on each
(23) of those photos?
(24)    A.    Not on these.
(25)    Q.    Do you recall when you took those?

## Page 32

(1)    A.    No, I don't.
(2)    Q.    Well, would it have been in close
(3) proximity to the problem?
(4)    A.    Yes.
(5)    Q.    What is BMS 1216?
(6)    A.    This is one of the roof leaks that
(7) ran down the rear wall near the rear loading dock.
(8)    Q.    Now, this seems to be dated January
(9) 16, 2006?
(10)    A.    This is when I started taking the
(11) photos of – with a new digital camera.
(12)    Q.    This is the wall of the loading dock?
(13)    A.    That's the rear loading dock. Would
(14) be right here next to the electrical equipment
(15) room.
(16)    Q.    And do you know how long – the
(17) photograph obviously depicts some sort of a
(18) staining on the wall. Do you know how long that
(19) was there?
(20)    A.    No, I do not.
(21)    Q.    Is it possible that was there as a
(22) result of the leaks in the roof that caused the
(23) roof to be replaced to begin with?
(24)    A.    This was the original cause to have
(25) the roof replaced.

## Page 33

(1)  Q.  So this BMS 1216 is not to your

(2)  knowledge intended to depict something that

(3)  happened during the roof replacement?

(4)  A.  No.

(5)  Q.  Then you are looking at BMS 1217; and

(6)  can you tell me what that is?

(7)  A.  This is a picture of an animal room

(8)  where they have sealed drains with plastic and

(9)  sealed the ventilation system with plastic before

(10)  they cleaned the room so that nothing could go down

(11)  in the sewage or get into the ventilation system.

(12)  Q.  Now would you look through those

(13)  pictures and tell me whether any of the pictures

(14)  depict the existence of the dust or other particle

(15)  matter that you found when you came to the facility

(16)  in September?

(17)  A.  BMS 01236, this was the debris in the

(18)  office area.

(19)  Q.  Now, this is, this photograph is

(20)  dated January 16, 2006?

(21)  A.  That's correct.

(22)  Q.  And I assume you are pointing out

(23)  some marks on the floor of the room there?

(24)  A.  Um-hum.

(25)  Q.  And is that what the dust and debris

## Page 34

(1)  looked like?

(2)  A.  Yes.

(3)  Q.  Now, that's in the office area. What

(4)  office area is that in the facility?

(5)  A.  It's considered the secretary area on

(6)  this blueprint. This is above BMS 01232, this is

(7)  debris above the animal room, 13.

(8)  Q.  And that is also dated January 16,

(9)  2006?

(10)  A.  That's correct. BMS 01241, this is

(11)  debris catwalk above room 13.

(12)  Q.  And you are referring to a legend in

(13)  the back of that photograph?

(14)  A.  Yes. BMS 01243, this is typical of

(15)  the debris that was in the facility. That's my

(16)  foot. Grating above men's roof.

(17)  Q.  Grating above men's room?

(18)  A.  Yes.

(19)  Q.  So does that have a separate ceiling?

(20)  A.  Yes, it does.

(21)  Q.  That was also taken on January 16,

(22)  2006; is that correct?

(23)  A.  Yes. BMS 01244, debris on top of air

(24)  handler No. 5.

(25)  Q.  Where is that located?

## Page 35

(1)  A.  Intersticial space above the men's

(2)  room.

(3)  Q.  That's between the drop ceiling and

(4)  roof deck?

(5)  A.  The decking, yes. BMS 01245, this is

(6)  debris that came in above the boiler room.

(7)  Q.  And the boiler room is located on the

(8)  same level as the rest of the facility?

(9)  A.  Yes, the boiler room is ground level

(10)  and this is on top of it. BMS 01247, this is

(11)  debris in the northwest corner of the building.

(12)  That's outside.

(13)  Q.  That's outside at ground level?

(14)  A.  Yes. BMS 01246, this is dust and

(15)  debris above the water lines above the boiler room.

(16)  Q.  So Mr. Post, you've been kind enough

(17)  to point out a number of the pictures that were

(18)  taken. They seem to have mostly been taken in

(19)  January of 2006, that you state accurately depicts

(20)  the type of dust and debris that infiltrated the

(21)  facility in Somerville?

(22)  A.  That's correct.

(23)  Q.  And the fact that that was still

(24)  there in January of 2006 would indicate that those

(25)  areas at least had not been cleaned yet by your

## Page 36

(1)  cleaning crews?

(2)  A.  That's correct.

(3)  MR. VINICOMBE:   Objection to the form

(4)  of the question.

(5)  Q.  You can answer.

(6)  MR. VINICOMBE:   Go ahead.

(7)  A.  That's correct.

(8)  Q.  And do you know whether any of that

(9)  dust and debris was tested for the existence of

(10)  asbestos containing materials?

(11)  A.  There were tests taken. I don't know

(12)  if that, you know, debris.

(13)  Q.  You don't know?

(14)  A.  I don't know.

(15)  Q.  So when the cleaning crew came in and

(16)  started to clean up, how long did that take them to

(17)  clean the facility?

(18)  A.  There was an initial cleaning.

(19)  Q.  When did that take place?

(20)  A.  Within weeks after the September

(21)  incident. Then we had to wear a full PPE the whole

(22)  time. Then contract was given to Bristol

(23)  Environmental to come in and physically clean the

(24)  facility after the new roof was installed.

(25)  Q.  And that happened at some time in

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 48 of 93

BSA                    Bristol vs. Somerville:  Dep. of Robert Post:  1-26-07                    XMAX(10/10)

## Page 37

(1)  December 2005, isn't that correct?

(2)  A.  That's correct.

(3)  Q.  Were you there on site supervising

(4)  the continuing clean-up?

(5)  A.  Yes.

(6)  Q.  And you continued to do that until

(7)  the clean-up was completed?

(8)  A.  Yes.

(9)  Q.  I believe you said that was

(10) approximately February of 2006?

(11) A.  Yes.

(12) Q.  Now, as part of the clean-up, did you

(13) do any construction at the property?

(14) A.  I--

(15) Q.  That may not be a fair question. You

(16) know what? If you don't mind, after the clean-up

(17) was completed in February 2006, did things return

(18) to normal to your knowledge at the premises?

(19) A.  After the clean-up was finished, then

(20) I had to go back and restore the facility, put it

(21) back together.

(22) Q.  And what did that consist of?

(23) A.  Replacing ceilings, lighting,

(24) ventilation.

(25) Q.  What happened to those components?

## Page 38

(1)  A.  Most of them were taken out and

(2)  thrown away during the clean-up.

(3)  Q.  So the tiles that were removed from

(4)  the drop ceiling would be discarded?

(5)  A.  Yes, because they were contaminated.

(6)  Q.  Because they had dust on them?

(7)  A.  Yes.

(8)  Q.  And when you say lighting, the

(9)  lighting was actually taken out and discarded?

(10) A.  Umm, I would say, if we look at BMS

(11) 01233, this was the condition of the corridor

(12) between the men's and ladies' room, and this is

(13) what it looked like after it was cleaned.

(14) Q.  Did it look like that because the

(15) drop ceiling had been removed?

(16) A.  Drop ceiling was removed. T wires

(17) were removed.

(18) Q.  What was removed?

(19) A.  T wires. They hold up the tiles.

(20) Q.  Those grids that go up?

(21) A.  Grids, grids.

(22) Q.  Why were those removed, do you know?

(23) A.  They had to be removed to get the

(24) lifts up to the decking for the Bristol

(25) Environmental to clean from the decking on down.

## Page 39

(1)  Q.  So to get whatever they needed to be

(2)  boosted up to the decking, they had to take the

(3)  grids out?

(4)  A.  That's correct.

(5)  Q.  And so all the grids were removed

(6)  throughout the facility, is that fair to say?

(7)  A.  Yes.

(8)  Q.  All the ceiling tiles were removed

(9)  throughout the facility?

(10) A.  Yes.

(11) Q.  And how much of the lighting was

(12) removed?

(13) A.  All of it.

(14) Q.  Every light fixture throughout the

(15) facility was removed?

(16) A.  I'm sorry, they were not removed.

(17) They were replaced. They were running on wires

(18) during the cleaning process and some were damaged

(19) during the cleaning process.

(20) Q.  By the cleaning crew?

(21) A.  By the cleaning crew.

(22) Q.  So are those the ones that were

(23) replaced?

(24) A.  Yes.

(25) Q.  Were there other fixtures that

## Page 40

(1)  remained and continue there?

(2)  A.  Every fixture in the animal room 1

(3)  through 9 was taken down, reused and put back up.

(4)  Q.  Was any work -- strike that.

(5)  How long did it take you, if you recall, to

(6)  rebuild or refit the facility?

(7)  A.  Couple months. We had to

(8)  decontaminate, rebuild.

(9)  Q.  Well, as far the decontamination

(10) goes, I assume that when you testified that by

(11) February it was certified asbestos free, that's the

(12) decontamination, is that fair to say?

(13) A.  We did areas, because the facility

(14) was a functioning facility, we did one area,

(15) decontaminated it, rebuilt it and moved the animals

(16) from one side of the facility to the clean side.

(17) Then we went to the project of doing the second

(18) phase of the animal rooms, cleaning them,

(19) decontaminating them, rebuilding them. Then we

(20) moved into the warehouse area, decontaminated that

(21) and rebuilt what we needed to do. Same with the

(22) office and bathrooms. They were decontaminated.

(23) The ceilings come out. They were decontaminated,

(24) new ceilings and lighting went back in and then

(25) they could be occupied.

Page 41

(1)   Q.   So I can understand when you say
(2)   decontaminated, you mean clean up the dust?
(3)   A.   Clean up the dust.
(4)   Q.   And was that done by February of
(5)   2006?
(6)   A.   I would say March 2006 the dust was,
(7)   the decontamination was completed.
(8)   Q.   And when was reconstruction
(9)   completed?
(10)  A.   By March, about 50 percent of the
(11)  reconstruction was already done.
(12)  Q.   Do you know whether the employees had
(13)  returned to the facility by then?
(14)  A.   The employees continued to work
(15)  throughout the whole time.
(16)  Q.   Wearing the Tyvek suits?
(17)  A.   Yes, sir.
(18)  Q.   And when you were doing some
(19)  rebuilding, the employees just moved to another
(20)  part of the facility, is that fair to say?
(21)  A.   That's fair. That's correct.
(22)  Q.   Do you know – strike that.
(23)  MR. MAHER:   Could we mark this whole
(24)  book?
(25)  (Exhibit SF-1, binder, marked for

Page 42

(1)   identification.)
(2)   Q.   Mr. Post, I want to show you a binder
(3)   that has been marked SF-1. It's entitled
(4)   "Somerville Costs." I don't know if you've seen
(5)   this before. I'll represent to you that this was
(6)   provided to my client by representatives of
(7)   Bristol-Myers, and my understanding is that it sets
(8)   forth a substantial amount of the documentation
(9)   supporting the damage claim in this case, and I
(10)  just wanted to go through a few of these things
(11)  with you, and I don't know, the pages are not
(12)  really numbered consecutively, so I think we have
(13)  to blunder through, if you don't mind.
(14)  Were you responsible at all for the care,
(15)  custody and housing of the monkeys at the facility?
(16)  A.   No.
(17)  Q.   That was Mr. Deck?
(18)  A.   Yes.
(19)  Q.   About a third of the way through, and
(20)  again I apologize for the, any difficulty, but
(21)  there is a document that's entitled draft for
(22)  internal use only and it's followed by an invoice
(23)  from Ron Caruso Construction. This is what it
(24)  looks like. It seems to be a requisition for
(25)  $1,680?

Page 43

(1)   A.   Okay, I have it in front of me.
(2)   Q.   Do you have that, Mr. Post?
(3)   A.   I have it in front of me, yes.
(4)   Q.   This seems to be some sort of an
(5)   internal document. Could you describe generally
(6)   what this document is?
(7)   A.   This is a requisition that we put in
(8)   SAP.
(9)   Q.   What is SAP?
(10)  A.   It's a program that we use to keep
(11)  track of costs. I don't know what SAP means.
(12)  Q.   But it's part of your computer
(13)  system?
(14)  A.   It's our accounting system, yes.
(15)  Q.   Now, who would generate a document
(16)  such as this?
(17)  A.   I go out, I would go out to Ron
(18)  Caruso Construction and ask for a quote for some
(19)  work. He comes in, gives me a quote. I attach the
(20)  quote with an e-mail to the admin of our department
(21)  saying please create a service order or purchase
(22)  order for this amount. The admin would put it into
(23)  SAP and then when it's approved, this document is
(24)  generated with a P.O. number on it and that's how
(25)  the – Ron Caruso gets paid by this P.O. number

Page 44

(1)   after the work is completed.
(2)   Q.   So this is in essence your purchase
(3)   order to Ron Caruso Construction for whatever work
(4)   he quoted to you?
(5)   A.   Yes.
(6)   Q.   And this seems to be followed up in
(7)   the book with a proposal from Ron Caruso
(8)   Construction for certain work?
(9)   A.   Yes.
(10)  Q.   And the proposal is for $1,680; is
(11)  that correct?
(12)  A.   That's correct.
(13)  Q.   Now, did you deal directly with Ron
(14)  Caruso Construction company?
(15)  A.   Yes, I did.
(16)  Q.   And who were they?
(17)  A.   They are a construction company
(18)  that's an approved BMS vendor.
(19)  Q.   They are an approved Bristol-Myers
(20)  vendor?
(21)  A.   BMS vendor.
(22)  Q.   So you went out to them and
(23)  contracted with them to do certain work at the
(24)  Somerville facility, is that fair to say?
(25)  A.   Yes.

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 50 of 93

BSA                    Bristol vs. Somerville:  Dep. of Robert Post:  1-26-07          XMAX(12/12)

Page 45

(1)    Q.    And these are invoices, purchase
(2)   orders for certain of that work. This one seems to
(3)   refer to paint dry walls in offices and bathrooms?
(4)    A.    That's correct.
(5)    Q.    Continuing in the binder, there's
(6)   another one of the draft requisition forms and has
(7)   to do with Turtle & Hughes for $4,309.79. Is that
(8)   correct?
(9)    A.    Yes, it is.
(10)   Q.    Were you responsible for contracting
(11)  with Turtle & Hughes?
(12)   A.    Yes, I was.
(13)   Q.    What did they provide?
(14)   A.    Replacement ceiling tiles for the
(15)  facility.
(16)   Q.    So is it fair to say that as we go
(17)  through this and documents that were provided
(18)  consist of a proposal or some sort of a quote from
(19)  a contractor and then one of those internal
(20)  requisition documents, that these are things that
(21)  you would have negotiated for the construction of
(22)  the facility?
(23)   A.    Yes.
(24)   Q.    Two or three documents further down
(25)  there's one of these requisitions for Wackenhut

Page 46

(1)   Security Systems. Would you have been involved
(2)   with Wackenhut Security Systems, you personally?
(3)    A.    Yes.
(4)    Q.    And this is a purchase order for
(5)   $2,179, and I believe that it is followed up by an
(6)   e-mail from you regarding certain expenses at
(7)   Wackenhut. Can you describe those for me?
(8)    A.    The facility has 24/7 security. They
(9)   are in the front office where they have their
(10)  monitoring station.
(11)   Q.    So they are inside the building?
(12)   A.    Inside the building 24/7. They were
(13)  not allowed in the building during the clean-up, so
(14)  I had to get them a security vehicle so they could
(15)  set out front of the facility.
(16)   Q.    What kind of vehicle, a trailer?
(17)   A.    No, it was a Jeep or something like
(18)  that.
(19)   Q.    A rental car?
(20)   A.    SUV.
(21)   Q.    A rental car?
(22)   A.    Yes.
(23)   Q.    And so this is an expense for renting
(24)  the SUV that sat in the parking lot?
(25)   A.    Yes, with the security officer in it.

Page 47

(1)    Q.    And there's also some sort of a cell
(2)   phone expense included in there. Do you see that?
(3)    A.    Yes, I do. They had a cell phone
(4)   because they could not access the building's phone
(5)   service. They couldn't go in the building.
(6)    Q.    The next requisition seems to be
(7)   regarding waste management Inc. and -- strike that.
(8)   About two pages further along there's a
(9)   requisition for Ron Caruso Construction?
(10)   MR. VINICOMBE:    Excuse me, I'm sorry.
(11)   (Discussion off the record.)
(12)   Q.    I'm referring you to a requisition
(13)  for Ron Caruso Construction Company for $10,900
(14)  which is, I'm not sure if it's supported by an
(15)  invoice, but the requisition refers to supply and
(16)  install a new ceiling grid. Is that what you
(17)  described before that the grid had to come down so
(18)  that the cleaning people's lifts could go up?
(19)   A.    Yes.
(20)   Q.    And then Ron Caruso's construction
(21)  company came in and replaced that grid?
(22)   A.    That's correct.
(23)   Q.    There's a requisition that again is
(24)  just a page or two further along to General Air
(25)  Systems, Inc. Are you familiar with that?

Page 48

(1)    A.    Yes, I am.
(2)    Q.    And it seems to refer to a set of
(3)   supply air filters. Were those filters for the
(4)   facility?
(5)    A.    Yes, they were.
(6)    Q.    Now, are those filters that you have
(7)   available and use as part of your regular
(8)   maintenance?
(9)    A.    No. I had to purchase those filters
(10)  because the ones that were in the air handlers were
(11)  contaminated with dust from the roofing project.
(12)   Q.    Well, as a matter of regular
(13)  maintenance, do you ever replace the filters in the
(14)  air handlers?
(15)   A.    Yes, on a twice a year basis.
(16)   Q.    Do you have those in stock or do you
(17)  go out and buy them each time?
(18)   A.    No, I go out and buy them because
(19)  there's no storage in the facility.
(20)   Q.    Do you have any idea when the last
(21)  time the air handlers and filters were changed?
(22)   A.    I do not.
(23)   Q.    Let me retrace that. Do you have any
(24)  idea when was the last time prior to this invoice
(25)  that the filters and the air handlers were changed?

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 51 of 93

BSA                Bristol vs. Somerville:  Dep. of Robert Post:  1-26-07                XMAX(13/13)

## Page 49

(1)   A.   That information's available, but I
(2)   do not have it with me.
(3)   Q.   Then about four or five pages further
(4)   along there is another requisition for Ron Caruso
(5)   Construction Company and the total amount of
(6)   $31,150, and I'm not sure exactly what it refers
(7)   to. Do you know what work he did for that payment?
(8)   A.   He put up – he worked in the lobby
(9)   area, maintenance office, lunchroom, room 51,
(10)   electrical closet. He removed existing grid and
(11)   replaced aluminum cap grid, replaced ceiling tiles
(12)   in animal rooms, caulked tile to grid to wall and
(13)   had an electrician for five days to re-hang the
(14)   lights.
(15)   Q.   Now, this is in addition to whatever
(16)   he billed you before to replace the grid?
(17)   A.   I had stated this was done in three
(18)   phases, so that's why there's different bills in
(19)   different areas.
(20)   Q.   Two or three pages further along is a
(21)   requisition for Bristol Environmental and the total
(22)   sum of $283,000. Would you have been involved in
(23)   approving that payment?
(24)   A.   No.
(25)   Q.   Who would have been? Would that be

## Page 50

(1)   Barbara Owen?
(2)   A.   The GOA approver on this certificate
(3)   is Anton Lemli.
(4)   Q.   Who is he?
(5)   A.   He's a director over in
(6)   Lawrenceville.
(7)   Q.   A director of what?
(8)   A.   Director of facilities.
(9)   Q.   How would he have been involved?
(10)   A.   As the dollar amounts on requisitions
(11)   change, your granting power also changes.
(12)   Q.   So you have a certain authority to
(13)   approve requisitions?
(14)   A.   Yes.
(15)   Q.   Anton Lemli has more authority than
(16)   you, is that fair to say?
(17)   A.   Yes.
(18)   Q.   This was referred to him for his
(19)   approval?
(20)   A.   Yes.
(21)   Q.   Who's Kathryn O'Connor?
(22)   A.   Our department admin, secretary,
(23)   admin, whatever.
(24)   Q.   In your facilities department?
(25)   A.   In facilities in Plainsboro.

## Page 51

(1)   Q.   Now, behind that requisition it
(2)   appears that there's a proposal from Bristol
(3)   Environmental addressed to Mr. Robert Pappa, and I
(4)   probably asked you that before, who is Mr. Pappa at
(5)   Bristol-Myers?
(6)   A.   He's the facilities manager for
(7)   Plainsboro, and he is my manager.
(8)   Q.   And is there any reason that this
(9)   would have been addressed to him?
(10)   A.   At the time I believe he got involved
(11)   in the clean-up because he wanted to know the
(12)   dollars, prices of clean up.
(13)   Q.   So would Mr. Pappa have been the one
(14)   involved in negotiating this proposal with Bristol
(15)   Environmental?
(16)   A.   No.
(17)   Q.   Who would have been there?
(18)   A.   I did the walk-through with Bristol
(19)   Environmental at the Somerville facility.
(20)   Q.   So this proposal which is addressed
(21)   to Mr. Pappa is dated December 23. Does this
(22)   result from the walk-through that you did with
(23)   Bristol Environmental?
(24)   A.   Yes.
(25)   Q.   As you walked through, did they point

## Page 52

(1)   out things to you that had to be done?
(2)   A.   They took notes. They didn't make
(3)   any suggestions at the time. They just took notes
(4)   and the extent of the clean-up.
(5)   Q.   Did you point out things to them as
(6)   you walked through?
(7)   A.   They went everywhere in the facility
(8)   and looked for themselves.
(9)   Q.   Now, on the second page of that
(10)   proposal in the third paragraph it references
(11)   ceiling tiles and grid. It says all areas that
(12)   ceiling tile exists will be removed and properly
(13)   disposed. All grid will be removed and properly
(14)   disposed. Note the perimeter tract will remain for
(15)   BMS to reinstall ceiling tile.
(16)   Is that what you described previously as far
(17)   as the tiles and the grids having to be replaced?
(18)   A.   That's correct.
(19)   Q.   And that replacement was not within
(20)   the proposal from Bristol Environmental, is that
(21)   true?
(22)   A.   That's correct. They did not replace
(23)   any ceiling tiles or grid.
(24)   Q.   Now, is Bristol Environmental
(25)   affiliated in any way with Bristol-Myers, do you

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 52 of 93

BSA                   Bristol vs. Somerville:  Dep. of Robert Post:  1-26-07                    XMAX(14/14)

Page 53

(1) know?

(2)    A.   No.

(3)    Q.   No, you don't know, or no, they are

(4) not?

(5)    A.   They are not.

(6)    Q.   And do you know whether you sought

(7) any other estimates or proposals for this work?

(8)    A.   They were recommended by

(9) Environmental Health and Safety Department. They

(10) had done work at the Lawrenceville facility. They

(11) were an approved contractor and this was considered

(12) an emergency, so...

(13)    Q.   Well, by December – strike that.

(14) So the answer is you did not seek any other

(15) estimates or proposals from other contractors?

(16)    A.   I did not.

(17)    Q.   Further along in the book there is a

(18) requisition that is issued to Blasland, Bouck & Lee

(19) in Syracuse, New York. Did you find that?

(20)    A.   Yes, I did.

(21)    Q.   Do you have any idea who Blasland,

(22) Bouck & Lee are?

(23)    A.   No. I've only heard the initials

(24) BB&L.

(25)    Q.   Did you contract with them at all?

Page 54

(1)    A.   No, I did not.

(2)    Q.   And did you approve this requisition

(3) in any way?

(4)    A.   No, I did not.

(5)    Q.   When the work was done to restore and

(6) repair the facility, was any additional work done

(7) beyond what was necessary to just put the facility

(8) back in the condition it was in prior to the roof

(9) incident?

(10)    A.   No.

(11)    Q.   Is –

(12)    A.   I replaced in kind everything that we

(13) took out. I just put the same thing back. It was

(14) much easier to negotiate service, you know,

(15) contracts with the vendors and everything else. I

(16) bought the tiles, all the ceiling tiles from our

(17) approved vendor.

(18)    Q.   That's Turtle & Hughes?

(19)    A.   Turtle & Hughes which saved us money

(20) in that aspect and only had Ron Caruso put up the

(21) grids. We put the tiles in. That's kind of how

(22) the project went.

(23)    Q.   Did you put in any new HVAC at all?

(24)    A.   No.

(25)    Q.   Did you put in any new electrical or

Page 55

(1) plumbing?

(2)    A.   The light, if you want to say

(3) electrical, we – the old T-12, two by four hanging

(4) fixtures were taken out and new T-8 fixtures were

(5) put in. It was a cost savings in buying the new

(6) T-8s than retrofitting the old T-12s.

(7)    Q.   Did you reconfigure any of the rooms

(8) or offices?

(9)    A.   No.

(10)    Q.   Knock down any walls or replace them?

(11)    A.   No.

(12)    Q.   Were you involved at all in approving

(13) or supervising the work that Slavco Construction

(14) did to replace the remainder of the roof in

(15) December 2005?

(16)    A.   I was there Friday afternoon when

(17) Slavco showed up. They had agreed to do the work

(18) over the weekend when the employees were not there.

(19) It was late in the evening. It was very cold.

(20) They started on the roof and I was concerned about

(21) what they were doing. The one that – the water

(22) they were using to try to keep down the dust was

(23) freezing, and I expected the Somerville Police

(24) Department to show up because somebody was working

(25) on the roof in the middle of the night. That was

Page 56

(1) my concerns.

(2)    Q.   Did you stay there while they were

(3) there?

(4)    A.   No, I left.

(5)    Q.   Do you know whether the police ever

(6) showed up?

(7)    A.   I didn't get that call.

(8)    Q.   Slavco eventually finished their work

(9) and the roof was completed in December of 2005,

(10) isn't that true?

(11)    A.   That's correct.

(12)    Q.   Do you know whether Bristol-Myers had

(13) any problems or complaints about the finished

(14) product that was completed in 2005 – in December?

(15)    A.   No, I'm very happy with the roofing

(16) project – the product, put it that way. There are

(17) no leaks. It looks nice.

(18)    MR. MAHER:   I have no further

(19) questions. Thank you very much, Mr. Post.

(20)    MR. VINICOMBE:   Before we go off the

(21) record, Larry, as I mentioned earlier, Larry, that when

(22) Bob showed up this morning he had found a binder

(23) containing invoices which as I understand it and

(24) perhaps Bob can identify is duplicative of what's

(25) been produced. There may be some additional

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 53 of 93

BSA                    Bristol vs. Somerville:  Dep. of Robert Post:  1-26-07                    XMAX(15/15)

Page 57

(1) invoices in here marked Somerville service tickets,
(2) quotes and packing slips. I have one copy for you
(3) that has no Bates stamps on it. We'll produce
(4) another copy with the Bates numbers, so it will be
(5) easier to refer to in the future if there's any
(6) need for it. I wanted to make that available to
(7) you.
(8)     MR. MAHER:   Maybe we can go back on
(9) the record.
(10) CONTINUED DIRECT EXAMINATION BY MR. MAHER:
(11)     Q.    Mr. Post, this binder that counsel
(12) just delivered to me consists of documents that
(13) you've located since the document production. Is
(14) that accurate?
(15)     A.    Yes, it is.
(16)     Q.    And would it be fair to say that
(17) you're presenting these documents as further backup
(18) to the costs that are being claimed in this
(19) arbitration?
(20)     A.    Some of those documents are the cost
(21) of the clean-up at Somerville and others are just
(22) documents of work that we did at the facility. I
(23) just gathered them and I did not have time to sort
(24) through them or confirm what was in there. There's
(25) also duplicates from what you showed me.

Page 58

(1)     Q.    Is there some sort of a facilities
(2) file that you maintained for all work done in
(3) Somerville?
(4)     A.    We have a Maximo system, so if there
(5) is any preventative maintenance, work order goes
(6) out and the mechanic performs the work and it's
(7) signed off on. Preventative maintenance also of
(8) the air handlers and filter changes and it's stuff
(9) like that. If something breaks, then I'm
(10) responsible for getting a contractor in to get it
(11) repaired.
(12)     Q.    These documents that were just
(13) produced, where would the hard copies of these
(14) documents be maintained at your office?
(15)     A.    On my desk. That's exactly where it
(16) was.
(17)     Q.    As a result of this case or just in
(18) general?
(19)     A.    Just in general. This was documents
(20) that I collected at the site as things were coming
(21) in and as people were handing me stuff. Only so
(22) that I would have a record if somebody ever come
(23) back and ask me what was put in, you know, what
(24) came into the facility. Was it delivered to the
(25) facility, you know. It was -- it's not a complete

Page 59

(1) record, but what was given to me on a daily basis I
(2) saved.
(3)     Q.    And maintained in your desk file?
(4)     A.    I maintained it in Plainsboro.
(5)     MR. MAHER:   Thank you very much.
(6)     (Time noted at 11:30 a.m.)

Page 60

(1) C E R T I F I C A T E
(2)
(3)     I, Donna Brunck, a Notary Public, Certified
(4) Shorthand Reporter, of the State of New Jersey,
(5) Certificate No. XI01487, do hereby certify prior to
(6) the commencement of the examination, ROBERT POST
(7) was sworn by me to testify the truth, the whole
(8) truth and nothing but the truth.
(9) I DO FURTHER CERTIFY that the foregoing is a
(10) true and accurate transcript of the testimony as
(11) taken stenographically by and before me at the
(12) time, place and on the date hereinbefore set forth.
(13) I DO FURTHER CERTIFY that I am neither a
(14) relative nor employee nor attorney nor counsel of
(15) any of the parties to this action, and that I am
(16) neither a relative nor employee of such attorney or
(17) counsel, and that I am not financially interested
(18) in this action.
(19) I DO FURTHER CERTIFY that the within
(20) transcript format complies with Rule NJ ADC
(21) 13:43-5.9.
(22)
(23)
(24) Donna Brunck, CSR
(25) License No. XI01487

Page 61

(1)  I N D E X

(2)

(3)

(4)  WITNESS PAGE

(5)  ROBERT POST

(6)  Direct Examination by Mr. Maher 3

(7)

(8)  E X H I B I T S

(9)

(10)  NUMBER DESCRIPTION PAGE

(11)  SF-1 binder 41

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Look-See Concordance Report**

UNIQUE WORDS: 990
TOTAL OCCURRENCES: 2,740
NOISE WORDS: 384
TOTAL WORDS IN FILE: 9,270

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

COVER PAGES = 2

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES ON

- - -

IGNORES PURE NUMBERS

- - -

POSSESSIVE FORMS ON

**– $ –**

**$1,680** [1]
42:25; 44:10
**$10,900** [1]
47:13
**$2,179** [1]
46:5
**$283,000** [1]
49:22
**$31,150** [1]
49:6
**$4,309.79** [1]
45:7

**– 1 –**

**11:30** [1]
59:6
**13:43-5.9** [1]
60:21

**– 2 –**

**24/7** [2]
46:8, 12

**– A –**

**a.m.** [1]
59:6
**ability** [2]
3:18; 4:7
**able** [1]
4:14
**access** [1]
47:4
**accident** [2]
12:11, 12
**according** [1]
3:3
**accounting** [1]
43:14
**accurate** [2]

57:14; 60:10
**accurately** [1]
35:19
**acknowledge** [1]
23:9
**action** [4]
18:2; 24:3; 60:15; 18
**ADC** [1]
60:20
**addition** [1]
49:15
**additional** [2]
54:6; 56:25
**addressed** [3]
51:3, 9, 20
**admin** [4]
43:20, 22; 50:22, 23
**administered** [1]
9:15
**advised** [1]
14:9
**affected** [2]
19:12; 20:6
**affiliated** [1]
52:25
**afternoon** [1]
55:16
**agreed** [1]
55:17
**Air** [1]
47:24
**air** [8]
18:10; 34:23; 48:3, 10, 14, 21, 25; 58:8
**allowed** [1]
46:13
**aluminum** [1]
49:11
**amount** [3]
42:8; 43:22; 49:5
**amounts** [1]
50:10
**animal** [7]
8:3; 9:25; 33:7; 34:7; 40:2, 18; 49:12
**animals** [3]
8:7; 10:1; 40:15
**answer** [3]
14:17; 36:5; 53:14
**answers** [2]
3:19, 22
**Anton** [2]
50:3, 15
**anybody** [1]
21:17
**anymore** [1]
23:5
**apologize** [3]
8:2; 17:1; 42:20
**Appears** [1]
30:13
**appears** [2]
19:1; 51:2
**appointed** [1]
14:8
**approval** [1]
50:19
**approve** [2]
50:13; 54:2
**approved** [5]
43:23; 44:18, 19;

53:11; 54:17
**approver** [1]
50:2
**approving** [2]
49:23; 55:12
**Approximately** [3]
6:18, 19; 18:18
**approximately** [5]
6:20, 22; 7:3; 27:4; 37:10
**arbitration** [3]
3:9; 7:1; 57:19
**area** [9]
20:2; 21:20; 33:18; 34:3, 4, 5; 40:14, 20; 49:9
**areas** [8]
20:17; 29:5; 12, 20; 35:25; 40:13; 49:19; 52:11
**arrangements** [2]
12:23; 13:2
**arranging** [1]
14:4
**arrived** [2]
21:19; 25:11
**asbestos** [1]
27:11; 36:10; 40:11
**asking** [1]
3:16
**aspect** [1]
54:20
**aspects** [2]
6:7
**asphalt** [1]
21:10
**assigned** [4]
7:4, 12; 9:7; 17:3
**assignment** [1]
6:21
**assume** [3]
4:5; 33:22; 40:10
**assuming** [1]
26:1
**attach** [1]
43:19
**attorney** [2]
60:14, 16
**authority** [2]
50:12, 15
**available** [3]
48:7; 49:1; 57:6
**aware** [2]
4:11; 17:19; 30:25

**– B –**

**backup** [1]
57:17
**Barbara** [4]
24:21; 26:21; 28:11; 50:1
**barrier** [2]
23:7, 18
**Barrymore** [1]
3:1
**basis** [2]
48:15; 59:1
**Bates** [8]
18:23, 25; 30:6, 10, 13; 31:8; 57:3, 4

bathrooms [2]
40:22; 45:3
**BB** [1]
53:24
**bedding** [2]
20:4, 7
**behind** [1]
51:1
**believe** [9]
7:18; 11:10; 15:14; 22:25; 25:19; 26:12; 37:9; 46:5; 51:10
**beneath** [1]
20:19
**billed** [1]
49:16
**bills** [1]
49:18
**binder** [6]
41:25; 42:2; 45:5; 56:22; 57:11; 61:11
**black** [1]
21:10
**Blasland** [2]
53:18, 21
**blueprint** [1]
34:6
**blunder** [1]
42:13
**BMS** [27]
8:22; 11:18; 19:1, 25; 30:12, 14, 19, 20; 31:6, 20; 32:5; 33:1, 5, 17; 34:6, 10, 14, 23; 35:5, 10, 14; 38:10; 44:18, 21; 52:15
**Bob** [2]
56:22, 24
**boiler** [4]
35:6, 7, 9, 15
**book** [3]
41:24; 44:7; 53:17
**boosted** [1]
39:2
**Bouck** [2]
53:18, 22
**bought** [1]
54:16
**box** [1]
20:13
**boxed** [1]
20:3
**breaks** [1]
58:9
**Bristol** [12]
3:10; 10:4; 28:4; 36:22; 38:24; 49:21; 51:2, 14, 18, 23; 52:20, 24
**Bristol-Myers** [20]
4:18; 5:24; 6:4, 10, 14; 8:4, 13; 9:16; 11:1; 12:13; 13:6; 14:25; 18:22; 24:13; 27:21; 42:7; 44:19; 51:5; 52:25; 56:12
**broken** [1]
12:10, 12
**brown** [1]
21:6; 29:23
**Brunck** [2]

60:3, 24
**Brunswick** [1]
3:1
**building** [17]
5:15, 17, 19, 23; 12:2, 4, 8; 23:13; 25:8, 11, 12; 27:11; 35:11; 46:11, 12, 13; 47:5
**building's** [2]
20:20; 47:4
**built** [1]
20:12
**buy** [2]
48:17, 18
**buying** [1]
55:5

**– C –**

**call** [4]
17:23, 24; 18:1; 56:7
**calls** [1]
12:16
**camera** [1]
32:11
**cap** [1]
49:11
**capacity** [1]
6:4
**car** [3]
18:3; 46:19, 21
**care** [2]
27:3; 42:14
**Caruso** [10]
42:23; 43:18, 25; 44:3, 7, 14; 47:9, 13; 49:4; 54:20
**Caruso's** [1]
47:20
**case** [3]
23:4; 42:9; 58:17
**catwalk** [1]
34:11
**caulked** [1]
49:12
**caused** [2]
29:17; 32:22
**ceiling** [20]
20:11, 16, 19, 20; 29:7; 34:19; 35:3; 38:4, 15, 16; 39:8; 45:14; 47:16; 49:11; 52:11, 12, 15, 23; 54:16
**ceilings** [10]
28:16, 18, 19, 20, 22, 24, 25; 37:23; 40:23, 24
**cell** [2]
47:1, 3
**Certificate** [1]
60:5
**certificate** [1]
50:2
**Certified** [1]
60:3
**certified** [2]
27:11; 40:11
**CERTIFY** [3]
60:9, 13, 19
**certify** [1]

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 56 of 93

BSA                     Bristol vs. Somerville:  Dep. of Robert Post: 1-26-07                     Look-See(18)

60:5
change [1]
  50:11
changed [2]
  48:21, 25
changes [2]
  50:11; 58:8
Chapman [3]
  13:25; 14:1; 15:3
charge [2]
  5:7; 6:13
choice [1]
  19:17
chunks [3]
  21:1, 10, 14
claim [1]
  42:9
claimed [1]
  57:18
Clean [1]
  41:3
clean [9]
  26:13; 27:22; 36:16,
  17, 23; 38:25; 40:16;
  41:2; 51:12
clean-up [15]
  27:10, 19; 28:9, 14;
  29:6; 37:4, 7, 12, 16,
  19; 38:2; 46:13;
  51:11; 52:4; 57:21
cleaned [4]
  29:14; 33:10; 35:25;
  38:13
cleaning [15]
  15:21; 16:3, 5; 28:23;
  29:11, 12; 36:1, 15,
  18; 39:18, 19, 20, 21;
  40:18; 47:18
cleanliness [2]
  16:12; 17:9
client [2]
  5:24; 42:6
closet [1]
  49:10
cold [1]
  55:19
collected [1]
  58:20
colored [1]
  30:22
coming [3]
  14:7; 22:12; 58:20
commencement [1]
  60:6
Company [2]
  47:13; 49:5
company [4]
  8:24; 44:14, 17; 47:21
complaints [1]
  56:13
complete [1]
  58:25
completed [8]
  27:10; 37:7, 17; 41:7,
  9; 44:1; 56:9, 14
complies [1]
  60:20
components [1]
  37:25
comprehensive [1]
  17:5

computer [1]
  43:12
concern [2]
  23:2, 8
concerned [3]
  23:3, 12; 55:20
concerns [1]
  56:1
condition [3]
  16:21; 38:11; 54:8
conduct [1]
  3:10
confirm [1]
  57:24
confused [1]
  17:1
confusing [2]
  9:5, 6
consecutively [1]
  42:12
considered [2]
  34:5; 53:11
consist [3]
  28:14; 37:22; 45:18
consistency [1]
  21:5
consists [1]
  57:12
Construction [9]
  42:23; 43:18; 44:3, 8,
  14; 47:9, 13; 49:5;
  55:13
construction [4]
  37:13; 44:17; 45:21;
  47:20
contact [1]
  13:20
containing [2]
  36:10; 56:23
contains [1]
  18:23
contaminated [2]
  38:5; 48:11
continue [3]
  23:17; 27:6; 40:1
CONTINUED [1]
  57:10
continued [2]
  37:6; 41:14
Continuing [1]
  45:5
continuing [2]
  26:3; 37:4
contract [4]
  16:11, 13; 36:22;
  53:25
contracted [1]
  44:23
contracting [1]
  45:10
contractor [9]
  16:4, 8, 16; 22:13, 22;
  28:4; 45:19; 53:11;
  58:10
contractors [4]
  16:2; 27:21; 28:1;
  53:15
contracts [2]
  13:7; 54:15
conversation [1]
  23:14

coordinate [1]
  15:1
coordinating [1]
  15:18
coordinator [1]
  5:11
copies [1]
  58:13
copy [2]
  57:2, 4
corner [1]
  19:23; 35:11
corridor [3]
  20:2; 38:11
corridors [1]
  20:18
cost [2]
  55:5; 57:20
Costs [1]
  42:4
costs [2]
  43:11; 57:18
counsel [5]
  18:22; 30:23; 57:11;
  60:14, 17
Couple [1]
  40:7
court [2]
  3:18, 24
cover [1]
  23:18
covered [2]
  19:14; 21:13
crannies [1]
  17:10
create [2]
  3:19; 43:21
crew [4]
  29:6; 36:15; 39:20, 21
crews [2]
  15:22; 36:1
CSR [1]
  60:24
current [1]
  4:24
currently [1]
  4:17
custody [1]
  42:15
customer [1]
  12:2

– D –

daily [1]
  59:1
damage [1]
  42:9
damaged [1]
  39:18
Dan [2]
  7:8; 10:19
dark [1]
  23:23
date [4]
  14:8; 27:13; 31:4;
  60:12
dated [4]
  32:8; 33:20; 34:8;
  51:21
dates [1]

31:3, 22
Davis [1]
  3:8
day [11]
  23:20, 22, 24; 25:5, 9,
  11; 26:2, 7, 9; 27:6, 17
daylight [3]
  21:20; 22:3; 23:3
days [4]
  9:22; 26:4, 24; 49:13
deal [2]
  13:21; 44:13
dealing [2]
  5:16; 13:14
dealings [1]
  6:2
deals [1]
  13:9
debris [13]
  28:20; 33:17, 25; 34:7,
  11, 15, 23; 35:6, 11,
  15, 20; 36:9, 12
December [6]
  37:1; 51:21; 53:13;
  55:15; 56:9, 14
December, 2005 [2]
  37:1; 55:15
December 23 [1]
  51:21
December of 2005 [1]
  56:9
decision [2]
  25:20; 26:11
Deck [8]
  8:15; 10:9, 17; 17:25;
  24:17; 25:12; 42:17
deck [3]
  20:22; 21:11; 35:4
decking [10]
  21:21, 22, 23; 22:5;
  23:15; 28:23; 35:5;
  38:24, 25; 39:2
decontaminate [1]
  40:8
decontaminated [5]
  40:15, 20, 22, 23; 41:2
decontaminating [1]
  40:19
decontamination [3]
  40:9, 12; 41:7
delineate [1]
  19:13
delivered [2]
  57:12; 58:24
Department [2]
  53:9; 55:24
department [9]
  8:23; 10:25; 24:6, 10,
  12; 26:13; 43:20;
  50:22, 24
depict [2]
  33:2, 14
depicts [2]
  32:17; 35:19
deposed [1]
  3:12
deposition [1]
  3:11
describe [6]
  18:12; 19:13; 20:23;
  22:2; 43:5; 46:7

described [6]
  5:8; 21:7; 30:8; 31:8;
  47:17; 52:16
DESCRIPTION [1]
  61:10
desk [2]
  58:15; 59:3
determine [1]
  21:15
determined [1]
  16:14
difficulty [1]
  42:20
digital [1]
  32:11
DIRECT [2]
  3:5; 57:10
Direct [1]
  61:6
Director [1]
  50:8
director [2]
  50:5, 7
discarded [2]
  38:4, 9
discuss [1]
  23:11
Discussion [2]
  18:20; 47:11
disposed [2]
  52:13, 14
dock [8]
  19:22; 20:1, 18; 21:20,
  24; 32:7, 12, 13
document [7]
  18:21; 42:21; 43:5, 6,
  15, 23; 57:13
documentation [1]
  42:8
documents [10]
  45:17, 20, 24; 57:12,
  17, 20, 22; 58:12, 14,
  19
dollar [1]
  50:10
dollars [1]
  51:12
Donna [2]
  60:3, 24
doors [1]
  12:7
draft [2]
  42:21; 45:6
drains [1]
  33:8
draw [3]
  19:15, 16, 20
Drop [1]
  38:16
drop [7]
  20:11, 16, 19; 28:25;
  35:3; 38:4, 15
drove [2]
  18:3; 25:23
dry [1]
  45:3
duly [1]
  3:2
duplicates [1]
  57:25
duplicative [3]

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 57 of 93

BSA

Bristol vs. Somerville:  Dep. of Robert Post:  1-26-07

Look-See(19)

56:24
Dust [1]
18:6
dust [41]
17:23; 18:9, 10; 19:12,
15; 20:6, 23, 25; 21:3,
4, 6, 13, 17; 22:12, 18;
23:12; 24:4, 7, 16;
25:23; 26:14, 15;
28:15, 21; 29:13, 16,
17, 21, 23; 33:14, 25;
35:14, 20; 36:9; 38:6;
41:2, 3, 6; 48:11;
55:22

– E –

e-mail [3]
14:9; 43:20; 46:6
easier [3]
19:18; 54:14; 57:5
EH [2]
24:6; 26:12
EHS [1]
24:10
electrical [4]
32:14; 49:10; 54:25;
55:3
electrician [1]
49:13
else's [1]
11:8
emergency [1]
53:12
employed [1]
4:17
employee [2]
60:14, 16
employees [7]
25:14, 24; 26:23;
41:12, 14, 19; 55:18
end [1]
30:14
entitled [2]
42:3, 21
entity [1]
13:5
Environmental [13]
24:11; 26:20; 28:4;
36:23; 38:25; 49:21;
51:3, 15, 19, 23;
52:20, 24; 53:9
equipment [3]
24:24; 31:17; 32:14
essence [1]
44:2
estimates [2]
53:7, 15
evening [1]
55:19
eventually [1]
56:8
everybody [1]
24:8
exact [1]
27:13
exactly [2]
49:6; 58:15
EXAMINATION [2]
3:5; 57:10
Examination [1]

61:6
examination [1]
60:6
Excuse [1]
7:22; 47:10
Exhibit [1]
41:25
exhibits [1]
18:24
existence [4]
24:4, 15; 33:14; 36:9
existing [1]
49:10
exists [1]
52:12
expected [1]
55:23
expense [2]
46:23; 47:2
expenses [1]
46:6
explain [1]
4:3
extensions [1]
6:8
extent [1]
52:4

– F –

Facilities [1]
4:25
facilities [11]
5:8, 9, 11; 10:2; 11:17;
15:7; 50:8, 24, 25;
51:6; 58:1
facility [98]
5:6, 13, 14, 19; 6:11,
14, 17; 7:4, 6, 9, 14,
21; 8:3, 5, 9, 12, 14,
24; 9:4, 8, 24; 10:13,
18, 23; 11:5; 12:18,
21; 13:11, 23; 14:5,
12; 15:15, 23; 16:3, 5,
12, 21; 17:3, 10, 16,
23; 18:11, 13, 16;
19:4, 5, 10, 12, 14;
20:8; 22:19; 23:4, 12;
24:9; 25:23, 25; 26:3,
14; 27:19, 22; 29:11;
31:12, 13; 33:15; 34:4,
15; 35:8, 21; 36:17,
24; 37:20; 39:6, 9, 15;
40:6, 13, 14, 16;
41:13, 20; 42:15;
44:24; 45:15, 22; 46:8,
15; 48:4, 19; 51:19;
52:7; 53:10; 54:6, 7;
57:22; 58:24, 25
fact [2]
11:12; 35:23
failed [1]
9:2
fair [12]
16:17, 19; 17:3; 37:15;
39:6; 40:12; 41:20, 21;
44:24; 45:16; 50:16;
57:16
familiar [4]
8:2; 16:20; 17:8;
47:25

February [5]
27:15; 37:10, 17;
40:11; 41:4
February, 2006 [1]
37:17
February of 2006 [2]
37:10; 41:4
feed [2]
20:4, 7
Fidelco [3]
3:9; 5:25; 6:3
file [2]
58:2; 59:3
filter [1]
58:8
filters [7]
48:3, 6, 9, 13, 21, 25
financially [1]
60:17
find [3]
16:15; 18:5; 53:19
finish [2]
3:21, 23
finished [2]
22:14; 37:19; 56:8, 13
firm [1]
3:7
first [6]
3:2; 6:11, 14; 17:19;
22:16; 30:7
five [2]
49:3, 13
fixture [2]
39:14; 40:2
fixtures [2]
39:25; 55:4
floor [5]
19:2, 3, 5, 13; 33:23
floors [3]
22:20; 28:16, 17
followed [3]
42:22; 44:6; 46:5
follows [1]
3:3
foot [1]
34:16
foregoing [1]
60:9
forgive [1]
29:1
form [3]
14:14, 16; 36:3
format [1]
60:20
forms [1]
45:6
forth [2]
42:8; 60:12
found [2]
33:15; 56:22
four [3]
29:3; 49:3; 55:3
Fourth [1]
5:20
free [2]
27:11; 40:11
freezing [1]
55:23
Friday [1]
55:16
front [5]

31:3; 43:1, 3; 46:9, 15
full [2]
17:23; 36:21
function [2]
16:6; 26:16
functioning [1]
40:14
future [1]
57:5

– G –

gaping [1]
22:5
garbled [1]
3:24
gathered [1]
57:23
generate [1]
43:15
generated [2]
12:1; 43:24
gets [1]
43:25
give [3]
3:14; 14:15; 30:9
given [4]
6:21; 19:9; 36:22;
59:1
gives [1]
43:19
gloves [1]
25:4
GOA [1]
50:2
goes [4]
8:11, 14; 40:10; 58:5
Gowned [1]
27:2
granting [1]
50:11
Grating [1]
34:16, 17
great [1]
17:1
Greenbaum [1]
3:8
grey [1]
21:4
grid [10]
47:16, 17, 21; 49:10,
11, 12, 16; 52:11, 13,
23
Grids [1]
38:21
grids [6]
38:20, 21; 39:3, 5;
52:17; 54:21
ground [2]
35:9, 13
group [11]
10:10; 13:3, 4, 8, 13,
17, 21; 14:1; 15:8, 9,
17

– H –

Hamilton [1]
5:2
handing [1]
58:21
handler [1]

34:24
handlers [5]
48:10, 14, 21, 25; 58:8
hanging [1]
55:3
happy [1]
56:15
hard [1]
58:13
He's [3]
15:7; 50:5; 51:6
head [1]
13:17
Health [1]
53:9
health [2]
24:11; 26:20
hear [1]
4:14
heard [2]
12:20; 53:23
hearing [2]
12:23; 14:3
heavier [1]
21:6
hepa [1]
29:10
hereby [1]
60:5
hereinbefore [1]
60:12
Hillside [2]
5:2; 7:9
hired [1]
27:21
hold [1]
38:19
holes [11]
21:22, 23; 22:2, 5, 6,
8, 11; 23:10, 15, 18
home [5]
25:18, 19, 24; 26:1, 23
household [1]
21:4
Houses [1]
8:6
housing [1]
42:15
Hughes [4]
45:7, 11; 54:18, 19
HVAC [1]
54:23

– I –

I've [1]
53:23
idea [4]
7:10; 48:20, 24; 53:21
identification [1]
42:1
identify [1]
56:24
Inc [1]
47:7, 25
incident [12]
6:22, 24; 7:15; 9:9;
10:11, 16; 17:6; 27:7,
24; 28:6; 36:21; 54:9
included [2]
12:22; 47:2

BSA
Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 58 of 93
Bristol vs. Somerville:  Dep. of Robert Post:  1-26-07
Look-See(20)

indicate [1]
35:24
infiltrated [1]
24:5; 35:20
infirmities [1]
4:13
information's [1]
49:1
informed [3]
12:18; 16:23; 24:7
initial [1]
36:18
initials [1]
53:23
Inside [1]
46:12
inside [6]
13:5; 17:5; 20:8; 24:9;
29:7; 46:11
inspection [4]
10:13; 17:5, 15; 22:17
inspections [1]
11:23
install [1]
47:16
installed [1]
36:24
instructions [2]
3:14, 15
insulation [1]
23:6
intended [1]
33:2
interact [1]
16:16
interested [1]
60:17
Interior [1]
11:18
interior [2]
11:15; 27:22
internal [3]
42:22; 43:5; 45:19
Intersticial [1]
35:1
Introduction [1]
10:17
invoice [3]
42:22; 47:15; 48:24
invoices [3]
45:1; 56:23; 57:1
involve [1]
18:17
involved [10]
6:6; 13:1, 15; 28:11;
46:1; 49:22; 50:9;
51:10, 14; 55:12
involvement [2]
15:12, 18
issued [1]
53:18

– J –

Jack [1]
13:25
January [7]
6:20; 32:8; 33:20;
34:8, 21; 35:19, 24
January 16, 2006 [4]
32:8; 33:20; 34:8, 21

January of 2005 [1]
6:20
January of 2006 [2]
35:19, 24
Jeep [1]
46:17
Jersey [3]
3:2; 13:18; 60:4
job [2]
16:15; 18:7
John [5]
8:15; 10:17; 17:25;
24:17; 25:11

– K –

Kathryn [1]
50:21
keep [4]
4:13; 11:18; 43:10;
55:22
Knock [1]
55:10
knowledge [2]
33:2; 37:18

– L –

labeled [1]
20:1
laboratory [1]
10:7
ladies [1]
38:12
landlord [2]
13:7, 9
landlord's [1]
11:10
Larry [1]
56:21
last [2]
48:20, 24
late [1]
55:19
law [2]
3:3, 7
Lawrence [1]
3:7
Lawrenceville [2]
50:6; 53:10
lead [1]
23:1
leaked [1]
16:24
leaks [3]
32:6, 22; 56:17
lease [3]
6:7, 8; 13:9
Lee [2]
53:18, 22
legend [1]
34:12
Lemli [2]
50:3, 15
level [3]
35:8, 9, 13
License [1]
60:25
lift [1]
29:2
lifts [3]
28:22; 38:24; 47:18

light [2]
39:14; 55:2
lighting [5]
37:23; 38:8, 9; 39:11;
40:24
lights [1]
49:14
lines [1]
35:15
list [1]
28:3
loading [8]
19:22; 20:1, 17; 21:20,
24; 32:7, 12, 13
lobby [1]
49:8
located [4]
5:20; 34:25; 35:7;
57:13
location [1]
5:1
looks [2]
42:24; 56:17
lot [6]
11:3, 5; 29:20; 30:1, 3;
46:24
lunchroom [5]
20:5, 15, 16; 22:1;
49:9

– M –

MAHER [11]
3:5; 13:24; 18:19;
30:11, 16; 31:20;
41:23; 56:18; 57:8, 10;
59:5
Maher [2]
3:7; 61:6
main [2]
23:8; 28:3
maintained [4]
58:2, 14; 59:3, 4
maintaining [1]
11:15
maintenance [10]
5:13; 11:4, 24; 15:22,
24; 48:8, 13; 49:9;
58:5, 7
management [1]
47:7
manager [5]
8:15; 15:7; 25:12;
51:6, 7
March [3]
27:15; 41:6, 10
March, 2006 [1]
41:6
March of 06 [1]
27:15
Marine [1]
4:23
mark [1]
41:23
marked [3]
41:25; 42:3; 57:1
marks [1]
33:23
mask [1]
25:3
material [1]

24:4
materials [2]
21:2; 36:10
matter [4]
21:8; 22:12; 33:15;
48:12
Maximo [1]
58:4
mean [3]
16:25; 22:4; 41:2
means [4]
3:16; 4:4; 21:21;
43:11
mechanic [1]
58:6
mechanical [1]
31:17
medical [1]
8:22
medically [1]
8:17
meet [1]
10:18
men's [4]
34:16, 17; 35:1; 38:12
mentioned [2]
8:19; 24:22; 56:21
middle [1]
55:25
mill [1]
21:4
mind [3]
31:14; 37:16; 42:13
money [1]
54:19
monitoring [1]
46:10
monkeys [2]
8:6; 42:15
month [1]
27:14
months [1]
40:7
moon [1]
27:2
morning [2]
3:6; 56:22
mostly [1]
35:18
moved [3]
40:15, 20; 41:19
MR [22]
3:5; 13:22, 24; 14:14;
18:19; 19:19; 30:9, 11,
12, 16, 18; 31:19, 20;
36:3, 6; 41:23; 47:10;
56:18, 20; 57:8, 10;
59:5
Mr [18]
3:6, 12; 4:17; 10:9;
14:1; 15:3; 30:21;
35:16; 42:2, 17; 43:2;
51:3, 4, 13, 21; 56:19;
57:11; 61:6
multi-floor [1]
18:13
Mutter [2]
7:8; 10:19
Myers [2]
3:10; 10:5
myself [1]

9:6; 25:12

– N –

name [2]
3:6; 19:16
negative [1]
9:24
negotiate [3]
16:11, 13; 54:14
negotiated [1]
45:21
negotiating [2]
6:7; 51:14
nice [1]
56:17
night [1]
55:25
NJ [1]
60:20
nooks [1]
17:9
normal [1]
37:18
North [1]
3:1
northwest [1]
35:11
Notary [1]
60:3
Note [1]
52:14
noted [1]
59:6
notes [3]
17:16; 52:2, 3
noticed [2]
23:15
notified [2]
24:15; 25:22
NUMBER [1]
61:10
number [5]
18:23, 25; 35:17;
43:24, 25
numbered [1]
42:12
numbers [2]
30:10; 57:4

– O –

O'Connor [1]
50:21
oath [1]
4:8
Objection [2]
14:14; 36:3
objection [1]
14:16
observations [1]
12:2
observe [1]
22:16
observed [1]
22:18
obtain [1]
21:16
Obviously [1]
4:8
obviously [1]
32:17

BSA

Bristol vs. Somerville:   Dep. of Robert Post:  1-26-07

Look-See(23)

Syracuse [1]
   53:19
system [5]
   33:9, 11; 43:13, 14;
   58:4
Systems [3]
   46:1, 2; 47:25

── T ──

T-12 [1]
   55:3
T-12s [1]
   55:6
T-8 [1]
   55:4
T-8s [1]
   55:6
takes [1]
   9:21
talk [1]
   21:3
talking [4]
   6:24; 21:4; 22:4, 5
talks [1]
   13:6
tar [1]
   21:10
TB [4]
   7:19; 9:2, 13, 21
test [5]
   7:19; 8:7; 9:2, 13, 22
tested [3]
   8:17; 9:21; 36:9
testified [4]
   9:7, 19; 19:11; 40:10
testifies [1]
   3:3
testify [1]
   60:7
testimony [1]
   60:10
tests [1]
   36:11
Thank [2]
   56:19; 59:5
There's [3]
   20:4; 47:23; 57:24
there's [9]
   13:8; 45:5, 25; 47:1, 8;
   48:19; 49:18; 51:2;
   57:5
they've [1]
   30:5
third [2]
   42:19; 52:10
three [9]
   5:8, 9; 7:18; 9:9, 21;
   27:25; 45:24; 49:17,
   20
thrown [1]
   38:2
tickets [1]
   57:1
tile [3]
   49:12; 52:12, 15
tiles [13]
   29:2, 3; 38:3, 19; 39:8;
   45:14; 49:11; 52:11,
   17, 23; 54:16, 21
times [1]

9:9
total [2]
   49:5, 21
track [1]
   43:11
tract [1]
   52:14
trailer [1]
   46:16
transcript [6]
   3:20, 24; 4:9; 60:10,
   20
true [3]
   52:21; 56:10; 60:10
truth [3]
   60:7, 8
Turtle [4]
   45:7, 11; 54:18, 19
twice [1]
   48:15
type [1]
   35:20
Typical [1]
   29:3
typical [2]
   29:1; 34:14
Tyvek [2]
   25:1; 41:16

── U ──

Um-hum [1]
   33:24
Umm [1]
   38:10
understand [6]
   4:2, 14; 17:2; 20:14;
   41:1; 56:23
understanding [1]
   42:7
understood [1]
   4:6
United [1]
   4:23

── V ──

V-I-V-A-R-I-U-M [1]
   7:25
vacuum [1]
   28:15
vacuums [1]
   29:10
vehicle [2]
   46:14, 16
vendor [4]
   44:18, 20, 21; 54:17
vendors [1]
   54:15
ventilation [3]
   33:9, 11; 37:24
verbatim [1]
   3:20
VINICOMBE [11]
   13:22; 14:14; 19:19;
   30:9, 12, 18; 31:19;
   36:3, 6; 47:10; 56:20
visit [2]
   7:14; 17:15
visited [1]
   9:9
visits [2]

7:18; 10:16
Vivarium [1]
   7:23
vivarium [2]
   7:21, 25

── W ──

Wackenhut [3]
   45:25; 46:2, 7
walk-through [2]
   51:18, 22
walked [2]
   51:25; 52:6
wall [4]
   32:7, 12, 18; 49:12
walls [2]
   45:3; 55:10
wanted [3]
   42:10; 51:11; 57:6
warehouse [3]
   20:13; 40:20
waste [1]
   47:7
water [2]
   35:15; 55:21
waterproof [2]
   23:4, 7
watertight [2]
   23:8, 13
We'll [1]
   57:3
wear [9]
   7:20; 8:23, 25; 9:3, 19,
   23, 25; 10:2; 36:21
Wearing [1]
   41:16
weekend [1]
   55:18
weeks [5]
   6:22; 7:3; 27:25; 28:6;
   36:20
weren't [2]
   25:25; 30:18
wet [1]
   29:10
What's [1]
   4:24
what's [1]
   56:24
whatsoever [1]
   14:6
white [2]
   25:2, 3
Who's [1]
   15:6; 50:21
window [3]
   12:10, 12, 14
windows [1]
   12:7
wires [3]
   38:16, 19; 39:17
withdraw [1]
   16:1
WITNESS [2]
   19:21; 61:4
word [1]
   8:2
work [25]
   5:4, 17; 7:20; 26:10;
   29:22; 40:4; 41:14;

43:19; 44:1, 3, 8, 23;
   45:2; 49:7; 53:7, 10;
   54:5, 6; 55:13, 17;
   56:8; 57:22; 58:2, 5, 6
worked [1]
   49:8
working [1]
   55:24
wouldn't [2]
   17:8; 22:7
written [1]
   17:17

── X ──

XI01487 [2]
   60:5, 25

── Y ──

year [1]
   48:15
years [3]
   4:21; 6:18, 19
York [1]
   53:19
you'll [1]
   3:17
you've [4]
   5:8; 35:16; 42:4;
   57:13

Case 3:07-cv-02763-AET-TJB Document 57-2 Filed 12/07/09 Page 61 of 93

BSA

Bristol vs. Somerville: Dep. of Robert Post: 1-26-07

Look-See(21)

occupancy [1]
6:14
occupants [2]
12:21; 14:4
occupied [3]
6:11; 10:1; 40:25
office [9]
5:3, 5; 33:18; 34:3, 4;
40:22; 46:9; 49:9;
58:14
officer [1]
46:25
offices [2]
45:3; 55:8
Okay [1]
43:1
okay [1]
30:10
old [2]
55:3, 6
ones [3]
31:1; 39:22; 48:10
open [1]
21:11
operation [1]
5:13
opinions [1]
21:17
order [6]
30:17; 43:21, 22; 44:3;
46:4; 58:5
orders [1]
45:2
original [1]
32:24
outgoing [1]
10:19
outside [6]
16:2, 4, 8, 16; 35:12,
13
overall [1]
16:21
oversee [1]
28:9
Owen [4]
24:21; 26:21; 28:11;
50:1

– P –

P.O. [2]
43:24, 25
packing [1]
57:2
PAGE [2]
61:4, 10
page [2]
47:24; 52:9
pages [4]
42:11; 47:8; 49:3, 20
paid [1]
43:25
paint [1]
45:3
papers [1]
58:21
Pappa [5]
15:6; 51:3, 4, 13, 21
paragraph [1]
52:10
parking [3]

11:3, 5; 46:24
part [5]
14:11; 37:12; 41:20;
43:12; 48:7
particle [1]
33:14
particles [1]
29:24
parties [1]
60:15
payment [2]
49:7, 23
people [8]
5:16; 15:22, 24, 25;
25:8, 10; 27:4; 58:21
people's [1]
47:18
percent [3]
18:18; 25:4; 41:10
percentage [1]
19:11
performs [2]
16:5; 58:6
perimeter [1]
52:14
period [1]
27:19
permitted [1]
8:16
Personal [1]
24:24
personally [6]
11:14, 23; 15:17; 18:2;
21:16; 46:2
phase [1]
40:18
phases [1]
49:18
phone [4]
17:23; 47:2, 3, 4
photo [1]
31:4
photograph [3]
32:17; 33:19; 34:13
photos [7]
31:4, 6, 7, 11, 15, 23;
32:11
physical [4]
4:12; 5:12; 7:19; 8:22
physically [4]
7:20; 10:18; 30:24;
36:23
picture [1]
33:7
pictures [10]
29:20, 25; 30:1, 3, 7,
22, 23; 33:13; 35:17
pieces [3]
21:1, 9; 22:19
pin [1]
22:4
Place [1]
3:1
place [2]
36:19; 60:12
Plainsboro [7]
5:5; 15:8; 17:22; 18:4;
50:25; 51:7; 59:4
plan [1]
19:2, 3, 5, 14
Plans [1]

26:13
plastic [2]
33:8, 9
please [2]
7:24; 43:21
plumbing [1]
55:1
point [4]
23:9; 35:17; 51:25;
52:5
pointing [1]
33:22
Police [1]
55:23
police [1]
56:5
policy [3]
8:24; 10:5, 10
portion [1]
19:14
position [1]
4:24
positive [1]
9:22
POST [3]
3:1; 60:6; 61:5
Post [9]
3:6, 12; 4:17; 30:21;
35:16; 42:2; 43:2;
56:19; 57:11
power [1]
50:11
PPE [3]
24:9, 22; 36:21
premises [2]
8:17; 37:18
presenting [1]
57:17
Preventative [1]
58:7
preventative [1]
58:5
previously [1]
52:16
prices [1]
51:12
Princeton [1]
15:8
prior [8]
9:9; 10:11, 16; 16:21;
17:10; 48:24; 54:8;
60:5
problem [2]
17:20; 32:3
problems [1]
56:13
proceeding [1]
3:9
proceedings [1]
4:10
process [2]
39:18, 19
produce [1]
57:3
produced [3]
18:22; 56:25; 58:13
product [2]
16:10; 56:14, 16
production [1]
57:13
program [1]

43:10
project [11]
14:22, 23, 24; 15:16,
19; 16:22; 23:1;
40:17; 48:11; 54:22;
56:16
promises [1]
28:5
proper [1]
24:9
properly [2]
52:12, 13
property [6]
11:6, 16; 17:6, 21;
24:5; 37:13
proposal [8]
44:7, 10; 45:18; 51:2,
14, 20; 52:10, 20
proposals [2]
53:7, 15
protected [1]
25:4
protective [1]
24:24
provide [1]
45:13
provided [3]
30:22; 42:6; 45:17
proximity [1]
32:3
Public [1]
60:3
purchase [5]
43:21; 44:2; 45:1;
46:4; 48:9
purpose [2]
10:15; 31:10

– Q –

quarantine [1]
8:9
question [8]
4:2, 5, 6; 14:15, 16;
17:2; 36:4; 37:15
questions [7]
3:15, 17, 19, 23; 4:14,
15; 56:19
quote [4]
43:18, 19, 20; 45:18
quoted [1]
44:4
quotes [1]
57:2

– R –

rags [1]
29:10
rain [1]
23:4
ran [1]
32:7
range [5]
30:10, 12, 14; 31:8
re-hang [1]
49:13
realty [6]
13:3, 4, 13, 17, 21;
14:1
rear [5]
18:11, 15; 32:7, 13

reason [3]
4:12; 10:2; 51:8
rebuild [1]
40:6, 8
rebuilding [2]
40:19; 41:19
rebuilt [2]
40:15, 21
recall [6]
6:10; 17:24; 22:24;
23:24; 31:25; 40:5
received [1]
17:22
recently [1]
17:3
recommendation [1]
24:8
recommended [1]
53:8
reconfigure [1]
55:7
reconstruction [2]
41:8, 11
record [8]
18:19, 20; 31:19;
47:11; 56:21; 57:9;
58:22; 59:1
refer [4]
18:23; 45:3; 48:2;
57:5
references [1]
52:10
referred [1]
50:18
referring [2]
34:12; 47:12
refers [2]
47:15; 49:6
refit [1]
40:6
regarding [2]
46:6; 47:7
Regular [1]
15:24
regular [4]
15:22; 16:6; 48:7, 12
reinstall [1]
52:15
relative [2]
60:14, 16
remain [1]
52:14
remainder [1]
55:14
remained [1]
40:1
remember [1]
22:3
removal [2]
6:25; 17:20
remove [1]
26:14
removed [20]
28:16, 18, 19, 22, 25;
38:3, 15, 16, 17, 18,
22, 23; 39:5, 8, 12, 15,
16; 49:10; 52:12, 13
renews [1]
13:7
rental [2]
46:19, 21

Case 3:07-cv-02763-AET-TJB   Document 57-2   Filed 12/07/09   Page 62 of 93

BSA                    Bristol vs. Somerville:   Dep. of Robert Post:  1-26-07                    Look-See(22)

renting [1]
  46:23
rents [1]
  5:24
repair [4]
  11:5, 24; 14:5; 54:6
repaired [1]
  58:11
repairs [1]
  13:9
rephrase [3]
  4:3; 11:3; 14:23
replace [8]
  12:13, 23; 13:2; 48:13;
  49:16; 52:22; 55:10,
  14
replaced [10]
  12:19; 32:23, 25;
  39:17, 23; 47:21;
  49:11; 52:17; 54:12
Replacement [1]
  45:14
replacement [5]
  15:1, 13; 29:17; 33:3;
  52:19
Replacing [1]
  37:23
Reporter [1]
  60:4
reporter [2]
  3:18, 25
reports [2]
  17:17; 21:16
represent [2]
  3:8; 42:5
representative [1]
  8:13
representatives [2]
  6:3; 42:6
Requirement [1]
  8:21
requirement [1]
  8:20
requirements [1]
  11:25
requisition [14]
  42:24; 43:7; 45:6, 20;
  47:6, 9, 12, 15, 23;
  49:4, 21; 51:1; 53:18;
  54:2
requisitions [3]
  45:25; 50:10, 13
respect [5]
  5:18; 10:7; 13:22;
  17:20; 24:3
respirator [12]
  7:20; 8:19, 20, 21, 23,
  25; 9:3, 19, 23, 25;
  10:2; 24:25
respond [3]
  3:23; 4:5, 15
responding [2]
  3:17; 4:6
responsibilities [2]
  19:10; 27:3
responsibility [20]
  5:11; 9:8; 10:22, 23;
  11:2, 9, 11, 16, 20, 21;
  12:4, 7, 13; 14:11, 19,
  20; 15:12; 26:17, 19;
  28:8

responsible [15]
  5:12; 6:16; 7:6, 11;
  11:4, 15; 14:25; 15:21;
  16:9, 10, 12; 27:18;
  42:14; 45:10; 58:10
rest [1]
  35:8
restore [2]
  37:20; 54:5
result [5]
  3:21; 18:1; 32:22;
  51:22; 58:17
retrace [1]
  48:23
retrofitting [1]
  55:6
return [1]
  37:17
returned [1]
  41:13
reused [1]
  40:3
Right [1]
  19:25
right [3]
  27:23; 31:16; 32:14
ROBERT [3]
  3:1; 60:6; 61:5
Robert [2]
  15:6; 51:3
role [1]
  14:4; 26:2, 3
Ron [11]
  42:23; 43:17, 25; 44:3,
  7, 13; 47:9, 13, 20;
  49:4; 54:20
roof [40]
  6:25; 10:11, 16; 12:4,
  18, 23; 13:2; 14:5, 19;
  15:1, 12, 16, 19;
  16:22, 24, 25; 17:6,
  20; 20:8, 21; 22:14,
  25; 26:10; 28:6; 29:17,
  22; 31:17; 32:6, 22,
  23, 25; 33:3; 34:16;
  35:4; 36:24; 54:8;
  55:14, 20, 25; 56:9
roofer [3]
  13:14; 14:7; 18:7
roofer's [1]
  31:17
roofing [8]
  21:2, 14; 22:13, 19,
  22; 29:24; 48:11;
  56:15
room [22]
  3:25; 10:1, 3; 20:1, 12;
  21:11, 25; 32:15; 33:7,
  10, 23; 34:7, 11, 17;
  35:2, 6, 7, 9, 15;
  38:12; 40:2; 49:9
rooms [3]
  20:4; 22:11; 40:18;
  49:12; 55:7
Rowe [1]
  3:8
Rule [1]
  60:20
run [2]
  3:25; 21:4
running [3]

23:1; 27:18; 39:17

– S –

Safety [1]
  53:9
safety [2]
  24:11; 26:20
sample [2]
  24:7; 26:15
SAP [4]
  43:8, 9, 11, 23
sat [1]
  46:24
saved [2]
  54:19; 59:2
savings [1]
  55:5
saying [1]
  43:21
screaming [1]
  3:25
sealed [2]
  33:8, 9
second [2]
  40:17; 52:9
secretary [2]
  34:5; 50:22
Security [2]
  46:1, 2
security [4]
  10:24; 46:8, 14, 25
seek [1]
  53:14
send [1]
  24:18
separate [4]
  10:25; 13:5, 8; 34:19
September [11]
  6:25; 7:15; 9:10;
  10:12; 12:17; 16:22;
  17:10; 24:1; 28:6;
  33:16; 36:20
September, 2005 [2]
  6:25; 24:1
September of 2005 [3]
  7:15; 9:10; 10:12;
  12:17; 17:10
service [4]
  43:21; 47:5; 54:14;
  57:1
sets [2]
  10:10; 42:7
sewage [1]
  33:11
SF-1 [3]
  41:25; 42:3; 61:11
shelves [2]
  21:12, 13
shelving [1]
  22:20
Shorthand [1]
  60:4
show [5]
  18:21, 24; 31:12; 42:2;
  55:24
signed [1]
  58:7
single [1]
  18:14
sir [1]

41:17
site [1]
  37:3; 58:20
situation [1]
  26:8
Slavco [3]
  55:13, 17; 56:8
slips [1]
  57:2
Smith [1]
  3:8
somebody [5]
  11:8, 23; 24:18; 55:24;
  58:22
Someone [1]
  14:24
someone [1]
  16:8
Somerville [26]
  3:9; 5:2, 19, 20, 24;
  6:3, 11, 13; 7:4, 11,
  14; 9:8; 10:13; 11:6;
  14:5; 18:4; 19:4;
  27:16; 35:21; 42:4;
  44:24; 51:19; 55:23;
  57:1, 21; 58:3
sorry [5]
  9:5; 28:18; 31:16;
  39:16; 47:10
sort [12]
  8:7; 10:4; 17:16; 18:9;
  19:2; 29:1; 32:17;
  43:4; 45:18; 47:1;
  57:23; 58:1
sought [1]
  53:6
space [1]
  35:1
speak [2]
  3:22; 22:21
specific [1]
  5:3
specifically [1]
  5:18
spell [1]
  7:24
spoke [2]
  22:24; 23:2
Squibb [3]
  3:10; 4:18; 11:1
staining [1]
  32:18
stamp [3]
  18:23, 25; 31:8
stamped [2]
  19:1; 30:6
stamps [1]
  57:3
stand [1]
  24:23
standards [1]
  11:19
standing [1]
  21:19
start [2]
  27:23; 31:6
started [6]
  15:16; 28:23; 29:11;
  32:10; 36:16; 55:20
starting [1]
  19:23

State [1]
  60:4
state [1]
  35:19
stated [1]
  49:17
States [1]
  4:23
station [1]
  46:10
stay [3]
  23:22; 26:23; 56:2
stenographically [1]
  60:11
stock [1]
  48:16
storage [7]
  20:1, 4, 7, 18; 21:11,
  25; 48:19
story [1]
  18:14
straighten [1]
  30:19
Street [1]
  5:20
strike [6]
  8:12; 12:11; 27:5;
  30:15; 40:4; 41:22;
  47:7; 53:13
strip [1]
  23:5
strippers [1]
  31:18
stripping [1]
  22:14
structure [1]
  13:12
stuff [1]
  58:8
subject [1]
  7:1
substantial [1]
  42:8
suggestions [1]
  52:3
suit [1]
  25:1
suits [4]
  25:2, 3; 27:3; 41:16
sum [1]
  49:22
supervise [2]
  11:17; 14:11
supervising [3]
  15:18; 37:3; 55:13
supervisor [2]
  4:25; 7:9
supply [2]
  47:15; 48:3
supported [1]
  47:14
supporting [1]
  42:9
surprise [1]
  15:15
suspended [1]
  26:10
SUV [2]
  46:20, 24
sworn [2]
  3:2; 60:7

# EXHIBIT 11



# ENVIRONMENTAL HEALTH INVESTIGATIONS, Inc.

655 West Shore Trail
Sparta, New Jersey 07871

Phone/Fax: 973-729-5649
www.ehi-inc.com

March 19, 2007

Lmaher@greenbaumlaw.com

Mr. Lawrence P. Maher
Greenbaum, Rowe, Smith & Davis LLP
Metro Corporate Campus One
PO Box 5600
Woodbridge, NJ 07095

Re: Summary of Oral Report - William S. Kerbel, CIH

Dear Mr. Maher:

I am adopting the attached oral report subject to the following clarification.

Roof material is classified by the US EPA as a Category One non friable asbestos containing material.

Please let me know if you have any questions.

Very truly yours,

William S. Kerbel, CIH
President

cover2007.GreenbaumRoweSmithDavis

# SUMMARY OF ORAL REPORT FROM WILLIAM S. KERBEL, CIH

I am a certified industrial hygienist and the President of Environmental Health Investigations, Inc. in Sparta, New Jersey. We were retained by Somerville Fidelco to provide consultation and monitoring of the roof removal operations conducted at 76 Fourth Street, Somerville, New Jersey in December 2005. We also participated in establishing procedures and protocols for the December 2005 roof removal. During the roof removal we observed the work of Slavco Construction and conducted air quality tests in the roof area. We were aware of the protective measures employed by Tuff Wrap on the interior of the facility. In addition, I have reviewed the following materials:

1.      Correspondence dated February 9, 2007 from counsel for Bristol Myers attaching test results from September 22,2005 on samples collected by Blasland, Bouck & Lee.

2.      Letters from Eagle Industrial Hygiene Associates dated September 29, 2005, November 15, 2005, January 26, 2006 and April 10, 2006 which summarize the results of their various tests at the facility.

3.      Proposal letter dated December 23, 2005 from Bristol Environmental which sets forth the services to be rendered and costs to be charged for cleanup of the facility.

4.      Transcript of Deposition of Pat Bortner, Bristol Environmental Supervisor.

5.      Transcript of Deposition of David Burkhardt, Eagle Industrial Hygiene.

Asbestos containing roof material is unique. It is classified as a Category I Hazardous Material. It typically consists of a number of layers of different materials in addition to any asbestos, and is bound together by asphalt. As a result, asbestos containing roof material is not hazardous in its bulk form. Unless the roof material is pulverized and asbestos fibers are released there is no danger.

Bulk samples of roof material at the Somerville facility were gathered in September 2005 from a limited area of the interior of the facility. The bulk samples tested positive for a percentage of asbestos. It appears that a preliminary cleanup of these areas was conducted in October 2005. The remainder of the cleanup did not take place until after the "second phase" of the roof removal and replacement in December 2005. It is evident from the proposal letter dated December 23, 2005 from Bristol Environmental and the deposition of Pat Bortner that the cleanup of the remaining dust and debris at the facility was performed by asbestos abatement professionals with all requisite protection and precautions. However, it is my opinion that there was no evidence that the material which was being cleaned up contained asbestos, and no reason to utilize licensed asbestos workers.

Every test performed by Eagle Environmental after September 2005 was negative for asbestos. Vacuum samples of the dust throughout the facility were negative and recurring air

quality samples during the cleanup were also negative. There is no scientific basis to believe that the dust which was vacuumed and wiped down throughout the facility contained asbestos. There are many reasons to believe that it did not.

- The "first phase" roof removal by Badger Roofing did not involve the entire roof. Therefore, it is unlikely that the entire facility would have dust and debris from the first stage roof removal.

- The "second stage" roof removal in December 2005 utilized extraordinary asbestos abatement procedures which would have prevented any asbestos containing roof materials from entering the facility.

- The facility was wrapped in six-mil plastic sheeting during the second stage of roof removal.

It is my opinion, based on the procedures and precautions employed during the second stage of the roof removal, that any dust and debris which had to be cleaned up in the entire facility would not have contained asbestos. It is possible that the dust came from the new roof which was installed after the old roof was replaced. The new roof material does not contain asbestos.

Based on the materials I reviewed it is evident that Bristol-Myers utilized an abundance of caution throughout this event and cleaned up the facility using licensed asbestos abatement personnel. However, since there is no evidence that any of the dust and debris which was cleaned up at the facility after December 2005 contained asbestos, it is my opinion that the cleanup could have been performed using unlicensed labor at a substantial lesser cost.

# EXHIBIT 12

# GREENBAUM, ROWE, SMITH & DAVIS LLP

PAUL A. ROWE
WENDELL A. SMITH
ALAN E. DAVIS
DAVID L. BRUCK
MICHAEL A. BACKER
MARTIN E. DOLLINGER
DEAN A. GAVER
ROBERT C. SCHACHTER
MARTIN L. LEFELSTAT
DENNIS A. ESTIS
WILLIAM D. GRAND
RAYMOND M. BROWN
ALAN S. NAAR
STEPHEN H. KNEE
ROBERT M. GOODMAN
DOUGLAS K. WOLFSON
MARK H. SOBEL
HAL W. MANDEL
BARRY S. GOODMAN
LAWRENCE P. MAHER
THOMAS J. DENITZIO, JR.
ROBERT S. GOLDSMITH
JOHN D. NORTH
KENNETH T. BILLS
THOMAS C. SENTER
MARGARET GOODZEIT
W. RAYMOND FELTON
CHRISTINE F. LI
MERYL A. G. GONCHAR

MICHAEL K. FEINBERG
CARLTON T. SPILLER
JOSEPH M. ORIOLO
ARON M. SCHWARTZ
SABRINA A. KOGEL
JACQUELINE M. PRINTZ
STEVEN C. DELINKO
DAVID A. ROTH
GARY K. WOLINETZ
KEVIN T. McNAMARA
RICHARD L. HERTZBERG
ELLEN A. SILVER
ANDREA J. SULLIVAN
MARC D. POLICASTRO
MARC J. GROSS
LUKE J. KEALY
C. BRIAN KORNBREK
CIPORA S. WINTERS
GALIT KIERKUT
BRIAN R. SELVIN
PETER D. CRAWFORD, JR.
EMILY A. KALLER
ARREN S. GOLDMAN
DARREN C. BARREIRO
OLIVIER SALVAGNO
STEVEN NUDELMAN
DINA M. VANIDES
HANY A. MAWLA

OF COUNSEL
ROBERT S. GREENBAUM    ARTHUR M. GREENBAUM
                       FRANKLIN M. SACHS
                       J. WARREN WOOD III

COUNSEL
CHRISTINE F. MARKS     HOWARD B. HANDER
ROBERT S. UNDERHILL    LORA L. FONG
STEVEN FIRKSER         JODI L. ROSENBERG
ALLEN V. BROWN         MICHELE GIBSON

ROSEMARY CULCASI       JEFFREY A. SIROT
ERIC H. MELZER         MICHAEL A. GOROKHOVICH
MARINA SOLO            LISA J. CLAPP
ROBERT BECKELMAN       GREGG H. HILZER
MAJA M. OBRADOVIC      LISA B. DIPASQUA
JANE J. FELTON         MEGHAN O. MURRAY
STACEY R. COHEN        ERNEST E. D'ANGELO
MICHAEL A. KLEIN       JORDAN A. STERN
DEAN E. LOVENTHAL      CATHLENE Y. BANKER
SENWAN AKHTAR          LAURA M. BILOTTA
BRYAN D. PLOCKER       JAMIE A. YONKS
DAVID T. SHIVAS        JEANETTE TANNER
DAVID S. SCHECHTER     MICHAEL G. D'ALBA
ADAM B. KAPLAN         BLAKELY D. FISHLIN
JESSICA F. BATTAGLIA   KATIE M. HOLDEN
JEMI M. GOULIAN        JULIE KUSHNER
JOHN B. NANCE          CHRISTOPHER J. LEDOUX
MICHELLE M. SEKOWSKI   CATHERINE S. SHIMSKY

COUNSELORS AT LAW

METRO CORPORATE CAMPUS ONE
P.O. BOX 5600
WOODBRIDGE, N. J. 07095-0988
(732) 549-5600
FAX (732) 549-1881

DELIVERY ADDRESS:
99 WOOD AVE. SOUTH
ISELIN, NEW JERSEY 08830-2712

75 LIVINGSTONE AVENUE
ROSELAND, NEW JERSEY 07068-3701
(973) 535-1600
FAX (973) 535-1698

EMAIL: INFO@GREENBAUMLAW.COM
WWW.GREENBAUMLAW.COM

WM. L. GREENBAUM (1914-1983)
ALLEN RAVIN (1957-1997)

REPLY TO:   Woodbridge

March 30, 2007

**VIA FACSIMILE 212-754-0330**

**AND REGULAR MAIL**

David M. Rubin, Esq.
Golenbach Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue
New York, NY 10022

Re:   18 115 Y 01071 06
      Bristol-Myers Squibb Company v. Somerville Fidelco Associates, L.P.

Dear Mr. Rubin:

We represent the Respondent, Somerville Fidelco Associates, L.P. in the above referenced matter which is scheduled for an Arbitration Hearing which will commence before you on April 17, 2007. Pursuant to the Scheduling Order in this matter, we are submitting this Letter-Brief to summarize some of the issues to be determined in the Arbitration. It is not our intention to provide a comprehensive recitation of the case which will be presented on behalf of our client at the Hearing.

GREENBAUM, ROWE, SMITH & DAVIS LLP

David M. Rubin, Esq.
March 30, 2007
Page 2

This matter arises out of a commercial landlord-tenant relationship between the Respondent, as Landlord and Bristol-Myers Squibb ("BMS"), as the sole tenant in a building located at 76 Fourth Street, Somerville, New Jersey. The tenant utilized the facility to house monkeys until they were transported to other BMS locations to be used in pharmaceutical testing.

In September 2005 Badger Roofing, an independent contractor retained by the Landlord to replace the roof on the leased premises started work which caused some dust and debris to enter a portion of the building. Employees of BMS stopped the roof work on September 22, 2005. BMS arranged for samples of the material from one corner of the building to be tested, and informed the Landlord that some of the samples contained asbestos. In response to the tenant's concerns, the Landlord engaged a new contractor, Slavco Construction, Inc., to complete the roof removal using state-of-the-art methods and precautions which were approved by BMS. The methods and precautions included asbestos abatement measures, air monitoring and plastic sheathing on the interior of the facility. The remainder of the roof was removed and replaced between December 16 and December 19, 2005.

Thereafter, BMS embarked on a massive cleanup and reconstruction of the premises which lasted through April 2006. The cleanup was performed by licensed asbestos workers, using asbestos abatement protocols, and included the removal, disposal and reconstruction of interior ceilings and other significant tenant fit-up, at a substantial expense. BMS never asked

GREENBAUM, ROWE, SMITH & DAVIS LLP

David M. Rubin, Esq.
March 30, 2007
Page 3

the Landlord to perform any of this cleanup, and never submitted any of the proposed cleanup procedures or cost estimates to Landlord before the work was completed.

All tests performed after September 2005 on samples of the dust and debris which entered the building were negative for asbestos. All air sampling tests conducted in the interior and exterior of the building failed to detect asbestos fibers in the air in concentrations above permissible exposure limits at any time.

## DAMAGES

The actions of BMS in this case were not reasonable or justified, and the extraordinary expenses incurred should not be the responsibility of the Landlord. BMS incurred all of the expenses and performed all of the work at the premises without offering the Landlord an opportunity to mitigate any alleged damages. The Landlord has defenses and offset under the terms of the Lease between the parties.

1.  <u>Cleanup</u>. BMS must prove that it was necessary and reasonable to incur more than $300,000 in expenses to cleanup dust which allegedly infiltrated the leased premises as a result of the two-stage roof removal and replacement activity in 2005, despite the fact that every test of the dust and the air throughout the facility after September 2005 failed to detect the presence of asbestos. Even the September tests which were performed on samples from a limited area of the premises failed to indicate wide-spread presence of asbestos.

GREENBAUM, ROWE, SMITH & DAVIS LLP

David M. Rubin, Esq.
March 30, 2007
Page 4

2.    Reconstruction. BMS must prove that it was necessary and reasonable to pay more than $60,000 for construction work on the tenant fit-up during the cleanup of the premises in 2006, and that such reconstruction should be the responsibility of the Landlord.

3.    Monkey Boarding. BMS is claiming approximately $225,000 in damages to "board" monkeys during the roof replacement and cleanup period at the premises. BMS must prove that these significant damages were necessary and reasonable, and could not have been mitigated.

4.    Rent Abatement. BMS is seeking a partial rent abatement at the leased premises during the roof replacement and "cleanup period". BMS will not be able to prove that the premises were untenable at any time. Moreover, to the extent that BMS is seeking to recover all of its out-of-pocket costs, including monkey boarding costs, protective equipment and consumables, alternative security arrangements and the like, a rent abatement would be duplicative of these claims.

## LEASE DEFENSES

There are provisions in the original Lease dated October 23, 1987 between the Landlord and BMS which provide defenses and setoffs to the claims of BMS.

1.    Setoff For Roof Replacement. Section 5.1 of the Lease makes the Landlord responsible for "...necessary structural repairs to the roof and walls of the building...". It is

GREENBAUM, ROWE, SMITH & DAVIS LLP

David M. Rubin, Esq.
March 30, 2007
Page 5

evident from this language that the parties were making a distinction involving the structural component of the roof as opposed to replacement of the membrane, insulation and other covering materials. Otherwise, the word "structural" is unnecessary in the sentence. Various cases and authorities have addressed the distinction between a landlord's responsibility for structural components, and a tenant's responsibility for the remainder of the premises. There are judicial decisions on both sides of this issue, and BMS has submitted an Expert Report. Nevertheless, as indicated in the case of Southeast Banks Trust Company, N.A. v. Higginbotham Chevrolet-Oldsmobile, Inc. 445 So. 2d 347 (Fla. 1984), the clear and unambiguous statement of the parties in the lease must be followed without reference to any parol evidence of the parties' intentions.

There is no evidence that the structural components of the roof were damaged or required repair. Landlord has expended $136,040 in removing and replacing the membrane and covering of the roof. This expense is the responsibility of BMS under the clear language of the Lease, and Landlord is entitled to a setoff in this amount against any damages awarded to BMS in this proceeding.

2.   Exculpation and Limitation of Damages.   Section 11.4 of the Lease limits the Landlord's liability for damages caused by Landlord or its contractors for property damage, and exculpates Landlord for "...inconvenience, annoyance, disturbance, loss of business...". Therefore, most of the claims of BMS have been contractually waived in the Lease.

GREENBAUM, ROWE, SMITH & DAVIS LLP

David M. Rubin, Esq.
March 30, 2007
Page 6

## CONCLUSION

The Landlord had meritorious defenses and a valid setoff against the damages which have been claimed by BMS in this Arbitration Proceeding.

Respectfully submitted,

Greenbaum, Rowe, Smith & Davis LLP
Counsel for Respondent, Somerville Fidelco
Associates, L.P.

By: _____
       Lawrence P. Maher

LPM:gav
cc:  Charles J. Vinicombe, Esq.- via fax 609-799-7000 and reg. mail
      Patricia M. Fisk - via fax only 401-435-6529

# EXHIBIT 13

DrinkerBiddle&Reath
L L P

Charles J. Vinicombe
609-716-6562
charles.vinicombe@dbr.com

March 29, 2007

Law Offices

105 College Road East
P.O. Box 627
Princeton, NJ
08542-0627

609-716-6500 phone
609-799-7000 fax
www.drinkerbiddle.com

A Delaware Limited
Liability Partnership

CALIFORNIA
DELAWARE
ILLINOIS
NEW JERSEY
NEW YORK
PENNSYLVANIA
WASHINGTON DC
WISCONSIN

<u>Via Federal Express</u>

David M. Rubin, Esq.
Golenbach Eiseman Assor Bell & Peskoe LLP
437 Madison Ave.
New York, NY 10022

     **Re:**   **18 459 01071 06**
           **Bristol-Myers Squibb Company v. Somerville Fidelco Associates, L.P.**

Dear Mr. Rubin:

    Our law firm represents Claimant Bristol-Myers Squibb Company ("BMS") in the above-referenced arbitration. This matter is scheduled for an arbitration hearing during the month of April. Please accept this letter as BMS's pre-hearing submission and brief.

    The subject matter of this arbitration is an asbestos incident that occurred at 76 Fourth Street in Somerville, New Jersey (the "Somerville Facility"). The Somerville Facility is a 16,000 square foot building owned by Respondent Somerville Fidelco Associates, L.P. ("Somerville Fidelco"). BMS has been a tenant at the facility since 1987. (*See* Stipulation of Facts, ¶2). The facility is used by BMS to house and quarantine monkeys that are used in pharmaceutical drug testing. (*See* Stipulation of Facts, ¶6).

    On October 23, 1987, BMS, as tenant, entered into a Lease with Somerville Fidelco, as landlord, for the Somerville Facility (the "Lease"). (*See* Stipulation of Facts, ¶3). The Lease had an original three-year term and subsequently was extended through a number of Lease Extension Agreements. (*See* Stipulation of Facts, ¶4). The current lease extension (the November 25, 2002 Lease Extension No. 2) is due to expire on October 31, 2008. (*See* Stipulation of Facts, ¶5). The Lease is attached at Tab A.

**Factual Background**

    By way of background, on July 15, 2005, Somerville Fidelco hired a roofing contractor, Badger Roofing Company, Inc. ("Badger"), to remove and replace the roof at the Somerville Facility. (*See* Stipulation of Facts, ¶10). The roof had a history of leaks going back to at least 1996. (*See* Stipulation of Facts, ¶7). At the time that Badger was retained, the roof had reached the end of its life expectancy and was in a highly deteriorated condition. The roof leaks were so extensive that they created a safety hazard, with water leaking down the interior walls over electrical and environmental controls inside the facility.

Jonathan I. Epstein,
Partner responsible for
Princeton Office

Established 1849

DrinkerBiddle&Reath
LLP

David M. Rubin, Esq.
March 29, 2007
Page 2

Badger provided its roof removal services for Somerville Fidelco starting in September of 2005. (*See* Stipulation of Facts, ¶12). Approximately four months before Badger began its work, Somerville Fidelco had hired a roofing consultant, Harry H. Leavy, Inc. ("HHL"). On May 25, 2005, HHL sent a written Report to Somerville Fidelco's representative, Barry Ages. The Report, entitled "Presentation of Visual Roof Survey," documents the deteriorated condition of the roof. In the Report, HHL states that the purpose of the survey was to "identify and evaluate the present condition of the smooth surfaces built-up roof system on the building" and that the "Roof Survey Report does not include . . . Testing for Asbestos Containing Roof Materials (ACRM)." On page 3, under "Roof Data," HHL states that the "Insulation" was "Unknown. (*Suggest core samples be taken*)." (*See* Stipulation of Facts, ¶14) (Emphasis added).

Despite its roofing consultant's recommendation that core samples be taken to determine the composition of the roof and whether asbestos containing materials ("ACM") were present, Somerville Fidelco never arranged for core samples to be taken. (*See* Stipulation of Facts, ¶15). Somerville Fidelco did not provide the HHL Report to Badger and did not inform Badger that Somerville Fidelco had received a report from HHL suggesting that core samples be taken of the roof. (*See* Stipulation of Facts, ¶¶16, 17). As confirmed by Barry Ages and Badger's representative, Scott Badger, in their depositions, Somerville Fidelco also did not inform Badger that core samples had not been taken and that no determination had been made whether the roof contained asbestos materials. Badger also did not inquire of Somerville Fidelco whether core samples had been taken or whether the roof contained ACM. (*See* Stipulation of Facts, ¶15).

In his deposition, Mr. Badger testified that Badger is not a qualified asbestos removal contractor and that had Badger known that asbestos was present in the roofing materials at the Somerville Facility, Badger would have proceeded differently—Badger would have either subcontracted the roof removal phase of the project to a qualified asbestos contractor or it would have retained an expert to develop a protocol that Badger could have used to implement appropriate removal measures. (*See* Scott Badger Dep.— annexed at Tab B—at pages 9, 47-51, 65-67). Instead, Badger proceeded with its roof removal work as if ACM was not present.

As a result of Badger's roof removal activities, dust and debris containing asbestos materials infiltrated the Somerville Facility through gaps in the roof decking. When clouds of dust entered the facility, BMS immediately insisted that Badger cease its activities. BMS thereafter arranged for two environmental testing firms, Blasland, Bouck & Lee, Inc. ("BB&L") and Eagle Industrial Hygiene Associates, Inc. ("Eagle"), to conduct sampling and testing on the materials that infiltrated the facility. (*See* Stipulation of Facts, ¶25). Wipe samples of dust and bulk samples of debris that had entered the

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 3

facility and core samples taken from the roof confirmed the presence of asbestos at regulated levels—more than 1%. (*See* Stipulation of Facts, ¶25).

The asbestos infiltration at the Somerville Facility adversely affected BMS in a number of respects. First and foremost, BMS was concerned about human exposure to asbestos dust and fibers. Seven BMS employees—and a number of third parties—were present in the facility at the time of the roofing job. BMS addressed this situation by sending letters to contractors and other third parties that were present at the facility notifying them of their potential exposure to asbestos. BMS also sent its employees to BMS's medical offices for information concerning their potential exposure. Those employees currently are participating in a medical monitoring program that BMS is funding. The New Jersey Department of Labor ("DOL") also became involved, with a DOL representative visiting the site and requesting information (including sampling results) from BMS to satisfy the DOL's concerns that the asbestos incident was being handled appropriately.

Second, BMS was concerned about the monkeys' potential exposure to asbestos dust. BMS has a large financial investment both in the monkeys and its drug testing. If the monkeys were exposed to asbestos, they would be considered compromised. Because the monkeys were housed in self-contained, environmentally controlled (HEPA filtrated) rooms within the facility, eventually BMS was able to determine, to a reasonable degree of certainty, that the monkeys had not been exposed or compromised.

Third, BMS had to address the continuation of the roofing job. At BMS's insistence, the roofing job was suspended until Somerville Fidelco retained an asbestos removal company, Slavco Construction, Inc. ("Slavco"), and developed a protocol to appropriately complete the roof removal portion of the roofing job.

Fourth, BMS had to address the asbestos contamination of the facility. The contamination was addressed in two phases. In October of 2005—after the roofing job had been suspended—BMS retained the services of Bristol Environmental, Inc. ("BEI") (no relation to BMS) to conduct a gross decontamination of the facility so that BMS could conduct limited operations at the facility. After the roofing job was completed in December of 2006, BEI conducted a more extensive cleanup of the facility which started in January and ended in March of 2007. (*See* Stipulation of Facts, ¶33).

Fifth, BMS had to address the impact that the asbestos contamination had on its operations. Although BMS was able to conduct operations on a reduced basis with employees wearing protective gear while the facility was contaminated, the contamination of the facility reduced the usable space at the facility.

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 4

## Somerville Fidelco's Liability[1]

### Somerville Fidelco's Liability For Badger's Negligence

Somerville Fidelco is liable to BMS for Badger's negligence in causing asbestos to infiltrate the Somerville Facility pursuant to Section 11.4 of the Lease, which provides that Somerville Fidelco has the right to enter the leased premises to make repairs and that:

> The Landlord agrees to do all such work at all reasonable times during usual business hours and in connection with the doing of any such work to cause as little inconvenience, annoyance, disturbance, loss of business or other damage to the Tenant as may reasonably be possible in the circumstances, and in the event the Landlord shall cause any damage to Tenant's property or *if damage caused by Landlord's* or its agent's or *contractor's negligence, Landlord shall be liable for the damage.*

(Emphasis added).

In accordance with Section 112 of the Clean Air Act ("CAA"), the United States Environmental Protection Agency ("USEPA") established National Emissions Standards for Hazardous Air Pollutants ("NESHAP") to protect the public. *See* USEPA, *Common Questions on the Asbestos NESHAP*, available at http://www.epa.gov/region04/air/asbestos/asbqa.htm. In March 1971, the USEPA identified asbestos as a hazardous air pollutant, and in April 1973, the USEPA promulgated the Asbestos NESHAP (40 *C.F.R.* §61 *et seq.*). The Asbestos NESHAP protects the public by minimizing the release of asbestos fibers during activities involving the processing, handling, and disposal of ACM. Accordingly, the Asbestos NESHAP specifies written notification procedures and work practices that must be followed during demolitions and renovations[2] of all structures and commercial buildings. *See id.*

---

[1]   BMS reserves the right to assert other bases of Somerville Fidelco's common law and statutory liability.

[2]   "Renovation" is defined as "altering a facility or one or more facility components in any way, including the stripping or removal of [Regulated Asbestos Containing Material] from a facility component." 40 *C.F.R.* §61.141. "Operations in which load-supporting structural members are wrecked or taken out are demolitions." *Id.*

DrinkerBiddle&Reath
LLP

David M. Rubin, Esq.
March 29, 2007
Page 5

The Asbestos NESHAP categorizes ACM as either "friable" or "nonfriable".[3]  40 *C.F.R.* §61, App. A to Subpart M, *Interpretive Rule Governing Roof Removal Operations*, at 1.1. "Nonfriable ACM is further classified as either Category I ACM or Category II ACM." *See id.* at 1.2. Category I ACM includes asphalt roofing products containing more than 1% asbestos.[4]  Category II ACM includes all other nonfriable ACM, including, for example, asbestos-cement shingles containing more than 1% asbestos. *See id.*

The applicability of the Asbestos NESHAP to Category I and Category II ACM depends upon: (i) the condition of the material at the time of renovation; (ii) the nature of the ACM removal method; and, (iii) the amount of ACM involved. *See id.*

Category I and Category II ACM regulated under the Asbestos NESHAP may be further categorized as "regulated asbestos-containing material" ("RACM"). *Id.* at 1.3. "RACM includes: (1) friable ACM; (2) Category I nonfriable ACM that has become friable; (3) Category I nonfriable ACM that has or will be sanded, ground, cut, or abraded; [and,] (4) Category II nonfriable ACM that has . . . been . . . crumbled, pulverized, or reduced to powder." *Id.*

For Category I ACM (asphalt roofing products), if the area of the roof to be removed is at least 160 square feet, the removal is subject to the Asbestos NESHAP *unless* "slicing,"[5] or other methods that do not sand, grind, cut or abrade, are utilized to remove the ACM. *See* 40 *C.F.R.* §61, App. A to Subpart M, at 1.A.1.

For all Category II ACM, if the area of roof to be removed is at least 160 square feet, the removal is subject to the Asbestos NESHAP. *See* 40 *C.F.R.* §61, App. A to Subpart M at 1.A.2.

Persons conducting renovations that are subject to the Asbestos NESHAP must provide written notification of the renovation to the regulatory agencies at least 10

---

[3]    "Friable ACM is ACM that, when dry, can be crumbled, pulverized or reduced to powder by hand pressure." 40 *C.F.R.* §61, App. A to Subpart M, at 1.1.

[4]    "Asphalt roofing products which may contain asbestos include built-up roofing; asphalt-containing single ply membrane systems; asphalt shingles; asphalt-containing under layment felts; asphalt-containing roof coatings and mastics; and, asphalt-containing base flashings." *Id.* at 1.2.

[5]    "As EPA interprets the NESHAP, the use of certain manual methods (using equipment such as axes, hatchets, or knives, spud bars, pry bars, and shovels, but not saws) or methods that slice, shear or punch (using equipment such as a power slicer or power plow) do not constitute 'cutting, sanding, grinding or abrading.'" *Id.* at 1.C.1.

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 6

working days in advance of the renovation.  *See* 40 *C.F.R.* §61, App. A to Subpart M at 2.1.

In accordance with the Asbestos NESHAP, notifications of demolition or renovation projects involving ACM must contain certain specified information, including the scheduled starting and completion date of the work; the location of the project site; the names of asbestos removal contractors; methods of removal; and, the amount of ACM involved in the demolition or renovation.  *See* 40 *C.F.R.* §61.145(b).  The USEPA has interpreted the Asbestos NESHAP to require that either the owner of the building or the operator of the demolition or renovation project must submit the required notification.  *See* USEPA, *Common Questions on the Asbestos NESHAP*, available at *http://www.epa.gov/region04/air/asbestos/asbqa.htm.*

If roofing materials contain more than 1% asbestos and the renovation activity involves RACM covered by the Asbestos NESHAP (e.g., Category I nonfriable ACM that has become friable or Category I nonfriable ACM that has or will be sanded, ground, cut, or abraded), work practices described in 40 *C.F.R.* §61.145(c) must be followed.  *See* 40 *C.F.R.* §61, App. A to Subpart M at 1.A.3.  In general, 40 *C.F.R.* §61.145(c) requires that:

- All RACM must be removed from the facility "before any activity begins that would break up, dislodge, or similarly disturb the material or preclude access to the material for subsequent removal . . . .";

- When facility components that contain RACM are being taken out of the facility as a unit or in sections, all RACM exposed during cutting or disjoining operations must be adequately wetted[6] and carefully lowered to the ground, not dropping, throwing, sliding, or otherwise disturbing the RACM;

- If RACM is stripped from a facility component that remains in place, the RACM must be adequately wetted;

- All RACM material that has been removed or stripped must be adequately wetted, and it must remain wet until collected, contained and prepared for disposal;

---

[6]       In renovation operations, wetting is not required if: (a) the facility owner or operator has obtained prior written approval from the EPA based on a written application that wetting would unavoidably damage equipment or present a safety hazard; and, (b) the facility owner or operator uses various emissions controls described within the regulations.  40 *C.F.R.* §61.145(c)(3)(i).

DrinkerBiddle&Reath
LLP

David M. Rubin, Esq.
March 29, 2007
Page 7

- No RACM may be stripped, removed, or otherwise handled or disturbed at a facility unless there is at least one on-site representative trained in the provisions of 40 *C.F.R.* §61.145 present at the facility.

40 *C.F.R.* §61.145(c) *et seq.*

When performing renovation activities involving RACM that are subject to the Asbestos NESHAP, the observation of dust from ACM materials may be used as evidence of a violation of the "adequately wet" requirement. *See* USEPA, *Asbestos/NESHAP Regulated Asbestos Containing Materials Guidance*, available at http://www.epa.gov/region4/air/asbestos/asbmatl.htm. Moreover, visible asbestos-containing debris on the ground outside the boundaries of a work site is considered a "visible emission," and a violation of the Asbestos NESHAP. *See id.*

In addition to the work practices that are prescribed in 40 *C.F.R.* §61.145(c), the Asbestos NESHAP requires that all material produced by the sanding, grinding, cutting, or abrading of Category I nonfriable ACM must be treated as asbestos-containing waste material subject to the waste handling and collection provisions of 40 *C.F.R.* §61.150. *See id.* That is, the debris from Category I nonfriable ACM that has been sanded, ground, cut or abraided must be collected and processed in a manner that either: (a) does not discharge visible emissions to the outside air; or, (b) cleans emissions containing particulate asbestos material before they escape to, or are vented to, the outside air. *See* 40 *C.F.R.* §61.150 *et seq.*

Similar to the USEPA's Asbestos NESHAP, the Occupational Safety and Health Administration's ("OSHA") Asbestos Standard for the Construction Industry (29 C.F.R. §1926.1101 *et seq.*) (hereinafter "OSHA Standard") regulates worker exposure to asbestos (both ACM and RACM) during the following construction[7] activities:[8] repairing, maintaining, or renovating asbestos-containing structures; and, cleaning up asbestos releases. 29 *C.F.R.* §1926.1101(a) *et seq.*

The OSHA Standard establishes a classification system for asbestos work and establishes mandatory work practices that must be followed to reduce exposures from each Class of asbestos work. The Classes of asbestos work established by the OSHA Standard are as follows:

---

[7]   Construction work means "work for construction, alteration, and/or repair, including painting and decorating" 29 *C.F.R.* §1910.12(b).

[8]   The list provided is not all inclusive. *See* 29 *C.F.R.* §1926.1101(a) *et seq.*

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 8

*Class I* — Removal of asbestos-containing thermal system insulation ("TSI") and sprayed-on or troweld on surfacing materials ("SM").

*Class II* — Removal of other types of ACM that are not TSI, such as resilient floors or roofing materials.

*Class III* — Repair and maintenance operations where ACM or presumed asbestos-containing material is disturbed.

*Class IV* — Custodial activities where employees clean up ACM debris produced by construction, maintenance or repair activities.

*See* 29 C.F.R. §1926.1101(b) *and* Occupational Health and Safety Administration, U.S. Dept. of Labor, Pub. OSHA 3096, *Asbestos Standard for the Construction Industry* (2002) at 3.

The OSHA Standard establishes extensive minimum safety requirements for each Class of asbestos work. No matter what Class of asbestos work is being performed, the OSHA Standard establishes minimum requirements for the following: Permissible Exposure Limits (PELs);[9] Initial Exposure Assessments & Negative Exposure Assessments;[10] Regulated Areas & Warning Signs; Competent Persons;[11] Air Monitoring; Medical Surveillance; Respirators; Protective Clothing; Training; Decontamination; Engineering Controls; and, Permitted and Prohibited Work Practices. *See* 29 C.F.R. §1926.1101 *et seq.*

Further, *regardless of exposure levels*, the OSHA Standard requires that employers must use the following engineering controls and work practices for Class I, II, III, and IV work:

---

[9]     The PEL for airborne concentrations of asbestos is 0.1 f/cc as an 8-hour time weighted average (TWA). The Short Term Exposure Limit ("STEL") is 1 f/cc as averaged over a sample period of 30 minutes. Occupational Health and Safety Administration, U.S. Dept. of Labor, Pub. OSHA 3096, *Asbestos Standard for the Construction Industry* (2002) at 4.

[10]     An Initial Exposure Assessment is conducted for purposes of estimating the concentration of asbestos that employees will be exposed to when the work is performed. A Negative Exposure Assessment ("NEI") demonstrates that employee exposures during the operation are consistently below the PEL for asbestos. *Id.* at 5.

[11]     Employers must designate a "Competent Person" to supervise all Classes of asbestos operations covered under the OSHA Standard. The Competent Person must be trained to identify asbestos hazards and be vested with the authority to correct them. A Competent Person must frequently inspect job sites, materials, and equipment. *Id.* at 4-5.

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 9

- Vacuum cleaners equipped with HEPA (High Efficiency Particulate Air) filters to collect all asbestos-containing or presumed asbestos-containing debris and dust.

- Wet methods or wetting agents to control employee exposures except when infeasible (e.g., due to the creation of electrical hazards, equipment malfunction, and slipping hazards).

- Prompt cleanup and disposal in leak-tight containers of asbestos-contaminated wastes and debris.

*See* 29 *C.F.R.* §1926.1101(g)(1) *et seq.; OSHA 3096, Asbestos Standard for the Construction Industry* at 19.

In addition, the following work practices are prohibited for all asbestos-related work or work that disturbs ACM or presumed asbestos-containing materials, *regardless of measured exposure levels*:

- High speed abrasive disc saws not equipped with a point-of-cut ventilator or enclosure with HEPA-filtered exhaust air.

- Compressed air to remove asbestos or ACM.

- Dry sweeping, shoveling, or other dry cleanup of dust and debris.

- Employee rotation to reduce exposure.

*OSHA 3096, Asbestos Standard for the Construction Industry* at 20.

Under the OSHA Standard, persons who conduct Class IV work (i.e., the cleanup of ACM debris produced by construction, maintenance or repair activities) *must* have attended an asbestos awareness training program and they *must* use wet methods and HEPA vacuums to clean ACM or presumed asbestos-containing debris. *See* 29 *C.F.R.* §1926.1101(g)(10)   Further, when cleaning debris and waste in "regulated areas,"[12] persons conducting Class IV work *must* wear respirators. *See* 29 *C.F.R.* §1926.1101(g)(10)(i).

When it comes to examining asbestos containing roofing materials and other surfacing materials that may contain asbestos, the USEPA recommends, *inter alia*, that:

---

[12]    "A regulated area is a marked-off site where employees work with asbestos, including any adjoining areas where debris and waste from work accumulates or where airborne concentrations of asbestos exceed, or can possibly exceed, the PEL." *Id.* at 12.

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 10

(a) building materials should be grouped into homogeneous areas based on uniformity of texture and color of the materials; and, (b) at least three cores samples should be obtained from each homogeneous area by selecting sampling locations that are representative of the homogeneous area. *See* USEPA Toxic Substances publication entitled *Guidance for Controlling Asbestos-Containing Materials in Buildings*, EPA560/5-85-024 (June 1985) at 2-6.

According to the USEPA, if asbestos is found, a control or abatement program should be initiated. *See id.* at 2-1. Further, the USEPA advises that:

> "[w]henever the presence of asbestos is in doubt, prudence is recommended: *treat the material as if it contains asbestos.*" *Id.* at 2-4. (Emphasis added)

Identification of homogeneous areas is the first important step in the process of devising an asbestos control or abatement program (*see id.* at 6-6), however, it is "[t]he likelihood of fiber release from ACM that determines the need for and timing of additional action." *Id.* at 4-1.

The USEPA advises that "[t]he likelihood of fiber release from ACM is based on evaluating [the] current condition [of the ACM] and the potential for future disturbance, damage, or erosion." *Id.* According to the USEPA, "[a]ir monitoring alone should not be used for assessment." *Id.* "For example, if [air] sampling is conducted for a short time during a quiet period (i.e., when air movement is limited), many fibers will settle out of the air onto the floor or other surfaces and may not be captured on the filter." *Id.* at 6-5. Moreover, "assessment by air monitoring alone is not recommended because it reflects conditions only at the time of sampling." *Id.* at 4-2. Air monitoring "provides no information about fiber release potential and future air levels." *Id.* at 4-3.

The asbestos contamination at the Somerville Facility was caused by the negligence of Badger, who failed to comply with the Asbestos NESHAP, failed to comply with the OSHA Standard, and failed to follow sound industrial hygiene practices governing the removal of ACM and RACM at the Somerville Facility.

The work at the Somerville Facility that was performed by Badger, involved the removal of more than 160 square feet of Category I non-friable ACM (*see* Stipulation of Facts, ¶11). which, after it was reduced to dust, debris, and powder from having been abraded with a rotating blade Panther saw, became RACM that was subject to the Asbestos NESHAP. *See* 40 C.F.R. §61, App. A to Subpart M at 1.3. Moreover, as Badger's work involved the removal of asbestos-containing roofing materials other than TSI, Badger's work qualified as Class II asbestos work under the OSHA Standard. *See*

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 11

29 *C.F.R.* §1926.1101(g); OSHA 3096, *Asbestos Standard for the Construction Industry* at 3.

 Badger (which is *not* a licensed or qualified asbestos removal company) was negligent because it:

- Violated the Asbestos NESHAP[13] by failing to provide ten (10) days advance notice of the roofing work involving the removal of ACM, or to ensure that the building owner, Somerville Fidelco, provided ten (10) days advance notice of the roofing work involving the removal of ACM. *See* 40 *C.F.R.* §61, App. A to Subpart M at 2.1. If the regulatory agencies had been notified that Badger intended to remove ACM and RACM without appropriate engineering controls and work practices, the regulatory agencies likely would not have permitted the removal to take place until specific engineering controls and work practices were implemented.

- Violated the Asbestos NESHAP when it failed to remove all RACM from the facility before commencing activities that would break-up or dislodge the materials. *See* 40 *C.F.R.* §61.145(c).

- Violated the Asbestos NESHAP when it failed to adequately wet, and carefully lower to the ground all RACM that was exposed during cutting or disjoining operations. *See* 40 *C.F.R.* §61.145(c). Indeed, BMS employees observed that work performed by Badger produced a large cloud of dust and debris. *See* USEPA, *Asbestos/NESHAP Regulated Asbestos Containing Materials Guidance* (observation of dust from ACM materials may be used as evidence of a violation of the "adequately wet" requirement and visible asbestos-containing debris on the ground outside the boundaries of a work site is considered a "visible emission," and a violation of the Asbestos NESHAP).

- Violated the Asbestos NESHAP when it failed to ensure that at least one on-site representative trained in the provisions of the Asbestos NESHAP was present at the Somerville Facility before any RACM was stripped, removed, or otherwise handled or disturbed. *See* 40 *C.F.R.* §61.145(c).

---

[13] Under New Jersey law, non-compliance with applicable government regulations provides strong evidence of negligence. *See Constantino v. Ventriglia*, 324 N.J. Super. 437, 441 (App. Div. 1999), *certif. denied*, 163 N.J. 10 (2000); *Sanna v. National Sponge Co.*, 209 N.J. Super. 60, 69 (App. Div. 1986); *Shatz v. TEC Technical Co.*, 174 N.J. Super. 135, 143-44 (App. Div. 1980).

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 12

- Violated the OSHA Standard[14] when it failed to ensure the on-site presence of a properly trained "Competent Person" to supervise asbestos work. *See* 29 C.F.R. §1926.1101(g)(7)(i) *and* OSHA, *Asbestos Standard for the Construction Industry* at 4-5.

- Violated the OSHA Standard when it failed to perform an Initial Exposure Assessment or conduct a Negative Exposure Assessment. *See* 29 C.F.R. §1926.1101(g)(7)(ii) *and* OSHA, *Asbestos Standard for the Construction Industry* at 5. But for its attempts to wet down the materials, Badger did not take any precautions when handling the ACM at the Somerville Facility.

- Violated the OSHA Standard when it failed to provide cutting machine misting or HEPA filters for the Panther saw that it used to remove ACM materials from the roof of the Somerville Facility. *See* 29 C.F.R. §1926.1101(g)(7)(iv) *and* OSHA, *Asbestos Standard for the Construction Industry* at 20.

- Failed to inquire of Somerville Fidelco about the existence of, or need for, core samples to determine whether ACM was present within the roofing materials at the Somerville Facility. Although Badger is aware that roofing materials can and do contain asbestos, Badger never asked Somerville Fidelco about the presence of ACM in the roofing materials at the Somerville Facility. (*See* Stipulation of Facts, ¶¶18, 19). As Badger has acknowledged, if it knew that the roofing materials contained asbestos, it would have either subcontracted the roof removal phase of the project to a qualified asbestos removal contractor or retained an expert to develop an asbestos removal protocol for Badger to follow.

As a result of its negligence, Badger inappropriately proceeded with the roofing job as if ACM was not present, failed to implement EPA and OSHA removal measures, and caused asbestos and ACM to infiltrate the Somerville facility.

---

[14] *See supra* n.13. *See also* 29 C.F.R. §1926.1101(d)(2) ("Asbestos hazards at a multi-employer work site shall be abated by the contractor who created or controls the source of asbestos contamination."); *Universal Constr. Co., Inc. v. Occupational Safety & Health Review Comm'n*, 182 F.3d 726, 730 (10th Cir. 1999) ("[T]he general rule regarding multi-employer construction worksites is that employers will be liable under [the Occupational Safety and Health Act ("Act")] for hazards the employer either created *or* controlled, *regardless of whose employees are threatened by the hazard*. Thus, a subcontractor that creates a hazard may be cited under [the Act] *even if its own employees are not threatened*." (emphasis added)).

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 13

## Somerville Fidelco's Negligence

Somerville Fidelco also is liable to BMS for Somerville Fidelco's negligence in connection with the asbestos incident at the Somerville Facility pursuant to Section 11.4 of the Lease, which provides that Somerville Fidelco has the right to enter the leased premises to make repairs and that:

> The Landlord agrees to do all such work at all reasonable times during usual business hours and in connection with the doing of any such work to cause as little inconvenience, annoyance, disturbance, loss of business or other damage to the Tenant as may reasonably be possible in the circumstances, and in the event the Landlord shall cause any damage to Tenant's property or *if damage caused by Landlord's* or its agent's or contractor's *negligence, Landlord shall be liable for the damage.*

(Emphasis added).

Somerville Fidelco was negligent because it:

- Violated the Asbestos NESHAP by failing to provide ten (10) days advance notice of the roofing work involving the removal of ACM, or to ensure that its contractor, Badger, provided ten (10) days advance notice of the roofing work involving the removal of ACM. *See* 40 *C.F.R.* §61, App. A to Subpart M at 2.1.

- Violated the OSHA Standard by failing to inform BMS of the presence, location, and quantity of ACM or presumed asbestos-containing materials at the Somerville Facility. *See* 29 *C.F.R.* §1926.1101(k)(2)(ii)(D) *and* OSHA STANDARD INTERPRETATION LETTER, *Building and/or Facility Owner Notification Requirements* (Feb. 1996) available at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIONS&p_id=22084.

- Violated the OSHA Standard by failing to inform BMS that, when Badger was hired to repair and replace the roof of the Somerville Facility, work that was subject to the OSHA Standard was about to take place. *See* 29 *C.F.R.* §1926.1101(k)(2)(ii)(D) *and* OSHA STANDARD INTERPRETATION LETTER, *Building and/or Facility Owner Notification Requirements* (Feb. 1996). Rather, Somerville Fidelco's contractor, Badger, simply informed BMS that Badger would be removing the roof of the Somerville Facility and, therefore, BMS could expect to have some dust enter the facility.

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 14

- Failed to survey and inspect the Somerville Facility for the presence of ACM and
  presumed asbestos-containing materials. *See* USEPA *Guidance for Controlling
  Asbestos-Containing Materials in Buildings* at 2-1. Somerville Fidelco failed to
  survey and inspect the Somerville Facility for the presence of ACM and presumed
  asbestos-containing materials, despite the fact that it commissioned the HHL
  Report which recommended that core samples be taken from the roof.

- Violated the OSHA Standard by failing to notify Badger about the presence,
  location, and quantity of ACM or presumed asbestos-containing materials in the
  areas of the building or facility where Badger performed its work. *See* 29 *C.F.R.*
  §1926.1101(k)(2)(ii)(B) and OSHA STANDARD INTERPRETATION LETTER,
  *Building and/or Facility Owner Notification Requirements* (Feb. 1996). Indeed,
  Somerville Fidelco did not inform Badger that the HHL Report that was
  commissioned by Somerville Fidelco recommended that the roof of the
  Somerville Facility be tested for asbestos. (*See* Stipulation of Facts, ¶16, 17).

As a result of Somerville Fidelco's negligence, Badger proceeded with the roofing
job as if ACM was not present, failed to implement EPA and OSHA required removal
measures and protections, and caused asbestos and ACM to infiltrate the Somerville
facility.

### Somerville Fidelco's Liability For The Asbestos Contamination
### As A "Casualty" Under The Lease

Moreover, regardless of whether or not Somerville Fidelco or Badger was
negligent, Somerville Fidelco is liable under the Lease because the asbestos infiltration
caused by Badger constitutes a "casualty" under the Lease, for which Somerville Fidelco
has assumed liability.

Sections 22.2 and 22.3 of the Lease provide that if the lease premises are "damaged
by fire, explosion *or other casualty*, Landlord shall as soon as reasonable proceed to
repair such damage" and that "[i]n the event of the damage or destruction of the demised
premises by fire or other cause, Landlord will promptly repair and restore, as the case
may be, the premises so that the premises after such work shall be substantially the same
as prior to such damage." (Emphasis added).

The term "casualty" means a "fortuitous" event or an event by "chance" or
"accident." *See Compagnie Des Bauxites De Guinee v. Insurance Co. of N. Am.*, 724
F.2d 369, 372 (3rd Cir. 1983); *Faron v. Penn Mut. Life Ins. Co.*, 179 F.2d 480, 482 (3rd
Cir. 1950); *Morton Thiokol, Inc. v. General Accident Ins. Co. of Am.*, 1987 N.J. Super.
LEXIS 1487, slip op. at *10 (Ch. Div. 1987).

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 15

The asbestos infiltration caused by Badger's roofing work constitutes a "casualty" within the meaning of the Lease. *See Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3rd Cir. 2002); *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997); *David Danzeisen Realty Corp. v. Continental Ins. Co.*, 170 A.D.2d 432, 565 N.Y.S.2d 223 (2nd Dept. 1991). For example, in *David Danzeisen*, a court held that damage caused by a roofing contractor was a "fortuitous" event and therefore covered under a property insurance policy. The insurer disclaimed coverage, contending that the loss was not fortuitous. The court disagreed, finding that the plaintiff had relied upon a roofing contractor "to do whatever was necessary to properly complete the job," that the loss caused by the contractor was "to a substantial extent beyond (plaintiff's) control" and, therefore, a fortuitous event covered under the insurance policy. *David Danzeisen*, 170 A.D.2d at 432, 565 N.Y.S.2d 224.

## BMS's Damages

Pursuant to the terms of the Lease, an arbitration award should be entered in favor of BMS and against Somerville Fidelco for a total of $746,191 broken down as follows:

- $449,981 for costs incurred by BMS to decontaminate the Somerville Facility;

- $224,210 for animal care and lodging costs incurred by BMS when monkeys that had been purchased and released for delivery by a Texas vendor had to be detained at the vendor while the Somerville Facility was contaminated; and

- $72,000 for a rent abatement during the six month period (October 2005 through March 2006) that BMS had limited use of the facility while the facility was contaminated.

## BMS's Asbestos Cleanup Costs

Pursuant to Sections 11.4, 22.2 and 22.3 of the Lease, Somerville Fidelco is liable for the cleanup costs (totaling $449,981) incurred by BMS to decontaminate the Somerville facility. These costs are summarized on the Chart annexed hereto at Tab C in items 2 through 16.

The cleanup of dust and debris within the Somerville Facility was governed by the requirements of the OSHA Standard that pertain to Class IV asbestos work and the cleanup authorized by BMS was reasonable, appropriate, and necessary. Under the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), friable and non-friable asbestos-containing roofing debris and dust are considered hazardous substances, the release of which must

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 16

be contained and cleaned up in order to minimize the hazards of exposure. *See* 40 *C.F.R.* §302.4. *See also* USEPA, *Monthly Hotline Report, RCRA, Superfund and EPCRA* (Oct. 1996) available at http://www.epa.gov/epaoswer/ hotline/ 96report/oct.txt ("Although releases of non-friable asbestos are exempt from release notification requirements, such releases are still subject to CERCLA response and liability provisions"). Because test results confirmed that the dust and roofing debris that entered the facility as a result of Badger's roofing work contained friable asbestos, all dust and roofing debris that entered the facility needed to be contained and cleaned up in order to prevent the building occupants from being exposed to, and redistributing, the materials.

Pursuant to EPA guidance, after it has been confirmed that building materials at a facility contain asbestos, all building materials at a facility that are of the same sort, texture, and color as the confirmed asbestos-containing materials should be presumed to be asbestos-containing materials. *See* USEPA Toxic Substances publication entitled *Guidance for Controlling Asbestos-Containing Materials in Buildings*, EPA560/5-85-024 (June 1985). Moreover, because of the impracticality of sampling every piece of dust and roofing debris that entered the facility, it was appropriate for BMS to approve a scope of work that required BEI to treat all of the dust and debris that entered the facility as though they were materials that contained asbestos that was, or could be, rendered friable.

### BMS's Animal Care and Lodging Costs

Pursuant to Section 11.4 of the Lease, Somerville Fidelco is also liable for the animal care and lodging costs that BMS incurred because monkeys that were already purchased and released for delivery had to be detained at BMS's Texas vendor. These costs (totaling $224,210) are summarized on the Chart annexed at Tab C in item 1 ("BRF Monkey Boarding").

After quarantine, monkeys are shipped from the Somerville Facility to other BMS facilities where they participate in medical trials. As monkeys are shipped out for medical trials, new monkeys are received from Texas. In order to maintain a monkey census that would be sufficient to meet demand for 2006, BMS normally would have received shipments of approximately 100 monkeys in both the third and fourth quarters of 2005. This, however, did not happen. Shipments of new monkeys were not received at the Somerville Facility during the later half of September 2005 and the fourth quarter of 2005 because dust and debris from asbestos-containing roofing materials had infiltrated the Somerville Facility and created a risk of exposure to both the monkeys and the personnel who were resident at the Somerville Facility. All the while, the remaining monkeys were shuffled from room to room within the Somerville Facility so as to accommodate on-going cleanup activities.

DrinkerBiddle&Reath
L L P

David M. Rubin, Esq.
March 29, 2007
Page 17

### Rent Abatement

Pursuant to Sections 11.4 and 22.3 of the Lease, BMS should also be awarded a rent abatement equal to two-thirds ($12,000 per month) of the monthly rent of $18,000 for the six-month period (October 2005 through March 2006) that BMS had limited use of the facility while the facility was contaminated.

Under Section 11.4 of the Lease, Somerville Fidelco is generally liable for damage caused to BMS as a result of Somerville Fidelco's and/or Badger's negligence. Moreover, under Section 22.3 of the Lease, BMS is entitled to a rent abatement regardless of whether or not Somerville Fidelco and Badger were negligent. Section 22.3 provides in this regard that:

> If the premises should be thus rendered untenantable, the rent shall abate until the premises can again be used for *Tenant's usual business.* . . . In the event that the demised premises shall be partially damaged or destroyed by fire or other cause so as effectively to limit the use of a portion of the premises for the business of Tenant then the rent shall *abate in proportion to the size of the area rendered untenantable* until such time as effective use of said area is restored.  (Emphasis added)

Pursuant to this provision, BMS should be awarded a partial rent abatement for the six-month period that it had reduced use of the facility. *See Neurology Servs., Inc. v. Fairfax Medical PWH, LLC*, 67 Va. Cir. 1 (2005)(complaint alleging that landlord's contractors caused asbestos contamination of the tenant's medical office stated viable claim that landlord had breached the leased and that tenant had been deprived of beneficial use of the facility for its intended purpose); *see also SunAmerica Fin., Inc. v. 260 Peachtree Street, Inc.*, 415 S.E.2d 677 (Ga. Ct. App. 1992)(presence of asbestos in leased premises breached leased and resulted in constructive eviction), *cert. denied*, 1992 GALEXIS 306 (1992).

### BMS Is Not Financially Responsible Under The Lease For The Roof Repair Costs Incurred By Somerville Fidelco

In this arbitration, Somerville Fidelco has improperly asserted a setoff defense (but no counterclaim) seeking to setoff the costs it incurred for the roof repairs against any damages that may be awarded to BMS.

The landlord's and tenant's repair obligations are governed by Section 5.1 of the Lease (entitled "Repairs"). This Section provides that Somerville Fidelco "shall make the necessary structural repairs to the roof and walls of the building of which the Premises

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 18

are a part (such obligation not to include operating parts such as overhead ducts or fans or skylights)" and that BMS is responsible for other repairs.

As noted above, the history of roof leaks at this facility dates back to at least 1996. At no time, did Somerville Fidelco ever expense any roof repair costs (including any of the repair costs at issue in this arbitration) to BMS.

Somerville Fidelco's financial responsibility for "structural repairs to the roof" extends to the replacement of the roof membrane at issue. "Structural repairs to the roof" refers to the whole of the roof, not just to the portions of the roof that are structural elements of the building. While the roofing membrane is not a structural member of the building, it is a component of the structure of the roof, which as a whole includes the supporting structural framework, the decking, the insulation, and the waterproofing membrane, together with its flashing and curbs.

Courts have generally recognized that the replacement of a roof is a landlord's responsibility, not a tenant's responsibility. *See Supervalu Operations, Inc. v. Center Design, Inc.*, 206 W.Va. 311, 524 S.E. 2d 666 (W. Va. 1999); *Kalus v. Food Fair, Inc.*, 220 Va. 529, 260 S.E. 2d 212 (Va. 1979); *Reed v. Classified Parking System*, 232 So. 2d 103 (La. App.), *cert. den.*, 234 So. 2d 194 (La. 1970); *Dolid v. Leatherkraft Corp.*, 39 N.J. Super. 194 (App. Div. 1956). In fact, the notion of a tenant having financial responsibility for a substantial improvement such as the replacement of a roof is so unusual and counterintuitive that courts have declined to assign such responsibility to a tenant in the absence of explicit lease language delegating such a responsibility to a tenant. *See ASP Props. Group v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1274, 35 Cal. Rptr. 3d 343, 355 (4th Dist. 2005); *Sandelman v. Buckeye Realty, Inc.*, 216 Ill. App. 3d 226, 230, 576 N.E. 2d 1038, 1040 (1st Dist.), *appeal denied*, 42 Ill. 2d 665, 584 N.E.2d 139 (1991).

Somerville Fidelco's position that BMS is financially responsible for the roof replacement is belied by the facts that: (i) BMS had no involvement in the selection of Badger as a contractor for the roof replacement; (ii) Somerville Fidelco never provided BMS with any estimates for the cost of replacing the roof; (iii) Somerville Fidelco never sought BMS's approval of the roof replacement costs; and, (iv) the roof replacement primarily benefited Somerville Fidelco, as the building owner, inasmuch as the roof replacement is warranted for 20 years and BMS's lease is due to expire 3 years into that warranty period.

Somerville Fidelco' defense for a setoff of its roofing expenses against any damages that may be awarded to BMS is a contrived position. Until BMS requested compensation from Somerville Fidelco for the damages caused by the asbestos incident, Somerville Fidelco

DrinkerBiddle&Reath

David M. Rubin, Esq.
March 29, 2007
Page 19

had never taken the position that BMS had any financial responsibility under the Lease for any roof repairs.

      In addition to the materials referenced above, we have enclosed at Tabs 1 through 30 the legal authorities referenced in this letter.

Sincerely yours,

Charles J. Vinicombe

Enclosures
CJV/sds

cc:     Lawrence P. Maher, Esq.
        (via federal express with enclosures)