UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>SOMERVILLE FIDELCO ASSOCIATES,<br>L.P. and BADGER ROOFING CO., INC.<br><br>Defendants.<br><br>and<br><br>SOMERVILLE FIDELCO ASSOCIATES,<br>L.P.<br><br>Third Party Plaintiff,<br><br>v.<br><br>QUINCY MUTUAL FIRE INSURANCE<br>COMPANY and AMERICAN HOME<br>ASSURANCE COMPANY,<br><br>Third Party Defendants. | CIVIL ACTION NO. 3:07-cv-02763<br>(AET) (TJB)<br><br><br><br><br><br><br><br><br><br>**LOCAL RULE 56.1 COUNTER-STATEMENT OF MATERIAL FACTS IN OPPOSITION TO AMERICAN HOME ASSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT** |

In Opposition to the Motion for Summary Judgment submitted by American Home Assurance Company ("AHA"), Defendant Somerville Fidelco Associates, L.P. ("Fidelco") submits the following Counter-Statement of Material Facts:

1. Disputed insofar as AHA characterizes the Complaint for Declaratory Judgment filed by Scottsdale Insurance Company ("Scottsdale"). The pleading speaks for itself.

2. Disputed insofar as AHA characterizes Fidelco's Third Party Complaint against AHA and Quincy Mutual Fire Insurance Company ("Quincy"). The pleading speaks for itself.

3. Undisputed.

4. Disputed, insofar as who is an insured in modified by the applicable Certificates of Insurance which name Somerville Fidelco Associates LP as an additional insured with respect to Bristol Myers Squibb's ("BMS") CGL and All Risks coverage during the applicable time period. (See Matloff Cert and Exhibit 44)

5. Undisputed.

6. Undisputed

7. Undisputed.

8. Undisputed.

9. Undisputed.

10. Undisputed.

11. Undisputed.

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Disputed, insofar as the portion of the lease provision regarding insurance is not the only relevant portion since Section 6.1 requires BMS to "keep the demised premises, together with the fixtures therein and the fixtures, appurtenances and equipment used in the operation thereof . . . insured against loss or damage by fire, extended coverage and vandalism and malicious mischief, to the full insurable value thereof. . . ." (Matloff Cert. and Exhibit 1)

16. Undisputed.

17. Undisputed.

18. Disputed, insofar as Section 11.4 of the lease provision regarding "Landlord's Right to Inspect and to make Repairs" is not the only relevant portion of that section of the lease since Section 11.1 discusses the tenant's obligation to make certain repairs relating back to Section 5. (Matloff Cert. and Exhibit 1)

19. Disputed, insofar as Section 29.2 is also a relevant provision regarding the allowing of liability and provides: "The Tenant agrees to and does hereby indemnify and save harmless the Landlord against and from any and all claims, demands, actions, suits, proceedings,

judgments, levies, costs, expenses and counsel fees by or on behalf of any person or persons, firm or firms, corporation or corporations, arising out of or in connection with Tenant's maintenance or use of the demised premises or the operation of its business which may be conducted therein by said Tenant or any person or persons." (Matloff Cert. and Exhibit 1)

20.  Undisputed.

21.  Undisputed.

22.  Undisputed.

23.  Undisputed.

24.  Undisputed.

25.  Undisputed.

26.  Disputed, insofar as while both wipe and bulk samples were taken the asbestos only was detected in two bulk samples, which means that the asbestos was non-friable. (See Matloff Cert. and Exhibit 20 at Attachment 1) See also Exhibit L to Cohen Cert. wherein BMS indicates in letter that bulk samples contained asbestos.

27.  Undisputed.

28.  Undisputed.

29.  Undisputed.

30.  Disputed insofar as while AHA accurately quotes BMS's letter we contest the accuracy of BMS's characterization of the facts asserted.

31.  Undisputed.

32.  Disputed insofar as while AHA accurately quotes BMS's letter we contest the accuracy of BMS's characterization of the facts asserted.

33.  Disputed insofar as while AHA accurately quotes BMS's arbitration demand we contest the accuracy of BMS's characterization of the facts asserted.

34.  Undisputed.

35.  Undisputed.

36.  Undisputed.

37.     Disputed insofar as while AHA accurately quotes BMS's arbitration submission we contest the accuracy of BMS's characterization of the costs incurred and the categorization of these costs.

38.     Undisputed.

39.     Undisputed.

40.     Undisputed.

**Additional Material Facts in Dispute**

1.      Fidelco owns commercial property located at 76 Fourth Street which it leased to BMS pursuant to a written lease and various lease extensions. (Matloff Cert. and Exhibit 1)

2.      BMS used the facility for the housing of monkeys used in drug testing at other BMS facilities. (Matloff Cert. at Exhibit 13)

3.      The roof on the building was in need of repair and Fidelco entered into a written contract with Badger Roofing Co., Inc. ("Badger") to remove the existing roof and replace it. (Matloff Cert. at Exhibit 13) The contract consisted of Badger's written proposal which was signed and accepted by Barry Ages on behalf of Fidelco on July 14, 2005. In addition, Robert Hanley of Badger forwarded an AIA form Contract incorporating the proposal and the numerous terms and conditions of AIA Document A201-1997 to Mr. Ages under cover of a letter dated August 3, 2005. The general conditions include a requirement that the contractor obtain insurance. (Matloff Cert. and Exhibits 2, 3, and 4)

4.      On September 22, 2005, just a short time after the work commenced, BMS demanded that Badger cease work because of the amount of dust and debris from the roof work that was entering the interior of the facility. (Matloff Cert. and Exhibits 5 and 12)

5.      BMS was concerned that the dust might contain asbestos; Fidelco retained an asbestos abatement company known as Slavco Construction Inc. to complete the removal using state of the art methods and precautions approved by BMS, including asbestos abatement measures, air monitoring and plastic sheathing on the interior of the facility. The remainder of the roof was removed and replaced Between December 16 and December 19, 2005. (Matloff Cert. and Exhibit 12)

6.      Fidelco's retention of Slavco was motivated by the desire to maintain good relations with its tenant rather than any belief that there was a need for asbestos abatement. Fidelco indicated to the Tenant in a November 4, 2005 letter that: "It has been established that the debris that fell during the prior roof removal activity was interior dust dislodged during the removal. Such material did not contain asbestos and did not come from the exterior. . . While

tenant has indicated its responsibility to clean the building, it has not yet done so." (Matloff Cert. and Exhibit 6)

7. BMS responded in its November 11, 2005 letter, contesting its responsibility for cleaning the building and indicating that "adverse impacts, including costs and expenses, that have resulted from the debris and dust that is in the interior of the leasehold, which is affecting BMS's ability to use the leasehold for the purpose for which it was intended. . ." At a certain point BMS was requesting a rent abatement for a six month period. (Matloff Cert. and Exhibits 13 and 49)

8. Air sampling done for BMS did not detect asbestos above permissible exposure limits. (Matloff Cert. and Exhibit 11 and 20)

9. In an overabundance of caution, BMS undertook a complete cleaning and dust removal process using licensed asbestos workers and asbestos abatement protocols, which was done in two phases. In the second phase, BMS embarked on a massive cleanup and reconstruction of its facility which took from January until April 2006 to complete and included the removal, disposal and reconstruction of interior ceilings, lighting, painting, etc. BMS claimed that it cost them $225,000 to "board" monkeys which they were supposed to take for delivery during this entire time period. In various letters BMS also sought rent abatement for a six month period. (Matloff Cert. and Exhibits 11, 13 and 20)

10. It is uncontested that despite continued testing no asbestos of any type, even in bulk samples, was discovered during the second phase of the cleanup. (Matloff Cert. and Exhibit 11and 12)

11. During the arbitration BMS provided a spreadsheet of damages that showed that $214,878.80 was invoiced for monkey boarding during November 2005 to March 2006 because the Building could not be used during the clean-up work. Other costs on plaintiff's spreadsheet are for trailers, replacement of tile, new ceiling grids, new ceilings, new tiles, painting, new air filters, diffusers, collars, dampers and ducts. (Matloff Cert. and Exhibit 20 at Attachment 4)

12. On August 6, 2006, BMS served Fidelco with a demand for arbitration seeking to recover the costs for damages to its property and loss of use of the property allegedly caused by Badger in removing the roof. BMS's initial demand sought $734,175 in damages.(Matloff Cert. and Exhibit 8)

13. Fidelco is an additional insured of BMS's Policies with AHA as required by various provisions of Section 6 of the BMS-Fidelco Lease. Certificates of Insurance provide that Fidelco is an additional insured as to both CGL coverage and property damage. (Matloff Cert. and Exhibit 44)

14. On March 14, 2007 Fidelco's counsel provided AHA with notice of a claim and a copy of the arbitration demand. In this notice counsel states that "Bristol-Myers alleges that roofing materials and dust entered the Building causing property damage and loss of use. No response was received. (See Matloff Cert and Exhibit 45)

15. Because no response was received Fidelco's counsel sent a follow up letter on April 4, 2007 requesting coverage again and indicating that the first arbitration hearing was scheduled to being on April 17, 2007. No response was received. (See Matloff Cert and Exhibit 46)

16. On April 26, 2007, Fidelco's counsel again wrote to AHA memorializing her voice mail message of that day advising that settlement was imminent and indicating that if they did not hear from AHA by the close of business on Friday, April 27, 2007 they would assume that the insurer had no objection to the settlement and agrees that the settlement is not in violation of the AHA policy. Again AHA did not respond and the settlement was consummated. (See Matloff Cert and Exhibit 47)

17. BMS and Fidelco settled on the eve of the arbitration hearing, and BMS was paid a total of $575,000 in settlement. Fidelco incurred approximately $122,862.41 in legal fees to defend itself in the arbitration proceeding. (Matloff Cert. and Exhibits 18 and 43)

18. There is a disputed issue of fact with respect to whether BMS or Fidelco had responsibility for the roof and the other repairs under the provisions of the lease as this was an issue briefed but never decided in the arbitration. (Matloff Cert. and Exhibits 1, 12 and 13)

19. There is a disputed issue of fact with respect to whether the property for which damages are sought is property belonging to Fidelco or BMS based upon the provisions of the lease. (Matloff Cert. and Exhibits 1, 12, and 13)

20. There is a disputed issue of fact as to whether coverage should be provided for that portion of the damages which relate to loss of use of the property which encompasses the rent abatement requested of $72,000 and almost $225,000 costs for boarding the monkeys.

21. Although Fidelco was aware that there was a problem with the manner in which the roofing project was being performed in September 2005, the Demand for Arbitration seeking monetary damages was not served upon Fidelco until August 4, 2006, which is during the 06-07 AHA policy period. While BMS "expressed concern" regarding the dust, and indicated by letter dated November 11, 2005 that it was reserving its rights, (See Exhibit J and L to Cohen Cert.) it constitutes a factual issue as whether or not this would constitute a claim for damages sufficient to trigger knowledge that would preclude coverage under an insurance policy.

NAGEL RICE, LLP
Attorneys for Somerville Fidelco LP

By: _____
JAY J. RICE

Dated: 12/7/09