IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY<br><br>Plaintiff<br><br>vs.<br><br>SOMERVILLE FIDELCO ASSOCIATES, L.P., AND BADGER ROOFING CO., INC.<br><br>Defendants<br><br>and<br><br>SOMERVILLE FEDELCO ASSOCIATES, L.P.<br><br>Third-Party Plaintiffs<br><br>vs.<br><br>QUINCY MUTUAL FIRE INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY<br><br>Third-Party Defendants | UNITED STATES DISTRICT COURT FOR DISTRICT OF NEW JERSEY<br>TRENTON COUNTY<br>LAW DIVISION<br><br>DOCKET NO. 07-CV-02763<br><br>CIVIL ACTION<br><br><br>*MOTION  RETURN DATE: TBD*<br><br><br><br>*MOVANT REQUESTS ORAL ARGUMENT* |

---

***PLAINTIFF'S REPLY BRIEF TO SOMMERVILE FIDELCO'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT***

---

Jay A. Gebauer
Quinn M. McCusker
On the Brief

## *TABLE OF CONTENTS*

POINT I: SF IS NOT AN ADDITIONAL INSURED.............................   1

    A.    SF's Contract with Badger Does Not Contain Language Identifying SF as an
          Additional Insured, as Required by the Policy.....................................   1
    B.    A Contract That Fails to Meet the Policy's Requirements, Combined with a
          Certificate of Insurance, Does Not Qualify SF as an Additional Insured ......   1
    C.    The AIA Document is Not Binding and Does Not Modify the SF – Badger
          Contract or Create a Question of Fact..........................................   7

POINT II: THE ASBESTOS EXCLUSION IS APPLICABLE AND ENFORCEABLE..   7

    A.    Asbestos was Discovered in the Facility on Numerous Occasions...............   7
    B.    After Asbestos was Discovered, the Entire Project Was Treated as an
          Asbestos Contamination.............................................................   9
    C.    SF is Not Entitled to Defense and Indemnification for its Own Cross Claim
          Against Badger.....................................................................   10

POINT III: SCOTTSDALE SPECFICALLY RESERVED ITS RIGHT TO DENY
COVERAGE TO SF ON ANY GROUNDS CONTAINED IN THE POLICY..............   10

POINT IV: NO COVERAGE IS PROVIDED FOR BREACH OF CONTRACT...........   12

    A.    SF's Damages are Based Solely on its own Breach of Contract, Not Badger's
          Negligence........................................................................   12

POINT V: NO COVERAGE IS AVAILABLE FOR DAMAGES TO SF'S OWN
PROPERTY.....................................................................   14

CONCLUSION...................................................................15

## ***TABLE OF AUTHORITIES***

### ***CASE LAW***

American Motorist Ins. Co. v. Superior Acoustics, Inc., 277 A.D.2d 97, 716 N.Y.S.2d 389 (1st Dep't 2000) ............................................……......................... 2

Cincinnati Ins. Co. v. Gateway Construction Co., 865 N.E. 2d 395 (Ill. App. 2007) ...... 6

Clarendon Am. Ins. Co. v. Aargus Sec. Sys., 374 Ill. App. 3d 591 (Ill. App. 2007) .........2

Donegal Mut. Ins. Co. v. Grossman, 195 F. Supp. 2d 657 (M.D. Pa. 2001) ..................3

Elizabeth Water Co. v. Hartford Casualty Ins. Co., 18 F. Supp. 2d 464 (D.N.J. 1998)... 11, 12

Getto v. Village of Palos Park, IL, 1999 U.S. Dist. LEXIS 3453 (N.D. Ill. 1999) ......... 2

Latino v. Greg's Landscaping, Inc., 2006 WL 2457837 (Law Div. August 18, 2006)... 4, 5, 6

Moleon v. Kreisler Borg Florman Gen. Constr. Co., 304 A.D.2d 337, 758 N.Y.S.2d 621 (1st Dep't 2003) .............................……..........……............................……         2

National Union Fire Ins. Co. v. Liberty Mutual Ins. Co., 2008 U.S. Dist. LEXIS 14291 (S.D. Flo. 2008) ................................……..........……......................... 6

Nationwide Mut. Ins. Co. v. Johnson, 450 Pa. Super. 519, 676 A.2d 680 (1996) ............6

O'Brien v. Nationwide Mut. Ins. Co., 455 Pa. Super. 568, 689 A.2d 254 (1997) ............6

Rupp v. American Crystal Sugar Co., 465 N.W.2d 614 (N.D. 1991) ....................... 5

Rust/Lucky v. Williams Crane & Rigging, Inc., 1994 U.S. Dist LEXIS 2633 (E.D. Pa. 1994) ..............................................……..........……..................................         2

Shaler ex rel. Shaler v. Toms River Obstetrics & Gynecology Assoc., 383 N.J. Super. 650 (App. Div. 2006) ..............................................……..........……...............         6

Travelers Indem. Co. v. Dammann & Co., 2008 U.S. Dist. LEXIS 9759 (D.N.J. 2008). 13, 14

United States Fire Ins. Co. v. Hartford Ins. Co., 726 N.E. 2d 126 (Ill. App. 2000) ......         6

Van Orman v. American Insurance Co.,680 F. 2d. 301 (3d Cir. 1982) ..................... 3, 4

Vinco Inc. v. Royal Ins. Co. of Am., 29 Fed. Appx. 753 (2nd Cir. 2002) ..................... 2

## POINT I

## SF IS NOT AN ADDITIONAL INSURED

*A.*     *SF's Contract with Badger Does Not Contain Language Identifying SF as an Additional Insured, as Required by the Policy*

SF's opposition misrepresents Scottsdale's argument. SF portrays Scottsdale's argument to be that there was no contract between SF and Badger. This is not the case. Initially, Scottsdale concedes that the signed Proposal amounted to a contract between Badger and SF. (Exhibit I). Moreover, Scottsdale's argument is more narrowly tailored. Specifically, Scottsdale's argument is that the contract did not contain an additional insured clause, as required by the Policy.

The Policy specifically and unequivocally required Badger and SF to "have agreed in writing in a contract or agreement that [SF] be added as an additional insured..." (Exhibit A, Exhibit B). In order to meet this requirement, the SF – Badger contract needed to say something to the effect of "SF is an additional insured under the Policy." It did not. SF, therefore, cannot be considered an additional insured. There is no factual dispute on this issue.

*B.*     *A Contract That Fails to Meet the Policy's Requirements, Combined with a Certificate of Insurance, Does Not Qualify SF as an Additional Insured*

SF's argument seems to be the following: a contract, without any language naming SF as an additional insured, plus a post-dated Certificate of insurance (that specifically states it does not confer additional insured status) qualifies SF as an additional insured under the Policy. This argument lacks all merit and has no legal basis whatsoever.

As indicated above, the contract does not say SF is an additional insured. The Certificate does not add anything to support SF's position. If anything, the language contained in the Certificate defeats SF's argument.

The Certificate states:

> "This certificate is issued as matter of information only and confers no rights upon the certificate holder. This certificate does not amend, extend or alter the coverage afforded by the policies below." (Exhibit C).
>
> "This Certificate of Insurance…does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed hereon." (Exhibit C).

Based on the above disclaimers, the Certificate cannot be used to establish SF is an additional insured. SF, therefore, is not entitled to coverage under the Policy.

Foreign case law supports Scottsdale's position[1] that Certificates of Insurance cannot alter coverage. *See* Moleon v. Kreisler Borg Florman Gen. Constr. Co., 304 A.D.2d 337, 758 N.Y.S.2d 621 (1st Dep't 2003) (A certificate of insurance containing a disclaimer that the certificate was informational and did not alter the actual policy's coverages was insufficient to establish additional insured coverage.); American Motorist Ins. Co. v. Superior Acoustics, Inc., 277 A.D.2d 97, 716 N.Y.S.2d 389 (1st Dep't 2000) (A certificate, which contained disclaimers that it was for information only, conferred no rights on the holder and did not extend or alter coverage provided by the policy); Clarendon Am. Ins. Co. v. Aargus Sec. Sys., 374 Ill. App. 3d 591, 597-598 (Ill. App. 2007) (certificates of insurance are not contracts and cannot alter the fact that the written contract does not contain an obligation to provide for additional insured coverage.); *and see generally*, Vinco Inc. v. Royal Ins. Co. of Am., 29 Fed. Appx. 753 (2nd Cir. 2002) (A certificate of insurance is a purely informational document.)[2].

---

[1] This has been Scottsdale's position from the beginning. As indicated by Scottsdale's coverage counsel's April 24, 2007 letter to SF's attorney, certificates of insurance do not demonstrate SF is an additional insured. (SF's Brief, Exhibit 22).

[2] *See also* Getto v. Village of Palos Park, IL, 1999 U.S. Dist. LEXIS 3453 (N.D. Ill. 1999); Rust/Lucky v. Williams Crane & Rigging, Inc., 1994 U.S. Dist LEXIS 2633 (E.D. Pa. 1994) (fact that certificate of insurance named contractor as additional insured did not mean that the contractor was actually an additional insured on the policy of insurance); Donegal Mut. Ins. Co. v. Grossman, 195 F. Supp. 2d 657 (M.D. Pa. 2001) (where certificate of

- 2 -

SF characterized two cases cited in Scottsdale's brief as "inapposite"; i.e. American Wrecking Corp. and Enlgert. As indicated in its brief, however, Scottsdale relied on those cases to illustrate that, while New Jersey courts have heard cases involving both identical (American Wrecking Corp.) and similar (Englert) Policy provisions requiring specific written language to trigger coverage, the Courts have not questioned the validity of such provisions.[3] With that said, Scottsdale would certainly not concede that no cases directly addressed an issue and then, in the next sentence, cite cases that directly addressed that same issue. Moreover, SF fails to address the numerous additional cases[4] Scottsdale cited in support of this point.

Next, turning to the case law cited by SF, while Scottsdale does not deny that the Van Orman v. American Insurance Co. decision generally referenced[5] that two or more writings may constitute a contract, that case has no applicability to the present matter. 680 F. 2d. 301 (3d Cir. 1982). Nothing in the Van Orman case supports the proposition that the two

---

insurance states that it provides no coverage greater than or inconsistent with the policy, and coverage does not provide that the party in question is indeed an additional insured, claim of additional insured status fails).

[3] The American Wrecking Corp. case contained the following provision:

A. Who is An Insured (Section II) is amended to include as an insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability arising out of your ongoing operations performed for that insured. A person's or organization's status as an insured under this endorsement ends when your operations for that insured are completed. American Wrecking Corp., 400 N.J. Super. 276, 946 A.2d 1084 (App. Div. 2008).

The Englert case involved required a similar written provision to trigger either primary or excess coverage: "[t]his insurance is excess over any valid and collectible insurance unless you have agreed in a written contract for this insurance to apply on a primary or contributory basis." 389 N.J. Super. 44, 991 A.2d 72 (App. Div. 2006)

[4] Hartz Mountain Indus. v. Preserver Ins. Co., 2008 N.J. Super. Unpub. LEXIS 1290 (App. Div. 2008), Emplrs Ins. Co. v. Harleysville Ins. Co., 2008 U.S. Dist. LEXIS 69359 (D.N.J. 2008), Employers Ins. Co. v. Harleysville Ins. Co., 2007 U.S. Dist. LEXIS 7257 (D.N.J. 2007)

[5] The Court did not find the argument convincing. Id. at 305.

- 3 -

documents at issue here – the contract and the Certificate – may be viewed together to satisfy the Policy's requirement[6]. Nothing in that case supports abrogating the specific Policy language that the contract name SF as an additional insured. Nothing in <u>Van Orman</u> supports an argument that the Certificate is anything more than an informational document and cannot alter the Policy's coverage. The <u>Van Orman</u> case is irrelevant to this matter.

SF then goes on to cite the unpublished case of <u>Latino v. Greg's Landscaping, Inc.</u> for the premise that the existence of Certificates of insurance raises a factual issue precluding summary judgment. 2006 WL 2457837 (Law Div. August 18, 2006). This case is completely distinguishable from the present matter.

The <u>Latino</u> matter arose out of an alleged slip and fall on snow/ice at a site owned by Endov and Nexus. 2006 WL 2457837 at 1. Endov and Nexus hired Greg's Landscaping ("GL") to perform snow removal. <u>Id</u>. Endov and Nexus filed a third-party complaint against Farm Family Insurance Co., GL's insurer, based on GL's agreement by contract to provide primary liability insurance naming Endov and Nexus as additional insureds. <u>Id</u>.

The indemnification clause in the agreement between Endov/Nexus and GL provided:

> Contractor [GL] agrees to indemnify and hold Management and/or Owner (Endov/Nexus), and their agents, servants and/or employees, harmless from and against any and all lawsuits, claims, demands, liabilities, damages or expenses (including reasonable attorney's fees) which may be made, suffered or incurred by reason of any act or omission of Contractor, or its agent, servants and/or employees. 2006 WL 2457837 at 1-2.

The agreement also contained the following provision:

> Contractor [GL] shall maintain Comprehensive General Liability and Automobile Liability Insurance as set forth on Exhibit B which shall be deemed to be primary coverage for Owner and/or Management (Nexus/Endov) in the event of any

---

[6] That the SF and Badger specifically "agree[] in writing...that [SF] be added as an additional insured..."

> claim, damage or injury in any way relating to snow. 2006 WL
> 2457837 at 3.

Endov and Nexus moved for summary judgment, claiming that the indemnification provisions contained in its agreement with GL should be enforced. Id. at 1. Farm Family cross-moved for summary judgment, claiming that GL never purchased insurance naming Endov and Nexus as additional insureds. Id.

Nexus and Endov argued that GL's failure to name them as additional insureds in its policy was a breach of contract. Nexus and Endov also argued that the second contract provision was enough to trigger coverage by Farm Family. 2006 WL 2457837 at 3. The Court held these arguments raised sufficient factual issues to deny summary judgment. Id.

The Latino case is factually distinguishable, as the contract at issue in that case contained language requiring GL to obtain insurance coverage for Nexus and Endov[7]. The SF – Badger contract contains no such language.

Additionally, SF mischaracterizes the Court's holding. The court did not find questions of fact existed merely because there was a certificate of insurance. The questions of fact arose because there was an issue whether GL's failure to name Nexus/Endov as additional insureds in the policy was a breach of contract. There was also an issue whether the contract, as written, did in fact require Farm Family to defend and indemnify Nexus/Endov[8]. Both of these issues are completely absent from the present matter because the SF – Badger

---

[7] The other case cited by SF, Rupp v. American Crystal Sugar Co., dealt with a contract that specifically required a party to be added to a policy as an additional insured. 465 N.W.2d 614, 615, 617 (N.D. 1991).

[8] The exact language of the opinion is as follows: "Nexus and Endov state that, under this case law, [GL's] failure to name them as additional insureds on its policy is a breach of its agreement with Nexus/Endov, and *that the contract should be enforced as if they had been named on the policy. For this reason* as well, sufficient factual issues regarding coverage under the Farm Family policy for Nexus and Endov exist, and Farm Family's motion for summary judgment must be denied." (emphasis added). 2006 WL 2457837 at 3.

contract contains no such language. As a result, the Latino must not lead this Court to deny Scottsdale's motion.

The most telling aspect of SF's opposition regarding the additional insured issue is not the case law it cites but, rather, the abundance of case law and arguments SF fails to address. For instance, SF does not address National Union Fire Ins. Co. or United States Fire Ins. Co. which found that, when the additional insured endorsement requires that the agreement be in writing, additional insured coverage is properly denied when no such written agreement exists. National Union Fire Ins. Co. v. Liberty Mutual Ins. Co., 2008 U.S. Dist. LEXIS 14291 (S.D. Flo. 2008) or United States Fire Ins. Co. v. Hartford Ins. Co., 726 N.E. 2d 126 (Ill. App. 2000).

Likewise, SF fails to address Scottsdale's argument that a post-dated Certificate would not be effective for an incident occurring prior to the date of the Certificate. Cincinnati Ins. Co. v. Gateway Construction Co., 865 N.E. 2d 395 (Ill. App. 2007) O'Brien v. Nationwide Mut. Ins. Co., 455 Pa. Super. 568, 689 A.2d 254 (1997); Nationwide Mut. Ins. Co. v. Johnson, 450 Pa. Super. 519, 676 A.2d 680 (1996).

On this issue, SF wrote: "It is unclear when each of the Certificates was issued, as some are undated although there is one dated June 29, 2006." In fact, the June 29, 2006 Certificate was supplied by SF's own arbitration counsel, Ellen Silver[9]. (SF's Brief, Exhibit 20)[10]. This Certificate post-dates Badger's work by approximately eight (8) months.

---

[9] A prospective insured has the burden of demonstrating it is entitled to coverage under an insurance policy. Shaler ex rel. Shaler v. Toms River Obstetrics & Gynecology Assoc., 383 N.J. Super. 650, 662 (App. Div. 2006)(It is well-settled that the insured bears the burden of establishing that a claim lies within the policy's scope of coverage.)(citations omitted).

[10] Note: In order to avoid confusion, all references to exhibits attached to SF's brief will contain the following: "SF's Brief, Exhibit __". All other citations to exhibits refer specifically to Scottsdale's exhibits.

Therefore, even if this Court were to determine SF was entitled to coverage as an additional insured, this coverage would not begin until June 29, 2006.

Based on the above, it is clear that SF is not entitled to coverage under the Policy as an additional insured.

### C. The AIA Document is Not Binding and Does Not Modify the SF – Badger Contract or Create a Question of Fact

The issue regarding this AIA document is a purely legal one; i.e. whether an unsigned, parol contract modifies a duly executed, complete and signed contract. SF asserts no legal justification for this argument.

There is absolutely no factual dispute regarding the AIA Document. That document – which was *not* signed by anyone from Badger – was not part of any "contract". The letter from Mr. Haney clearly instructed Mr. Ages from SF to sign and return the AIA document. (SF's Brief, Exhibit 3). It is undisputed this was never done. At no point did Dr. Mr. Ages or any other SF representative return a signed copy of the AIA Document. (Exhibit I, SF's Brief, Exhibits 2, 3 and 4). Other than this initial letter, no other letters, correspondence, notes or other documents reference this AIA contract.

What SF is trying to do is to create an issue of fact out of thin air. There is no dispute that this document was never signed by either Badger or SF. The fact that an unsigned contract exists certainly does not support a finding that such a document is binding. Likewise, the mere existence of the AIA document is not enough to create an issue of fact sufficient to defeat this motion.

### POINT II

### THE ASBESTOS EXCLUSION IS APPLICABLE AND ENFORCEABLE

### A. Asbestos was Discovered in the Facility on Numerous Occasions

- 7 -

It is undisputed that asbestos was found inside the building. Asbestos was found in bulk, wipe and air samples on numerous occasions from September of 2005 through March of 2006.

"Bulk Samples of roof material at the Somerville facility were gathered in September 2005 from a limited area of the *interior* of the facility. The bulk samples tested positive for a percentage of asbestos." (SF's Brief, Exhibit 11)(emphasis added). In fact, asbestos-containing material was initially found in two separate areas of the facility; the loading dock and the storage room. (SF's Brief, Exhibit 11). This was confirmed by Eagle's reports. (Exhibit V).

Additionally and significantly, in September of 2005, wipe samples from the top of a refrigerator near the break room and the top shelf above employees' desks also tested positive for asbestos. (Exhibit A – ATTACHED HERETO).

Thereafter, an air sample from inside animal room #11 tested positive for asbestos. (Exhibit A – ATTACHED HERETO).

Finally, Chrysotile asbestos was detected in air samples taken on February 7, February 16 and March 1, 2006 (2 positive results). (Exhibit A – ATTACHED HERETO). The "Sampling Data" included in the arbitration file indicated that the February 6, 2006 positive test was an air sample taken in the "Hallway o/s boiler room." The February 15, 2006 positive test was from an air sample taken in the "Animal room 5-9 corridor." Finally, the March 1, 2006 finding included two positive tests from an air samples taken 1) "Hallway o/s boiler room"; and 2) "Hallway o/s lunch room." (Exhibit A – ATTACHED HERETO).

SF's assertion that there was no asbestos found inside the Facility other than the bulk samples is patently false. Overall, from September of 2005 through March of 2006, multiple

tests were positive for asbestos on numerous occasions. These positive tests were from bulk

material, wipe samples and air tests. (Exhibit A – ATTACHED HERETO).

**B.     *After Asbestos was Discovered, the Entire Project Was Treated as an Asbestos Contamination***

When viewed as a whole, the facts of this case unequivocally establish that this project

was handled as an asbestos contamination. Slavco – an asbestos contractor – was hired to

finish the roof removal. Eagle was hired to conduct asbestos testing. Bristol was hired to

conduct an asbestos abatement. Contrary to SF's assertion that BMS's damages primarily

arose from the removal of dust and other non-asbestos containing materials, BMS's damages

arose exclusively because of asbestos contamination. (*See* BMS's Arbitration Statement,

Exhibit 3[11]).

Such damages fall within paragraphs 3. and 4. of the asbestos exclusion – damages

arising from "the removal of asbestos from any good product or structure." (Exhibit A,

Exhibit E). Likewise, the asbestos abatement and clean up process constitute the "disposal of

asbestos or goods or products containing asbestos" and are excluded from coverage under the

Policy. (Exhibit A, Exhibit E).

---

[11] The March 29, 2007 letter from BMS's counsel to the mediator contains the following introductory language: "The subject matter of this arbitration is an asbestos incident that occurred at 76 Fourth Street in Somerville, New Jersey…" (Exhibit 3, p. 1 of the March 29, 2007 letter). The letter goes on: "As a result of Badger's roof removal activities, dust and debris containing asbestos materials infiltrated the Somerville Facility through gaps in the roof decking." (Exhibit 3, p. 2 of the March 29, 2007 letter). As one final example, the letter goes on: "The asbestos infiltration at the Somerville Facility adversely affected BMS in a number of respects. First and foremost, BMS was concerned about human exposure to asbestos dust and fibers…Second, BMS was concerned about the monkeys' potential exposure to asbestos dust…Third, BMS had to address the continuation of the roofing job…[BMS insisted SF retain] an asbestos removal company…and develop[] a protocol to appropriately complete the roof removal…Fourth, BMS had to address the asbestos contamination of the facility…Fifth, BMS had to address the impact that the asbestos contamination had on its operations." (Exhibit 3, p. 3 of the March 29, 2007 letter).

Clearly the asbestos exclusion applies and no coverage is available. As such, coverage for BMS's damages is properly denied to both SF and Badger.

## C.   SF is Not Entitled to Defense and Indemnification for its Own Cross Claim Against Badger

SF asserts the following: "[T]he claims brought by [SF] against Badger…do not raise claims relating to asbestos. [SF] is suing Badger for failing to take reasonable precautions in undertaking the roof removal process which resulted in extensive dust infiltration…" (SF's Brief, p. 20).

This argument must fail. It is undisputed that all of BMS's damages, and, therefore, all of SF's damages, arise from asbestos contamination and/or breach of contract. That SF couched its cross claims against Badger in negligence terms does not defeat any of the defenses and exclusions referenced above.

This claim is quite ambiguous and SF fails to cite any legal authority supporting such a conclusion. This claim for defense and indemnification must be thrown out.

## POINT III

## SCOTTSDALE SPECFICALLY RESERVED ITS RIGHT TO DENY COVERAGE TO SF ON ANY GROUNDS CONTAINED IN THE POLICY

SF asserts that Scottsdale is not entitled to raise any coverage denial other than the asbestos exclusion because no other exclusions were previously raised. This contention directly contradicts the record.

Scottsdale specifically and repeatedly indicated it was reserving its rights to raise any coverage issues until *after* it was determined that SF was an additional insured. (SF's Brief, Exhibits 19, 22, 24 and 26).

From its initial letter to SF's counsel, Scottsdale asserted that SF was not an additional insured under the Policy. (SF's Brief, Exhibit 19). Moreover, this initial letter specifically

- 10 -

requested SF provide Scottsdale with a copy of the contract between Badger and SF so Scottsdale could determine whether SF was an additional insured. (SF's Brief, Exhibit 19). A written contract was never supplied.

When Scottsdale retained coverage counsel, these attorneys continually asserted that Scottsdale would evaluate any coverage available to SF once Scottsdale determined that SF was an additional insured. (SF's Brief, Exhibit 22, 24 and 26). This determination depended on the production of a contract. (SF's Brief, Exhibit 22, 24 and 26). Again, no contract was ever produced.

Significantly, these letters also contained a reservation of rights: "Nothing in this letter should be construed as a waiver of any rights or reservations available to Scottsdale Insurance Company"; "Scottsdale reserves all rights it has or may have regarding this matter including any and all coverage defenses"; and "[W]e will not surrender or waive any of Scottsdale's rights to limit or deny coverage." (SF's Brief, Exhibit 22, 24 and 26).

Since no contract was ever supplied to Scottsdale or its coverage counsel, SF was never determined to be an additional insured. That being the case, Scottsdale did not complete a coverage analysis relevant to any policy exclusions or limitations relevant to SF. Scottsdale, specifically and repeatedly, however, reserved the right to do so. As a result, all the coverage limitations at issue herein are validly asserted by Scottsdale and must not be limited.

SF relies on the case of Elizabeth Water Co. v. Hartford Casualty Ins. Co. for the proposition that Scottsdale waived raising any additional policy limitations or exclusions. *See* 18 F. Supp. 2d 464 (D.N.J. 1998). That case has no bearing on the present matter. The Court's

finding in <u>Elizabeth Water</u> was based on the fact that a carrier did not raise certain exclusions until a late stage in the litigation[12]. 18 F. Supp. 2d 464, 465.

Unlike the <u>Elizabeth Water Co.</u> case, Scottsdale specifically reserved its rights to assert any and all coverage issues against SF once it was determined that SF was an additional insured. Additionally and significantly, the policy exclusions were raised in the Complaint commencing this case, not late in the litigation process. The exclusions form the entire basis for Scottsdale's pleading and cannot be said to surprise or prejudice SF.

## POINT IV

### NO COVERAGE IS PROVIDED FOR BREACH OF CONTRACT

*A.   SF's Damages are Based Solely on its own Breach of Contract, Not Badger's Negligence*

SF's damages herein were not directly suffered by SF itself. BMS, not SF, was the damaged party. The entirety of SF's damages are, in effect, BMS's damages. (Exhibit 5). SF has no independent damages of its own. SF did not have to pay to refurbish the Facility. (Exhibit 5). SF did not pay Eagle or Bristol to conduct asbestos testing and asbestos abatement. (Exhibit 5). It was not SF's monkeys that were "boarded". (Exhibit 5). SF's business was not interrupted. (Exhibit 5). All of these damages are distinctly and solely attributable to BMS. SF's damages arose because it paid BMS for these damages.

BMS's underlying claim against SF was for breach of contract, specifically, "breach of commercial lease." (Exhibit 3)(SF's Brief, Exhibit 1)[13]. The lease specifically required SF

---

[12] All exclusions addressed herein were included in the Complaint, at the inception of litigation. (Exhibit 7). Count Three of the Complaint indicates that "The Policy provides no coverage for breach of contract." (Exhibit 7). Count Four also indicates that exclusions j, k, and l barred coverage. (Exhibit 7).

[13] The lease contained the following provisions:

> ¶ 5.1 Landlord [SF] shall make the necessary structural repairs to the roof…Except for the [roof repairs]…,Tenant [BMS] shall be responsible for all maintenance and repairs of and to the premises…

to perform the roof repairs. The lease also required SF to reimburse BMS if any contractor SF hired by SF to perform the roof repairs damaged BMS. BMS was only able to recover its damages from SF is because SF specifically agreed in the lease to cover these damages. But for the existence of this lease, and specifically ¶5.1 and ¶11.4, BMS's claim would have been against Badger, not SF. Clearly, SF's damages arise solely from a breach of contract and are properly excluded from coverage.

SF relies heavily on the unpublished opinion of <u>Travelers Indem. Co. v. Dammann & Co.</u>, 2008 U.S. Dist. LEXIS 9759 (D.N.J. 2008). In that case, Dammann produced vanilla beans which it contracted to sell to IFF. 2008 U.S. Dist. LEXIS 9759 at 2-3. IFF processed the beans into vanilla extract. <u>Id</u>. at 3. IFF discovered that some of the beans may have been contaminated by mercury, so it put Dammann on notice that it would be making claims for damages for the alleged failure to deliver conforming vanilla beans. <u>Id</u>.

Plaintiff, Travelers Indemnity Company, Dammann's insurer, filed a complaint seeking a declaration of non-liability under two insurance policies which it issued to Dammann. <u>Id</u>. at 1.

The claim by IFF against Dammann would be (as suit had not yet been brought) for breach of contract *and* the other specified damages. These damages included: clean up, remediation and damage to IFF's property and potential liability for damages suffered by other parties which may have used the contaminated vanilla extract. 2008 U.S. Dist. LEXIS 9759 at 15.

---

¶ 11.4 The Landlord agrees to do all such work at all reasonable times during usual business hours and in connection with the doing of any such work to cause as little inconvenience, annoyance, disturbance, loss of business or other damage to the Tenant as may reasonably be possible in the circumstances, and in the event the Landlord shall cause any damages to Tenant's property or *if damage caused by Landlord's....contractor's negligence, Landlord shall be liable for the damage.* (Emphasis added).

The Court held that IFF's claims − apart from those that would make whole under the contract − constituted an "occurrence" as a matter of law. 2008 U.S. Dist. LEXIS 9759 at 15-16.

The most striking difference between the present case and the <u>Dammann</u> case is the positions of the damaged parties seeking coverage under the respective policies.

In <u>Dammann</u>, the damaged party, IFF, was a direct party to the contract as well as the party who would be seeking reimbursement under the Policy. The Court held that IFF's damages such as clean up would be an occurrence under the Policy.

In this case, however, the actual damaged party is not part of this suit. Likewise, the lease between SF and BMS is not directly in play and certainly not the basis for SF's damages claim against Badger.

SF was not damaged by Badger. BMS was damaged by Badger. Even so, SF − not Badger − reimbursed BMS. This was done because SF had agreed to do so pursuant to the lease. SF now seeks reimbursement from Badger and/or Scottsdale for this payment. Such a payment clearly arose "by reason of the assumption of liability in a contract". Again, but for the existence of the lease, SF would not have been responsible to reimburse BMS.

In sum, SF's counter claim against Scottsdale and cross claim against Badger are grounded solely in an effort to recover money SF paid to BMS pursuant to the terms of the SF − BMS lease.  This is type of recovery for contractual liability is specifically excluded by the Policy and no coverage is available.

## POINT V

## NO COVERAGE IS AVAILABLE FOR DAMAGES TO SF'S OWN PROPERTY

SF inexplicably claims that this exclusion would only apply to Badger as the primary insured and not to SF as an additional insured. Assuming for the moment that SF is an

additional insured, SF would be subject to every one of the policy's coverage limitations and exclusions to the same extent as Badger. An additional insured status certainly does not entitle SF to *better* coverage than the primary insured.

SF owned the Facility and rented it to BMS. The clear and unambiguous language of the Policy unequivocally states that no coverage exists for any claim for "repair, replacement, enhancement, restoration or maintenance of such property for any reason." The asbestos abatement certainly falls under this exclusion. As a result, this claim is excluded from coverage under the Policy.

## CONCLUSION

For the reasons contained in Scottsdale's moving papers, as well as for the reasons outlined above, Scottsdale requests that Summary Judgment be granted in its favor.

Respectfully submitted,

Date: January 11, 2010

Jay A. Gebauer
POST & SCHELL, P.C.
Overlook Center 2nd Floor
100 Overlook Drive
Princeton, NJ  08540
Attorney for Plaintiff, Scottsdale

- 15 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY<br><br>Plaintiff<br><br>vs.<br><br>SOMERVILLE FIDELCO ASSOCIATES, L.P., AND BADGER ROOFING CO., INC.<br><br>Defendants<br><br>and<br><br>SOMERVILLE FEDELCO ASSOCIATES, L.P.<br><br>Third-Party Plaintiffs<br><br>vs.<br><br>QUINCY MUTUAL FIRE INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY<br><br>Third-Party Defendants | UNITED STATES DISTRICT COURT FOR DISTRICT OF NEW JERSEY<br>TRENTON COUNTY<br>LAW DIVISION<br><br>DOCKET NO. 07-CV-02763<br><br>CIVIL ACTION<br><br><br>*MOTION  RETURNABLE:*<br>*TBD*<br><br><br><br>*MOVANT REQUESTS ORAL*<br>*ARGUMENT* |

*REPLY TO SOMERVILLE FIDELCO'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

*RESPONSE TO SOMERVILLE FIDELCO'S ADDITIONAL STATEMENT OF MATERIAL FACTS*

Jay A. Gebauer
Quinn M. McCusker
On the Brief

_Note: In order to avoid confusion, all references to exhibits attached to SF's brief will contain the following: "SF's Brief, Exhibit __". All other citations to exhibits refer specifically to Scottsdale's exhibits._

1.     Undisputed.

2.     Undisputed.

3.     Disputed. The "contract" SF refers to is a construction proposal that does not contain any language referring to SF's status as an additional insured or contain any reference to insurance coverage whatsoever. (Exhibit I, SF's Brief, Exhibit 2). Additionally, the AIA Document was not part of any "contract". The letter from Mr. Haney clearly instructed SF employee, Barry Ages, to sign and return the AIA document. (SF's Brief, Exhibit 3). It is undisputed this was never done. At no point did Dr. Mr. Ages or any other SF representative return a signed copy of the AIA Document. (SF's Brief, Exhibits 2, 3 and 4). Moreover, SF's counsel during the underlying arbitration never supplied either the construction proposal or the AIA document to Scottsdale, which was critical in Scottsdale's determination that SF was not an additional insured. (_See_ SF's Brief, Exhibit 19, 22, 24 and 26).

4.     Disputed. BMS was also concerned the dust and/or debris may contain asbestos.

5.     Disputed. SF mischaracterizes Ms. Owen's testimony and the entire arbitration process. BMS's actions were absolutely prompted by, and its damages primarily based upon, the presence of asbestos. (_See_ BMS's Arbitration Statement, Exhibit 3[1]). Ms. Owen also

---

[1] The March 29, 2007 letter from BMS's counsel to the mediator contains the following introductory language: "The subject matter of this arbitration is an asbestos incident that occurred at 76 Fourth Street in Somerville, New Jersey..." (Exhibit 3, p. 1 of the March 29, 2007 letter). The letter goes on: "As a result of Badger's roof removal activities, dust and debris containing asbestos materials infiltrated the Somerville Facility through gaps in the roof decking." (Exhibit 3, p. 2 of the March 29, 2007 letter). As one final example, the letter goes on: "The asbestos infiltration at the Somerville Facility adversely affected BMS in a number of respects. First and foremost, BMS was concerned about human exposure to asbestos dust and fibers...Second, BMS was concerned about the monkeys' potential

testified that after asbestos was discovered in the building, BMS took a conservative approach and acted under the assumption that asbestos containing material had entered the building. (Exhibit X, 20:14-21:2). Ms. Owen also confirmed that Bristol Environmental cleaned the building under the assumption that all the dust and debris was contaminated with asbestos. (Exhibit X, 51:20-23, 53:5-15, 57:16-58:5). The decision to conduct the cleanup as an asbestos abatement rather than a general cleanup was made by BMS. (Exhibit X, 59:23-60:22). Moreover, as indicated in its March 24, 2006 letter to SF, BMS indicated that it "incurred considerable costs and expenses to prevent its employees and research monkeys from being exposed to asbestos and asbestos containing materials..." (Exhibit 4).

6.      Undisputed.

7.      Disputed. SF's motivation for hiring Slavco is irrelevant. It is undisputed that the roofing material contained asbestos. (Exhibit H). It is undisputed that asbestos-containing material was found inside the building. (Exhibit V). Additionally and significantly, in September of 2005, wipe samples from the top of a refrigerator near the break room and the top shelf above employees' desks also tested positive for asbestos. (Exhibit A – ATTACHED HERETO). Thereafter, an air sample from inside animal room #11 tested positive for asbestos. (Exhibit A – ATTACHED HERETO). Chrysotile asbestos was detected on samples taken on February 7, February 16 and March 1, 2006 (2 positive results). (Exhibit A – ATTACHED HERETO). The "Sampling Data" included in the arbitration file indicated that the February 6, 2006 positive test was an air sample taken in the "Hallway o/s boiler room."; The February 15, 2006 positive test was from an air sample taken in the "Animal room 5-9

exposure to asbestos dust...Third, BMS had to address the continuation of the roofing job...[BMS insisted SF retain] an asbestos removal company...and develop[] a protocol to appropriately complete the roof removal...Fourth, BMS had to address the asbestos contamination of the facility...Fifth, BMS had to address the impact that the asbestos contamination had on its operations." (Exhibit 3, p. 3 of the March 29, 2007 letter).

corridor" and the March 1, 2006 finding included two positive tests from an air samples taken 1) "Hallway o/s boiler room"; and 2) "Hallway o/s lunch room." (Exhibit A – ATTACHED HERETO).

Finally, BMS's own arbitration statement indicates the basis for its damages was premised on asbestos contamination. (*See* Footnote 1, *supra*).

8.    Undisputed as to the language in BMS's November 11, 2005 letter. The letter also contains the following language: "On or about September 26 or 27[th], BMS provided to [SF] the bulk sample results of the materials that fell inside the building during [SF]'s initial roof removal activities. These sample results showed that the materials contained asbestos and were from the exterior of the building. Furthermore, subsequent to supplying [SF] with the bulk samples, core sampling – which [SF] actively participated in and has copies of sampling results – also showed that the roof materials contained asbestos." (SF's Brief, Exhibit 49). This was confirmed by Eagle's reports. (Exhibit V).

9.    Disputed. An air sample from inside animal room #11 tested positive for asbestos in September of 2005. (Exhibit A – ATTACHED HERETO). Additionally, the "Sampling Data" indicated that a February 6, 2006 positive test was an air sample taken in the "Hallway o/s boiler room."; The February 15, 2006 positive test was from an air sample taken in the "Animal room 5-9 corridor" and the March 1, 2006 finding included two positive tests from an air samples taken 1) "Hallway o/s boiler room"; and 2) "Hallway o/s lunch room." (Exhibit A – ATTACHED HERETO).

10.    Disputed as to the phrase "overabundance of caution." According to Eagle, "it was appropriate for BMS to approve a scope of work that required…all of the dust and debris that entered the facility as though they were materials that contained asbestos that was, or could be, rendered friable." (*See* Eagle's March 7, 2007 Report, Exhibit V).

11.     Disputed. Other samples, however, did test positive. It is undisputed that asbestos was found inside the building: "Bulk Samples of roof material at the Somerville facility were gathered in September 2005 from a limited area of the *interior* of the facility. The bulk samples tested positive for a percentage of asbestos." (SF's Brief, Exhibit 11)(emphasis added). In fact, asbestos-containing material was initially found in two separate areas of the facility; the loading dock and the storage room. (SF's Brief, Exhibit 11). Additionally and significantly, in September of 2005, wipe samples from the top of a refrigerator near the break room and the top shelf above employees' desks also tested positive for asbestos. (Exhibit A – ATTACHED HERETO). Thereafter, an air sample from inside animal room #11 tested positive for asbestos. (Exhibit A – ATTACHED HERETO).

        Moreover, Chrysotile asbestos was detected on samples taken on February 7, February 16 and March 1, 2006 (2 positive results). (Exhibit A – ATTACHED HERETO). The "Sampling Data" included in the arbitration file indicated that the February 6, 2006 positive test was an air sample taken in the "Hallway o/s boiler room."; The February 15, 2006 positive test was from an air sample taken in the "Animal room 5-9 corridor" and the March 1, 2006 finding included two positive tests from an air samples taken 1) "Hallway o/s boiler room"; and 2) "Hallway o/s lunch room." (Exhibit A – ATTACHED HERETO).

12.     Undisputed.

13.     Undisputed.

14.     Undisputed.

15.     Undisputed.

16.     Undisputed.

17.     Undisputed.

18.     Undisputed.

19.    Disputed. The letter specifically indicates that SF is not an additional insured under the Policy issued to Badger. The letter also indicates that, in order to be an additional insured, SF must supply a written contract. (SF's Brief, Exhibit 19). A written contract was never supplied by SF's coverage counsel.

20.    Undisputed as to the content of the letter.

21.    Disputed. The Certificate provided was dated 6/29/06; approximately 8 months after Badger performed its work. (SF's Brief, Exhibit 20). Additionally, a written contract was never supplied. (SF's Brief, Exhibit 20).

22.    Disputed. This "fact" consists of statements made by SF's own attorney in the underlying arbitration. SF's attorney's self-serving conclusions are not relevant to this matter. Additionally, a written contract was not supplied with this letter. (SF's Brief, Exhibit 20).

23.    Disputed. This "fact" consists of statements made by SF's own attorney in the underlying arbitration. SF's own attorney's self-serving statements and legal arguments seeking coverage from Scottsdale are not dispositive as to any issue presently before the Court.

24.    Undisputed. However, as indicated by Scottsdale's initial denial letter, SF would not be considered an additional insured under the Policy until such time as SF provided Scottsdale with a written contract. (*See* SF's Brief, Exhibit 19). A written contract was never supplied.

25.    Undisputed. Additionally, counsel for Scottsdale indicated that once Scottsdale determines that SF qualifies as an additional insured, it would evaluate any other information as to coverage. (SF's Brief, Exhibit 22). This letter also contained a reservation of rights: "Nothing in this letter should be construed as a waiver of any rights or reservations available to Scottsdale Insurance Company." (SF's Brief, Exhibit 22).

26.    Undisputed.

27.     Undisputed. Additionally, the letter indicated that Scottsdale could not give its consent because SF "has yet to provide the necessary information confirming it qualifies as an additional insured under Badger Roofing's policy." The letter went on: "Scottsdale has requested the relevant information on several occasions. The necessary information would included an unambiguous contract provision requiring Badger to add [SF] to its policy as an additional insured. If such contract language exists, it must be immediately forwarded to Scottsdale and this firm in accordance with policy's [sic] cooperation clause...*Scottsdale reserves all rights it has or may have regarding this matter including any and all coverage defenses*." (SF's Brief, Exhibit 24)(emphasis added).

28.     Undisputed.

29.     Undisputed. Additionally, the letter also indicates that Scottsdale "will not surrender or waive any of Scottsdale's rights to limit or deny coverage." (SF's Brief, Exhibit 26).

30.     Undisputed. No contract was ever supplied.

31.     Disputed. Starting with the January 31, 2007 letter, Scottsdale made it clear that SF was not an additional insured under the Policy until it supplied the written contract. (SF's Brief, Exhibit 19).

32.     Disputed. The "contract" SF refers to is a construction proposal that does not contain any language referring to SF's status as an additional insured or contain any reference to insurance coverage whatsoever. (Exhibit I, SF's Brief, Exhibit 2). Additionally, the AIA Document was not part of any "contract". The letter from Mr. Haney clearly instructed Mr. Ages from SF to sign and return the AIA document. (SF's Brief, Exhibit 3). It is undisputed this was never done. At no point did Dr. Mr. Ages or any other SF representative return a signed copy of the AIA Document. (Exhibit I, SF's Brief, Exhibits 2, 4 and 4). Moreover,

SF's counsel during the underlying arbitration never supplied neither the construction proposal nor the AIA document to Scottsdale.

Finally, The Certificates were issued *after* Badger's work was completed and contain disclaimers specifically indicating that the Certificates themselves are not proof of coverage. (Exhibit C).

33.     Disputed. No proof of legal fees has ever been submitted.

34.     Undisputed.

35.     Disputed. All correspondence from Scottsdale to counsel for SF indicated that Scottsdale was reserving making a determination on coverage once SF provided the requisite documents showing it was an additional insured under Badger's Policy. (SF's Brief, Exhibits 19, 22, 24 and 26). A written contract was never supplied. Moreover, all correspondence contained a reservation of rights.

Date: January 11, 2010                                    Respectfully submitted,


                                                          Jay A. Gebauer
                                                          POST & SCHELL, P.C.
                                                          Overlook Center 2nd Floor
                                                          100 Overlook Drive
                                                          Princeton, NJ  08540
                                                          Attorney for Plaintiff, Scottsdale Ins. Co.